**FILED**

**July 27, 2010**

CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

0002805743

**15**

RON BENDER (SBN 143364)
TODD M. ARNOLD (SBN 221868)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: rb@lnbyb.com; tma@lnbyb.com

Proposed Attorneys for Chapter 11 Debtors and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF CALIFORNIA
## (SACRAMENTO DIVISION)

| | |
|---|---|
| In re:<br><br>MATTERHORN GROUP, INC.,<br><br>     Debtor.<br>_____<br><br>VITAFREZE FROZEN CONFECTIONS, INC.,<br><br>     Debtor.<br>_____<br><br>DELUXE ICE CREAM COMPANY,<br><br>     Debtor.<br>_____<br><br>☒ Affects ALL DEBTORS<br>☐ Affects only MATTERHORN GROUP, INC.<br>☐ Affects only VITAFREZE FROZEN<br>             CONFECTIONS, INC.<br>☐ Affects only DELUXE ICE CREAM COMPANY | [Proposed] Lead Case No. 10-39672 (MSM)<br>[Proposed] Jointly Administered with Case Nos. 10-39664 (MSM), and 10-39670 (MSM).[1]<br><br>DC No. LNB-1<br><br>Chapter 11 Cases<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE DEBTORS' EMERGENCY MOTION FOR AN ORDER (1) AUTHORIZING THE DEBTORS' USE OF CASH COLLATERAL ON AN INTERIM BASIS PENDING A FINAL HEARING, (2) SCHEDULING A FINAL HEARING, (3) AUTHORIZING THE DEBTORS' CONTINUED USE OF CERTAIN PORTIONS OF THE DEBTORS' CASH MANAGEMENT SYSTEM, AND (4) AUTHORIZING THE MAINTENANCE OF THE DEBTORS' EXISTING BANK ACCOUNTS FOR AN INTERIM PERIOD**<br><br><u>Hearing:</u><br>Date:     TBD<br>Time:     TBD<br>Place:    Department A<br>          Judge Michael S. McManus<br>          Courtroom No. 28, Floor No. 7<br>          Robert T. Matsui Courthouse<br>          501 I Street<br>          Sacramento, CA 95814 |

---

[1] Motion for Joint Administration pending.

MEMORANDUM ON
CASH COLLATERAL MOTION

1  Matterhorn Group, Inc. ("MGI"), Vitafreze Frozen Confections, Inc. ("Vitafreze"), and

2  Deluxe Ice Cream Company ("Deluxe"), the debtors and debtors in possession in the above-

3  captioned (proposed) jointly administered Chapter 11 bankruptcy cases (collectively, the

4  "Debtors"), hereby file their Memorandum of Points and Authorities in support of their motion

5  (the "Motion") for an order, in substantially the form of the interim order on the Motion (the

6  "Interim Order") filed as Exhibit "2" concurrently herewith, (1) authorizing the Debtors' use of

7  cash collateral on an interim basis pending a final hearing, (2) scheduling a final hearing, (3)

8  authorizing the Debtors' continued use of certain portions of the Debtors' cash management

9  system, and (4) authorizing the maintenance of the Debtors' existing bank accounts for an

10  interim period.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.**

**STATEMENT OF FACTS**

**A.**     **BACKGROUND.**

On July 26, 2010 (the "Petition Date"), the Debtors each filed voluntary petitions under

Chapter 11 of 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"). The Debtors continue to

operate their business, manage their financial affairs, and operate their bankruptcy estates as

debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

MGI was formed in 2004 as a vehicle to "roll-up" frozen novelty manufacturing

companies in the Western United States. The initial step in this strategy was MGI's acquisition of

Vitafreze, Deluxe, and Matterhorn Ice Cream Company ("Matterhorn"),[2] each of which became

wholly owned subsidiaries of MGI. As a result of these acquisitions, by 2005, the Debtors had

(1) established themselves as high-quality, high-service private label manufacturers with a strong

Western United States customer base, and (2) become one of the dominant producers of ice cream

novelties in the Western United States.

