RON BENDER (SBN 143364)
TODD M. ARNOLD (SBN 221868)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: rb@lnbyb.com; tma@lnbyb.com

Attorneys for Chapter 11 Debtors and Debtors in Possession

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF CALIFORNIA
### (SACRAMENTO DIVISION)

| | |
|---|---|
| In re:<br><br>MATTERHORN GROUP, INC.,<br><br>    Debtor.<br><br>VITAFREZE FROZEN CONFECTIONS, INC.,<br><br>    Debtor.<br><br>DELUXE ICE CREAM COMPANY,<br><br>    Debtor.<br><br>☒ Affects ALL DEBTORS<br>☐ Affects only MATTERHORN GROUP, INC.<br>☐ Affects only VITAFREZE FROZEN CONFECTIONS, INC.<br>☐ Affects only DELUXE ICE CREAM COMPANY | Lead Case No. 10-39672 (MSM)<br>Jointly Administered with Case Nos. 10-39664 (MSM), and 10-39670 (MSM)<br><br>DC No. LNB-11<br><br>Chapter 11 Cases<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE DEBTORS' MOTION FOR AN ORDER AUTHORIZING THE DEBTORS' CONTINUED USE OF CASH COLLATERAL**<br><br>Hearing:<br>Date:    September 8, 2010<br>Time:    10:00 a.m.<br>Place:   Department A<br>            Judge Michael S. McManus<br>            Courtroom No. 28, Floor No. 7<br>            Robert T. Matsui Courthouse<br>            501 I Street<br>            Sacramento, CA 95814 |

Matterhorn Group, Inc. ("MGI"), Vitafreze Frozen Confections, Inc. ("Vitafreze"), and Deluxe Ice Cream Company ("Deluxe"), the debtors and debtors in possession in the above-captioned, jointly administered Chapter 11 bankruptcy cases (collectively, the "Debtors"), hereby file their Memorandum of Points and Authorities in support of their motion (the "Motion") for an order, in substantially the form of the order on the Motion (the "Interim Order") filed as Exhibit "2" concurrently herewith, authorizing the Debtors' continued use of cash collateral.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### STATEMENT OF FACTS

**A.   BACKGROUND.**

On July 26, 2010 (the "Petition Date"), the Debtors each filed voluntary petitions under Chapter 11 of 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"). The Debtors continue to operate their business, manage their financial affairs, and operate their bankruptcy estates as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. The Debtors' Chapter 11 cases are being jointly administered pursuant to a prior order of the Court.

MGI was formed in 2004 as a vehicle to "roll-up" frozen novelty manufacturing companies in the Western United States. The initial step in this strategy was MGI's acquisition of Vitafreze, Deluxe, and Matterhorn Ice Cream Company ("Matterhorn"),[1] each of which became wholly owned subsidiaries of MGI. As a result of these acquisitions, by 2005, the Debtors had (1) established themselves as high-quality, high-service private label manufacturers with a strong Western United States customer base, and (2) become one of the dominant producers of ice cream novelties in the Western United States.

---

[1] Matterhorn is also a wholly owned subsidiary of MGI. Matterhorn is not operating and has not filed a bankruptcy case.

In 2006, in an effort to improve operations and profitability, MGI (1) closed Matterhorn's manufacturing plant in Caldwell, Idaho and consolidated its manufacturing into Vitafreze, located in Sacramento, California, and Deluxe, located in Salem, Oregon, and (2) took aggressive steps to restructure its remaining operations to reduce overhead and reposition MGI with its customers and suppliers. The Debtors' administrative office is located in Las Vegas, Nevada.

At present, the Debtors, which have approximately 31 non-union employees and 226 union employees, are collectively one of the largest independent producers of ice cream and water-ice novelty products in the United States. The Debtors manufacture (1) self-branded products for grocery retailers, (2) products from brand licenses held by the Debtors, such as Mike and Ike™, HotTamales™, Zours™, and Crystal Light™ popsicles, (3) co-branded products, and (4) the Debtors' own products, including the Debtor's Oh My! Goodness™ branded products. The Debtors' customers include the largest big-box grocery retailers, club stores, and independent cooperative distribution companies in the United States, such as Wal*Mart, Sam's Club, Giant Eagle, Kroger, Stater Brothers, Albertsons, Winco Foods, Raley's, Save Mart Supermarkets, Safeway, Smart & Final, the Schwan Food Company, and Western Family. The Debtors also sell to various retailers in Mexico.

