FILED
September 29, 2010
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
0002964451

11

RON BENDER (SBN 143364)
TODD M. ARNOLD (SBN 221868)
J.P. FRITZ (SBN 245240)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: rb@lnbyb.com; tma@lnbyb.com

Attorneys for Chapter 11 Debtors and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF CALIFORNIA
## (SACRAMENTO DIVISION)

| | |
|---|---|
| In re:<br><br>MATTERHORN GROUP, INC.,<br><br>    Debtor.<br><br>--- <br>VITAFREZE FROZEN CONFECTIONS, INC.,<br><br>    Debtor.<br><br>--- <br>DELUXE ICE CREAM COMPANY,<br><br>    Debtor.<br><br>---<br>☒ Affects ALL DEBTORS<br>☐ Affects only MATTERHORN GROUP, INC.<br>☐ Affects only VITAFREZE FROZEN CONFECTIONS, INC.<br>☐ Affects only DELUXE ICE CREAM COMPANY | Lead Case No. 10-39672 (MSM)<br>Jointly Administered with Case Nos. 10-39664 (MSM), and 10-39670 (MSM).<br><br>DC No. LNB-13<br><br>Chapter 11 Cases<br><br>**DEBTORS' EMERGENCY MOTION FOR AN ORDER: (1) APPROVING SETTLEMENT AGREEMENT BETWEEN THE DEBTORS AND KEY BANK; (2) APPROVING AUCTION SALE FORMAT AND BIDDING PROCEDURES; (3) APPROVING FORM OF NOTICE TO BE PROVIDED TO INTERESTED PARTIES; (4) APPROVING FORM OF ASSET PURCHASE AGREEMENT FOR PROSPECTIVE OVERBIDDERS TO USE; AND (5) SCHEDULING A COURT HEARING TO CONSIDER APPROVAL OF THE SALE TO THE HIGHEST BIDDER**<br><br>Hearing:<br>Date:    TBD<br>Time:    TBD<br>Place:   Department A<br>            Judge Michael S. McManus<br>            Courtroom No. 28<br>            Floor No. 7<br>            Robert T. Matsui Courthouse<br>            501 I Street<br>            Sacramento, CA 95814 |

3
EMERGENCY MOTION FOR ORDER APPROVING BID PROCEDURES

Matterhorn Group, Inc. ("MGI"), Vitafreze Frozen Confections, Inc. ("Vitafreze"), and Deluxe Ice Cream Company ("Deluxe"), the debtors and debtors in possession in the above-captioned, jointly administered Chapter 11 bankruptcy cases (collectively, the "Debtors"), hereby file this Emergency Motion (the "Motion") for approval of, among other things, an auction sale format and bidding procedures and a settlement agreement the Debtors have entered into with their primary secured creditor Key Bank, N.A. (the "Bank").

The Debtors commenced their bankruptcy cases by filing voluntary petitions under Chapter 11 of 11 U.S.C. § 101 et seq. (the "Bankruptcy Code") on July 26, 2010 (the "Petition Date"). The Debtors continue to operate their business, manage their financial affairs, and operate their bankruptcy estates as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

MGI was formed in 2004 as a vehicle to "roll-up" frozen novelty manufacturing companies in the Western United States. The initial step in this strategy was MGI's acquisition of Vitafreze, Deluxe, and Matterhorn Ice Cream Company ("Matterhorn"),[1] each of which became wholly owned subsidiaries of MGI. As a result of these acquisitions, by 2005, the Debtors had (1) established themselves as high-quality, high-service private label manufacturers with a strong Western United States customer base, and (2) become one of the dominant producers of ice cream novelties in the Western United States.

In 2006, in an effort to improve operations and profitability, MGI (1) closed Matterhorn's manufacturing plant in Caldwell, Idaho and consolidated its manufacturing into Vitafreze, located in Sacramento, California, and Deluxe, located in Salem, Oregon, and (2) took aggressive steps to

---

[1] Matterhorn is also a wholly owned subsidiary of MGI. Matterhorn is not operating and has not filed a bankruptcy case.

restructure its remaining operations to reduce overhead and reposition MGI with its customers and suppliers. The Debtors' administrative office is located in Las Vegas, Nevada.

