**14**

RON BENDER (SBN 143364)
TODD M. ARNOLD (SBN 221868)
J.P. FRITZ (SBN 245240)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: rb@lnbyb.com; tma@lnbyb.com

Attorneys for Chapter 11 Debtors and Debtors in Possession

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
(SACRAMENTO DIVISION)

| | |
|---|---|
| In re:<br><br>MATTERHORN GROUP, INC.,<br><br>    Debtor.<br><br>VITAFREZE FROZEN CONFECTIONS, INC.,<br><br>    Debtor.<br><br>DELUXE ICE CREAM COMPANY,<br><br>    Debtor.<br><br>☒ Affects ALL DEBTORS<br>☐ Affects only MATTERHORN GROUP, INC.<br>☐ Affects only VITAFREZE FROZEN CONFECTIONS, INC.<br>☐ Affects only DELUXE ICE CREAM COMPANY | Lead Case No. 10-39672 (MSM)<br>Jointly Administered with Case Nos. 10-39664 (MSM), and 10-39670 (MSM)<br><br>DC No. LNB-13<br><br>Chapter 11 Cases<br><br>**DECLARATION OF ANDREW DE CAMARA IN SUPPORT OF THE DEBTORS' EMERGENCY MOTION FOR AN ORDER: (1) APPROVING SETTLEMENT AGREEMENT BETWEEN THE DEBTORS AND KEY BANK; (2) APPROVING AUCTION SALE FORMAT AND BIDDING PROCEDURES; (3) APPROVING FORM OF NOTICE TO BE PROVIDED TO INTERESTED PARTIES; (4) APPROVING FORM OF ASSET PURCHASE AGREEMENT FOR PROSPECTIVE OVERBIDDERS TO USE; AND (5) SCHEDULING A COURT HEARING TO CONSIDER APPROVAL OF THE SALE TO THE HIGHEST BIDDER**<br><br>Hearing:<br> Date:    TBD<br> Time:   TBD<br> Place:  Department A<br>          Judge Michael S. McManus<br>          Courtroom No. 28<br>          Floor No. 7<br>          Robert T. Matsui Courthouse |

501 I Street
Sacramento, CA 95814

## DECLARATION OF ANDREW DE CAMARA

I, Andrew De Camara, hereby declare as follows:

1. I am over 18 years of age. Except where otherwise stated, I have personal knowledge of the facts set forth below and, if called to testify, I could and would testify competently thereto.

2. I am a Managing Director and Executive Vice President of Sherwood Partners, LLC ("Sherwood"). Sherwood is a premier business consulting firm with deep and extensive experience in the restructuring and turnaround of financially distressed companies. Sherwood's growth and success have been built upon its seasoned business professionals who have, over many years, gone above and beyond traditional tactics to help its clients achieve exceptional results. All of Sherwood's professionals have a vast amount of experience as financial advisors, including in the representation of companies such as the Debtors, and Sherwood has served as the financial advisor in a number of Chapter 11 bankruptcies.

3. I have 15 years experience in strategic planning and financial planning including corporate restructurings, mergers & acquisitions and financial forecasting. I have been a professional at Sherwood for 9 years. I have extensive experience finding solutions for financially distressed companies and have been involved in various Chapter 11 filings as an advisor to debtors, secured creditors and unsecured creditor committees. Prior to joining Sherwood, I worked in the licensing group at a major Hollywood studio where I was responsible for retail strategies both in the United States and internationally. I hold an M.B.A. from the University of Southern California. I also earned a Bachelor of Arts degree from Georgetown University.

4. I make this Declaration in support of the emergency motion filed by Matterhorn Group, Inc. ("MGI"), Vitafreze Frozen Confections, Inc. ("Vitafreze"), and Deluxe Ice Cream

Company ("Deluxe"), the debtors and debtors in possession in the above-captioned, jointly administered Chapter 11 bankruptcy cases (collectively, the "Debtors"), for approval of, among other things, an auction sale format and bidding procedures.

5. Since the filing of the Debtors' Chapter 11 bankruptcy cases on July 26, 2010, Sherwood has served as the Debtors' financial advisor. One of our primary roles for serving as the Debtors' financial advisor has been in the preparation of the Debtors' various operating cash collateral budgets. I have worked on these cases primarily with Jason Caporrino of Sherwood. Jason holds an M.B.A. from Harvard Business School and a B.S. in Economics from Pennsylvania State University, and has made visits to the Debtors' administrative offices in Las Vegas, Nevada to personally review portions of the Debtors' Books and Records to assist Sherwood in the preparation of the budgets.

