FILED
September 29, 2010
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
0002964452

1 | RON BENDER (SBN 143364)
2 | TODD M. ARNOLD (SBN 221868)
J.P. FRITZ (SBN 245240)
3 | LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
4 | Los Angeles, California 90067
Telephone:  (310) 229-1234
5 | Facsimile:  (310) 229-1244
Email: rb@lnbyb.com; tma@lnbyb.com
6
Attorneys for Chapter 11 Debtors and Debtors in Possession

7

**UNITED STATES BANKRUPTCY COURT**
8 | **EASTERN DISTRICT OF CALIFORNIA**
**(SACRAMENTO DIVISION)**

9 | In re:

Lead Case No. 10-39672 (MSM)
10 | MATTERHORN GROUP, INC.,

Jointly Administered with Case Nos. 10-39664 (MSM), and 10-39670 (MSM).
11

DC No. LNB-13
12 |      Debtor.

Chapter 11 Cases
13

14 | VITAFREZE FROZEN CONFECTIONS, INC.,

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEBTORS' EMERGENCY MOTION FOR AN ORDER: (1) APPROVING SETTLEMENT AGREEMENT BETWEEN THE DEBTORS AND KEY BANK; (2) APPROVING AUCTION SALE FORMAT AND BIDDING PROCEDURES; (3) APPROVING FORM OF NOTICE TO BE PROVIDED TO INTERESTED PARTIES; (4) APPROVING FORM OF ASSET PURCHASE AGREEMENT FOR PROSPECTIVE OVERBIDDERS TO USE; AND (5) SCHEDULING A COURT HEARING TO CONSIDER APPROVAL OF THE SALE TO THE HIGHEST BIDDER**
15 |      Debtor.

16

17 | DELUXE ICE CREAM COMPANY,

18 |      Debtor.

19

⊠ Affects ALL DEBTORS
20 | ☐ Affects only MATTERHORN GROUP, INC.
☐ Affects only VITAFREZE FROZEN
21 |        CONFECTIONS, INC.
☐ Affects only DELUXE ICE CREAM COMPANY
22

23

24 | Hearing:
Date:    TBD
25 | Time:    TBD
Place:   Department A
26 |           Judge Michael S. McManus
27 |           Courtroom No. 28
          Floor No. 7
28 |           Robert T. Matsui Courthouse

26

501 I Street
Sacramento, CA 95814

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF BID PROCEDURES MOTION

**26**

# <u>TABLE OF CONTENTS</u>

MEMORANDUM OF POINTS AND AUTHORITIES..................................................................3

I.     COMPANY BACKGROUND ......................................................................................3

II.    THE ASSET SALE PROCESS ..................................................................................6

III.   THE DEBTORS SETTLEMENT AGREEMENT WITH THE BANK ...........................7

        1.      Sale Process. ...........................................................................................7
        2.      Sale Proceeds ..........................................................................................8
        3.      Residual Assets Other than Avoidance Causes of Action ....................8
        4.      Cash Collateral Use Before Sale. ...........................................................9
        5.      Cash Collateral Use After Sale ...............................................................9
        6.      Allowed Super-Priority Claim and Treatment of Avoidance Causes of Action ..... 9
        7.      The Bank's Allowed Deficiency Claim .................................................10
        8.      Full Resolution of the Bank's Claim ....................................................10
        9.      Investment Banker Retention ..............................................................11
        10.    Information Wall Regarding Potential Insider Buyers .........................11
        11.    Subordinated Claims ...........................................................................11
        12.    Release of Claims ................................................................................12

IV.   THE DEBTORS' PROPOSED AUCTION SALE PROCESS .....................................12

V.    DISCUSSION.......................................................................................................16

        A.      The Court Should Approve the Debtors' Proposed Auction Sale
              and Bidding Procedures as Being in the Best Interests of the
              Debtors' Estates ....................................................................................16

        B.      The Court Should Approve the Debtors' Settlement Agreement with the Bank .. 18

VI.   CONCLUSION ....................................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

In re Atlanta Packaging Products, Inc.
   99 B.R. 124 (Bankr. N.D. Ga. 1988) .................................................................. 17

In re Blair
   538 F.2d 849 (9th Cir. 1976) .......................................................................... 19

In re Carson
   82 B.R. 847 ........................................................................................... 18

In re Crowthers McCall Pattern, Inc.
   114 B.R. 877 (Bankr. S.D.N.Y. 1990) ................................................................ 17

In re Hydronic Enterprise, Inc.
   58 B.R. 363 (Bankr. D. R.I. 1986) .................................................................... 18

In re Lee Way Holding Co.
   120 B.R. 881 (Bankr. S.D. Ohio 1990) ................................................................ 20

In re Mobile Air Drilling Co., Inc.
   53 B.R. 605 (Bankr. N.D. Ohio 1985) ................................................................. 18

In re W.T. Grant & Co.
   699 F.2d 599 (2nd Cir. 1983) ......................................................................... 19

Knowles v. Putterbaugh (In re Hallet)
   33 B.R. 564 (Bankr. D. Me. 1983) .................................................................... 18

Martin v. Kane (In re A & C Properties)
   784 F.2d 1377 (9th Cir. 1986), cert. denied 479 U.S. 854 (1986) .................................. 18, 19

Matter of Carla Leather, Inc.
   44 B.R. 457 (Bankr. S.D. N.Y. 1984) ................................................................. 19