---

[2] Matterhorn is also a wholly owned subsidiary of MGI. Matterhorn is not operating and has not filed a bankruptcy case.

**15**

1    In 2006, in an effort to improve operations and profitability, MGI (1) closed Matterhorn's

2  manufacturing plant in Caldwell, Idaho and consolidated its manufacturing into Vitafreze, located

3  in Sacramento, California, and Deluxe, located in Salem, Oregon, and (2) took aggressive steps to

4  restructure its remaining operations to reduce overhead and reposition MGI with its customers

5  and suppliers.  The Debtors' administrative office is located in Las Vegas, Nevada.

6    At present, the Debtors, which have approximately 31 non-union employees and 226

7  union employees, are collectively one of the largest independent producers of ice cream and

8  water-ice novelty products in the United States.  The Debtors manufacture (1) self-branded

9  products for grocery retailers, (2) products from brand licenses held by the Debtors, such as Mike

10  and Ike™, HotTamales™, Zours™, and Crystal Light™ popsicles, (3) co-branded products, and

11  (4) the Debtors' own products, including the Debtor's Oh My! Goodness™ branded products.

12  The Debtors' customers include the largest big-box grocery retailers, club stores, and independent

13  cooperative distribution companies in the United States, such as Wal*Mart, Sam's Club, Giant

14  Eagle, Kroger, Stater Brothers, Albertsons, Winco Foods, Raley's, Save Mart Supermarkets,

15  Safeway, Smart & Final, the Schwan Food Company, and Western Family.  The Debtors also sell

16  to various retailers in Mexico.

17  **B.    THE DEBTORS' SECURED DEBT.**

18    The Debtors' primary secured creditor is Key Bank, N.A. (the "Bank").  As of the Petition

19  Date, pursuant to that certain Amended and Restated Revolving Credit and Term Loan

20  Agreement (as amended) (the "Loan Documents"), the Debtors owed the Bank approximately

21  $1,249,983 on a term loan (the "Term Loan") and approximately $9,314,953 on a revolving line

22  of credit (the "Line" and together with the Term Loan, the "Bank Loans") for a total of

23  approximately $10,564,936.  The Bank Loans are allegedly secured by first priority liens on

24  substantially all of the Debtors' assets, including the Debtors' cash collateral (the "Cash

25  Collateral").  Under the Loan Documents, (1) the amount available under the Line is based on

26  80% of eligible accounts receivable and 60% of eligible inventory, subject to periodic step downs

27

28

MEMORANDUM ON
CASH COLLATERAL MOTION

1  in total maximum availability, which is currently $9.5 million, and (2) the Bank Loans mature on

2  July 1, 2011.

3       In addition to the Bank, the UCC-1 lien reports (the "UCC Reports") obtained by the

4  Debtors from Idaho, the state in which the Debtors are incorporated, indicate that additional other

5  entities (the "Other Secured Parties") may have liens upon certain of the Debtors' assets. A true

6  and correct copy of the UCC Reports was filed as Exhibit "3" concurrently herewith. Based on a

7  review of the UCC Reports, the Debtors believe that the liens of the Other Secured Parties only

8  relate to particular equipment leased or purchased by the Debtors. Therefore, the Debtors do not

9  believe that the liens of the Other Secured Parties extend to the Debtors' Cash Collateral.