B.   **THE DEBTORS' SECURED DEBT.**

The Debtors' primary secured creditor is Key Bank, N.A. (the "Bank"). As of the Petition Date, pursuant to that certain Amended and Restated Revolving Credit and Term Loan Agreement (as amended) (the "Loan Documents"), the Debtors owed the Bank approximately $1,249,983 on a term loan (the "Term Loan") and approximately $9,314,953 on a revolving line of credit (the "Line" and together with the Term Loan, the "Bank Loans") for a total of approximately $10,564,936. The Bank contends that the Bank Loans are secured by first priority liens on substantially all of the Debtors' assets, including the Debtors' cash collateral (the "Cash

Collateral"), although it appears to the Debtors that the Bank does not have a perfected lien against the assets of MGI, which raises a number of potential preference and fraudulent conveyance issues for the Bank. The Bank Loans mature on July 1, 2011.

In addition to the Bank, Pacific Mezzanine Fund L.P. ("PMF") and CC&B Holdings, Inc. ("CC&B") appear to have liens on some or all of the Debtors' assets, including the Debtors' cash collateral, securing a bridge loan in the amount of $750,000 ($500,000 from CC&B and $250,000 from PMF). PMF owns approximately 53% of MGI's common stock. Nathan W. Bell, a Managing Member of PMF, is the current Chairman of the Debtors' Board of Directors, and the Debtors' President. CC&B owns approximately 15% of MGI's common stock. A principal of CC&B (Michael Newell) is also a member of the Debtors' Board of Directors. PMF and CC&B made this loan to the Debtors shortly prior to the Petition Date to assist the Debtors with their cash flow needs and to assist the Debtors to pay down their debt to the Bank. The Debtors understand that both PMF and CC&B are very supportive of the Debtors and their reorganization efforts.

C.     **THE NECESSITY FOR FILING BANKRUPTCY.**

During the period of 2007 through 2009, the Debtors gross revenues increased substantially from approximately $42,564,029 in 2007, to approximately $47,986,399 in 2008, to approximately $54,436,328 in 2009. Unfortunately, due to expansion into new product categories, increased costs related thereto, a delayed selling season due to unusually cool temperatures in the Debtors geographical market and the continued need to make capital expenditures to maintain the Debtors' manufacturing facilities, these increases in gross revenue did not result in corresponding increases in net income and liquidity. Instead, based on the foregoing and seasonal fluctuations in the Debtors' business and borrowing limits under the Loan Documents, the Debtors found themselves in a cash crunch and were unable to meet their funding

4                    MEMORANDUM ON
                                        CASH COLLATERAL MOTION

needs solely from advances made by the Bank. In consideration of the Debtors' ongoing cash crunch and the need for breathing room to formulate and implement a restructuring plan or a sale, the Debtors came to the conclusion that filing for bankruptcy protection was in the best interests of the Debtors and their creditors.

D.  **PRIOR CASH COLLATERAL USE AND THE PURPOSE FOR THIS MOTION.**

Since the Petition Date, the Debtors have been using cash collateral in accordance with stipulated orders with the Bank which have been approved by the Court. The current stipulated cash collateral order expires on September 8, 2010, the same date as the current continued cash collateral hearing date. The Debtors have presented the Bank (and the recently formed Creditors' Committee) with a proposed budget which would provide for the Debtors' continued use of cash collateral through the week ending October 8, 2010, and have suggested to the Bank and the Creditors' Committee that the parties enter into a stipulated cash collateral order which would be identical to the currently operative stipulated cash collateral order. The Bank has advised the Debtors that the Bank will only stipulate to the Debtors' continued use of cash collateral if the Debtors embark on an expedited sale process with the intention of consummating a sale of substantially all of the Debtors' assets by the early part of October, 2010.

The Debtors have advised the Bank and the Creditors' Committee that they, working in conjunction with the Debtors' financial advisor, Sherwood Partners, are in the process of completing a comprehensive one-year operating budget and will deliver that one-year budget to the Bank and the Creditors' Committee when it is completed, which will be prior to the September 8, 2010 hearing on this Motion. However, counsel for the Debtors advised the Court and all parties at the recently held case status conference on August 30, 2010 that it is now clear that the Debtors will not be able to survive economically on cash collateral use alone over the next year, which means that the Debtors will have to embark on an asset sale process unless the

5        MEMORANDUM ON
CASH COLLATERAL MOTION

Debtors are able to obtain additional funding, which currently does not exist. But the Debtors believe that they will not run out of money until some point in early 2011, which is more than four months away.