At present, the Debtors, which have approximately 31 non-union employees and 226 union employees, are collectively one of the largest independent producers of ice cream and water-ice novelty products in the United States. The Debtors manufacture (1) self-branded products for grocery retailers, (2) products from brand licenses held by the Debtors, such as Mike and Ike™, HotTamales™, Zours™, and Crystal Light™ popsicles, (3) co-branded products, and (4) the Debtors' own products, including the Debtor's Oh My! Goodness™ branded products. The Debtors' customers include the largest big-box grocery retailers, club stores, and independent cooperative distribution companies in the United States, such as Wal*Mart, Sam's Club, Giant Eagle, Kroger, Stater Brothers, Albertsons, Winco Foods, Raley's, Save Mart Supermarkets, Safeway, Smart & Final, the Schwan Food Company, and Western Family. The Debtors also sell to various retailers in Mexico.

The Debtors' primary secured creditor is Key Bank, N.A. (the "Bank"). As of the Petition Date, pursuant to that certain Amended and Restated Revolving Credit and Term Loan Agreement (as amended) (the "Loan Documents"), the Debtors owed the Bank approximately $1,249,983 on a term loan (the "Term Loan") and approximately $9,314,953 on a revolving line of credit (the "Line" and together with the Term Loan, the "Bank Loans") for a total of approximately $10,564,936. The Bank contends that the Bank Loans are secured by first priority liens on substantially all of the Debtors' assets, including the Debtors' cash collateral (the "Cash Collateral"), although it appears to the Debtors that the Bank does not have a perfected lien against the assets of MGI, which raises a number of potential preference and fraudulent conveyance issues for the Bank. The Bank Loans mature on July 1, 2011.

In addition to the Bank, Pacific Mezzanine Fund L.P. ("PMF") and CC&B Holdings, Inc. ("CC&B") appear to have liens on some or all of the Debtors' assets, including the Debtors' cash collateral, securing a bridge loan in the amount of $750,000 ($500,000 from CC&B and $250,000 from PMF). PMF owns approximately 53% of MGI's common stock. Nathan W. Bell, a Managing Member of PMF, is the current Chairman of the Debtors' Board of Directors, and the Debtors' President. CC&B owns approximately 15% of MGI's common stock. A principal of CC&B (Michael Newell) is also a member of the Debtors' Board of Directors. PMF and CC&B made this loan to the Debtors shortly prior to the Petition Date to assist the Debtors with their cash flow needs and to assist the Debtors to pay down their debt to the Bank. The Debtors understand that both PMF and CC&B are very supportive of the Debtors.

During the period of 2007 through 2009, the Debtors gross revenues increased substantially from approximately $42,564,029 in 2007, to approximately $47,986,399 in 2008, to approximately $54,436,328 in 2009. Unfortunately, due to expansion into new product categories, increased costs related thereto, a delayed selling season due to unusually cool temperatures in the Debtors geographical market and the continued need to make capital expenditures to maintain the Debtors' manufacturing facilities, these increases in gross revenue did not result in corresponding increases in net income and liquidity. Instead, based on the foregoing and seasonal fluctuations in the Debtors' business and borrowing limits under the Loan Documents, the Debtors found themselves in a cash crunch and were unable to meet their funding needs solely from advances made by the Bank. In consideration of the Debtors' ongoing cash crunch and the need for breathing room to formulate and implement a restructuring plan or a sale, the Debtors came to the conclusion that filing for bankruptcy protection was in the best interests of the Debtors and their creditors.

Since the Petition Date, the Debtors have been using cash collateral in accordance with three prior orders which have been approved by the Court. The Bank consented to the Debtors' cash collateral use in connection with the first two orders. The Bank filed a limited opposition to the Debtors' third cash collateral motion because the Bank wanted the Debtors to agree to an expedited sale process as a condition to the Debtors' continued use of cash collateral.

The Debtors made clear to the Bank and the Creditors' Committee from the outset of these cases that before the Debtors would be in a position to agree upon an expedited sale process, the Debtors first had to complete a one-year operating budget to determine if it was possible for the Debtors to reorganize on a stand-alone basis or to remain in Chapter 11 for an extended period of time and operate solely through use of the Debtors' cash collateral. With the assistance of the Debtors' financial advisor, Sherwood Partners, several weeks ago the Debtors completed a comprehensive one-year operating budget and delivered a copy of that one-year budget to the Bank and the Creditors' Committee. As counsel for the Debtors advised the Court at the last case status conference held on August 30, 2010, it is now clear that the Debtors will **not** be able to survive economically on cash collateral use alone over the next year or even past the beginning of 2011. As a result, the only way for the Debtors to avoid a complete shut down and liquidation of their business is for the Debtors to consummate an expedited sale of their assets or to obtain millions of dollars of additional financing. Given the extent of the Debtors' debt structure, it is not possible for the Debtors to obtain the necessary additional financing to survive beyond the early part of 2011. The Debtors have therefore concluded that embarking on an expedited asset sale process is in the overwhelming best interests of the Debtors' estates and the only way to avoid a complete shut down and liquidation of the Debtors' business.