6. Over the past few weeks, Mr. Caporrino and I have expended considerable effort reviewing the Debtors' Books and Records containing the data necessary to prepare the Debtors' budgets, discussing various variables and assumptions that would have to be considered in preparing the budgets, and in actually preparing the budgets.

7. Early on in these Chapter 11 cases, the Bank advised the Debtors that the Bank wanted to see the Debtors embark on an expedited asset sale process. In fact, the Bank attempted to link its consent to the Debtors' third cash collateral motion to the Debtors' agreement to embark upon such an expedited asset sale process. The Debtors made clear to the Bank and the Creditors' Committee from the outset of these cases that before the Debtors would be in a position to agree upon an expedited sale process, the Debtors first had to complete a one-year operating budget to determine if it was possible for the Debtors to reorganize on a stand-alone basis or to remain in Chapter 11 for an extended period of time and operate solely through use of the Debtors' cash collateral. With the assistance of Sherwood, several weeks ago the Debtors

completed a comprehensive one-year operating budget and delivered a copy of that one-year budget to the Bank and the Creditors' Committee.

8. As counsel for the Debtors advised the Court at the last case status conference held on August 30, 2010, it is now clear that the Debtors will <u>not</u> be able to survive economically on cash collateral use alone over the next year or even past the beginning of 2011. As a result, I believe that the only way for the Debtors to avoid a complete shut down and liquidation of their business is for the Debtors to consummate an expedited sale of their assets or to obtain millions of dollars of additional financing. Given the extent of the Debtors' debt structure, I do not believe that it is possible for the Debtors to obtain the necessary additional financing to survive beyond the early part of 2011. The Debtors' Board of Directors has therefore concluded that embarking on an expedited asset sale process is in the overwhelming best interests of the Debtors' estates and the only way to avoid a complete shut down and liquidation of the Debtors' business. I agree with the Debtors' conclusions in this regard.

9. Given the fact that the Bank asserts a senior priority lien against all or substantially all of the assets that the Debtors will be seeking to sell, the Debtors' Board has been advised that the only way for the Debtors to be able to sell their assets free and clear of the Bank's liens and claims is to do so with the Bank's consent or to embark in significant litigation with the Bank.

10. For the past several weeks, the Debtors and the Bank have engaged in extensive discussions regarding an asset sale process. The Debtors made clear to the Bank from the outset that the Debtors would not be willing to embark upon a consensual and expedited sale process unless the Debtors and the Bank were able to reach an agreement on (i) a minimum floor price that the Bank would consent to in order to make sure that the Debtors actually consummated a sale given the disruption to the Debtors' business operations from engaging in such a sale process, and (ii) an allocation of the sale proceeds which benefited creditors other than the Bank in a

DE CAMARA DECLARATION IN SUPPORT OF BID PROCEDURES MOTION

material manner and which the Debtors believed was an equitable result under the circumstances. I understand that the Debtors and the Bank were able to reach such an agreement, which is memorialized in the Settlement Agreement being filed concurrently herewith as Exhibit "1".

11. The Settlement Agreement is designed to insure that the highest price possible is paid for the Purchased Assets, taking into account the circumstances of these cases and the terms of the Settlement Agreement. While the Debtors' estates benefit from a higher purchase price because they will receive 15% of the Net Sale Proceeds, I believe that this will be more than offset and result in a net loss for the Debtors' estates if any delay in the sale process results in a material depletion in the Debtors' cash since the Debtors' estates retain 100% of their cash existing at the time of the Sale Closing. Given the seasonality of the Debtors' business and the fact that the Debtors are now in the slow part of their season, the Debtors' cash is being depleted with the passage of time at a fairly rapid pace. As a result, while I recognize that the time frame for consummating a sale process as set forth in the Settlement Agreement is tight, I believe that it is to the advantage of the Debtors' estates to have the sale process occur in the most expeditious manner possible provided sufficient time exists for legitimately interested buyers to conduct due diligence and be in a position to bid at an auction sale if they so desire.