Newman v. Stein
   464 F.2d 689 (2nd Cir. 1972) ......................................................................... 19

United States v. Alaska National Bank (In re Walsh Constr., Inc.)
   669 F.2d 1325 (9th Cir. 1982) ........................................................................ 19

Woodson v. Fireman's Fund Ins. Co. (In re Woodson)
   839 F.2d 610 (9th Cir. 1988) ......................................................................... 18

**26**

**FEDERAL STATUTES**

11 U.S.C. § 101 ..................................................................................... 3, 6, 11

11 U.S.C. § 105(a) ........................................................................................ 16

11 U.S.C. § 363(b)(1) ................................................................................... 16

11 U.S.C. § 503(b)(9) ................................................................................... 21

11 U.S.C. § 507(a) ......................................................................................... 9

11 U.S.C. § 507(b) .................................................................................... 9, 20

11 U.S.C. §§ 1107 and 1108 ........................................................................... 3


**OTHER AUTHORITIES**

Bankr. R. 2002 ............................................................................................. 16

Bankr. R.  6004 ............................................................................................ 16

Bankr. R. 6004(f) ......................................................................................... 16

Bankr. R.9019(a) ......................................................................................... 18

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## COMPANY BACKGROUND

Matterhorn Group, Inc. ("MGI"), Vitafreze Frozen Confections, Inc. ("Vitafreze"), and Deluxe Ice Cream Company ("Deluxe"), the debtors and debtors in possession in the above-captioned, jointly administered Chapter 11 bankruptcy cases (collectively, the "Debtors"), commenced their bankruptcy cases by filing voluntary petitions under Chapter 11 of 11 U.S.C. § 101 et seq. (the "Bankruptcy Code") on July 26, 2010 (the "Petition Date"). The Debtors continue to operate their business, manage their financial affairs, and operate their bankruptcy estates as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

MGI was formed in 2004 as a vehicle to "roll-up" frozen novelty manufacturing companies in the Western United States. The initial step in this strategy was MGI's acquisition of Vitafreze, Deluxe, and Matterhorn Ice Cream Company ("Matterhorn"),[1] each of which became wholly owned subsidiaries of MGI. As a result of these acquisitions, by 2005, the Debtors had (1) established themselves as high-quality, high-service private label manufacturers with a strong Western United States customer base, and (2) become one of the dominant producers of ice cream novelties in the Western United States.

In 2006, in an effort to improve operations and profitability, MGI (1) closed Matterhorn's manufacturing plant in Caldwell, Idaho and consolidated its manufacturing into Vitafreze, located in Sacramento, California, and Deluxe, located in Salem, Oregon, and (2) took aggressive steps to

---

[1] Matterhorn is also a wholly owned subsidiary of MGI. Matterhorn is not operating and has not filed a bankruptcy case.

**26**

restructure its remaining operations to reduce overhead and reposition MGI with its customers and suppliers. The Debtors' administrative office is located in Las Vegas, Nevada.

At present, the Debtors, which have approximately 31 non-union employees and 226 union employees, are collectively one of the largest independent producers of ice cream and water-ice novelty products in the United States. The Debtors manufacture (1) self-branded products for grocery retailers, (2) products from brand licenses held by the Debtors, such as Mike and Ike™, HotTamales™, Zours™, and Crystal Light™ popsicles, (3) co-branded products, and (4) the Debtors' own products, including the Debtor's Oh My! Goodness™ branded products. The Debtors' customers include the largest big-box grocery retailers, club stores, and independent cooperative distribution companies in the United States, such as Wal*Mart, Sam's Club, Giant Eagle, Kroger, Stater Brothers, Albertsons, Winco Foods, Raley's, Save Mart Supermarkets, Safeway, Smart & Final, the Schwan Food Company, and Western Family. The Debtors also sell to various retailers in Mexico.

The Debtors' primary secured creditor is Key Bank, N.A. (the "Bank"). As of the Petition Date, pursuant to that certain Amended and Restated Revolving Credit and Term Loan Agreement (as amended) (the "Loan Documents"), the Debtors owed the Bank approximately $1,249,983 on a term loan (the "Term Loan") and approximately $9,314,953 on a revolving line of credit (the "Line" and together with the Term Loan, the "Bank Loans") for a total of approximately $10,564,936. The Bank contends that the Bank Loans are secured by first priority liens on substantially all of the Debtors' assets, including the Debtors' cash collateral (the "Cash Collateral"), although it appears to the Debtors that the Bank does not have a perfected lien against the assets of MGI, which raises a number of potential preference and fraudulent conveyance issues for the Bank. The Bank Loans mature on July 1, 2011.

In addition to the Bank, Pacific Mezzanine Fund L.P. ("PMF") and CC&B Holdings, Inc. ("CC&B") appear to have liens on some or all of the Debtors' assets, including the Debtors' cash collateral, securing a bridge loan in the amount of $750,000 ($500,000 from CC&B and $250,000 from PMF). PMF owns approximately 53% of MGI's common stock. Nathan W. Bell, a Managing Member of PMF, is the current Chairman of the Debtors' Board of Directors, and the Debtors' President. CC&B owns approximately 15% of MGI's common stock. A principal of CC&B (Michael Newell) is also a member of the Debtors' Board of Directors. PMF and CC&B made this loan to the Debtors shortly prior to the Petition Date to assist the Debtors with their cash flow needs and to assist the Debtors to pay down their debt to the Bank. The Debtors understand that both PMF and CC&B are very supportive of the Debtors.