10  **C.      THE NECESSITY FOR FILING BANKRUPTCY.**

11       During the period of 2007 through 2009, the Debtors gross revenues increased

12  substantially from approximately $42,564,029 in 2007, to approximately $47,986,399 in 2008, to

13  approximately $54,436,328 in 2009. Unfortunately, due to expansion into new product

14  categories, increased costs related thereto, a delayed selling season due to unusually cool

15  temperatures in the Debtors geographical market and the continued need to make capital

16  expenditures to maintain the Debtors' manufacturing facilities, these increases in gross revenue

17  did not result in corresponding increases in net income and liquidity. Instead, based on the

18  foregoing and seasonal fluctuations in the Debtors' business and borrowing limits under the Loan

19  Documents, the Debtors found themselves in a cash crunch and were unable to meet their funding

20  needs solely from advances made by the Bank. As a result, Pacific Mezzanine Fund, L.P. and

21  CC&B Holdings, Inc., two of MGI's primary equity holders, recently infused an additional $0.75

22  million into the Debtors which was essentially used to pay down Key Bank's revolving credit line

23  as it stepped down $1.0 million on July 1, 2010. In consideration of the Debtors' ongoing cash

24  crunch and the need for breathing room to formulate and implement a restructuring plan or a sale,

25  the Debtors came to the conclusion that filing for bankruptcy protection was in the best interests

26  of the Debtors and their creditors.

27

28

**D.** **THE DEBTORS' ASSET BASE.**

As set forth in the Debtors' (a) proposed operating budget (the "Budget"), a copy of which was filed as Exhibit "1" concurrently herewith, and (b) most recent consolidated balance sheet through June 2010, a copy of which was filed as Exhibit "4" concurrently herewith, as of the close of business on the Petition Date, the Debtors' assets had a fair market value of approximately $24,245,129, as follows:

| Asset | Fair Market Value |
|---|---|
| Cash (including checks in transit) | $1,070,539 |
| Accounts Receivable | $5,061,602 |
| Inventory (finished and raw goods) | $8,114,144 |
| Furniture, Fixtures & Equipment (book value net of accumulated depreciation) | $2,721,435 |
| Other Assts (pre-paid insurance, pre-paid license fees, pre-paid promotions, amortizable artwork, etc.) | $1,607,909 |
| Goodwill (including approximately $211,000 of intellectual property) | $5,669,500 |
| **Total** | **$24,245,129** |

**E.** **THE DEBTORS' IMMEDIATE NEED FOR USE OF CASH COLLATERAL AND PROPOSED USES.**

Pursuant to Bankruptcy Rule 4001(b)(2), while the Court cannot conduct a final hearing on the Motion earlier than 14 days after service of this Motion, the Court may conduct a preliminary hearing before such 14-day period expires to enable the Debtors to use Cash Collateral as is necessary to avoid immediate and irreparable harm to the Debtors' estates pending a final hearing. Such an expedited procedure is routine in Chapter 11 as it is the rare Chapter 11 debtor that can survive for 14 days or more without use of any funds. Given the nature of the Debtors' business (production of ice cream and water-ice novelty products), the Debtors have no ability to survive for more than a few days unless the Debtors are provided immediate use of Cash Collateral to continue with the operation of their business.

It is imperative that the Debtors obtain immediate access to their Cash Collateral to pay their operating expenses for, among other things, rent, lease payments, insurance, salaries, wages, raw materials, shipping, utilities, taxes, marketing, etc. Without the ability to use Cash Collateral

**15**

for these purposes, the Debtors would be forced to immediately shut down their business and cease operations, which would decimate the going concern value of the Debtors' and any chance for a an effective reorganization to the extreme prejudice of the Debtors' creditors and bankruptcy estates.

The Debtors' proposed Budget, a copy of which was filed as Exhibit "1" concurrently herewith, contains the expenses the Debtors believe must be paid in order for the Debtors to continue to operate and preserve the value of their business pending a reorganization. The expenses contained in the first few weeks of the Budget are those expenses the Debtors believe must be paid to enable the Debtors to avoid immediate and irreparable harm to the Debtors' business and bankruptcy estates. Included in the Budget are the following monthly salaries of the Debtors' "insiders" as that term is defined in Section 101(31): (1) Nathan W. Bell, Chairman of the Board, Chief Executive Officer and President - $25,000, (2) Jennifer K. Loving, Chief Financial Officer - $12,083.33, (3) Linda Pennington, Vice President of Operations - $11,666.66, (4) Greta Remington, Vice President of Sales and Marketing - $16,666.66, (5) Michael Newell, Board Member - $750, (6) John Jex, Board Member - $750, and (7) John Whetten, Board Member - $750. The revenues projected in the Budget are the revenues the Debtors project receiving if business proceeds as planned.