The interests of the Debtors' unsecured creditors are extremely important, both because many of them provided the Debtors with trade credit without which the Debtors would not have been able to survive over these past few years and because of the questions surrounding the perfection of the Bank's liens and the possible preference and fraudulent conveyance exposure the Bank is facing as a result of the fact that the Bank does not appear to have a perfected lien against MGI, which is the entity through which all or nearly all of the Debtors' funds flowed through prior to the Petition Date. The Creditors' Committee was only recently formed and, at the request of the Creditors' Committee, the initial meeting between the Debtors and the Creditors' Committee is scheduled to take place on September 14, 2010.

The Debtors have already made clear to the Bank that for the Debtors to agree to embark on an expedited asset sale process, the Creditors' Committee would need to be supportive of that process and the Bank would have to agree to an allocation of the sale proceeds which was acceptable to the Creditors' Committee and to the Debtors. The Debtors are unaware of any such asset allocation proposal having even been made by the Bank, and the Debtors have not been advised by the Creditors' Committee that it supports such an expedited asset sale process.

The Debtors are not refusing to proceed with an expedited asset sale process as the Bank desires. But the Debtors have not yet concluded that doing so is in the best interests of these estates, and the Debtors have not yet had the opportunity to finalize their twelve-month budget or to meet with the Creditors' Committee. The Debtors therefore are not in a position to conclude today, on September 1, 2010, that proceeding with such an expedited asset sale as the Bank desires is in the best interests of these estates or consistent with the desires of the Creditors'

Committee, and the Court previously scheduled a deadline of September 1, 2010 for the Debtors to file any supplemental cash collateral pleadings. For example, it may be that the Debtors and the Creditors' Committee agree that proceeding with an asset sale process is in the best interests of these estates, but not in the time frame desired by the Bank.

The Debtors are therefore filing this Motion to make sure the Debtors have continued use of cash collateral beyond September 8, 2010. Regardless of the outcome of discussion which is likely to take place with the Bank and the Creditors' Committee over the next week pending the hearing on September 8, 2010, it is the Debtors' understanding that the Bank does not want the Debtors' business to be shut down because if that occurred the going concern value of the Debtors' business would be lost.

E. **THE DEBTORS' PROPOSED OPERATING BUDGET AND THE DEBTORS' CURRENT AND PROJECTED ASSET BASE.**

Filed concurrently herewith as Exhibit "1" is the Debtors' proposed operating budget through October 8, 2010 (the "Budget"). As indicated in the Budget, the Debtors' total collateral base (excluding any value for the Debtors' intellectual property or good will) is expected to be $14,951,823 on September 10, 2010. The Budget includes a projected total collateral base for each week thereafter through the week ending October 8, 2010. As set forth in the Budget, the Debtors' total collateral base is expected to drop to $14,383,196 by the week ending October 8, 2010. This relatively modest decrease (approximately 3.8%) in the Debtors' total collateral base does not place the Bank in any meaningful risk, as it is still substantially in excess of the Bank's total indebtedness, particularly when weighed against the benefit of the Debtors and the Creditors' Committee having an opportunity to meet and to review the various options available to these estates in a thoughtful manner. While it may be that the Debtors and the Creditors' Committee ultimately agree with the Bank, the parties should not be forced to do so "under the

7   MEMORANDUM ON
CASH COLLATERAL MOTION

gun" as the Bank desires, when there is no meaningful risk to the Bank of a short delay in the decision making process especially given that we are dealing with Debtors that have more than $50 million of annual revenue.

The Debtors therefore submit that the Court should authorize the Debtors to continue using cash collateral through October 8, 2010 under the same terms and conditions as the Bank has already consented to twice, which includes the making of adequate protection payments to the Bank in the amount of $72,531 per month. The Debtors believe that doing so is in the best interests of their estates and their creditors, including the Bank, because the alternative to the Debtors' continued use of cash collateral is a complete shut down of the Debtors' business which would result in the loss of the jobs of all of the Debtors' employees and the decimation of the Debtors' going concern value.

## II.
## DISCUSSION

A.  **THE DEBTORS MUST BE AUTHORIZED TO USE CASH COLLATERAL TO OPERATE, MAINTAIN, AND PRESERVE THEIR BUSINESS IN ACCORDANCE WITH THE BUDGET.**

The Debtors' use of property of their estates is governed by Section 363 of the Bankruptcy Code. Section 363(c)(l) provides in pertinent part:

> If the business of the debtor is authorized to be operated under section . . .1108. . . of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. §363(c)(l). A debtor in possession has all of the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with Section 363. See 11 U.S.C. §1107(a).