Given the fact that the Bank asserts a senior priority lien against all or substantially all of the assets that the Debtors will be seeking to sell, the only way for the Debtors to be able to sell

their assets free and clear of the Bank's liens and claims is to do so with the Bank's consent or to embark in significant litigation with the Bank.

For the past several weeks, the Debtors and the Bank have engaged in extensive discussions regarding an asset sale process. The Debtors made clear to the Bank from the outset that the Debtors would not be willing to embark upon a consensual and expedited sale process unless the Debtors and the Bank were able to reach an agreement on (i) a minimum floor price that the Bank would consent to in order to make sure that the Debtors actually consummated a sale given the disruption to the Debtors' business operations from engaging in such a sale process, and (ii) an allocation of the sale proceeds which benefited creditors other than the Bank in a material manner and which the Debtors believed was an equitable result under the circumstances.

Fortunately, the Debtors and the Bank were able to reach such an agreement, which is memorialized in the Settlement Agreement being filed concurrently herewith as Exhibit "1". For all of the reasons set forth in the concurrently filed Memorandum of Points and Authorities in support of this Motion (the "Memorandum"), the Debtors believe that entering into the Settlement Agreement with the Bank is in the overwhelming best interests of the Debtors' estates and their creditors.

The Settlement Agreement creates the framework for the Debtors to proceed with an expedited sale of substantially all of their assets, free and clear of all liens, claims and interests, except for those assets which are designated as "Excluded Assets" in the template asset purchase agreement to be used by prospective bidders (which consist primarily of cash and avoidance causes of action).

In the Memorandum, the Debtors propose various auction sale procedures in order to conduct an auction sale of the Debtors' assets. The sale process will be managed by Sherwood Partners, LLC ("Sherwood"), which since the Petition Date has served as the Debtors' financial

8

EMERGENCY MOTION FOR ORDER APPROVING BID PROCEDURES

advisor but now, subject to the approval of the Court, will also serve as the Debtors' investment banker.

The Debtors, consistent with the advice and recommendations of Sherwood, have concluded that the auction sale and bidding procedures outlined in the Memorandum are designed to enable the Debtors' estates to obtain the highest price possible for the Purchased Assets and provide the greatest possible recovery for the Debtors' creditors, taking into account the terms of the Debtors' Settlement Agreement with the Bank and the fact that the Debtors' cash resources will decrease the longer the sale process takes to complete. No breakup fee is being proposed to be paid to any buyer because no stalking horse bidder has surfaced at this time. The auction will therefore be an open auction where no bidder has any bidding advantage over any other bidder.

The Debtors therefore submit that the proposed auction sale and bidding procedures described in the Memorandum are in the best interests of their estates, are necessary and appropriate to maximize the recovery for the Debtors' creditors, and should be approved by the Court as an exercise of the Debtors' sound business judgment. Importantly, the Debtors are not seeking at this time to have the Court approve the actual sale of the Purchased Assets to the winning bidder at the auction sale. That request will be set forth in a separate sale motion to be considered by the Court at the hearing to be held on November 8, 2010, at 10:00 a.m.

The Debtors submit that the terms of the Settlement Agreement with the Bank comport with the standards set forth above and are clearly in the best interests of the Debtors' bankruptcy estates taking into account the facts of these cases and the various options available to the Debtors.

The Debtors currently project that they will have in the range of approximately $2.3 million of cash in the middle of November, 2010, which is when the Debtors expect to consummate the sale of the Purchased Assets to the winning bidder at the auction sale. The Bank asserts a lien against all of the Debtors' cash and against all of the Purchased Assets that the

Debtors seek to sell to the winning bidder at the auction sale. Moreover, the Bank asserts a super-priority administrative claim against the Debtors pursuant to Section 507(b) of the Bankruptcy Code for all post-petition diminution in the value of the Bank's collateral, which the Debtors acknowledge will likely be more than $2.5 million.

While it appears that the Bank does not have a perfected lien against the assets owned by the parent company, MGI, all or most of the Debtors' tangible assets (e.g., inventory, accounts receivable, equipment, etc.) are owned by the Debtors' two operating subsidiaries, Vitafreze and Deluxe. So while the Debtors could file a lawsuit against the Bank to determine the extent and validity of the Bank's liens, and file a lawsuit against the Bank to seek to recover pre-petition payments made to the Bank on a preference and/or fraudulent conveyance theory, any such litigation would be highly complex and speculative, and the Debtors have no unencumbered cash to use to fund any such litigation. If the Debtors embarked on a litigation path, the outcome would be uncertain and could result in the Debtors' creditors receiving no distribution.