12. I have been advised by both the Debtors and the Bank that the Debtors' business has been aggressively marketed for sale in the recent past, and the Bank has been in discussions with a number of prospective buyers since the Petition Date. I have been further advised by both the Debtors and the Bank that they believe that they are aware of the identities of the likely buyer candidates who would be in a position to participate in an expedited auction sale process if they are interested in buying the Purchased Assets.

13. The Debtors and the Bank have requested Sherwood to serve as the investment banker, which Sherwood has agreed to do for the economic terms set forth in the Settlement

Agreement, which I submit is at a substantially lower cost to the Debtors' estates than would normally be charged by an investment banking firm. Moreover, since Sherwood has been serving as the Debtors' financial advisor since the Petition Date and has taken the lead role in the preparation of the Debtors' various cash collateral budgets and projections, I believe that Sherwood is familiar with the Debtors' business operations and assets and liabilities and, working in conjunction with the Debtors' management, will be in a position to facilitate the asset sale process.

14. After consultation with the Debtors and the Bank, Sherwood proposes the following sale procedures:

i. Sherwood will put together a "data room" which will contain the customary information that buyers of a business like this would generally want to review in deciding whether to purchase the business. Sherwood will share this information with any buyer who executes a confidentiality agreement and who demonstrates to Sherwood that the buyer has the reasonable financial ability to participate in an auction sale process within the required time frame if the buyer is interested in doing so. This is to insure that Sherwood does not waste its time and resources spending time with prospective buyers who do not have the realistic financial ability to purchase the Debtors' assets. To the extent that viable prospective buyers desire to obtain additional financial information from the Debtors beyond the information that Sherwood compiled, Sherwood will make every reasonable effort to facilitate providing that additional information to the buyer, and Sherwood will then add that information to the data room to make sure that all prospective buyers have equal access to the same information.

ii. Sherwood will provide all information and updates about the sale process concurrently to the Debtors, the Bank and counsel to the Committee, except that any members of the Debtors' Board of Directors or senior management who are prospective buyers or participants

**14**

in a buyer group will not receive any confidential sale information from Sherwood which is not made available to all prospective buyers.

iii. The actual auction sale will take place on Monday, November 1, 2010 commencing at 10:00 a.m. The auction sale will take place at the law offices of Committee counsel or of Debtors' counsel, depending upon which would be more convenient for the parties involved. In addition to all qualified bidders, present at the auction sale will be the Bank and its counsel; Committee counsel and any Committee members who desire to be present; Sherwood; the Debtors' bankruptcy counsel; and any independent Board members who desire to be present. The actual auction sale will be conducted primarily by Sherwood with the assistance of the Debtors' bankruptcy counsel (both of whom have conducted numerous auction sales in the past).

iv. In order to be eligible to participate in the auction sale, a prospective bidder will be required to do the following three things: (i) deliver a deposit in the amount of $500,000 to the Debtors' bankruptcy counsel which will be held in a segregated account and which will be non-refundable and constitute liquidated damages in favor of the Debtors' bankruptcy estate if the bidder is deemed to be the winning bidder at the auction sale, has its bid (and the Debtors' corresponding asset sale) approved by the Bankruptcy Court, and fails to close its purchase of the Purchased Assets; (ii) be deemed to be financially qualified to participate in the auction sale by Sherwood; and (iii) deliver to counsel for the Bank, counsel for the Committee and counsel for the Debtors any proposed changes the buyer has to the template asset purchase agreement the Debtors have prepared which is being filed concurrently herewith as Exhibit "3".

v. If more than one qualified bidder appears at the auction sale, Sherwood will randomly assign bidding numbers to the bidders. The following is how the bidding will work by example if there are three qualified bidders at the auction sale. The bidder who is assigned bidding #1 will be required to submit the first bid. If that bid is equal to or greater than the