During the period of 2007 through 2009, the Debtors gross revenues increased substantially from approximately $42,564,029 in 2007, to approximately $47,986,399 in 2008, to approximately $54,436,328 in 2009. Unfortunately, due to expansion into new product categories, increased costs related thereto, a delayed selling season due to unusually cool temperatures in the Debtors geographical market and the continued need to make capital expenditures to maintain the Debtors' manufacturing facilities, these increases in gross revenue did not result in corresponding increases in net income and liquidity. Instead, based on the foregoing and seasonal fluctuations in the Debtors' business and borrowing limits under the Loan Documents, the Debtors found themselves in a cash crunch and were unable to meet their funding needs solely from advances made by the Bank. In consideration of the Debtors' ongoing cash crunch and the need for breathing room to formulate and implement a restructuring plan or a sale, the Debtors came to the conclusion that filing for bankruptcy protection was in the best interests of the Debtors and their creditors.

/ / /

II.

## THE ASSET SALE PROCESS

Since the Petition Date, the Debtors have been using cash collateral in accordance with three prior orders which have been approved by the Court. The Bank consented to the Debtors' cash collateral use in connection with the first two orders. The Bank filed a limited opposition to the Debtors' third cash collateral motion because the Bank wanted the Debtors to agree to an expedited sale process as a condition to the Debtors' continued use of cash collateral.

The Debtors made clear to the Bank and the Creditors' Committee from the outset of these cases that before the Debtors would be in a position to agree upon an expedited sale process, the Debtors first had to complete a one-year operating budget to determine if it was possible for the Debtors to reorganize on a stand-alone basis or to remain in Chapter 11 for an extended period of time and operate solely through use of the Debtors' cash collateral. With the assistance of the Debtors' financial advisor, Sherwood Partners, several weeks ago the Debtors completed a comprehensive one-year operating budget and delivered a copy of that one-year budget to the Bank and the Creditors' Committee. As counsel for the Debtors advised the Court at the last case status conference held on August 30, 2010, it is now clear that the Debtors will <u>not</u> be able to survive economically on cash collateral use alone over the next year or even past the beginning of 2011. As a result, the only way for the Debtors to avoid a complete shut down and liquidation of their business is for the Debtors to consummate an expedited sale of their assets or to obtain millions of dollars of additional financing. Given the extent of the Debtors' debt structure, it is not possible for the Debtors to obtain the necessary additional financing to survive beyond the early part of 2011. The Debtors have therefore concluded that embarking on an expedited asset sale process is in the overwhelming best interests of the Debtors' estates and the only way to avoid a complete shut down and liquidation of the Debtors' business.

**26**

III.

## THE DEBTORS SETTLEMENT AGREEMENT WITH THE BANK

Given the fact that the Bank asserts a senior priority lien against all or substantially all of the assets that the Debtors will be seeking to sell, the only way for the Debtors to be able to sell their assets free and clear of the Bank's liens and claims is to do so with the Bank's consent or to embark in significant litigation with the Bank.

For the past several weeks, the Debtors and the Bank have engaged in extensive discussions regarding an asset sale process. The Debtors made clear to the Bank from the outset that the Debtors would not be willing to embark upon a consensual and expedited sale process unless the Debtors and the Bank were able to reach an agreement on (i) a minimum floor price that the Bank would consent to in order to make sure that the Debtors actually consummated a sale given the disruption to the Debtors' business operations from engaging in such a sale process, and (ii) an allocation of the sale proceeds which benefited creditors other than the Bank in a material manner and which the Debtors believed was an equitable result under the circumstances. Fortunately, the Debtors and the Bank were able to reach such an agreement, which is memorialized in the Settlement Agreement being filed concurrently herewith as Exhibit "1". The following is a summary of the most salient terms of the Settlement Agreement:

1. <u>Sale Process</u>. The Debtors will embark on an expedited asset sale process with the goal of having Bankruptcy Court approval of the asset sale to the highest bidder occur by October 31, 2010 with the sale to close by November 15, 2010. The Bank consents to a sale of all of the Debtors' assets (excluding cash on hand at the time of the closing of such sale and avoidance causes of action) with a floor price agreed to by the Bank and the Debtors which is not a matter of public record but which may be disclosed to the Bankruptcy Court under seal to the extent necessary. Any purchase price which is lower than the agreed upon floor price requires the Bank's written consent.

**26**

The Bank reserves the right to credit bid some or all of its secured debt at the sale up to $10,750,000. However, if the Bank does credit bid and take title to the Debtors' assets, the Bank will be required to leave the Debtors' bankruptcy estates in the identical cash position as the Debtors' bankruptcy estates would have been in had a sale to a buyer occurred at the same price as the Bank's credit bid. (See Paragraph 1 of the Settlement Agreement).

      2.    <u>Sale Proceeds</u>. The Bank will be paid 85% of the Net Sale Proceeds and 15% of the Net Sale Proceeds will be retained by the Debtors' bankruptcy estates free and clear of the Bank's liens and claims except as provided by Paragraphs 5 and 7 of the Settlement Agreement, with "Net Sale Proceeds" being defined as the actual purchase price paid by the buyer after deducting all expenses directly related to the sale including the fees and expenses of the Investment Banker. The Bank's share of the Net Sale Proceeds will be paid to the Bank from cash received at the time of the closing of the asset sale (the "Sale Closing") and, thereafter, at the time any further Net Sale Proceeds are received in the form of cash. If requested by the Bank, the Debtors will direct the Buyer to pay the Bank's share of Net Sale Proceeds directly to the Bank. (See Paragraph 2 of the Settlement Agreement).