**F.      THE DEBTORS' BANK ACCOUNTS AND CASH MANAGEMENT SYSTEM AND THE PROPOSED INTERIM MAINTENANCE THEREOF.**

The Debtors have four (4) bank accounts (the "Accounts") at the Bank as follows:

| Account Type and No. | Uses |
|---|---|
| MGI<br>Parent Sweep Account<br>********3873 | All deposits into the other three accounts discussed below, net of checks cleared, are swept into this account on a daily basis. The Bank draws from this account to pay down the Line. |
| Vitafreze<br>Subsidiary Account<br>********4443 | Vitafreze deposits check payments into this account. Additionally, approximately 2 of Vitafreze's customers wire payments directly into this account. This account is also used to pay all Vitafreze vendors and employees. The remaining balance in this account is swept into the MGI Parent Sweep Account on a daily basis. |
| Deluxe<br>Subsidiary Account<br>********4476 | Deluxe deposits check payments into this account. Additionally, approximately 3 of Deluxe's customers wire payments into this account. This account is also used to pay all Deluxe vendors and employees. The remaining balance in this account is swept into the |

**15**

| Account Type and No. | Uses |
|---|---|
| | MGI Parent Sweep Account on a daily basis. |
| Deluxe Payroll Account ********8881 | All credits from ADP, the Debtors' payroll processor, are deposited into this account. The balance in this account is swept into the MGI Parent Sweep Account on a daily basis. |

It would be impossible for the Debtors to immediately redirect wire deposits into the Vitafreze and Deluxe Subsidiary Accounts and the Deluxe Payroll Account. Thus, in order to maintain operations and Budget performance, it is essential that the Debtors be allowed to maintain the foregoing Accounts on an interim basis pending redirection of all deposits into debtor in possession accounts. Based on the foregoing, the Debtors request that they be allowed to maintain the Accounts and the pre-petition cash management system described above, with the following modifications:

1.      The MGI Parent Sweep Account will be closed;

2.      Each of the Debtors will immediately establish debtor in possession ("DIP") accounts at one of the banks appearing on the List of Authorized Depositories issued by the United States Trustee (the "UST") or otherwise approved by the UST;

3.      All check deposits to Vitafreze and Deluxe will be deposited into the DIP Vitafreze Subsidiary Account or the DIP Deluxe Subsidiary Account, as appropriate;

4.      All wire deposits into the Vitafreze Subsidiary Account, the Deluxe Subsidiary Account, and the Deluxe Payroll Account will be swept or transferred to the DIP Vitafreze Subsidiary Account or the DIP Vitafreze Subsidiary Account, as appropriate, on a daily basis (excluding weekends and holidays);

5.      All deposits into the DIP Vitafreze Subsidiary Account and the DIP Deluxe Subsidiary Account, less retentions to cover wires and checks in transit, will be swept or transferred to the DIP MGI Parent Account on a daily basis (excluding weekends and holidays); and

MEMORANDUM ON
CASH COLLATERAL MOTION

**15**

1   6.   As soon as all wire deposits into the Vitafreze Subsidiary Account, the Deluxe

2   Subsidiary Account, and the Deluxe Payroll Account have been redirected to the

3   DIP Vitafreze Subsidiary Account or the DIP Vitafreze Subsidiary Account, as

4   appropriate, the Vitafreze Subsidiary Account, the Deluxe Subsidiary Account,

5   and the Deluxe Payroll Account will be closed.