"Cash collateral" is defined as "cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents in which the estate and an entity other than the estate have an interest. . . ." 11 U.S.C. §363(a). Section 363(c)(2) allows the use of "cash collateral" under subsection (c)(l) if:

>  (A) each entity that has an interest in such cash collateral consents; or
>  (B) the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section.

See 11 U. S.C. §363(c)(2)(A) and (B).

It is well settled that it is appropriate for a Chapter 11 debtor to use cash collateral for the purpose of maintaining and operating its property. 11 U.S.C. § 363(c)(2)(B); In re Oak Glen R-Vee, 8 B.R. 213, 216 (Bankr. C.D. Cal. 1981); In re Tucson Industrial Partners, 129 B.R. 614 (B.A.P. 9th Cir. 1991). In addition, where the debtor is operating a business, it is extremely important that the access to cash collateral be allowed in order to facilitate the goal of reorganization: "the purpose of Chapter 11 is to rehabilitate debtors and generally access to cash collateral is necessary to operate a business." In re Dynaco Corporation, 162 B.R. 389 (Bankr. D.N.H. 1993), quoting In re Stein, 19 B.R. 458, 459 (Bankr. E.D. Pa. 1982).

The only source of revenue available to the Debtors to use to operate, maintain and preserve their business is the Debtors' cash from their business operations. As a result, the Debtors have no ability to continue to operate their businesses and maintain and preserve the going concern value of their business unless the Debtors have continued access to and use of their Cash Collateral to pay the Debtors' ordinary operating expenses as set forth in the Budget. The

Debtors inability to pay those expenses, including basic and critical operating expenses such as payroll, rent and product supply purchases, would result in the immediate closure of the Debtors' manufacturing facilities resulting in the termination of approximately 255 jobs and the decimation of the overall going concern value of the Debtors' business.

Consistent with the prior cash collateral orders that the Bank has agreed to and which were entered by the Court, in addition to those expenses set forth in the Budget, the Debtors also seek authority to use Cash Collateral to pay for the following: (a) all quarterly fees owing to the Office of the United States Trustee and all expenses owing to the Clerk of the Bankruptcy Court; and (b) all actual third-party, outside expenses incurred by the Debtors (or their counsel) directly related to the administration of the Debtors' bankruptcy estates (for items such as photocopying, postage, searches, etc.), not to exceed the total sum of $10,000 per month. In addition, the Debtors seek authority to deviate from the line items contained in the Budget by not more than 15% on a line item basis and not more than 10% on an aggregate basis. Moreover, if actual expenditures for any line items during a particular period are less than in the Budget, the difference shall carryover to the following period covered by the Budget. To the extent the Debtors' order volume exceeds the Debtors' projected order volume, the Debtors seek authority to increase the amount of their related variable cost operating expenses on a proportional basis. The Debtors also seek to have the authority to pay any other expenses related to the operation of the Debtors' business which are not contained in the Budget without the need for any further order of the Court provided the Bank and the Creditors' Committee consent to those payments in advance and in writing.

**14**

B. **THE BANK IS ADEQUATELY PROTECTED BY AN EQUITY CUSHION, CONTINUED ADEQUATE PROTECTION PAYMENTS, REPLACEMENT LIENS, AND THE DEBTORS' CONTINUED OPERATION OF THEIR BUSINESS.**

To the extent that an entity has a valid security interest in the revenues generated by property, those revenues constitute "cash collateral" under Section 363(a) of the Bankruptcy Code. Pursuant to Section 363(c)(2), the Court may authorize the debtor to use a secured creditor's cash collateral if the secured creditor is adequately protected. In re Mellor, 734 F.2d 1396, 1400 (9th Cir. 1984); see also In re O'Connor, 808 F.2d 1393, 1398 (10th Cir. 1987); In re McCombs Properties VI, Ltd., 88 B.R. 261, 265 (Bankr. C.D. Cal. 1988).

Pursuant to the Supreme Court case of United Savings Association v. Timbers of Inwood Forest Associates, 108 S.Ct. 626, 629 (1988) and subsequent case law, the property interest that a debtor must adequately protect pursuant to Sections 361(1) and (2) of the Bankruptcy Code is only the value of the lien that secures the creditor's claim. Timbers, 108 S.Ct. at 630; see also McCombs, at 266. Section 506(a) "limit[s] the secured status of a creditor (i.e., the secured creditor's claim) to the lesser of the [allowed amount of the] claim or the value of the collateral." McCombs, 88 B.R. at 266.