It currently appears to the Debtors that there are approximately $2.6 million of potential administrative claims arising from goods delivered to the Debtors within twenty days of the Petition Date pursuant to Section 503(b)(9) of the Bankruptcy Code. In addition, the Debtors estimate that they will have approximately $500,000-$1 million of additional administrative claims by the time of any sale closing resulting from additional post-petition outstanding expenses. The Debtors also believe that they likely will have some pre-petition priority claims, primarily resulting from taxes which were cut off as a result of the intervening bankruptcy filings.

With these being the facts of these cases, the Debtors believe that their Settlement Agreement with the Bank, which is the result of weeks of intensive negotiations, is in the overwhelming best interests of these estates and their creditors as the Settlement Agreement is designed to maximize the recovery for the Debtors' creditors in the following ways:

1. The timing of the asset sale is designed to maximize the amount of cash the Debtors will have to pay to their creditors by balancing the fact that the Debtors will be receiving only 15% of the sale proceeds but retaining 100% of their cash. Since the Debtors' cash will rapidly decline, particularly if the sale does not close by around the middle part of November, 2010, the Debtors' estates would bear 100% of the cost of any delay in the consummation of the sale. In contrast, the Debtors' estates only receive 15% of any upside that might be obtained from a higher sale price if delaying the timing of the sale would result in achieving a higher sale price, which itself is uncertain. So the timing of the sale process is designed to maximize the total amount of cash that will be retained by the Debtors' estates. This timing is also consistent with the desires of the Bank, which wants to see a sale closing in the most expeditious manner possible.

2. While the Debtors have no way of knowing how much the Purchased Assets will sell for, when 15% of any reasonable sale price is added to the Debtors' expected cash balance of approximately $2.3 million, the Debtors expect to be in a position to pay all allowed administrative claims (including the estimated $2.6 million of potential administrative claims arising under Section 503(b)(9) of the Bankruptcy Code to the extent they are allowed and not otherwise subject to avoidance causes of action and unpaid post-petition obligations to the Debtors' unions) in full or nearly in full. This is important because until allowed administrative claims are paid in full, there is no ability to pay any money to general unsecured creditors.

3. By capping the Bank's allowed super-priority administrative expense claim at $2.5 million and by the Bank agreeing that it will be paid only 85% of the Net Avoidance Action Recoveries on account of this claim, with the Debtors' estates to retain the other 15% of the Net Avoidance Action Recoveries until the Bank has been paid the total sum of $2.5 million and then 100% thereafter, the Debtors believe that the Settlement Agreement maximizes the prospects for a meaningful recovery for the Debtors' general unsecured creditors, when the Debtors believe that

11
EMERGENCY MOTION FOR ORDER APPROVING BID PROCEDURES

**11**

any other outcome for these estates are certain or nearly certain to result in the Debtors' general unsecured creditors receiving no distribution.

4. When balancing the interests of all of the various creditor constituencies in these cases, the Debtors believe that the Settlement Agreement is an extremely fair and equitable result for these estates, and the Debtors commend the Bank for acting reasonably and fairly under these difficult circumstances.

The Debtors therefore believe that the Settlement Agreement is in the overwhelming best interests of these estates and should be approved by the Court.

Based upon all of the foregoing, the Debtors respectfully request that this Court:

1. approve the auction sale format and bidding procedures described in the Memorandum;

2. approve the Debtors' proposed form of notice to be provided to creditors, prospective buyers and other parties in interest in the form attached as Exhibit "2" filed concurrently herewith;

3. approve the form of asset purchase agreement for prospective buyers to use by requiring prospective buyers either to use the form attached as Exhibit "3" filed concurrently herewith or to submit to the Debtors by October 28, 2010 a redlined version of a proposed asset purchase agreement which indicates the changes requested by the prospective buyer;

4. schedule a Court hearing for November 8, 2010 at 10:00 a.m. to consider approval of the Debtors' sale of the Purchased Assets to the winning bidder at the auction sale;

5. enter the form of Bidding Procedures Order attached as Exhibit "4" filed concurrently herewith;

6. enter an order approving the Debtors' Settlement Agreement with the Bank; and

/ / /

7. grant such other and further relief as the Court deems just and proper.

Date: September 29, 2010

LEVENE, NEALE, BENDER, YOO
& BRILL L.L.P.

*/s/ Ron Bender*
RON BENDER
TODD M. ARNOLD
J.P. FRITZ

13
EMERGENCY MOTION FOR ORDER APPROVING BID PROCEDURES