8                        DE CAMARA DECLARATION IN SUPPORT
                         OF BID PROCEDURES MOTION

confidential floor price the Bank has agreed to, then the bid made by bidder #1 will be deemed a qualified bid and the bidding will then proceed to bidder #2. Bidder #2 will then be required to submit a bid which is at least $100,000 higher than the qualified bid submitted by bidder #1 or drop out of the auction sale. The bidding will then turn to bidder #3 and then back to bidder #1 and continue (with bidding increments of at least $100,000) until all bidders but one have dropped out of the auction sale at which point the bidder who made the highest bid will be deemed the highest bidder, subject to the Bank's credit bid rights described above unless the highest bid made would result in the Bank receiving $10.75 million (which is the Bank's maximum agreed upon recovery). Once a bidder elects not to make a bid which is at least $100,000 higher than the previously made qualifying bid, the bidder will be deemed to have dropped out of the auction and will not be permitted back into the auction thereafter. If the Bank does not exercise its credit bid rights, the bidder who submitted the second highest bid at the auction sale will be deemed to constitute the winning backup bidder.

vi. If the first bid submitted by the bidder who is assigned bidding #1 is lower than the confidential floor price the Bank has agreed to, then it will be up to the Bank to decide whether the bid submitted by bidder #1 is a qualified bid. If the Bank decides that it is a qualified bid, the bidding will then proceed in the identical manner as described above. If the Bank decides that it is not a qualified bid, then the bidding will pass to bidder #2 to submit a bid, and this process will continue until a bidder submits a bid which is equal or greater to the confidential floor price or until the Bank decides that a bid is a qualified bid even though it is lower than the confidential floor price. Once a bid has been made which is equal or higher than the confidential floor price or has been determined by the Bank to constitute a qualified bid, the bidding will then proceed in the identical manner as described above. If no bid is submitted by any bidder which is

either equal or higher than the confidential floor price or been determined by the Bank to constitute a qualified bid, the auction sale will be terminated with no winning bidder.

vii. I understand that the Court has a hearing date and time of November 8, 2010 at 10:00 a.m. available to consider the Debtors' motion for approval of the sale of their assets to the highest bidder at the auction sale, as well as to assume and assign to the highest bidder any of the Debtors' executory contracts and unexpired leases that the buyer wishes to have assigned to it. The Debtors propose filing the various sale and assumption and assignment pleadings with the Court by November 3, 2010. Subject only to entry by the Court of the sale order, the winning bidder will have until November 15, 2010 to consummate the sale. If the winning bidder fails to do so, the winning bidder will be deemed to have forfeited its $500,000 non-refundable deposit unless the Court or the Debtors, the Bank and the Committee agree to provide the winning bidder an extension of time to close. If the winning bidder fails to close and forfeits its deposit, the winning back up bidder will be notified and will then have fifteen days to close its purchase of the Debtors' assets or will be deemed to have forfeited its deposit unless the Court or the Debtors, the Bank and the Committee agree to provide the winning backup bidder an extension of time to close.

viii. Filed as Exhibit "2" concurrently herewith is a form of Notice that the Debtors propose to serve on all creditors of these estates and provide to all prospective buyers identified by the Debtors, the Bank, the Committee and Sherwood.

15. I believe that the auction sale and bidding procedures outlined above are designed to enable the Debtors' estates to obtain the highest price possible for the Purchased Assets and provide the greatest possible recovery for the Debtors' creditors, taking into account the terms of the Debtors' Settlement Agreement with the Bank and the fact that the Debtors' cash resources will decrease the longer the sale process takes to complete. No breakup fee is being proposed to

be paid to any buyer because no stalking horse bidder has surfaced at this time. The auction will therefore be an open auction where no bidder has any bidding advantage over any other bidder.

16. On behalf of the Debtors, I therefore submit that the proposed auction sale and bidding procedures described above are in the best interests of their estates, are necessary and appropriate to maximize the recovery for the Debtors' creditors, and should be approved by the Court as an exercise of the Debtors' sound business judgment. Importantly, the Debtors are <u>not</u> seeking at this time to have the Court approve the actual sale of the Purchased Assets to the winning bidder at the auction sale. That request will be set forth in a separate sale motion to be considered by the Court at the hearing to be held on November 8, 2010, at 10:00 a.m.

17. I have reviewed the Debtors' Settlement Agreement with the Bank. I further submit that the terms of the Settlement Agreement with the Bank are clearly in the best interests of the Debtors' bankruptcy estates taking into account the facts of these cases and the various options available to the Debtors. The Debtors currently project that they will have in the range of approximately $2.3 million of cash in the middle of November, 2010, which is when I expect the Debtors to consummate the sale of the Purchased Assets to the winning bidder at the auction sale. The Bank asserts a lien against all of the Debtors' cash and against all of the Purchased Assets that the Debtors seek to sell to the winning bidder at the auction sale. Moreover, I understand that the Bank asserts a super-priority administrative claim against the Debtors for all post-petition diminution in the value of the Bank's collateral, which the Debtors acknowledge will likely be more than $2.5 million.