      3.    <u>Residual Assets Other than Avoidance Causes of Action</u>. The Bank will be paid 85% of any recoveries from the Debtors' assets not included in the sale of the Debtors' business (excluding cash on hand at the Sale Closing and Avoidance Causes of Action), net of any expenses incurred directly related to any such recoveries that are approved by the Bank or the Bankruptcy Court, including legal or other professional fees and expenses approved by the Bankruptcy Court, with 15% of any such net recoveries being retained by the Debtors' bankruptcy estates free and clear of the Bank's liens and claims except as provided by Paragraphs 5 and 7 of the Settlement Agreement. (See Paragraph 3 of the Settlement Agreement).

4.   <u>Cash Collateral Use Before Sale</u>.   Pending the Sale Closing, the Debtors will continue to manage and operate their business and bankruptcy estates in accordance with cash collateral orders and budgets that have been approved by the Bankruptcy Court.   However, notwithstanding any existing cash collateral order, the Debtors will not spend any of their money on capital expenditures unless the failure to do so will result in the Debtors being in violation of laws or regulations or cause material harm to the Debtors' business operations prior to the Sale Closing. (See Paragraph 4 of the Settlement Agreement).

5.   <u>Cash Collateral Use After Sale</u>.  Following the Sale Closing, the Debtors will have the right to use all of the cash in their estates at the time of the Sale Closing plus the 15% received by their estates from the recoveries described above to pay the allowed administrative and allowed priority claims in these cases.  If after paying all allowed claims entitled to priority under Section 507(a) of the Bankruptcy Code in full, the Debtors' bankruptcy estates are left with additional funds (exclusive of any recoveries from Avoidance Causes of Action), 85% of such additional funds will be paid to the Bank when first available and 15% of such additional funds will be retained by the Debtors' bankruptcy estates free and clear of the Bank's liens and claims.  (See Paragraph 5 of the Settlement Agreement).

6.   <u>Allowed Super-Priority Claim and Treatment of Avoidance Causes of Action</u>.  The Bank will be granted an allowed super-priority administrative expense claim under Section 507(b) of the Bankruptcy Code in the amount of $2.5 million on account of the post-petition diminution in the value of the Bank's collateral (recognizing that the Bank contends that the actual post-petition diminution in the value of the Bank's collateral is higher than this amount).  The Bank will be paid 85% of the Net Avoidance Action Recoveries on a monthly basis when available and 15% of the Net Avoidance Action Recoveries will be retained by the Debtors' bankruptcy estates free and clear of the Bank's liens and claims until the Bank has been paid the total sum of $2.5 million, which will

9

result in payment in full of the Bank's super-priority administrative expense claim.  The Bank will not receive any other payments from the Debtors' estates on account of its super-priority administrative expense claim.  "Net Avoidance Action Recoveries" means all recoveries from the pursuit of Avoidance Causes of Action after the payment of any expenses directly related to obtaining such recoveries that are approved by the Bank or the Bankruptcy Court, including legal or other professional fees and expenses approved by the Bankruptcy Court.  The Debtors will provide the Bank with reports on the status of Avoidance Causes of Action when distributions of the Bank's share of Net Avoidance Action Recoveries are received but, in any event, not less than quarterly commencing with the first calendar quarter of 2011.  The monthly distributions and reports to the Bank will be made within ten business days after the end of the relevant period.  (See Paragraph 6 of the Settlement Agreement).

7.   <u>The Bank's Allowed Deficiency Claim</u>.  The Bank will have an allowed general unsecured claim without any priority in an amount equal to $10,750,000 less any payments the Bank receives from the Debtors' estates  pursuant to the other provisions of this Agreement and the amount of any successful credit bid by the Bank excluding the cash portion of any such bid (the "Bank's Unsecured Deficiency Claim").  The Bank's Unsecured Deficiency Claim will share pro rata in any distributions made to general unsecured creditors.  The Bank agrees that the maximum amount of money that the Bank can receive from the Debtors' bankruptcy estates is $10,750,000. (See Paragraph 7 of the Settlement Agreement).

8.   <u>Full Resolution of the Bank's Claim</u>.  The Bank agrees that the treatment of its claims and liens set forth in this Agreement is in full settlement and satisfaction of any and all claims that the Bank has against the Debtors and the Debtors' bankruptcy estates and any of the Debtors' respective agents, employees, representatives, officers, directors, affiliates, attorneys,

**26**

financial advisors, investment bankers, assigns, and successors in interest. (See Paragraph 8 of the Settlement Agreement).

9. <u>Investment Banker Retention</u>. Subject to the approval of the Bankruptcy Court, the Debtors will immediately employ Sherwood as their investment banker (the "Investment Banker") to manage and conduct the asset sale process. Sherwood will provide all information and updates about the sale process concurrently to the Debtors, the Bank and counsel to the Committee. For serving as the Investment Banker, subject to the approval of the Bankruptcy Court, Sherwood will be paid an investment banking fee of $30,000 per month for two months (for a total of $60,000) plus a success fee of $75,000 upon the Sale Closing for a total investment banking fee of $135,000 plus reimbursement for Sherwood's actual third-party out-of-pocket expenses. (See Paragraph 9 of the Settlement Agreement).