6                                    **II.**

7                                **DISCUSSION**

8   **A.   THE DEBTORS MUST BE AUTHORIZED TO USE CASH COLLATERAL TO**

9   **OPERATE, MAINTAIN, AND PRESERVE THEIR BUSINESS IN ACCORDANCE**

10  **WITH THE BUDGET.**

11  The Debtors' use of property of their estates is governed by Section 363 of the Bankruptcy

12  Code.  Section 363(c)(l) provides in pertinent part:

13  
> If the business of the debtor is authorized to be operated under
14  section . . .1108. . . of this title and unless the court orders
> otherwise, the trustee may enter into transactions, including the
15  sale or lease of property of the estate, in the ordinary course of
> business, without notice or a hearing, and may use property of the
16  estate in the ordinary course of business without notice or a
> hearing.
17
18  11 U.S.C. §363(c)(l).  A debtor in possession has all of the rights and powers of a trustee with

19  respect to property of the estate, including the right to use property of the estate in compliance

20  with Section 363.  See 11 U.S.C. §1107(a).

21  "Cash collateral" is defined as "cash, negotiable instruments, documents of title,

22  securities, deposit accounts or other cash equivalents in which the estate and an entity other than

23  the estate have an interest. . . ."  11 U.S.C. §363(a).  Section 363(c)(2) allows the use of "cash

24  collateral" under subsection (c)(l) if:

25  (A)   each entity that has an interest in such cash collateral
> consents; or
26  (B)   the court, after notice and a hearing, authorizes such use,
> sale or lease in accordance with the provisions of this section.
27  See 11 U. S.C. §363(c)(2)(A) and (B).

28

**15**

It is well settled that it is appropriate for a Chapter 11 debtor to use cash collateral for the purpose of maintaining and operating its property. 11 U.S.C. § 363(c)(2)(B); In re Oak Glen R-Vee, 8 B.R. 213, 216 (Bankr. C.D. Cal. 1981); In re Tucson Industrial Partners, 129 B.R. 614 (B.A.P. 9th Cir. 1991). In addition, where the debtor is operating a business, it is extremely important that the access to cash collateral be allowed in order to facilitate the goal of reorganization: "the purpose of Chapter 11 is to rehabilitate debtors and generally access to cash collateral is necessary to operate a business." In re Dynaco Corporation, 162 B.R. 389 (Bankr. D.N.H. 1993), quoting In re Stein, 19 B.R. 458, 459 (Bankr. E.D. Pa. 1982).

At this time, the only source of revenue available to the Debtors to use to operate, maintain and preserve their business is the Debtors' cash existing on the Petition Date and the Debtors' post-petition operating revenue. As a result, the Debtors have no ability to continue to operate their businesses and maintain and preserve the going concern value of their business unless the Debtors have immediate access to and use of their Cash Collateral to pay the Debtors' ordinary operating expenses set forth above and in the Budget.

The expenses the Debtors must be able to pay from the Petition Date through August 24, 2010 are those expenses set forth in the Budget for this period. The Debtors inability to pay those expenses would cause immediate and irreparable harm to the Debtors, their business, their creditors and these bankruptcy estates. Indeed, the Debtors' inability to pay such basic and critical operating expenses such as payroll, rent and product supply purchases would result in the immediate closure of the Debtors' manufacturing facilities resulting in the termination of approximately 255 jobs and the decimation of the overall going concern value of the Debtors' business.

In addition to those expenses set forth in the Budget, the Debtors also seek authority to use Cash Collateral to pay for the following: (a) all quarterly fees owing to the UST and all expenses owing to the Clerk of the Bankruptcy Court; and (b) all actual third-party, outside expenses incurred by the Debtors (or their counsel) directly related to the administration of the Debtors' bankruptcy estates (for items such as photocopying, postage, searches, etc.), not to exceed the total sum of

**15**

1  $10,000 per month.  In addition, the Debtors seek authority to deviate from the line items contained

2  in the Budget by not more than 15% on a line item basis and not more than 10% on an aggregate

3  basis unless the Court or the Bank agrees to a greater variance.  Finally, many of the Debtors'

4  operating expenses are variable expenses which are tied to the Debtors' order volume.  To the

5  extent the Debtors' order volume exceeds the Debtors' projected order volume, the Debtors seek

6  authority to increase the amount of their related variable cost operating expenses on a proportional

7  basis.