The Ninth Circuit made clear in Mellor that in the case of an oversecured creditor, an equity cushion of 20% is considered clear adequate protection of a secured creditor's interest in cash collateral. Mellor, 734 F.2d at 1401; see also In re McGowan, 6 B.R. 241, 243 (Bankr. E.D. Pa. 1980) [holding a 10% cushion is sufficient to be adequate protection]; In re Rogers Development Corp., 2 B.R. 679, 685 (Bankr. E.D. Virg. 1980) [court decided that an equity cushion of approximately 15% to 20% was sufficient adequate protection to the creditor, even though the debtors had no equity in the property.]

As set forth above, the total amount allegedly owed by the Debtors to the Bank is approximately $10,564,936. As set forth in the Budget, the Debtors' total collateral base (excluding any value for the Debtors' intellectual property or good will) is expected to be $14,951,823 on September 10, 2010, and is expected to be $14,383,196 by the week ending October 8, 2010. The Bank therefore continues to be secured by a substantial equity cushion, which is well in excess of the de facto 20% equity cushion, which constitutes clear adequate protection as a matter of law under Mellor. Also importantly, even if the Bank disagrees with the Debtor's conclusions, the Debtors' current total collateral base is expected to drop by a relatively modest amount of approximately 3.8% to $14,383,196 by the week ending October 8, 2010. The Debtors submit that this relatively modest decrease in the Debtors' total collateral base, particularly for a seasonal business of this size, does not place the Bank in any meaningful risk, as the collateral base is still substantially in excess of the Bank's total indebtedness.

Despite the fact that the Bank is adequately protected by a substantial equity cushion, the Debtors nevertheless intend to continue to make monthly adequate protection payments to the Bank as the Debtors have done thus far in the amount of $72,531.

As additional adequate protection for the Bank and any other creditor with an interest in the Debtors' Cash Collateral, the Debtors seek to provide them with a replacement lien and 507(b) claims in the same manner as the prior cash collateral orders which have been approved by the Bank and entered by the Court.

Additionally, the law is also clear that the preservation of the value of a secured creditor's lien is sufficient to provide adequate protection to a secured creditor when a debtor seeks to use cash collateral. In re Triplett, 87 B.R. 25 (Bankr. W.D.Tex. 1988); see also In re Stein, 19 B.R. 458 (Bankr. E.D. Pa. 1982). In determining adequate protection, Courts have stressed the importance of promoting a debtor's reorganization. In O'Connor, the Tenth Circuit stated:

MEMORANDUM ON
CASH COLLATERAL MOTION

> In this case, Debtors, in the midst of a Chapter 11 proceeding, have proposed to deal with cash collateral for the purpose of enhancing the prospects of reorganization. This quest is the ultimate goal of Chapter 11. Hence, the Debtor's efforts are not only to be encouraged, but also their efforts during the administration of the proceeding are to be measured in light of that quest. Because the ultimate benefit to be achieved by a successful reorganization inures to all the creditors of the estate, a fair opportunity must be given to the Debtors to achieve that end. Thus, while interests of the secured creditor whose property rights are of concern to the court, the interests of all other creditors also have bearing upon the question of whether use of cash collateral shall be permitted during the early stages of administration.

O'Connor 808 F.2d at 1937.

Here, there can be no question that the <u>only</u> way for Debtors to preserve the going concern value of their business, as well as the Bank's collateral, and to avoid an immediate shut down of the Debtors' business, is for the Debtors to have the authority to continue to use Cash Collateral to pay the expenses contained in the Budget. Any other alternative is nonsensical and serves only to the severe detriment to all of the Debtors' creditors (including the Bank) and all other parties in interest in these cases. Thus, there is no doubt that the Debtors' continued use of Cash Collateral to fund operations will serve to provide yet another means of adequate protection for the Bank and any other creditors with an interest in the Debtors' Cash Collateral.

With the foregoing package of adequate protection measures, the Debtors submit that the Bank and any creditors with an interest in the Debtors' Cash Collateral are all adequately protected. Therefore, good cause exists for granting the relief requested in the Motion.

### III.
### <u>CONCLUSION</u>

**WHEREFORE**, the Debtors respectfully request that the Court enter an order in substantially the form filed as Exhibit "2" concurrently herewith and grant such other and further

13                MEMORANDUM ON
                                 CASH COLLATERAL MOTION

**14**

1 | relief as the Court deems just and proper under the circumstances of these cases.

Date: September 1, 2010          LEVENE, NEALE, BENDER, YOO
                                 & BRILL L.L.P.

                                 /s/ Ron Bender
                                 RON BENDER
                                 TODD M. ARNOLD
                                 Attorneys for Chapter 11 Debtors
                                 and Debtors in Possession