18. While I understand that it appears that the Bank does not have a perfected lien against the assets owned by the parent company, MGI, I also understand that all or most of the Debtors' tangible assets (e.g., inventory, accounts receivable, equipment, etc.) are owned by the Debtors' two operating subsidiaries, Vitafreze and Deluxe. So while I understand that the Debtors

**14**

could file a lawsuit against the Bank to determine the extent and validity of the Bank's liens, and file a lawsuit against the Bank to seek to recover pre-petition payments made to the Bank on a preference and/or fraudulent conveyance theory, the Debtors have been advised that any such litigation would be highly complex and speculative, and the Debtors have no unencumbered cash to use to fund any such litigation. If the Debtors embarked on a litigation path, the outcome would be uncertain and could result in the Debtors' creditors receiving no distribution.

19. I understand that it currently appears to the Debtors that there are approximately $2.6 million of potential administrative claims arising from goods delivered to the Debtors within twenty days of the Petition Date. In addition, the Debtors estimate that they will have approximately $500,000-$1 million of additional administrative claims by the time of any sale closing resulting from additional post-petition outstanding expenses. The Debtors also believe that they likely will have some pre-petition priority claims, primarily resulting from taxes which were cut off as a result of the intervening bankruptcy filings.

20. With these being the facts of these cases, I believe that the Debtors' Settlement Agreement with the Bank, which is the result of weeks of intensive negotiations, is in the overwhelming best interests of these estates and their creditors as the Settlement Agreement is designed to maximize the recovery for the Debtors' creditors in the following ways:

   i. The timing of the asset sale is designed to maximize the amount of cash the Debtors will have to pay to their creditors by balancing the fact that the Debtors will be receiving only 15% of the sale proceeds but retaining 100% of their cash. Since the Debtors' cash will rapidly decline, particularly if the sale does not close by around the middle part of November, 2010, the Debtors' estates would bear 100% of the cost of any delay in the consummation of the sale. In contrast, the Debtors' estates only receive 15% of any upside that might be obtained from a higher sale price if delaying the timing of the sale would result in achieving a higher sale price,

which itself is uncertain. So the timing of the sale process is designed to maximize the total amount of cash that will be retained by the Debtors' estates. This timing is also consistent with the desires of the Bank, which wants to see a sale closing in the most expeditious manner possible.

        ii.        While I currently have no way of knowing how much the Purchased Assets will sell for, when 15% of any reasonable sale price is added to the Debtors' expected cash balance of approximately $2.3 million, the Debtors expect to be in a position to pay all allowed administrative claims (including the estimated $2.6 million of potential administrative claims arising under Section 503(b)(9) of the Bankruptcy Code to the extent they are allowed and not otherwise subject to avoidance causes of action and unpaid post-petition obligations to the Debtors' unions) in full or nearly in full. This is important because I understand that until allowed administrative claims are paid in full, there is no ability to pay any money to general unsecured creditors.

        iii.        By capping the Bank's allowed super-priority administrative expense claim at $2.5 million and by the Bank agreeing that it will be paid only 85% of the Net Avoidance Action Recoveries on account of this claim, with the Debtors' estates to retain the other 15% of the Net Avoidance Action Recoveries until the Bank has been paid the total sum of $2.5 million and then 100% thereafter, I believe that the Settlement Agreement maximizes the prospects for a meaningful recovery for the Debtors' general unsecured creditors, when I believe that any other outcome for these estates are certain or nearly certain to result in the Debtors' general unsecured creditors receiving no distribution.

        iv.        When balancing the interests of all of the various creditor constituencies in these cases, I believe that the Settlement Agreement is an extremely fair and equitable result for these estates, and I commend the Bank for acting reasonably and fairly under these difficult circumstances.

21. I therefore believe that the Settlement Agreement is in the overwhelming best interests of these estates and should be approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 29th day of September, 2010, at Los Angeles, California.

*/s/ Andrew De Camara*
ANDREW DE CAMARA