10. <u>Information Wall Regarding Potential Insider Buyers</u>. Any members of the Debtors' Board of Directors or senior management who are prospective buyers or participants in a buyer group will not be permitted to participate as decision makers for the Debtors in the asset sale process or to receive any confidential sale information from Sherwood which is not made available to all prospective buyers. (See Paragraph 10 of the Settlement Agreement).

11. <u>Subordinated Claims</u>. Notwithstanding the existence of any subordination agreements to the contrary, if PMF and CC&B do not object to Bankruptcy Court approval of the Settlement Agreement and the implementation of the Settlement Agreement following such approval, then the Bank agrees that it will not contest or object to PMF and CC&B receiving their pro rata share of any distribution to the Debtors' general unsecured creditors on account of the approximately $750,000 that PMF and CC&B lent to the Debtors shortly prior to the Debtors' Chapter 11 bankruptcy filings. (See Paragraph 11 of the Settlement Agreement).

12.  Release of Claims.  Upon the Sale Closing, the Debtors will release the Bank from any claims.  (See Paragraph 12 of the Settlement Agreement).

IV.

THE DEBTORS' PROPOSED AUCTION SALE PROCESS

The Debtors propose the following sale procedures, which are designed to insure that the highest price possible is paid for the Purchased Assets, taking into account the circumstances of these cases and the terms of the Settlement Agreement.  While the Debtors' estates benefit from a higher purchase price because they will receive 15% of the Net Sale Proceeds, this will be more than offset and result in a net loss for the Debtors' estates if any delay in the sale process results in a material depletion in the Debtors' cash since the Debtors' estates retain 100% of their cash existing at the time of the Sale Closing.  Given the seasonality of the Debtors' business and the fact that the Debtors are now in the slow part of their season, the Debtors' cash is being depleted with the passage of time.  As a result, it is to the advantage of the Debtors' estates to have the sale process occur in the most expeditious manner possible provided sufficient time exists for legitimately interested buyers to conduct due diligence and be in a position to bid at an auction sale if they so desire.

It is important to note that the Debtors' business has been aggressively marketed for sale in the recent past, and the Bank has been in discussions with a number of prospective buyers since the Petition Date.  The Debtors and the Bank therefore believe that they are aware of the identities of the likely buyer candidates who would be in a position to participate in an expedited auction sale process if they are interested in buying the Purchased Assets.

The Debtors and the Bank have agreed that Sherwood will serve as the investment banker, which Sherwood has agreed to do at a substantially lower cost to the Debtors' estates than would normally be charged by an investment banking firm.  Moreover, since Sherwood has been serving

**26**

as the Debtors' financial advisor since the Petition Date and has taken the lead role in the preparation of the Debtors' various cash collateral budgets and projections, Sherwood is familiar with the Debtors' business operations and assets and liabilities and, working in conjunction with the Debtors' management, will be in a position to facilitate the asset sale process. The Debtors (with input from Sherwood) propose the following sale procedures:

1. Sherwood will put together a "data room" which will contain the customary information that buyers of a business like this would generally want to review in deciding whether to purchase the business. Sherwood will share this information with any buyer who executes a confidentiality agreement and who demonstrates to Sherwood that the buyer has the reasonable financial ability to participate in an auction sale process within the required time frame if the buyer is interested in doing so. This is to insure that Sherwood does not waste its time and resources spending time with prospective buyers who do not have the realistic financial ability to purchase the Debtors' assets. To the extent that viable prospective buyers desire to obtain additional financial information from the Debtors beyond the information that Sherwood compiled, Sherwood will make every reasonable effort to facilitate providing that additional information to the buyer, and Sherwood will then add that information to the data room to make sure that all prospective buyers have equal access to the same information.

2. As indicated above, Sherwood will provide all information and updates about the sale process concurrently to the Debtors, the Bank and counsel to the Committee, except that any members of the Debtors' Board of Directors or senior management who are prospective buyers or participants in a buyer group will not receive any confidential sale information from Sherwood which is not made available to all prospective buyers.

3. The actual auction sale will take place on Monday, November 1, 2010 commencing at 10:00 a.m. The auction sale will take place at the law offices of Committee

**26**

counsel or of Debtors' counsel, depending upon which would be more convenient for the parties involved. In addition to all qualified bidders, present at the auction sale will be the Bank and its counsel; Committee counsel and any Committee members who desire to be present; Sherwood; the Debtors' bankruptcy counsel; and any independent Board members who desire to be present. The actual auction sale will be conducted primarily by Sherwood with the assistance of the Debtors' bankruptcy counsel (both of whom have conducted numerous auction sales in the past).

4.      In order to be eligible to participate in the auction sale, a prospective bidder will be required to do the following three things: (i) deliver a deposit in the amount of $500,000 to the Debtors' bankruptcy counsel which will be held in a segregated account and which will be non-refundable and constitute liquidated damages in favor of the Debtors' bankruptcy estate if the bidder is deemed to be the winning bidder at the auction sale, has its bid (and the Debtors' corresponding asset sale) approved by the Bankruptcy Court, and fails to close its purchase of the Purchased Assets; (ii) be deemed to be financially qualified to participate in the auction sale by Sherwood; and (iii) deliver to counsel for the Bank, counsel for the Committee and counsel for the Debtors any proposed changes the buyer has to the template asset purchase agreement the Debtors have prepared which is being filed concurrently herewith as Exhibit "3".