8  **B.**     **THE BANK, ALONG WITH ANY OTHER CREDITOR WITH AN INTEREST IN**

9         **THE DEBTORS' CASH COLLATERAL, IS ADEQUATELY PROTECTED BY AN**

10        **EQUITY CUSHION, CONTINUED PAYMENTS, REPLACEMENT LIENS, AND**

11        **THE DEBTORS' CONTINUED OPERATION OF THEIR BUSINESS.**

12        To the extent that an entity has a valid security interest in the revenues generated by

13  property, those revenues constitute "cash collateral" under Section 363(a) of the Bankruptcy

14  Code.  Pursuant to Section 363(c)(2), the Court may authorize the debtor to use a secured

15  creditor's cash collateral if the secured creditor is adequately protected.  In re Mellor, 734 F.2d

16  1396, 1400 (9th Cir. 1984); see also In re O'Connor, 808 F.2d 1393, 1398 (10th Cir. 1987); In re

17  McCombs Properties VI, Ltd., 88 B.R. 261, 265 (Bankr. C.D. Cal. 1988).

18        Pursuant to the Supreme Court case of United Savings Association v. Timbers of Inwood

19  Forest Associates, 108 S.Ct. 626, 629 (1988) and subsequent case law, the property interest that a

20  debtor must adequately protect pursuant to Sections 361(1) and (2) of the Bankruptcy Code is

21  only the value of the lien that secures the creditor's claim.  Timbers, 108 S.Ct. at 630; see also

22  McCombs, at 266.  Section 506(a) "limit[s] the secured status of a creditor (i.e., the secured

23  creditor's claim) to the lesser of the [allowed amount of the] claim or the value of the collateral."

24  McCombs, 88 B.R. at 266.

25        The Ninth Circuit made clear in Mellor that in the case of an oversecured creditor, an

26  equity cushion of 20% is considered clear adequate protection of a secured creditor's interest in

27  cash collateral.  Mellor, 734 F.2d at 1401; see also In re McGowan, 6 B.R. 241, 243 (Bankr. E.D.

28

MEMORANDUM ON
                                   CASH COLLATERAL MOTION

**15**

Pa. 1980) [holding a 10% cushion is sufficient to be adequate protection]; In re Rogers Development Corp., 2 B.R. 679, 685 (Bankr. E.D. Virg. 1980) [court decided that an equity cushion of approximately 15% to 20% was sufficient adequate protection to the creditor, even though the debtors had no equity in the property.] As set forth above, (1) the total amount allegedly owed by the Debtors to the Bank is approximately $10,564,936, and (2) the Debtors' assets (**exclusive** of Other Assets and Goodwill) have a fair market value of approximately $16,967,720. Therefore, the Bank is secured by an equity cushion of approximately 61%, which constitutes clear adequate protection as a matter of law under Mellor. More importantly, as can be seen from the Budget, the Bank's equity cushion will remain virtually unchanged during the 30-day period covered by the Budget. That is, the Bank has an equity cushion of approximately 61% day 1 of the Budget and approximately 61% on day 29.

Despite the fact that the Bank is adequately protected by a substantial equity cushion that will not diminish in any material way during the period covered by the Budget, the Debtors intend to provide further protection to the Bank in the form of adequate protection payments in the amount of $54,000, which is about 6% interest on the balance of the Bank Loans, commencing in the month of August, 2010. See day 29 of the Budget ($54,000 adequate protection payment to the Bank).