5.      If more than one qualified bidder appears at the auction sale, Sherwood will randomly assign bidding numbers to the bidders. The following is how the bidding will work by example if there are three qualified bidders at the auction sale. The bidder who is assigned bidding #1 will be required to submit the first bid. If that bid is equal to or greater than the confidential floor price the Bank has agreed to, then the bid made by bidder #1 will be deemed a qualified bid and the bidding will then proceed to bidder #2. Bidder #2 will then be required to submit a bid which is at least $100,000 higher than the qualified bid submitted by bidder #1 or drop out of the auction sale. The bidding will then turn to bidder #3 and then back to bidder #1

and continue (with bidding increments of at least $100,000) until all bidders but one have dropped out of the auction sale at which point the bidder who made the highest bid will be deemed the highest bidder, subject to the Bank's credit bid rights described above unless the highest bid made would result in the Bank receiving $10.75 million (which is the Bank's maximum agreed upon recovery). Once a bidder elects not to make a bid which is at least $100,000 higher than the previously made qualifying bid, the bidder will be deemed to have dropped out of the auction and will not be permitted back into the auction thereafter. If the Bank does not exercise its credit bid rights, the bidder who submitted the second highest bid at the auction sale will be deemed to constitute the winning backup bidder.

6.      If the first bid submitted by the bidder who is assigned bidding #1 is lower than the confidential floor price the Bank has agreed to, then it will be up to the Bank to decide whether the bid submitted by bidder #1 is a qualified bid. If the Bank decides that it is a qualified bid, the bidding will then proceed in the identical manner as described in paragraph 5 above. If the Bank decides that it is not a qualified bid, then the bidding will pass to bidder #2 to submit a bid, and this process will continue until a bidder submits a bid which is equal or greater to the confidential floor price or until the Bank decides that a bid is a qualified bid even though it is lower than the confidential floor price. Once a bid has been made which is equal or higher than the confidential floor price or has been determined by the Bank to constitute a qualified bid, the bidding will then proceed in the identical manner as described in paragraph 5 above. If no bid is submitted by any bidder which is either equal or higher than the confidential floor price or been determined by the Bank to constitute a qualified bid, the auction sale will be terminated with no winning bidder.

7.      The Debtors understand that the Court has a hearing date and time of November 8, 2010 at 10:00 a.m. available to consider the Debtors' motion for approval of the sale of their assets to the highest bidder at the auction sale, as well as to assume and assign to the highest

**26**

bidder any of the Debtors' executory contracts and unexpired leases that the buyer wishes to have assigned to it. The Debtors propose filing the various sale and assumption and assignment pleadings with the Court by November 3, 2010. Subject only to entry by the Court of the sale order, the winning bidder will have until November 15, 2010 to consummate the sale. If the winning bidder fails to do so, the winning bidder will be deemed to have forfeited its $500,000 non-refundable deposit unless the Court or the Debtors, the Bank and the Committee agree to provide the winning bidder an extension of time to close. If the winning bidder fails to close and forfeits its deposit, the winning back up bidder will be notified and will then have fifteen days to close its purchase of the Debtors' assets or will be deemed to have forfeited its deposit unless the Court or the Debtors, the Bank and the Committee agree to provide the winning backup bidder an extension of time to close.

8.     Filed as Exhibit "2" concurrently herewith is a form of Notice that the Debtors propose to serve on all creditors of these estates and provide to all prospective buyers identified by the Debtors, the Bank, the Committee and Sherwood.

V.

DISCUSSION

A.     The Court Should Approve the Debtors' Proposed Auction Sale and Bidding Procedures as Being in the Best Interests of the Debtors' Estates.

Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate…." 11 U.S.C. § 363 (b)(1). Section 105(a) of the Bankruptcy Code provides in pertinent part that "[t]he Court may issue any order, process or judgment that is necessary and appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Bankruptcy Rules 2002 and 6004 govern the scope of the notice to be provided in the event a debtor elects to sell property of the

16

estate under Section 363; however, with respect to the procedures to be adopted in conducting a sale outside the ordinary course of a debtor's business, Bankruptcy Rule 6004 provides only that such sale may be by private sale or public auction, and requires only that the debtor provide an itemized list of the property sold together with the prices received upon consummation of the sale. Bankr. R. 6004(f).

Neither the Bankruptcy Code nor the Bankruptcy Rules contain specific provisions with respect to the procedures to be employed by a debtor in conducting a public or private sale. Nonetheless, as one Court has stated, "It is a well-established principle of bankruptcy law that the objective of bankruptcy rules and the [Debtors'] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate." <u>In re Atlanta Packaging Products, Inc.</u>, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988).

A corollary to these principles is that the Court should not "cherry-pick" among contractual provisions, objecting to select individual portions, if the agreement as a whole is supported by an articulated business judgment. At least one bankruptcy court has expressly applied this corollary to a transaction including breakup and overbid provisions in the sale of the debtor's business. In <u>In re Crowthers McCall Pattern, Inc.</u>, 114 B.R. 877 (Bankr. S.D.N.Y. 1990), the Court approved a transaction including provisions relating to a breakup fee and minimum overbids. In responding to objections to other provisions of the agreement, the Court held that:

> The Court is not to second guess the inclusion of some provisions as long as the Agreement as a whole is within reasonable business judgment, and the subject provisions do not distort the balance Congress struck in Chapter 11. <u>Cf.</u> <u>In re Ames Dep't Stores, Inc., Eastern Retailers Service Corp., et al.</u>, 115 B.R. 34, 37-38 (Bankr. S.D.N.Y. 1990) (some contractual provisions may be justified by the need to attract a prospective investor.).