As additional adequate protection for the Bank and any of the Other Creditors with an interest in the Debtors' Cash Collateral, the Interim Order filed as Exhibit "2" concurrently herewith provides for the Bank and the Other Creditors to receive a replacement lien against the Debtors' assets, with such replacement lien to have the same extent, validity, and priority as the pre-petition lien held by such creditors.

Additionally, the law is also clear that the preservation of the value of a secured creditor's lien is sufficient to provide adequate protection to a secured creditor when a debtor seeks to use cash collateral. In re Triplett, 87 B.R. 25 (Bankr. W.D.Tex. 1988); see also In re Stein, 19 B.R. 458 (Bankr. E.D. Pa. 1982). In determining adequate protection, Courts have stressed the importance of promoting a debtor's reorganization. In O'Connor, the Tenth Circuit stated:

MEMORANDUM ON
CASH COLLATERAL MOTION

**15**

In this case, Debtors, in the midst of a Chapter 11 proceeding, have proposed to deal with cash collateral for the purpose of enhancing the prospects of reorganization. This quest is the ultimate goal of Chapter 11. Hence, the Debtor's efforts are not only to be encouraged, but also their efforts during the administration of the proceeding are to be measured in light of that quest. Because the ultimate benefit to be achieved by a successful reorganization inures to all the creditors of the estate, a fair opportunity must be given to the Debtors to achieve that end. Thus, while interests of the secured creditor whose property rights are of concern to the court, the interests of all other creditors also have bearing upon the question of whether use of cash collateral shall be permitted during the early stages of administration.

O'Connor 808 F.2d at 1937.

Here, there can be no question that the only way for Debtors to preserve the going concern value of their business, as well as the Bank's collateral, and to avoid an immediate shut down of the Debtors' business, is for the Debtors to obtain the immediate authority to use Cash Collateral to pay the expenses contained in the Budget. Any other alternative is nonsensical and serves only to the severe detriment of the Bank and all other creditors and parties in interest. Thus, there is no doubt that the Debtors' continued use of Cash Collateral to fund operations will serve to provide yet another means of adequate protection for the Bank and any of the Other Creditors with an interest in the Debtors' Cash Collateral.

With the foregoing package of adequate protection measures, the Debtors submit that the Bank and any of the Other Creditors with an interest in the Debtors' Cash Collateral are all adequately protected. Therefore, good cause exists for granting the relief requested in the Motion.

**C.     THE PROCEDURAL REQUIREMENTS REGARDING APPROVAL OF THE MOTION HAVE BEEN SATISFIED.**

Pursuant to Bankruptcy Rule 4001(b)(1)(C), the Debtors are required to serve a copy of the Motion and supporting papers on (1) any entity with an interest in the Debtors' Cash Collateral, (2) any official committee of unsecured creditors, or, if no committee has been appointed, on the Debtors' top 20 general unsecured creditors, and (3) any other entity that the Court directs. As can be seen from the proof of service on the Motion and supporting papers, the Debtors have complied with the foregoing by serving a copy of the Motion and supporting papers

MEMORANDUM ON
                                        CASH COLLATERAL MOTION

1   on the Bank, the Other Secured Creditors, the Debtors' top 20 general unsecured creditors, the

2   UST, and parties requesting special notice in the manner directed by the Court.

3   **D.   THE DEBTORS SHOULD BE AUTHORIZED TO MAINTAIN THEIR**

4   **ACCOUNTS AND CASH MANAGEMENT SYSTEM FOR AN INTERIM**

5   **PERIOD.**

6   The UST has established certain operating guidelines for debtors-in-possession in order to

7   supervise the administration of Chapter 11 cases.  These guidelines require Chapter 11 debtors to,

8   among other things: (1) close all existing bank accounts and open new debtor-in-possession bank

9   accounts, including a general account through which all funds must flow, and (2) obtain checks

10  for all debtor-in-possession accounts which bear the designation "Debtor-in-Possession," the

11  bankruptcy case number and the type of accounts.