114 B.R. at 886.

The Debtors, consistent with the advice and recommendations of Sherwood, have concluded that the auction sale and bidding procedures outlined above are designed to enable the Debtors' estates to obtain the highest price possible for the Purchased Assets and provide the greatest possible recovery for the Debtors' creditors, taking into account the terms of the Debtors' Settlement Agreement with the Bank and the fact that the Debtors' cash resources will decrease the longer the sale process takes to complete.  No breakup fee is being proposed to be paid to any buyer because no stalking horse bidder has surfaced at this time.  The auction will therefore be an open auction where no bidder has any bidding advantage over any other bidder.

The Debtors therefore submit that the proposed auction sale and bidding procedures described above are in the best interests of their estates, are necessary and appropriate to maximize the recovery for the Debtors' creditors, and should be approved by the Court as an exercise of the Debtors' sound business judgment.  Importantly, the Debtors are <u>not</u> seeking at this time to have the Court approve the actual sale of the Purchased Assets to the winning bidder at the auction sale.  That request will be set forth in a separate sale motion to be considered by the Court at the hearing to be held on November 8, 2010, at 10:00 a.m.

B.      <u>The Court Should Approve the Debtors' Settlement Agreement with the Bank</u>.

The authority granted a debtor in possession to compromise a controversy or agree to a settlement is set forth in Bankruptcy Rule 9019(a), which provides in pertinent part that "[o]n motion by the [debtor in possession] and after hearing on notice to creditors ..., the court may approve a compromise or settlement."  The decision of whether a compromise should be accepted or rejected lies within the sound discretion of the Court.  <u>In re Carson</u>, 82 B.R. 847, 852 (Bankr. S.D. Ohio 1987; <u>In re Hydronic Enterprise, Inc.</u>, 58 B.R. 363, 365 (Bankr. D. R.I. 1986); <u>In re Mobile Air Drilling Co., Inc.</u>, 53 B.R. 605, 607 (Bankr. N.D. Ohio 1985); <u>Knowles v. Putterbaugh</u> (<u>In re Hallet</u>), 33 B.R. 564, 565 (Bankr. D. Me. 1983).

**26**

The Court of Appeals for the Ninth Circuit has long recognized that "[t]he bankruptcy court has great latitude in approving compromise agreements." Woodson v. Fireman's Fund Ins. Co. (In re Woodson), 839 F.2d 610, 620 (9th Cir. 1988). "The purpose of a compromise agreement is to allow the [debtor in possession] and the creditors to avoid the expenses and burdens associated with litigating sharply contested and dubious claims." Martin v. Kane (In re A & C Properties), 784 F.2d 1377, 1380-81 (9th Cir. 1986), cert. denied 479 U.S. 854 (1986). Accordingly, in approving a settlement agreement, the Court need not conduct an exhaustive investigation of the claims sought to be compromised. See United States v. Alaska National Bank (In re Walsh Constr., Inc.), 669 F.2d 1325, 1328 (9th Cir. 1982). Rather, it is sufficient that the Court find that the settlement was negotiated in good faith and is reasonable, fair, and equitable. See In re A & C Properties, supra, 784 F.2d at 1381.

The Court of Appeals for the Ninth Circuit has identified the following factors for consideration in determining whether a proposed settlement agreement is reasonable, fair, and equitable:

(a)     the probability of success in the litigation;

(b)     the difficulties, if any, to be encountered in the matter of collection;

(c)     the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; and

(d)     the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

In re A & C Properties, supra, 784 F.2d at 1381 (the "A & C Factors").

A court should not substitute its own judgment for the judgment of the trustee or the debtor in possession. Matter of Carla Leather, Inc., 44 B.R. 457, 465 (Bankr. S.D. N.Y. 1984). A court, in reviewing a proposed settlement, is not to decide the numerous questions of law and fact

19

but rather to canvass the issues to determine whether the settlement falls below the lowest point in the range of reasonableness. In re W.T. Grant & Co., 699 F.2d 599, 608 (2nd Cir. 1983), accord, Newman v. Stein, 464 F.2d 689, 693 (2nd Cir. 1972). The court should not conduct a "mini-trial" on the merits of the underlying cause of action. Matter of Walsh Const., Inc., 669 F.2d 1325, 1328 (9th Cir. 1982); In re Blair, 538 F.2d 849 (9th Cir. 1976). It is well established that compromises are favored in bankruptcy." In re Lee Way Holding Co., 120 B.R. 881, 891 (Bankr. S.D. Ohio 1990).

The Debtors submit that the terms of the Settlement Agreement with the Bank comport with the standards set forth above and are clearly in the best interests of the Debtors' bankruptcy estates taking into account the facts of these cases and the various options available to the Debtors.

The Debtors currently project that they will have in the range of approximately $2.3 million of cash in the middle of November, 2010, which is when the Debtors expect to consummate the sale of the Purchased Assets to the winning bidder at the auction sale. The Bank asserts a lien against all of the Debtors' cash and against all of the Purchased Assets that the Debtors seek to sell to the winning bidder at the auction sale. Moreover, the Bank asserts a super-priority administrative claim against the Debtors pursuant to Section 507(b) of the Bankruptcy Code for all post-petition diminution in the value of the Bank's collateral, which the Debtors acknowledge will likely be more than $2.5 million.