12  Section 105(a) of the Bankruptcy Code provides:

13

14          The court may issue any order, process or judgment that is
            necessary or appropriate to carry out the provisions of this title.  No
            provision of this title providing for the raising of an issue by a party

15          in interest shall be construed to preclude the court from, sua sponte,
            taking any action or making any determination necessary or

16          appropriate to enforce or implement court orders or rules, or to
            prevent an abuse of process.

17

18  11 U.S.C. § 105(a).  All of the relief requested herein regarding the maintenance of the Debtors'

19  Accounts and cash management system for an interim period is within the Court's authority to

20  grant at its discretion.  Indeed, courts have routinely granted Chapter 11 debtors authority to

21  continue using their existing cash management systems. See In re Pathmark Stores. Inc. et al.,

22  Case No. 00-02963(JJF) (D. Del. July 13, 2000); In re Safety-Kleen Corp., Case No. 00-

23  02303(PJW) (Bankr. D. Del. June 13, 2000); In re Eagle Food Centers, Inc., Case No. 00-

24  01311(RRN) (D. Del. March 2, 2000); In re Philip Services (Delaware), Inc., Case No. 99-

25  02385(MEW) (Bankr. D. Del. June 30, 1999); see also, In re Grant Broadcasting of Philadelphia,

26  Inc., 75 B.R. 819 (E.D. Penn. 1987); In re Charter Company, et al, 778 F.2d 617 (11th Cir. 1985).

27  Based on the foregoing, the Debtors respectfully request that the Court exercise its discretion to

28

grant the relief requested herein regarding the maintenance of the Debtors' Accounts and cash management system for an interim period.

## III.

## CONCLUSION

**WHEREFORE**, the Debtors respectfully request that the Court enter an order in substantially the form of the Interim Order filed as Exhibit "2" concurrently herewith and order as follows:

1.      finding, among other things, that notice of the Motion was appropriate under the circumstances and complied with all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules;

2.      granting the Motion on an interim basis pending a final hearing insofar as it relates to Cash Collateral;

3.      authorizing the Debtors, subject to the terms of the Interim Order, to use Cash Collateral to pay all of the expenses set forth in the Budget on an interim basis pending a final hearing;

4.      providing the Bank with payments as set forth in the Budget as adequate protection;

5.      providing the Bank and the Other Creditors with replacement liens as adequate protection;

6.      setting a final hearing on the Motion hearing insofar as it relates to Cash Collateral;

7.      granting the Motion on a final basis insofar as it relates to maintenance of the Accounts and the pre-petition cash management system;

8.      authorizing the Debtors to maintain the Accounts and the pre-petition cash management system as set forth in the Motion;

9.      compelling the Bank to release all holds or freezes on the Accounts to the extent that holds or freezes are placed on any of the Accounts by the Bank pre- or post-petition;

**15**

10.     ordering the Bank to promptly turnover to the Debtors all of the Debtors' funds which were in the Bank's possession or control at the time of the filing of the Debtors' bankruptcy cases and all funds which come into the Bank's possession or control after the time of the filing of the Debtors' bankruptcy cases for deposit by the Debtors into the Debtors' debtor-in-possession bank accounts;

11.     absent the prior approval of the Court and other than with regard to the Bank's receipt of any adequate protection payments from the Debtors which have been authorized by order of the Court, ordering the Bank not to apply any of the Debtors' funds which were in the Bank's possession or control at the time of the filing of the Debtors' bankruptcy cases or any funds which come into the Bank's possession or control after the time of the filing of the Debtors' bankruptcy cases against the Bank's debt; and

12.     granting such other and further relief as the Court deems just and proper.

Date: July 26, 2010

LEVENE, NEALE, BENDER, YOO
& BRILL L.L.P.

*/s/ Ron Bender*
RON BENDER
TODD M. ARNOLD
Proposed Attorneys for Chapter 11 Debtors
and Debtors in Possession