While it appears that the Bank does not have a perfected lien against the assets owned by the parent company, MGI, all or most of the Debtors' tangible assets (e.g., inventory, accounts receivable, equipment, etc.) are owned by the Debtors' two operating subsidiaries, Vitafreze and Deluxe. So while the Debtors could file a lawsuit against the Bank to determine the extent and validity of the Bank's liens, and file a lawsuit against the Bank to seek to recover pre-petition payments made to the Bank on a preference and/or fraudulent conveyance theory, any such

litigation would be highly complex and speculative, and the Debtors have no unencumbered cash to use to fund any such litigation. If the Debtors embarked on a litigation path, the outcome would be uncertain and could result in the Debtors' creditors receiving no distribution.

It currently appears to the Debtors that there are approximately $2.6 million of potential administrative claims arising from goods delivered to the Debtors within twenty days of the Petition Date pursuant to Section 503(b)(9) of the Bankruptcy Code. In addition, the Debtors estimate that they will have approximately $500,000-$1 million of additional administrative claims by the time of any sale closing resulting from additional post-petition outstanding expenses. The Debtors also believe that they likely will have some pre-petition priority claims, primarily resulting from taxes which were cut off as a result of the intervening bankruptcy filings.

With these being the facts of these cases, the Debtors believe that their Settlement Agreement with the Bank, which is the result of weeks of intensive negotiations, is in the overwhelming best interests of these estates and their creditors as the Settlement Agreement is designed to maximize the recovery for the Debtors' creditors in the following ways:

1. The timing of the asset sale is designed to maximize the amount of cash the Debtors will have to pay to their creditors by balancing the fact that the Debtors will be receiving only 15% of the sale proceeds but retaining 100% of their cash. Since the Debtors' cash will rapidly decline, particularly if the sale does not close by around the middle part of November, 2010, the Debtors' estates would bear 100% of the cost of any delay in the consummation of the sale. In contrast, the Debtors' estates only receive 15% of any upside that might be obtained from a higher sale price if delaying the timing of the sale would result in achieving a higher sale price, which itself is uncertain. So the timing of the sale process is designed to maximize the total amount of cash that will be retained by the Debtors' estates. This timing is also consistent with the desires of the Bank, which wants to see a sale closing in the most expeditious manner possible.

2.    While the Debtors have no way of knowing how much the Purchased Assets will sell for, when 15% of any reasonable sale price is added to the Debtors' expected cash balance of approximately $2.3 million, the Debtors expect to be in a position to pay all allowed administrative claims (including the estimated $2.6 million of potential administrative claims arising under Section 503(b)(9) of the Bankruptcy Code to the extent they are allowed and not otherwise subject to avoidance causes of action and unpaid post-petition obligations to the Debtors' unions) in full or nearly in full. This is important because until allowed administrative claims are paid in full, there is no ability to pay any money to general unsecured creditors.

3.    By capping the Bank's allowed super-priority administrative expense claim at $2.5 million and by the Bank agreeing that it will be paid only 85% of the Net Avoidance Action Recoveries on account of this claim, with the Debtors' estates to retain the other 15% of the Net Avoidance Action Recoveries until the Bank has been paid the total sum of $2.5 million and then 100% thereafter, the Debtors believe that the Settlement Agreement maximizes the prospects for a meaningful recovery for the Debtors' general unsecured creditors, when the Debtors believe that any other outcome for these estates are certain or nearly certain to result in the Debtors' general unsecured creditors receiving no distribution.

4.    When balancing the interests of all of the various creditor constituencies in these cases, the Debtors believe that the Settlement Agreement is an extremely fair and equitable result for these estates, and the Debtors commend the Bank for acting reasonably and fairly under these difficult circumstances.

The Debtors therefore believe that the Settlement Agreement is in the overwhelming best interests of these estates and should be approved by the Court.

VI.

CONCLUSION

**26**

Based upon all of the foregoing, the Debtors respectfully request that this Court:

1.　　approve the auction sale format and bidding procedures described herein;

2.　　approve the Debtors' proposed form of notice to be provided to creditors, prospective buyers and other parties in interest in the form attached as Exhibit "2" filed concurrently herewith;

3.　　approve the form of asset purchase agreement for prospective buyers to use by requiring prospective buyers either to use the form attached as Exhibit "3" filed concurrently herewith or to submit to the Debtors by October 28, 2010 a redlined version of a proposed asset purchase agreement which indicates the changes requested by the prospective buyer;

4.　　schedule a Court hearing for November 8, 2010 at 10:00 a.m. to consider approval of the Debtors' sale of the Purchased Assets to the winning bidder at the auction sale;

5.　　enter the form of Bidding Procedures Order attached as Exhibit "4" filed concurrently herewith;

6.　　enter an order approving the Debtors' Settlement Agreement with the Bank; and

7.　　grant such other and further relief as the Court deems just and proper.

Date: September 29, 2010　　　　　　　LEVENE, NEALE, BENDER, YOO
　　　　　　　　　　　　　　　　　　& BRILL L.L.P.

　　　　　　　　　　　　　　　　　　*/s/ Ron Bender*
　　　　　　　　　　　　　　　　　　RON BENDER
　　　　　　　　　　　　　　　　　　TODD M. ARNOLD
　　　　　　　　　　　　　　　　　　J.P. FRITZ

23

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF BID PROCEDURES MOTION