FILED
October 20, 2010
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
0003015301

*In re: Matterhorn Group, Inc.*
Case No. 10-39672 (MSM)
United States Bankruptcy Court –Eastern District of California
(Sacramento Division)

# EXHIBIT 4

## TO DECLARATION OF
## EMILY P. RICH
## IN SUPPORT OF UNIONS' JOINT
## MOTION TO WITHDRAW THE
## REFERENCE OF DEBTORS'
## MOTION TO MODIFY OR REJECT
## COLLECTIVE BARGAINING
## AGREEMENTS

### WITH
### THE BAKERY, CONFECTIONERY, TOBACCO
### WORKERS AND GRAIN MILLERS' LOCAL NO. 85
### AND TEAMSTERS LOCAL 324

**3 PAGES**

1  CHRISTIAN L. RAISNER, Bar No. 133839
2  EMILY P. RICH, Bar No. 168735
   YURI Y. GOTTESMAN, Bar No. 264924
3  WEINBERG, ROGER & ROSENFELD
   A Professional Corporation
4  1001 Marina Village Parkway, Suite 200
   Alameda, California 94501-1091
5  Telephone 510.337.1001
   Fax 510.337.1023
6
   Attorneys for Creditors
7  The Bakery, Confectionery, Tobacco Workers
   Union Local No. 85
8  And Teamsters Local 324

9            UNITED STATES BANKRUPTCY COURT

10           EASTERN DISTRICT OF CALIFORNIA

11              (SACRAMENTO DIVISION)

12  In re                          ) Lead Case No.      10-39672 (MSM)
                                   )
13  MATTERHORN GROUP, INC.,        ) (Jointly Administered with
                                   ) Nos. 10-39664 (MSM)
14          Debtor.                ) and 10-39670 (MSM)
                                   )
15                                 ) DC No. LNB-17
                                   )
16  _____)
                                   )
17  VITAFREZE FROZEN               ) Chapter 11 Case
    CONFECTIONS, INC.,             )
18                                 ) **DECLARATION OF YURI Y.**
           Debtor.                 ) **GOTTESMAN IN OPPOSITION TO**
19                                 ) **DEBTORS' MOTION TO MODIFY**
                                   ) **OR REJECT COLLECTIVE**
20  _____) **BARGAINING AGREEMENTS**
                                   ) DATE:            October 25, 2010
21  DELUXE ICE CREAM COMPANY,      ) TIME:            9:00 a.m.
                                   ) PLACE:           Department A
22         Debtor.                 )                  Courtroom 28
                                   )                  7th Floor
23                                 )                  Robert T. Matsui Courthouse
                                   )                  501 "I" Street
24  _____)                 Sacramento, CA  95814
                                   )
25  ☒ Affects ALL DEBTORS          ) Judge:           Michael S. McManus
    ☐ Affects only MATTERHORN GROUPS, INC.  )
26  ☐ Affects only VITRAFREZE FORZEN         )
           CONFECTIONS, INC.                 )
27  ☐ Affects only DELUXE ICE CREAM COMPANY  )
                                   )
28

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway
Suite 200
Alameda, CA  94501-1091
510.337.1001

1      I, YURI Y. GOTTESMAN, declare that:

2      1.    I am an associate with the law firm of Weinberg, Roger & Rosenfeld and one of the

3 attorneys of record for Attorneys for Creditors for The Bakery, Confectionery, Tobacco Workers

4 And Grain Millers' International Union Local No. 85 And Teamsters Local 324. I make this

5 declaration in support of The Bakery, Confectionery, Tobacco Workers And Grain Millers'

6 International Union Local No. 85 And Teamsters Local 324's Opposition to the Motion to Modify

7 or Reject Collective Bargaining Agreements.

8      2.    I am familiar with the matters set forth herein, and, if called as a witness, I could

9 and would competently testify thereto.

10     3.    Attached hereto as Exhibit A is a true and correct copy of the Declaration of

11 Mariavida Lewis attaching a Partial Transcript of the 9/2/2010 Creditors' Meeting herein, which

12 she transcribed from a compact disc.

13     4.    Attached hereto as Exhibit B is a true and correct copy of Christian L. Raisner's

14 8/31/2010 cover letter and request for information relating to the original proposal to Local 85

15 dated September 27, 2010 and addressed to Nathan W. Bell, CEO/President of MGI, Inc.

16     5.    Attached hereto as Exhibit C is a true and correct copy of Christian L. Raisner's

17 9/27/2010 cover letter and request for information needed to evaluate the necessity of the proposals

18 Debtors had made to Local 324; it was sent to Nathan W. Bell, CEO/President of MGI, Inc.

19     6.    Attached hereto as Exhibit D is a true and correct copy of Debtors' October 14,

20 2010 e-mail responding to Local 324's information request.

21     7.    Attached hereto as Exhibit E is a true and correct copy of Christian L. Raisner's

22 10/6/2010 e-mail to James Presley, on behalf of both Local 324 and Local 85, requesting detailed

23 information about the potential purchasers of the Debtors' assets.

24     8.    Attached hereto as Exhibit F is a true and correct copy of a 9/24/2010 letter from

25 David A. Rosenfeld, on behalf of Local 85, to Nathan W. Bell, CEO/President of MGI, Inc.

26     9.    Attached hereto as Exhibit G are true and correct copies of two Unfair Labor

27 Practice Charges filed with the National Labor Relations Board by the Unions on 10/14/2010.

28

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway
Suite 200
Alameda, CA 94501-1091
510.337.1001

- 2 -

10.     Attached hereto as Exhibit H is a true and correct copy of Reporter's Excerpt of Proceedings, Hearing on Motion for Order Authorizing Debtor's Continued Use of Cash Collateral, before the Honorable Michael S. McManus on 10/4/2010.

11.     Attached hereto as Exhibit I is a true and correct copy of Nathan W. Bell's response, on behalf of the Debtors, to both Unions' request for information regarding potential buyers.

12.     Attached hereto as Exhibit J is a true and correct copy of the Declaration of Nathan W. Bell In Support Of Debtors' Motion for an Order, Filed Oct. 8, 200 [DOC # 269].

13.     I accessed the website of Onetcenter.org and looked under the "operator" job title.  I arrived at the web address:  http://online.onetcenter.org/link/summary/51-4081.00#WagesEmployment and clicked on "California" under "Wages and Employment Trends." This brought me to the webpage which provided that the California median wage for operator is $14.48/hour, as opposed to the $11.94/hour wage cited in Debtors' § 1113 MPA at 12:4.  Attached hereto as Exhibit K is a true and correct copy of pages of the Onetcenter.org website, which I downloaded on 10/18/2010.  The $14.48 figure is shown on the second to last page of the exhibit.

14.     Attached hereto as Exhibit L is a true and correct copy of a letter that Steven D. Brock sent to Jennifer Loving of MGI on August 17, 2010

Executed under penalty of perjury, this 18th of October 2010 at Alameda, California.


              /s/ YURI Y. GOTTESMAN
              YURI Y. GOTTESMAN


125590/593388

WEINBERG, ROGER & ROSENFELD
A Professional Corporation
1001 Marina Village Parkway
Suite 200
Alameda, CA 94501-1091
510.337.1001

**122 PAGES**

CHRISTIAN L. RAISNER, Bar No. 133839
EMILY P. RICH, Bar No. 168735
YURI Y. GOTTESMAN, Bar No. 264924
WEINBERG, ROGER & ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501-1091
Telephone 510.337.1001
Fax 510.337.1023

Attorneys for Creditor
The Bakery, Confectionery, Tobacco Workers
Union Local No. 85 and Teamsters Local 324

# UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

### (SACRAMENTO DIVISION)

| | |
|---|---|
| In re | ) Lead Case No.   10-39672 (MSM) |
| MATTERHORN GROUP, INC., | ) (Jointly Administered with<br>) Nos. 10-39664 (MSM)<br>) and 10-39670 (MSM) |
| Debtor. | |
| | ) DC No.  LNB-17 |
| VITAFREZE FROZEN CONFECTIONS, INC., | ) Chapter 11 Case |
| Debtor. | ) **EXHIBITS A — L TO**<br>) **DECLARATION OF YURI Y.**<br>) **GOTTESMAN IN OPPOSITION TO**<br>) **DEBTORS' MOTION TO MODIFY**<br>) **OR REJECT COLLECTIVE**<br>) **BARGAINING AGREEMENTS** |
| DELUXE ICE CREAM COMPANY, | ) DATE:<br>) TIME:<br>) PLACE:    Department A<br>)                 Courtroom 28, 7th Floor<br>)                 Robert T. Matsui Courthouse<br>)                 501 "I" Street<br>)                 Sacramento, CA  95814 |
| Debtor. | |
| ☒ Affects ALL DEBTORS<br>☐ Affects only MATTERHORN GROUPS, INC.<br>☐ Affects only VITRAFREZE FORZEN<br>       CONFECTIONS, INC.<br>☐ Affects only DELUXE ICE CREAM COMPANY | ) Judge:      Michael S. McManus |

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway
Suite 200
Alameda, CA 94501-1091
510.337.1001

_____
_____)

# LIST OF EXHIBITS

| EXHIBIT NO. | DOCUMENT TITLE | EXHIBIT STARTS ON PAGE |
|---|---|---|
| A | Declaration of Mariavida Lewis | 3 |
| B | Christian L. Raisner's 8/31/2010 cover letter to Nathan Bell | 23 |
| C | Christian L. Raisner's 9/27/2010 cover letter to Nathan Bell | 31 |
| D | Debtors' October 14, 2010 email | 38 |
| E | Christian L. Raisner's 10/6/2010 email to James Presley | 47 |
| F | David A. Rosenfeld's 9/24/10 letter to Nathan Bell | 49 |
| G | Two Unfair Labor Practice Charges filed with the National Labor Relations Board by the Unions on 10/14/10 | 53 |
| H | Reporter's Excerpt of Proceedings, Hearing on Motion for Order Authorizing Debtor's Continued Use of Cash Collateral, before the Honorable Michael S. McManus on 10/4/2010 | 61 |
| I | Nathan Bell's Response of behalf of Debtors, to both Unions' request for information regarding potential buyers | 92 |
| J | Declaration of Nathan Bell in Support of Debtors' Motion for an Order, filed Oct. 8, 2010 (Doc #269) | 95 |
| K | "Operator" job title at O*Net OnLine | 108 |
| L | Steven Brock's letter dated August 17, 2010 to Jennifer Loving of MGI | 118 |

Dated: October 18, 2010

WEINBERG, ROGER & ROSENFELD
A Professional Corporation


By: /s/ Christian L. Raisner
CHRISTIAN L. RAISNER
Attorneys for Creditor
Northern California Bakery & Confectionery
Health and Welfare Trust Fund

125590/593435

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway
Suite 200
Alameda, CA 94501-1091
510.337.1001

- 2 -

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway
Suite 200
Alameda, CA 94501-1091
510.337.1001

# EXHIBIT A
## TO DECLARATION OF YURI Y. GOTTESMAN IN OPPOSITION TO DEBTORS' MOTION TO MODIFY OR REJECT COLLECTIVE BARGAINING AGREEMENTS

### OF
### THE BAKERY, CONFECTIONERY, TOBACCO WORKERS AND GRAIN MILLERS' LOCAL NO. 85 AND TEAMSTERS LOCAL 324

**2 PAGES**

1  CHRISTIAN L. RAISNER, Bar No. 133839
2  YURI Y. GOTTESMAN, Bar No. 264924
   WEINBERG, ROGER & ROSENFELD
3  A Professional Corporation
   1001 Marina Village Parkway, Suite 200
4  Alameda, California 94501-1091
   Telephone 510.337.1001
5  Fax 510.337.1023

6  Attorneys for Creditor
   Northern California Bakery & Confectionery
7  Health and Welfare Trust Fund

8             UNITED STATES BANKRUPTCY COURT

9             EASTERN DISTRICT OF CALIFORNIA

10                 (SACRAMENTO DIVISION)

| | |
|---|---|
| 11  In re | ) Lead Case No. 10-39672 (MSM) |
| 12  MATTERHORN GROUP, INC., | ) (Jointly Administered with Nos. 10-39664 |
| 13  Debtor. | ) (MSM) and 10-39670 (MSM) |
| 14  | ) DC No. LNB-17 |
| 15  VITAFREZE FROZEN CONFECTIONS, INC., | ) Chapter 11 Case |
| 16  Debtor. | ) **DECLARATION OF MARIAVIDA LEWIS** |
| 17  | ) **REGARDING TRANSCRIPTION** |
|     | ) **OF SEPTEMBER 2, 2010 CREDITORS'** |
|     | ) **MEETING** |
| 18  | ) |
| 19  | ) |
| 20  | ) |
| 21  DELUXE ICE CREAM COMPANY, | ) DATE:     October 25, 2010 |
| 22  Debtor. | ) TIME:     9:00 a.m. |
|     | ) PLACE:    Department A |
| 23  | ) Courtroom 28 |
|     | ) 7th Floor |
| 24  | ) Robert T. Matsui Courthouse |
|     | ) 501 "I" Street |
| 25  ☒ Affects ALL DEBTORS | ) Sacramento, CA 95814 |
|     ☐ Affects only MATTERHORN GROUPS, | ) |
| 26  INC. | ) Judge: Michael S. McManus |
|     ☐ Affects only VITAFREZE FROZEN | ) |
| 27  CONFECTIONS, INC. | ) |
|     ☐ Affects only DELUXE ICE CREAM | ) |
| 28  COMPANY | ) |

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway
Suite 200
Alameda, CA 94501-1091
510.337.1001

EXHIBIT A
-4-

1    I, Mariavida Lewis, hereby declare as follows:

2        1.      I am an employee in the law firm of Weinberg, Roger & Rosenfeld.

3        2.      To the best of my ability as a legal secretary, on October 13, 2010, I transcribed

4    excerpts from the CD provided to our firm by the Office of the U.S. Trustee of the 341 Meeting

5    dated September 2, 2010 into typewritten longhand.

6        3.      Attached hereto and incorporated herein as Exhibit "A" is a true and correct copy of

7    Transcription Excerpts of the 341 Meeting dated September 2, 2010.

8            I declare under penalty of perjury under the laws of the State of California that the

9    foregoing is true and correct.  Executed this 18th day of October 2010 in Alameda, California.

11                                    /s/ Mariavida Lewis
                                        Mariavida Lewis

12
     125590/593397
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway
Suite 200
Alameda, CA 94501-1091
510.337.1001

EXHIBIT A
-5-

# EXHIBIT A

## TO DECLARATION OF MARIAVIDA LEWIS

### OF

The Bakery, Confectionery, Tobacco Workers and
Grain Millers' International Union Local No. 85 and
Teamsters Local 324

MATTERHORN GROUP, INC.
CREDITORS' MEETING HELD 9/2/2010

| TIME FRAME | SPEAKER | SUMMARY |
|---|---|---|
| 00 — 00:45 | Al Massey | Hey, this is a meeting of creditors for the Matterhorn Group, Inc. Case No. 10-39672 which is jointly administered with Deluxe Ice Cream Company, Case No. 10-39670 and Vitafreze Frozen Confections, Inc., 10-39664. Their petitions were filed on July 26, 2010. Today's date is September 2, 2010. My name is Al Massey. I'm an attorney with the U.S. Trustee's Office. We are not the Trustee in the case. (Inaudible) is actually the Trustee. |
| 01:02 — 02:15 | Al Massey | Can I get the debtors' attorney or attorneys or attorneys to state their name? |
| | Ron Bender | My name is Ron Bender of Levene, Neale, Bender, Yoo & Brill. We're bankruptcy counsel to the debtors. |
| | Counsel, Felderstein Fitzgerald Willoughby & Pascuzzi | I'm a lawyer in Felderstein Fitzgerald Willoughby & Pascuzzi, we're here as local counsel for the debtors. |
| | Al Massey | Mr. Bell, can I get you to raise your right hand please? Do you swear or affirm to tell the truth, the whole truth and nothing but the truth. |
| | Nathan Bell | I do. |
| | Al Massey | Alright, can I get you to state your full name please? |
| | Nathan Bell | Nathan Wynn Bell. |
| | Al Massey | Okay, what is your connection with these debtor entities? |
| | Nathan Bell | I am currently CEO, President, Chairman of the Board of all 3 entities. |
| | Al Massey | Okay and when did you become the CEO? |
| | Nathan Bell | July 21st. |
| | Al Massey | And what were you doing before that? |

EXHIBIT A

-7-

**MATTERHORN GROUP, INC.**
**CREDITORS' MEETING HELD 9/2/2010**

| TIME FRAME | SPEAKER | SUMMARY |
|---|---|---|
| | Nathan Bell | A partner with Pacific Private Capital which is the managing entity of Pacific Mezzanine Fund. |
| | Al Massey | Do you still have duties with them? |
| | Nathan Bell | In name, yes. |
| 05:14 — 05:32 | Al Massey | When did Pacific Mezzanine become the majority shareholder at Matterhorn? |
| | Nathan Bell | Majority shareholder in voting rights would have been May 22, I believe the date was of 2009. |
| 11:23 — 11:32 | Nathan Bell | In '09, we had 55 million in sales — roughly. That's divided fifty-fifty (50/50) pretty well between two clients. |
| 15:15 — 15:57 | Al Massey | When was the last time on a consolidated basis they generated a profit or (inaudible) net profit? |
| | Nathan Bell | We had an EBIDTA positive number in June. We had $400,000 positive EBDITA. |
| | Al Massey | For the month? |
| | Nathan Bell | For the month of June. Yeah, that's got to be taken in context. June is a great month. |
| | Al Massey | Right, right. |
| | Nathan Bell | Greater volumes, greater profit. |
| | Al Massey | Okay, well, I guess spelling that out, when was the last time you had a profitable year? |
| | Nathan Bell | '09. We had $3 million EBIDTA in '09. |
| | Al Massey | Could you explain what the (inaudible) is? |
| 15:15 — 15:57 | Nathan Bell | We had $3 million of earnings before interest, taxes, depreciation and amortization. |
| 19:10 — 27:25 | Al Massey | Well, what would it take at this point to operate at a break even point on a solely net income, but no net loss either after all deductions? |

EXHIBIT A

-8-

2

# SUMMARY OF CREDITORS MEETING

## MATTERHORN GROUP, INC.
### CREDITORS' MEETING HELD 9/2/2010

| TIME FRAME | SPEAKER | SUMMARY |
|---|---|---|
| | Nathan Bell | Well, you mean on a cash basis or accrual basis? |
| | Al Massey | On accrual basis, how would you? |
| | Nathan Bell | On an accrual basis? |
| | Al Massey | How would you get there? |
| | Nathan Bell | Well, if we're talking the next 3 months. That's just not going to happen. That's highly unlikely. That would be wholly inconsistent or non-characteristic with our industry and certainly Matterhorn's history. You absorb losses in these months. You do not run, your manufacturing runs are not large enough to carry the full absorption of your overhead. You need the Spring and Summer months to fully absorb that overhead.; so on an accrual accounting basis, one bend with the probability, one standard deviation of probability — that's just unlikely. |
| | Al Massey | Okay, say like today is the beginning of the new year and like a year from now, what would it take to get to that year? |
| 19:10 — 27:25 | Nathan Bell | Oh, if you are talking about on an annual basis, that's not a problem at all. I can tell you that, some of the things we've done immediately. We estimated we've lost as much as $3 million in our Crystal Light program over the last 24, 18 to 24 months. Probably the greater portion of that is in the last 12 months. That's a significant number. If you just amortize that equally over the 2 years, that's a million and a half a year. That, when I say Crystal Light, I use that somewhat as catch-all for other licensed products. The reason that Crystal Light is important, there's a number of reasons that's important, you understand. That (a) we do less than truckload shipping for Crystal Light. We're |

EXHIBIT A

-9-

MATTERHORN GROUP, INC.
CREDITORS' MEETING HELD 9/2/2010

| TIME FRAME | SPEAKER | SUMMARY |
|---|---|---|
| | | all in our Wal-Mart stores in the nation, all their DCs, distribution centers. But to keep the chain full and timely, we need to do less than truckload of shipment. Well, less than truckload shipping really close up to 8-9-10% cost of sales number rather than 4-5% in a full truck context. So that's a significant hit. In addition, Crystal Light has kept our plants significantly busy. To the point that we had to make a Sophie's Choices if you will between which product to run and so it's my opinion, my managerial opinion that we have been making poor choices to run Crystal Light at the expense of crowding out profitable items and actually having poor service rates, fill rates to some of our customers on the more profitable and stable products. So the ramifications of petting out Crystal Light, the national brand of product, its transportation costs, the fact that we were not meeting our minimum royalties and having to pay a minimum royalty based on 50% of expected revenues and having a 17% royalty number instead of a 7% royalty number. |
| | Al Massey | Are you just talking about Crystal Light? |
| | Nathan Bell | All Crystal Light, yeah. All licensed products which is 95% Crystal Light. The royalty issue with transportation issue, sales and marketing issue, all of that is, will take a fair amount of noise and confusion out of the manufacturing process.

In addition, we will take significant noise out of our sales and marketing process. When you walk down the grocery store aisle on Saturday afternoon and the nice lady hands you a sample of sausage or whatever it is, we're contractually obligated to do that |

MATTERHORN GROUP, INC.
CREDITORS' MEETING HELD 9/2/2010

| TIME FRAME | SPEAKER | SUMMARY |
|---|---|---|
| | | throughout the Wal-Mart system; and when you do that for a two-hour session or so in Wal-Mart with all their stores, that's an 80,000 type number. That's a very expensive process. So you do that 2, 3, 4 times in a quarter, we're talking real money. So while we start with decent margins in the Crystal Light product, you end up with actually a negative margin — all things considered. So eliminating that, you save not only the absolute dollars but I think, until strongly that you've saved considerable confusion in the manufacturing, sales and marketing process.; and you free up capacity on your lines and increase your order fill rates with your customers with a stable products. That's point One is Crystal Light. Number two. |
| | Al Massey | Let me go back to Crystal Light, what does, has anything been done to discontinue that process or that's still ongoing? Still manufacturing for (inaudible) ? |
| | Nathan Bell | Yes. Yes, things have been done to discontinue. We're in discussions with Kraft as the licensor and with Wal-Mart who's our largest customer. We've notified both. We desired to discontinue the line. Wal-Mart is working with us in an effort to clear out our existing inventory, so that we're not left holding inventory and having to write that off. However, our current flow through or turn rates that would probably be at 5 to 6 months process, selling that out. But the good news is they're willing to take it on regular run rates so we are not having to discount it and so we will be getting our gross profit margin. And to the extent that we got it manufactured — which is a good extent cause it sits in warehouses right now. Then you free up your lines anyway plus we're coming in to our slower season so that what I mentioned before |

EXHIBIT A
-11-

MATTERHORN GROUP, INC.
CREDITORS' MEETING HELD 9/2/2010

| TIME FRAME | SPEAKER | SUMMARY |
|---|---|---|
| | | got capacity issues is really not an issue. So I think it works nicely to blow it, to have it pass through the pipeline in the next 4, 5 months. |
| | Al Massey | Is manufacturing continuing on Crystal Light? |
| | Nathan Bell | To the extent necessary to finish off existing raw good materials. |
| | Al Massey | When will that be over? |
| | Nathan Bell | Well, I think we'll be totally out of the program come January of next year. We'll probably finish producing, you know, Novemberish, somewhere in the November timeframe and the (inaudible) inventory system, and we'll be done. |
| | Al Massey | Okay, you were starting to move on to second point. |
| | Nathan Bell | Yeah, second, second point is we've been selling product we call the variety pack through Costco. It's a bulk item. It has, I believe, 42 novelties in a box. It's a nice big box. It's the size of a breadbox and we sell it for about $11 in Costco, that's the retail price. It comes out at about $6; I'm sorry 6-1/2 cents per ounce. If you look at anyone else in the plan (inaudible) around us in the Costco freezer box, they are all selling around 12 cents per ounce. So this is clearly a value item. It's very popular. It's popular because it's where, there is money on it. In addition to that, butter fat or prim prices have increased dramatically in the last few months and that has hurt our margins all the more. We have notified Costco that we want to get out of that product line. We've actually went to them and said, "Hey, we need to bump this to $2 a box to keep it viable, even at $2 a box, we think that's what it'll take for us to break even. They said "well, that's not going to last long if you're only breaking even so you |

EXHIBIT A
-12-

## SUMMARY OF CREDITORS MEETING

### MATTERHORN GROUP, INC.
CREDITORS' MEETING HELD 9/2/2010

| TIME FRAME | SPEAKER | SUMMARY |
|---|---|---|
| | | really talking about needing to raise it at $3, $4, $5." We said, "yes, that's right, in the long run." They said, "well, we'd rather just discontinue the product." Which is fine with us, very expensive packaging. It's got some internal packaging, that's not designed right; it's got some air spaces which cause some damage issues not having the reverse pressure from inside. |
| | Al Massey | Do you have an estimate of the loss attributed to the variety pack? You mentioned $3 million for Crystal Light. |
| | Nathan Bell | I don't know on top of my head. We think we're losing about 5%. Every, every dollar of sales we lose 5 cents. I guess what our variety pack that would probably be, I'm really going out on the limb here but it's probably about a million and a quarter or so. |
| | Al Massey | Per year? |
| | Nathan Bell | Yeah, that's probably low actually. I probably shouldn't guess. |
| 27:57 — 29:40 | Al Massey | Anything else that need to be fixed? |
| | Nathan Bell | Yeah, our Sacramento plant in particular. With both plants, we do not believe that our labor structure is sustainable. We consistently received competing bids from — let me rephrase, our customers consistently received competing bids from other manufacturers who have significant geographic disadvantage. Significant meaning east of the Mississippi. In some cases, Pennsylvania, New York, we are being underbid by other manufacturers and our customers are not shy about telling that, telling us that when we put through a price increase, they push back. But, when we put through price increase upon our largest customers, they said, "No, not going to take it. We got lower bids from others, you know, |

EXHIBIT A
-13-

7

MATTERHORN GROUP, INC.
CREDITORS' MEETING HELD 9/2/2010

| TIME FRAME | SPEAKER | SUMMARY |
|---|---|---|
| | | you guys need to deal with your cost structure or do whatever you're going to do, but you're going to lose our business unless you can give us better pricing." As we analyzed our cost structure, we believe that our union contracts are unsustainable; particularly, Sacramento. We got individuals, unskilled labor, etc. who are in many cases are not even well into $20 per hour on a fully loaded bases and that's just not competitive. So we have got to deal with that. I personally believe that Sacramento plant is just completely uneconomical without a drastic restructure of the labor costs. |
| 30:56 — 31:01 | Nathan Bell | Our landlords are generally good and cooperative. I think in both cases they want us there to continue. |
| 31:08 — 31:15 | Nathan Bell | But I wouldn't say the antiquated nature of the plant, in and of themselves, is unmanageable or necessary on economic. |
| 32:29 — 33:10 | Al Massey | Are you taking a salary from Manhattan Group? |
| | Nathan Bell | Yes, Matterhorn Group. |
| | Al Massey | I'm sorry, Matterhorn. |
| | Nathan Bell | Yes |
| | Al Massey | And, uh, how much is that? |
| | Nathan Bell | $300,000 a year run rate plus reimbursement on my health and travel. And I actually think there's a life insurance policy that's company policy for all officers. I haven't signed anything so I don't know if that's enforced. I would just note that my predecessor has taken $360,000. |
| | Al Massey | You call that a run rate, what does that mean? |

EXHIBIT A
-14-

## SUMMARY OF CREDITORS MEETING

### MATTERHORN GROUP, INC.
### CREDITORS' MEETING HELD 9/2/2010

| TIME FRAME | SPEAKER | SUMMARY |
|---|---|---|
| | Nathan Bell | Just annual salary. |
| | Al Massey | Okay. Are you just paid along with the other |
| | Nathan Bell | Yes. |
| | Al Massey | Paychecks? |
| | Nathan Bell | Yeah, W-2 employee. |
| 37:00 — 37:28 | Andrew De Camara | Andrew De Camara, Sherwood Partners, advisor to debtor. I'm not aware that they are delaying payments to the landlords or equipments. |
| | Nathan Bell | No, we're not delaying payments to the landlords and the equipment lessors would be, first of all, it wouldn't be a big number. Second of all, I think we'd hear from them if we're not paying them anything. I'm sorry I don't have that level of detail in that point. |
| | Al Massey | Apparently, you haven't heard from them. |
| | Nathan Bell | No, I haven't heard from them and I'm really tempted to say we just don't have any. |
| 37:33 — 37:50 | Al Massey | Post-petition, are these entities staying current on the trade debt? Payroll? |
| | Nathan Bell | Forgive me for laughing, but more than current on our trade debt. We're paying cash on delivery and cash in advance in some cases. That's been one of our challenges. |
| 38:00 — 39:26 | Al Massey | How about utilities and things like that? |
| | Nathan Bell | Yeah, we're current on all things and if we're not current, we have an agreement with them or made deposits and/or making installment payments over the few months. But all – let me say that all deposit and all the utility situations are resolved so far as the debtor (inaudible) and the utility provider. |
| | Al Massey | Was there any kind of a hiccup when it came to the wages? Did you have to delay payment |

EXHIBIT A
-15-

9

MATTERHORN GROUP, INC.
CREDITORS' MEETING HELD 9/2/2010

| TIME FRAME | SPEAKER | SUMMARY |
|---|---|---|
| | | because of the filing or anything like that? |
| | Nathan Bell | No, we were timely on all wages. I think there was certainly a time where I was very concerned. There were, I am having to go back in my memory, there were times where I thought we were going to miss but I don't believe we ever did miss. We have opted to not institute a pay increase in Salem as per the collective bargaining agreement. I think it's $25.47 per hour or so; but was to kick in August 1. We have not instituted that. The employees there are not happy. The Union, I am sure, is not happy. But I've got to make some ugly and hard choices. I also, we have stopped pension contributions as referred to Unions' contract, that was a $14,400 weekly number and we're not making those contributions as we speak. |
| 42:40 — 43:50 | Al Massey | So would it be fair to say that all options are on the table? Earnout? |
| | Nathan Bell | I will tell you that all options are on the table. I have visited with all the major vendors. I've visited with all the major customers. There is a viable entity here. I personally believe that any kind of discussion or notion of any type of liquidation will not be in anyone's best interest. That is not falsely posturing it. It's just very sincere. We've got a, you know, $50 million business which I planned by the way to have it dropped into the $40 million things as we dropped some skews and customers, but we've got a very solid business with a product that's geographically advantageous and there is every reason in the world for this business to continue provided that we can get our cost structure in line and make sure that we are selling product that which, in order to do some margin. That of course gives us a number of options as far |

EXHIBIT A
-16-

# SUMMARY OF CREDITORS MEETING

## MATTERHORN GROUP, INC.
### CREDITORS' MEETING HELD 9/2/2010

| TIME FRAME | SPEAKER | SUMMARY |
|---|---|---|
| | | per, you know, offering a plan and/or considering assets sale, scenarios that would have the entity continuing or at least the concept of the entity continuing. |
| 45:46 — 45:57 | Al Massey | I think the last thing was 6 month projections were a budget. |
| | Nathan Bell | We are working on a 12 month budget and we should have that to various interested parties within a few days. |
| 46:33 — 46:40 | Mary Olden | Mr. Bell, I'm Mary Olden, we've met before. For the record, Mary Olden on behalf of the interested creditors committee. |
| 47:20 — 47:31 | Nathan Bell | Thus far to my great delight, I have not seen a single indication of drop in volume from our customers. |
| 47:41 — 47:55 | Nathan Bell | My discussions with the senior executives in our largest customers have indicated no such drop-off at all.  In fact it's been quite the contrary; it's been one of support.  And thus far the sales levels have corroborated to that. |
| 51:32 — 52:27 | Nathan Bell | But thus far we have seen no indication of any relax in this at all.  I think we're doing a marvelous job in communicating with them.  In fact because of the butter fat market pricing, we just, last week decided we need to institute a price increase at an unusual period time of the year.  You would almost never do a price increase right now.  But, particularly in our hard-packed ice cream, we went to our vendor, customers and we said, "Hey, we're going to bump this up 9% and they, the butter fat market said "you're right, we need to do that."  So my point is we've given them some bad news and even in the face of bad news, they've remained loyal and stuck with us.  I'm not seeing signs of anything will be other than that so long as we keep our order fill |

# SUMMARY OF CREDITORS MEETING

## MATTERHORN GROUP, INC.
### CREDITORS' MEETING HELD 9/2/2010

| TIME FRAME | SPEAKER | SUMMARY |
|---|---|---|
| | | rates up. |
| 58:49 — 58:54 | Nathan Bell | The word "necessary" is a challenge to answer. |
| 1:07:27 — 1:08:00 | Mary Olden | I think short with pre-petition, is my understanding correct that Pacific Mezzanine Fund and CCB Holdings made a $750,000 capital contribution? |
| | Nathan Bell | Are you trying to turn the knife on me? |
| | Mary Olden | No, no, I'm sorry. |
| | Ron Bender | We characterized it in the pleadings as a loan, not a capital contribution. |
| | Mary Olden | Oh, okay. |
| | Ron Bender | Right? |
| | Nathan Bell | Yeah, I'm joking because yeah, painfully the answer is yes, we did. |
| | Ron Bender | But it's important to know. |
| | Mary Olden | It was structured as a loan. |
| | Ron Bender | Yes. |
| | Nathan Bell | Yes, it was a loan. It was a second lien position. |
| 1:17:49 — 1:18:25 | Mary Olden | Is there an unfunded pension liability to the Union? |
| | Nathan Bell | Unfunded in the sense that because of the stock market, the actuarial net value has decreased to a level that it cannot sustain the future payments but not unfunded in the sense that we have failed to make our contributions. Other than last month, we've made our contributions back since the time of Adam and Eve. But the market has killed us so yeah we have $4 million, $4.5 million unfunded liability figures that we're liable for as we speak and that's another reason for the bankruptcy frankly. |

EXHIBIT A

-18-

12

# SUMMARY OF CREDITORS MEETING

## MATTERHORN GROUP, INC.
### CREDITORS' MEETING HELD 9/2/2010

| TIME FRAME | SPEAKER | SUMMARY |
|---|---|---|
| 1:18:56 — 1:19:24 | Mary Olden | Have you or anyone else made projections of the debtors' profitability if they were to reject the Union contract? |
| | Nathan Bell | Yes. |
| | Mary Olden | And what do those look like? |
| | Nathan Bell | Much better. They make Sacramento viable. Sacramento is not viable with this current labor of contract and Salem is not as profitable as it should be on almost any comparable basis. |
| 1:27:33 — 1:27:36 | Yuri Gottesman | Yuri Gottesman, Weinberg, Roger & Rosenfeld. |
| 1:27:52 — 1:30:28 | Al Massey | Can I get you to speak up a little bit? Do you want to move that down here? |
| | Mary Olden | Do you want me to move down here? I'll let you seat closer to…. |
| | Yuri Gottesman | I can try to speak up a little bit, is that alright? |
| | Al Massey (?) | Yeah, you're probably fine at that level. |
| | Yuri Gottesman | Okay. I just have a few questions. |
| | Nathan Bell | Sure. |
| | Yuri Gottesman | You mentioned that the debtors had stopped and ceased contributions to the pension plans, and I'm wondering what other contributions have also ceased to other joint (inaudible) pensions. Other funds? |
| | Nathan Bell | Well, we have 3 pension obligations. Three retirement obligations. One is to the Bakers. One is to the Teamsters. And one is the commitment to the White Collar 401K. We've stopped all 3. |
| | Yuri Gottesman | For the pension plans? What about the health and welfare plans? |
| | Nathan Bell | We have continued to make those payments. |

EXHIBIT A

-19-

MATTERHORN GROUP, INC.
CREDITORS' MEETING HELD 9/2/2010

| TIME FRAME | SPEAKER | SUMMARY |
|---|---|---|
| | | You're raising a question that makes me wonder if you disagree with that. To my knowledge, we're continuing to pay that. That's been an order, if you will. |
| | Yuri Gottesman | Okay. Are there any plans to, in the near future, not to continue? |
| | Nathan Bell | There is a definite a plan to address them and try to bring those costs down. But there is no plan or intent as I sit here to default on an existing health plan. That will become an issue, you know, very quickly. It's underneath (inaudible), we would take position that they are economically unsustainable and inconsistent with (inaudible) rates. |
| | Yuri Gottesman | While we're on this topic, you sent the Union a proposal under Section 1113 and the Union, Chris Raisner, my colleague sent a response two days ago, did you receive that response? |
| | Nathan Bell | I'm not familiar with that. |
| | Ron Bender | I haven't received anything from Chris Raisner. Do you know to whom he sent the response? |
| | Yuri Gottesman | Mr. Bell, to you and cc to you as well. |
| | Ron Bender | I definitely did not receive it. I'm gonna give you…. |
| | Yuri Gottesman | It was faxed and sent by mail. |
| | Ron Bender | If I give you my business card, can I get an email sent to me on that? |
| | Yuri Gottesman | Sure, sure, no problem. |
| | Nathan Bell | I have not been in my Vegas office this week so I don't, if that's where it went. |
| | Yuri Gottesman | Yes, it went to your Vegas office. |
| | Nathan Bell | Well, shame on my staff for not giving it to |

EXHIBIT A
-20-

MATTERHORN GROUP, INC.
CREDITORS' MEETING HELD 9/2/2010

| TIME FRAME | SPEAKER | SUMMARY |
|---|---|---|
| | | me, but no, I have not seen it. I apologize. |
| | Ron Bender | If you give me your business card, I'll send you an email of all of our email addresses as well. |
| | Yuri Gottesman | Okay. |
| 1:30:48 — 1:32:48 | Yuri Gottesman | Just a couple of questions about Pacific Mezzanine. Do you know, you said there were a majority owner of MGI, do you know what percentage of shares they own? |
| | Nathan Bell | Yeah, it's a little complicated. They've got, it would be in the 50s, like 55% of the common which is the voting, but then they have more like 70 something in the preferred stock so in the economic sense, it's, you know, in the 70s. In a controlled position, it's more than 50s. |
| | Yuri Gottesman | And do you know what other industries Pacific Mezzanine is involved? |
| | Nathan Bell | I do. To answer your question with great specificity, in your first one – 52.87% of common stock and 69.93% of preferred stock. What other industry (inaudible) involved in, well, (inaudible) Mezzanine lender and generally they are second secured lender that got investments in one context as an environmental firm that does separates oily water, separates the oil from water. The other one is a major shareholder in a chain of "Relax the Back" retail stores. |
| | Yuri Gottesman | You say "Relax the Back?" |
| | Nathan Bell | "Relax the Back" – a chain of franchise retail stores. (Inaudible). |
| | Nathan Bell | It's just a (inaudible) end by design diverse portfolio. However, it's in the process of winding down. It started in 1995 as a tenure fund so it's extended itself and is in the |

EXHIBIT A
-21-

15

# SUMMARY OF CREDITORS MEETING

## MATTERHORN GROUP, INC.
## CREDITORS' MEETING HELD 9/2/2010

| TIME FRAME | SPEAKER | SUMMARY |
|---|---|---|
| | | process of winding up. |

122590/592848

# EXHIBIT B

## TO DECLARATION OF YURI Y. GOTTESMAN IN OPPOSITION TO DEBTORS' MOTION TO MODIFY OR REJECT COLLECTIVE BARGAINING AGREEMENTS

### OF

### THE BAKERY, CONFECTIONERY, TOBACCO WORKERS AND GRAIN MILLERS' LOCAL NO. 85 AND TEAMSTERS LOCAL 324

STEWART WEINBERG
DAVID A. ROSENFELD
WILLIAM A. SOKOL
VINCENT A. HARRINGTON, JR.
W. DANIEL BOONE
BLYTHE MICKELSON
BARRY E. HINKLE
JAMES RUTKOWSKI •
SANDRA RAE BENSON
CHRISTIAN L. RAISNER
JAMES J. WESSER
THEODORE FRANKLIN
ANTONIO RUIZ
MATTHEW J. GAUGER
ASHLEY K. IKEDA ••
LINDA BALDWIN JONES
PATRICIA A. DAVIS
ALAN G. CROWLEY
KRISTINA L. HILLMAN •••
EMILY P. RICH
BRUCE A. HARLAND
CONCEPCIÓN E. LOZANO-BATISTA
CAREN P. SENCER

LORI K. AQUINO ••
ANNE I. YEN
MANJARI CHAWLA
KRISTINA M. ZINNEN
JANNAH V. MANANSALA
MANUEL A. BOGUES ••••
KERIANNE R. STEELE •••
ANA M. GALLEGOS
GARY P. PROVENCHER
LISL R. DUNCAN
JORDAN D. MAZUR
JACOB J. WHITE
SHARON A. SEIDENSTEIN
LESLIE V. FREEMAN •••••
EZEKIEL D. CARDER •••••
YURI Y. GOTTESMAN

PATRICIA M. GATES, Of Counsel
ROBERTA D. PERKINS, Of Counsel
RICHARD T. DRURY, Of Counsel
NINA FENDEL, Of Counsel

• Also admitted in Arizona
•• Admitted in Hawaii
••• Also admitted in Nevada
•••• Also admitted in Illinois
••••• Also admitted in Missouri
•••••• Also admitted in New York

# WEINBERG, ROGER & ROSENFELD
A PROFESSIONAL CORPORATION

1001 Marina Village Parkway, Suite 200
Alameda, CA 94501-1091
TELEPHONE 510.337.1001
FAX 510.337.1023

August 31, 2010

Via U. S. Mail and Facsimile

Nathan W. Bell, CEO/President
Matterhorn Group, Inc.
1635 Village Center Circle, Suite 270
Las Vegas, NV 89134

Re: *Matterhorn Group, Inc.*
USBC – Eastern District Case No. 10-39673 (MSM) (Sacramento)
Jointly Administered with Nos. 10-39664 and 10-39670

Dear Mr. Bell:

This concerns the Company's proposal (the "Proposal") with your letter dated August 29, 2010 to Marty Zimmerman of Bakery Workers Local 85. This law firm represents Local 85 and I write now on its behalf.

Local 85 has read the Company proposal and has many questions about it and about the bankruptcy, especially as it may affect the employees of Vitafreze Frozen Confections, Inc. ("Vitafreze"). We ask for immediate responses to the information requests that follow with this letter. The information is needed to evaluate the Proposal in order to prepare counterproposals. Your urgent compliance with the information requests is required because you state that time is of the essence in this matter.

We cannot condone your statement that the Company will move to reject the collective bargaining agreement ("CBA") on September 7, if the Union does not by then agree to terms "substantially consistent" with the Proposal. Despite that unfortunate "take it or leave it" approach, Local 85 desires that

LOS ANGELES OFFICE
3435 Wilshire Boulevard, Suite 620
Los Angeles, CA 90010-1907
TEL 213.380.2344 FAX 213.381.1088

SACRAMENTO OFFICE
428 J Street, Suite 520
Sacramento, CA 95814-2341
TEL 916.443.6600 FAX 916.442.0244

HONOLULU OFFICE
1099 Alakea Street, Suite 1602
Honolulu, HI 96813-4500
TEL 808.528.8880 FAX 808.528.8881

EXHIBIT B
-24-

the Company meet and confer in good faith and attempt to reach mutually satisfactory modifications.

Accordingly, please contact the undersigned to arrange for dates and times to meet.

Sincerely,


Christian L. Raisner

CLR/jla
opeiu 3 afl-cio(1)

cc:     Ron Bender

## Information Requests

For the Union's consideration of your Proposal, please provide the most complete and reliable information available as to the following topics:

1.  Whether the Proposal and each part of it consists of necessary modifications.

2.  Proposal Section 2 B is a new section.

    What are the projected financial impacts of this new section regarding a new classification of Seasonal Employees?

3.  Proposed new Section 2C and E requiring affirmative choice to be members of the Union, which is already the exclusive collective bargaining representative

    What are the financial impacts projected for these changes?

    What commensurate loss is borne by those not covered by the CBA?

4.  Proposed section F regarding supervisors performance of bargaining unit work in certain cases, - What are the savings sought from this section? Provide documentation.

5.  Proposed section F, changing types of employees.

    What are the savings sought from this section? Provide documentation.

6.  Proposed Section 3, Seniority Rights, receives major modifications under the Proposal, containing items 1 through 7.

    Provide the projected financial impact of each of the modifications in Section 3.

    Provide documentation for each calculation of financial effects of each change.

    What are the non-financial effects of each of the modifications in that section?

    Provide documentation for each calculation of non-financial effects of each change.

    Why change termination for "just cause" to termination "for cause"?

    What are savings sought from the wages and benefits of the workers covered by the CBA?

EXHIBIT B

-26-

7.  Proposed Section 4 – Hours, Overtime and Working Conditions, A through D, makes major changes to the CBA.

    Provide the projected financial impact of each of the modifications in Section 4.Provide documentation for each calculation of financial effects of each change.

    What are the non-financial effects of each of the modifications in that section?

    Provide documentation for each calculation of non-financial effects of each change.

8.  Proposed Section 5 – Rights of the Parties, A and B, makes major changes to the CBA.

    Provide the projected financial impact of each of the modifications in Section 5.

    Provide documentation for each calculation of financial effects of each change.

    What are the non-financial effects of each of the modifications in that section?

    Provide documentation for each calculation of non-financial effects of each change.

9.  Proposed Section 6 – Holidays, A through H, makes major changes to the CBA.

    Provide the projected financial impact of each of the modifications in Section 6.

    Provide documentation for each calculation of financial effects of each change.

    What are the non-financial effects of each of the modifications in that section?

    Provide documentation for each calculation of non-financial effects of each change.

10. Proposed Section 7 – Vacations,  A through I, makes several major changes to the CBA.

    Provide the projected financial impact of each of the modifications in Section 7.

    Provide documentation for each calculation of financial effects of each change.

    What are the non-financial effects of each of the modifications in that section?

Nathan W. Bell, CEO/President
Matterhorn Group, Inc.
August 31, 2010
Page 5

> Provide documentation for each calculation of non-financial effects of each change.

11. Proposed Section 8 – Wages, Chart and A through E., makes several major changes to the CBA.

> Provide the projected financial impact of each of the modifications in Section 7.

> Provide documentation for each calculation of financial effects of each change.

> What are the non-financial effects of each of the modifications in that section?

> Provide documentation for each calculation of non-financial effects of each change.

12. Proposed Section 15 – Health and Welfare. A through G, makes several major changes to the CBA.

> Provide the projected financial impact of each of the modifications in Section 7.

> Provide documentation for each calculation of financial effects of each change.

> Provide the projected costs of developing and maintaining a health plan as stated in Proposed Section 15B.

> Provide the projected cost to the Debtor of employees' sickness.

> Provide the projected costs of developing and maintaining a 401(k) plan as stated in Proposed Section 15G.

> What are the non-financial effects of each of the modifications in that section?

> Provide documentation for each calculation of non-financial effects of each change.

13. The Proposal deletes CBA section 15, Dental Care; Section 16, Maintenance of Benefits: Health and Welfare/Dental; and Section 17 Pensions.

> Provide the projected financial impact of each of the modifications in Section 7.

> Provide documentation for each calculation of financial effects of each change.

> What are the non-financial effects of each of the modifications in that section?

Provide documentation for each calculation of non-financial effects of each change.

14. The Proposal Section 23, New Hires, changes the CBA (e.g. in 14B) by eliminating 120 days of health coverage for all new hires.

Provide the projected financial impact of each of the modifications in Section 23.

Provide documentation for each calculation of financial effects of each change.

What are the non-financial effects of each of the modifications in that section?

Provide documentation for each calculation of non-financial effects of each change.

15. Creation of the Proposal

Identify all persons who helped prepare the Proposal and state what work they performed respecting the Proposal.

State when work on the Proposal was performed, whether prepetition or postposition and by whom.

State the cost of preparing the Proposal to date.

Provide all documents used in preparing the Proposal, including all calculations, notes, communications and drafts.

16. As to whether the proposed modifications are necessary to permit the reorganization of the debtor —

   a.  When will a plan of reorganization be proposed?

   b.  Does the Company expect to sell a facility or asset? Which facility or asset?

   c.  To what extent is an asset sale necessary to a plan of reorganization?

17. Will the proposed modifications assure that all affected parties are treated fairly and equitably – provide all information relevant to this issue, including specifically:

   How are Union members treated fairly and equitably regarding the Proposal's
      Elimination of vacation?
      Elimination of pension?

> Elimination of health and dental for many employees and severe reduction
> for others?
> Reduction of wages?

18. Specify the loss of health, pension and dental benefits, if any of managerial
employees of the Debtor that are commensurate with the Proposal's treatment of
employees under the CBA. Please provide for each management person, before
and after the Proposal, name, position, salary, health insurance coverage, date of
hire, date of insurance coverage, and all other relevant information.

19. How is the Proposal fair and equitable to all affected parties?

   a. Why is a change in seniority rights necessary?

   b. Why is any change in Management Rights clause necessary?

   c. Specify the dollar cost of savings to be obtained by each proposed change
   from the current CBA. Provide the information used to make the calculations
   and the calculations actually made.

# EXHIBIT C
## TO DECLARATION OF
## YURI Y. GOTTESMAN
## IN OPPOSITION TO DEBTORS'
## MOTION TO MODIFY OR REJECT
## COLLECTIVE BARGAINING
## AGREEMENTS

### OF
### THE BAKERY, CONFECTIONERY, TOBACCO
### WORKERS AND GRAIN MILLERS' LOCAL NO. 85
### AND TEAMSTERS LOCAL 324

EXHIBIT C
-31-

STEWART WEINBERG
DAVID A. ROSENFELD
WILLIAM A. SOKOL
VINCENT A. HARRINGTON, JR.
W. DANIEL BOONE
BLYTHE MICKELSON
BARRY E. HINKLE
JAMES RUTKOWSKI •
SANDRA RAE BENSON
CHRISTIAN L. RAISNER
JAMES J. WESSER
THEODORE FRANKLIN
ANTONIO RUIZ
MATTHEW J. GAUGER
ASHLEY K. IKEDA ••
LINDA BALDWIN JONES
PATRICIA A. DAVIS
ALAN G. CROWLEY
KRISTINA L. HILLMAN •••
EMILY P. RICH
BRUCE A. HARLAND
CONCEPCION E. LOZANO-BATISTA
CAREN P. SENCER

LORI K. AGUINO ••
ANNE I. YEN
MANJARI CHAWLA
KRISTINA M. ZINNEN
JANNAH V. MANANSALA
MANUEL A. BOIGUES ••••
KERIANNE R. STEELE •••••
ANA M. GALLEGOS
GARY P. PROVENCHER
LISL R. DUNCAN
JORDAN D. MAZUR
JACOB J. WHITE
SHARON A. SEIDENSTEIN
LESLIE V. FREEMAN ••••••
EZEKIEL D. CARDER ••••••
YURI Y. GOTTESMAN

PATRICIA M. GATES, Of Counsel
ROBERTA D. PERKINS, Of Counsel
RICHARD T. DRURY, Of Counsel
NINA FENDEL, Of Counsel

• Also admitted in Arizona
•• Admitted in Hawaii
••• Also admitted in Nevada
•••• Also admitted in Illinois
••••• Also admitted in Missouri
•••••• Also admitted in New York

## WEINBERG, ROGER & ROSENFELD
### A PROFESSIONAL CORPORATION

1001 Marina Village Parkway, Suite 200
Alameda, CA 94501-1091
TELEPHONE 510.337.1001
FAX 510.337.1023

September 27, 2010

*Via U. S. Mail and Fax*

Nathan W. Bell, CEO/President
Matterhorn Group, Inc.
1635 Village Center Circle, Suite 270
Las Vegas, NV 89134

Re:  *Matterhorn Group, Inc.*
     USBC – Eastern District Case No. 10-39673 (MSM) (Sacramento)
     Jointly Administered with Nos. 10-39664 and 10-39670

Dear Mr. Bell:

This concerns the Company's proposal (the "Proposal") with your letter dated
September 22, 2010 to Derek Cutter of Teamsters Local 324. This law firm represents Local
324, and I write now on its behalf.

Local 324 has read the Proposal respecting the two CBAs and has many questions about it and
about the bankruptcy, especially as it may affect the employees of DeLuxe Ice Cream Company.
We ask for immediate responses to the information requests that follow concerning each of the
CBAs. The information is needed to evaluate the Proposal and in order to prepare
counterproposals. Your urgent compliance with the information requests is required because you
state that time is of the essence in this matter.

We cannot condone your statement that the Company will move to reject the collective
bargaining agreement ("CBA") on October 8, if the Union does not by then agree to terms
"substantially consistent" with the Proposal. Despite that unfortunate "take it or leave it"
approach, Local 324 desires that the Company meet and confer in good faith and attempt to
reach mutually satisfactory modifications.

LOS ANGELES OFFICE
3435 Wilshire Boulevard, Suite 620
Los Angeles, CA 90010-1907
TEL 213.380.2344 FAX 213.381.1088

SACRAMENTO OFFICE
428 J Street, Suite 520
Sacramento, CA 95814-2341
TEL 916.443.6600 FAX 916.442.0244

HONOLULU OFFICE
1099 Alakea Street, Suite 1602
Honolulu, HI 96813-4500
TEL 808.528.8880 FAX 808.528.8881

EXHIBIT C
-32-

Nathan W. Bell, CEO/President
Matterhorn Group, Inc.
September 27, 2010
Page 2


Accordingly, please contact the undersigned or my partner David Rosenfeld to arrange for dates and times to meet.

Sincerely,

Christian L. Raisner

CLR/jla
opeiu 3 afl-cio(1)

cc:     Ron Bender

EXHIBIT C
-33-

**Information Requests**

A.    For DeLuxe Machine Operators CBA

For the Union's consideration of your Proposal, please provide the most complete and reliable information available as to the following topics:

1.    Whether the Proposal and each part of it consists only of modifications that are necessary.

2.    Proposal Section 6.1, "New Proposed performance based wages", is new and has new wage rates.

    a.    What are the projected financial impacts of the proposed modifications of that section?

3.    The Proposal deletes Section 7.5, providing for premium pay between 4 p.m. and 2 a.m.

    a.    What are the financial impacts projected for these changes?

    b.    What commensurate loss is borne by those not covered by the CBA?

4.    The Proposal deletes Section 7.6, providing for shift premiums to be included in overtime rates.

    a.    What are the savings sought from this section? Provide documentation.

5.    The Proposal modifies Section 13.4 to delete the shift preference of seniority employees.

    a.    What are the savings sought from this section? Provide documentation.

6.    The Proposal Section 14, HEALTH & WELFARE, caps Employer health plan contributions at $350 per month and deletes reference to Kaiser and other language.]

    a.    What are the savings sought from this section? Provide documentation.

7.    The Proposal Section 15 deletes the Pension Plan and states that a 401(k) plan will be established.

    a.    What are the savings sought from this section? Provide documentation.

What will the 401(k) plan contain?

8.    The Proposed Section 16.5 provides for sharing equally the compensation and   expenses of arbitrators, deleting provision for payment by te losing party.

    a.    What is the purpose of this modification of Section 16.5?

EXHIBIT C
-34-

    b.     What are the savings sought from this section? Provide documentation.

9.      The Proposal Article 24, Training, substitutes most "qualified" for most "senior" in specifying who shall receive training positions.

    a.     What is the purpose of this modification?

    b.     What are the savings sought from this section? Provide documentation.

10.    Creation of the Proposal

    a.     Identify all persons who helped prepare the Proposal and state what work they performed respecting the Proposal.

    b.     State when work on the Proposal was performed, whether prepetition or postposition and by whom.

    c.     State the cost of preparing the Proposal to date.

    d.     Provide all documents used in preparing the Proposal, including all calculations, notes, communications and drafts.

11.    As to whether the proposed modifications are necessary to permit the reorganization of the debtor —

    a.     When will a plan of reorganization be proposed?

    b.     Does the Company expect to sell a facility or asset? Which facility or asset?

    c.     To what extent is an asset sale necessary to a plan of reorganization?

12.    Will the proposed modifications assure that all affected parties are treated fairly and equitably – provide all information relevant to this issue, including specifically information relevant to whether Union members are treated fairly and equitably by the Proposal regarding:

    a.     Elimination of seniority provisions?

    b.     Elimination of pension?

    c.     Severe reduction of health and dental benefits based on proposed cap and elimination of Kaiser?

    d.     Reduction of wages?

    e.     Impairment of union security?

EXHIBIT C
-35-

     f.     Impairment of seniority protections?

     13.     Specify the impairment of compensation, health, pension and dental benefits, if any of managerial employees of the Debtor that are commensurate with the Proposal's treatment of employees under the CBA. Please provide for each management person, before and under the Proposal, name, position, salary, health insurance coverage, date of hire, date of insurance coverage, percentage reduction experienced by the person and all other relevant information.

     14.     How is the Proposal fair and equitable to all affected parties?

     a.     Why are changes impairing seniority rights necessary?

     b.     Specify the dollar cost of savings to be obtained by each proposed change from the current CBA. Provide the information used to make the calculations and the calculations actually made.

     B.     <u>For CBA covering Palletizers:</u>

For the Union's consideration of your Proposal, please provide the most complete and reliable information available as to the following topics:

     1.     Proposed modification of Section 1.3 appears to remove union security as a condition of employment.

     a..     Why is this change to the union security article necessary?

     b.     Specify the dollar cost of savings to be obtained by this proposed change from the current CBA. Provide the information used to make the calculations and the calculations actually made.

     2.     Proposed modification of Section 6.1 replaces the entire existing wage scale with certain high, medium and low "performance based wages."

     a.     What are the projected financial impacts of the proposed modifications of this section?

     3.     The Proposal deletes Section 7.4, providing for premium pay between 4 p.m. and 2 a.m.

     b.     What are the financial impacts projected for these changes?

     c.     What commensurate loss is borne by those not covered by the CBA?

     4.     The Proposal deletes Section 7.5, providing for shift premiums to be included in overtime rates.

     a.     What are the savings sought from this section? Provide documentation.

EXHIBIT C
-36-

5. The Proposal deletes Section 7.7, specifying how to distribute overtime and available weekend work for the plant.

    a.    What are the financial impacts projected for these changes?

    b.    Why is this proposal necessary?

    c.    Why is this proposal fair and equitable to all affected persons?

6. The Proposal would modify the seniority provisions of Article 13, deleting seniority protections as to shift preference and as to seniority preference over probationary employees in transfers, promotions, retention during work force reductions, and respecting return to work.

    a.    What are the financial impacts projected for these changes?

    b.    Why is this proposal necessary?

    c.    Why is this proposal fair and equitable to all affected persons?

7. The Proposal Section 14, HEALTH & WELFARE, caps Employer health contributions at $350 per month and deletes reference to Kaiser.

    a.    What are the savings sought from this section? Provide documentation.

8. The Proposal Section 15 deletes the Pension Plan and states that a 401(k) plan will be established.

    a.    What are the savings sought from this section? Provide documentation.

    b.    What will the 401(k) plan contain?

9. Proposed Section 16.5 provides for sharing equally the compensation and expenses of arbitrators, deleting provision for payment by the losing party.

    a.    What is the purpose of this modification?

    b.    What are the savings sought from this section? Provide documentation.

10. The Proposal Section 21.1, Training, substitutes most "qualified" for most "senior" in specifying who shall receive training positions.

    a.    What is the purpose of this modification?

    b.    What are the savings sought from this section? Provide documentation.

EXHIBIT C
-37-

# EXHIBIT D

## TO DECLARATION OF YURI Y. GOTTESMAN IN OPPOSITION TO DEBTORS' MOTION TO MODIFY OR REJECT COLLECTIVE BARGAINING AGREEMENTS

### OF

### THE BAKERY, CONFECTIONERY, TOBACCO WORKERS AND GRAIN MILLERS' LOCAL NO. 85 AND TEAMSTERS LOCAL 324

**Chris Raisner**

| | |
|---|---|
| **From:** | Jim Presley [jim@verge.us.com] |
| **Sent:** | Thursday, October 14, 2010 10:34 AM |
| **To:** | Chris Raisner |
| **Cc:** | 'Jim Presley' |
| **Subject:** | Response to questions for Teamsters |
| **Attachments:** | Response to the Teamsters letter 10_04_2010.docx |

Chris,
Here is my response to the questions regarding the proposal to the Teamsters union in Salem.

Best,
Jim

Verge Inc.
415 776 4921 Office
415 265 2632 Cell
jim@verge.us.com
www.Verge.us.com

EXHIBIT D
-39-

10/18/2010

Nathan W. Bell, CEO/President
Matterhorn Group, Inc.
1635 Village Center Circle, Suite 270
Las Vegas, NV 89134


Re:     *Matterhorn Group, Inc.*

        USBC – Eastern District Case No. 10-39673 (MSM) (Sacramento)

        Jointly Administered with Nos. 10-39664 and 10-39670


Dear Mr. Bell:
This concerns the Company's proposal (the "Proposal") with your letter dated September 22,
2010 to Derek Cutter of Teamsters Local 324. This law firm represents Local 324, and I write
now on its behalf.

Local 324 has read the Proposal respecting the two CBAs and has many questions about it and
about the bankruptcy, especially as it may affect the employees of DeLuxe Ice Cream Company.
We ask for immediate responses to the information requests that follow concerning each of the
CBAs. The information is needed to evaluate the Proposal and in order to prepare
counterproposals. Your urgent compliance with the information requests is required because you
state that time is of the essence in this matter.

We cannot condone your statement that the Company will move to reject the collective
bargaining agreement ("CBA") on October 8, if the Union does not by then agree to terms
"substantially consistent" with the Proposal. Despite that unfortunate "take it or leave it"
approach, Local 324 desires that the Company meet and confer in good faith and attempt to
reach mutually satisfactory modifications.


Accordingly, please contact the undersigned or my partner David Rosenfeld to arrange for dates
and times to meet.

Sincerely,




Christian L. Raisner

CLR/jla

opeiu 3 afl-cio(1)


cc:     Ron Bender

## Information Requests

A.     For DeLuxe Machine Operators CBA
For the Union's consideration of your Proposal, please provide the most complete and reliable
information available as to the following topics:

1.     Whether the Proposal and each part of it consists only of modifications that are
necessary.

2.     Proposal Section 6.1, "New Proposed performance based wages", is new and has new
wage rates.

a.     What are the projected financial impacts of the proposed modifications of that section

        If we have the flexibility to hire and train a "new employee" that performs as well as the most
senior employee, this reduces the wages based on the schedules that are included in the proposal.


3.     The Proposal deletes Section 7.5, providing for premium pay between 4 p.m. and 2 a.m.


This reduces the cost of .15 per hour for the employees in this shift.


a.     What are the financial impacts projected for these changes?

        If there are 20 employees on this shift * .15 per hour * 8 hours = $24 per shift

In running 180 shifts, $4320.00

In running 250 shifts, $6000.00

b.      What commensurate loss is borne by those not covered by the CBA?

4.      The Proposal deletes Section 7.6, providing for shift premiums to be included in overtime rates.

a.      What are the savings sought from this section?  Provide documentation.

Multiply section 3a times 1 1/2.

5.      The Proposal modifies Section 13.4 to delete the shift preference of seniority employees.

a.      What are the savings sought from this section?  Provide documentation.

The need to pay the seniority rate for work that can be provided by less senior employees is the difference.

Current spread in wages between less senior and more senior employees as an example.

When senior employees pick their shift and are selected for overtime as well, the table below illustrates the differences. This is the current separation of wages.

|  | Low | high | No of positions |
|---|---|---|---|
| Operators | $13.47 | $17.51 | 16 |
| Maintenance | $11.78 | $19.73 | 7 |
| Hardening | $8.43 | $16.91 | 9 |
| Packers | $8.43 | $11.72 | 77 |

6.      The Proposal Section 14, HEALTH & WELFARE, caps Employer health plan contributions at $350 per month and deletes reference to Kaiser and other language.]

a.      What are the savings sought from this section?  Provide documentation.

|  | Current | Plan | # of empl. | Savings |
|---|---|---|---|---|
| Annualized per full time employees = | 7975.78 | 3775.78 | 80 | $302,062.78 |
| Annualized per seasonal employees = | 7975.78 | 0 | 48 | $328,837.44 |
|  |  |  | Total = | $630,900.22 |

Dental

| | | | | |
|---|---|---|---|---|
| Annualized per full time employees = | $63,042.21 | 0 | 80 | $63,042.21 |
| Annualized per _seasonal_ employees = | $38,480.31 | 0 | 48 | $38,480.31 |
| | | | Total | $91,522.52 |

7.     The Proposal Section 15 deletes the Pension Plan and states that a 401(k) plan will be established.

a.     What are the savings sought from this section?  Provide documentation.

| | Current Pension | 401K | | Total |
|---|---|---|---|---|
| Full time | $135,477.56 | $54,906.55 | $80,571.01 | $110,351.81 |
| Part time | $29,780.80 | 0 | $29,780.80 | |

Combined savings of health, pension and dental savings are = $832,774.55

What will the 401(k) plan contain?

> Matching funds of up to 2% of the wages.

8.     The Proposed Section 16.5 provides for sharing equally the compensation and   expenses of arbitrators, deleting provision for payment by the losing party.

a.     What is the purpose of this modification of Section 16.5?

b.     What are the savings sought from this section?  Provide documentation.

> Currently we are asked to enter into arbitration without following the steps agreed to in the CBA. This causes potentially unnecessary legal expenses.

9.     The Proposal Article 24, Training, substitutes most "qualified" for most "senior" in specifying who shall receive training positions.

a.     What is the purpose of this modification?

b.     What are the savings sought from this section?  Provide documentation.

This was answered in previous sections.

10.    Creation of the Proposal

a.    Identify all persons who helped prepare the Proposal and state what work they performed respecting the Proposal.

> James Presley and Nathan Bell were the authors

b.    State when work on the Proposal was performed, whether prepetition or postposition and by whom.

> Beginning the week of August 23[rd].

c.    State the cost of preparing the Proposal to date.

d.    Provide all documents used in preparing the Proposal, including all calculations, notes, communications and drafts.

11.    As to whether the proposed modifications are necessary to permit the reorganization of the debtor —

a.    When will a plan of reorganization be proposed?

b.    Does the Company expect to sell a facility or asset? Which facility or asset?
> All options are under consideration.

c.    To what extent is an asset sale necessary to a plan of reorganization?
> Unknown at this point.

12.    Will the proposed modifications assure that all affected parties are treated fairly and equitably – provide all information relevant to this issue, including specifically information relevant to whether Union members are treated fairly and equitably by the Proposal regarding:

a.    Elimination of seniority provisions? Yes

b.    Elimination of pension?   Yes

c.    Severe reduction of health and dental benefits based on proposed cap and elimination of Kaiser? Yes

d.    Reduction of wages? Ye

e.    Impairment of  union security? Yes

f.    Impairment of seniority protections? Yes

13.    Specify the impairment of compensation, health, pension and dental benefits, if any of managerial employees of the Debtor that are commensurate with the Proposal's treatment of employees under the CBA. Please provide for each management person, before and under the Proposal, name, position, salary, health insurance coverage, date of hire, date of insurance coverage, percentage reduction experienced by the person and all other relevant information.

14.    How is the Proposal fair and equitable to all affected parties?

a.    Why are changes impairing seniority rights necessary? For all the economic reasons documented in the paragraphs above.

b.    Specify the dollar cost of savings to be obtained by each proposed change from the current CBA.  Provide the information used to make the calculations and the calculations actually made.

**B.** **For CBA covering Palletizers:**

For the Union's consideration of your Proposal, please provide the most complete and reliable information available as to the following topics:

1.          Proposed modification of Section 1.3  appears to remove union security as a condition of employment.

a..          Why is this  change to the union security article necessary? <u>To allow for all potential employees to make their own decision as to whether they want to make contributions to the union and become union members.</u>
b.          Specify the dollar cost of savings to be obtained by this proposed change from the current CBA.  Provide the information used to make the calculations and the calculations actually made.
2.          Proposed modification of Section 6.1 replaces the entire existing wage scale with certain high, medium and low "performance based wages."

a.          What are the projected financial impacts of the proposed modifications of this section?

3.          The Proposal deletes Section 7.4, providing for premium pay between 4 p.m. and 2 a.m.

b.          What are the financial impacts projected for these changes?

c.          What commensurate loss is borne by those not covered by the CBA?

4.          The Proposal deletes Section 7.5, providing for shift premiums to be included in overtime rates.

a.          What are the savings sought from this section?  Provide documentation.

5.          The Proposal deletes Section 7.7, specifying how to distribute overtime and available weekend work for the plant.

a.          What are the financial impacts projected for these changes?

b.          Why is this proposal necessary?

c.          Why is this proposal fair and equitable to all affected persons?

6.          The Proposal would modify the seniority provisions of Article 13, deleting seniority protections as to shift preference and as to seniority preference over probationary employees in transfers, promotions, retention during work force reductions, and respecting return to work.

a.          What are the financial impacts projected for these changes?

b.          Why is this proposal necessary?

c.        Why is this proposal fair and equitable to all affected persons?

7.        The Proposal Section 14, HEALTH & WELFARE, caps Employer health contributions at $350 per month and deletes reference to Kaiser.

a.        What are the savings sought from this section?  Provide documentation.

8.        The Proposal Section 15 deletes the Pension Plan and states that a 401(k) plan will be established.

a.        What are the savings sought from this section?  Provide documentation.

b.        What will the 401(k) plan contain?

9.        Proposed Section 16.5 provides for sharing equally the compensation and   expenses of arbitrators, deleting provision for payment by the losing party.

a.        What is the purpose of this modification?

b.        What are the savings sought from this section?  Provide documentation.

10.       The Proposal Section 21.1, Training, substitutes most "qualified" for most "senior" in specifying who shall receive training positions.

a.        What is the purpose of this modification?

b.        What are the savings sought from this section?  Provide documentation.

# EXHIBIT E

## TO DECLARATION OF
## YURI Y. GOTTESMAN
## IN OPPOSITION TO DEBTORS'
## MOTION TO MODIFY OR REJECT
## COLLECTIVE BARGAINING
## AGREEMENTS

### OF
### THE BAKERY, CONFECTIONERY, TOBACCO
### WORKERS AND GRAIN MILLERS' LOCAL NO. 85
### AND TEAMSTERS LOCAL 324

**Chris Raisner**

---

**From:** Chris Raisner
**Sent:** Wednesday, October 06, 2010 5:04 PM
**To:** 'jim.presley@matterhorngroupinc.com'
**Cc:** 'nwbell@pacmezz.com'; 'rb@lnbyb.com'
**Subject:** Document in Word format

Jim Presley

Jim --

Unfortunately I will not be able to provide the document you requested re Vitafreze in Word format today. I expect to do so tomorrow morning, and I will let you know if there is a problem.

In the meantime, though, please forward the information requested regarding the CBA modifications proposed for Deluxe Ice Cream in Salem, which you said is ready.

Also, as I mentioned on the telephone, since the Company stated in court October 4 that the reason it would move to reject the CBAs was to appeal to some potential buyer that may want them rejected, both Unions will need you to identify each potential purchaser of the Debtors' assets, and to provide all information and representations passed between the Debtor or the sales agents and any of them relevant to finances of purchase and sale and labor costs and the CBA. Please therefore forward this information as well. If a nondisclosure agreement is desired, please also forward such NDA, or be in touch if one is desired.

Thank you.

-- Chris Raisner

*CHRISTIAN L. RAISNER*
WEINBERG, ROGER & ROSENFELD
Phone: (510) 337-1001
Fax: (510) 337-1023
e-mail: <mailto:craisner@unioncounsel.net>

EXHIBIT E

# EXHIBIT F
## TO DECLARATION OF
## YURI Y. GOTTESMAN
## IN OPPOSITION TO DEBTORS'
## MOTION TO MODIFY OR REJECT
## COLLECTIVE BARGAINING
## AGREEMENTS

### OF
### THE BAKERY, CONFECTIONERY, TOBACCO
### WORKERS AND GRAIN MILLERS' LOCAL NO. 85
### AND TEAMSTERS LOCAL 324

STEWART WEINBERG
DAVID A. ROSENFELD
WILLIAM A. SOKOL
VINCENT A. HARRINGTON, JR.
W. DANIEL BOONE
BLYTHE MICKELSON
BARRY E. HINKLE
JAMES RUTKOWSKI •
SANDRA RAE BENSON
CHRISTIAN L. RAISNER
JAMES J. WESSER
THEODORE FRANKLIN
ANTONIO RUIZ
MATTHEW J. GAUGER
ASHLEY K. IKEDA ••
LINDA BALDWIN JONES
PATRICIA A. DAVIS
ALAN G. CROWLEY
KRISTINA L. HILLMAN •••
EMILY P. RICH
BRUCE A. HARLAND
CONCEPCIÓN E. LOZANO-BATISTA
CAREN P. SENCER

# WEINBERG, ROGER & ROSENFELD

A PROFESSIONAL CORPORATION

1001 Marina Village Parkway, Suite 200
Alameda, CA 94501-1091
TELEPHONE 510.337.1001
FAX 510.337.1023

LORI K. AQUINO ••
ANNE I. YEN
MANJARI CHAWLA
KRISTINA M. ZINNEN
JANNAH V. MANANSALA
MANUEL A. BOÏGUES ••••
KERIANNE R. STEELE •••
ANA M. GALLEGOS
GARY P. PROVENCHER
LISL R. DUNCAN
JORDAN D. MAZUR
JACOB J. WHITE
SHARON A. SEIDENSTEIN
LESLIE V. FREEMAN •••••
EZEKIEL D. CARDER ••••••
YURY Y. GOTTESMAN

PATRICIA M. GATES, Of Counsel
ROBERTA D. PERKINS, Of Counsel
RICHARD T. DRURY, Of Counsel
NINA FENDEL, Of Counsel

• Also admitted in Arizona
•• Admitted in Hawaii
••• Also admitted in Nevada
•••• Also admitted in Illinois
••••• Also admitted in Missouri
•••••• Also admitted in New York

September 24, 2010

Nate Bell, CEO/President
Matterhorn Group, Inc.
1635 Village Center Circle, Suite 270
Las Vegas, NV 89134

Re:    Matterhorn Group, Inc. – Vitafreeze

Dear Mr. Bell:

This will confirm that Local 85 and Vitafreeze met at Local 85's office on September 20, to discuss Vitafreeze's proposals to modify the contract.

We began that discussion pointing out that the employer had made several proposals which had nothing to do with any economic issue. We pointed first to the proposal to modify the Union security clause and second to the proposal to modify the seniority clause. As pointed out, there seems to be no economic impact of these items and therefore, neither of these proposals concerns anything which is necessary with respect to a plan of reorganization. You and Mr. Presley attempted to justify the modification of the union security clause by suggesting that employees had the right to choose whether to be members of the Union or not. As I pointed out, that has nothing to do with the plan of reorganization and any financial issues affecting the debtor's effort to reorganize.

We had a similar discussion regarding the seniority clause. Although you speculated that there might be some individuals who the employer would rather promote or move into a position based upon skills rather than seniority, once again that has nothing to do with the plan of reorganization.

We asked whether you had a response to the August 31 letter, which my partner Chris Raisner sent asking for information regarding each of the employer's proposals to modify the Agreement. Mr. Presley explained that you were unable to respond because you could not determine the references in the letter. I explained that it was pretty simple that these were the references to the sections that you propose to change and therefore this should have been clear.

EXHIBIT F
-50-

LOS ANGELES OFFICE
3435 Wilshire Boulevard, Suite 620
Los Angeles, CA 90010-1907
TEL 213.380.2344 FAX 213.381.1088

SACRAMENTO OFFICE
428 J Street, Suite 520
Sacramento, CA 95814-2341
TEL 916.443.6600 FAX 916.442.0244

HONOLULU OFFICE
1099 Alakea Street, Suite 1602
Honolulu, HI 96813-4500
TEL 808.528.8880 FAX 808.528.8881

Your failure to provide that information made it extremely difficult for us to discuss your proposed modification. Indeed, the failure to provide the information is a violation of Section 1113, which requires the employer to provide such information.

We spent most of the time having a general discussion about the bankruptcy proceedings. As you explained it, the debtor has three choices: (1) Liquidation, (2) Reorganization, or, (3) A "363" Sale. You indicated you were trying to form an investor group to do a 363 sale whereby the new investor group would buy the assets and operate the business allowing the current debtor to liquidate.

We recognize, as you pointed out, this puts you in somewhat of a conflict situation with the interest of the debtor.

In any case, as we pointed out, there are a number of labor law issues involved in a 363 sale. For example, there are issues of sucessorship liability, bargaining obligations and in addition, the question of who will pick up the withdrawal liability for both the BCT Plan, as well as the Western Conference Plan.

You conceded that you had not really understood these issues and I took some time to explain how these issues generally work. At that point I recommended that you seek competent labor counsel, since you really could not talk about the various proposals without understanding the labor law ramifications.

At that point we terminated the meeting.

During the course, I made it quite plain that Local 85 recognizes that some modifications are necessary if there is going to be a plan of reorganization. The Union is willing to give concessions with respect to wages and benefits which are plainly cost or economic items. We understand the necessity of doing so. We, of course, did not get to any point about discussing that because you ended up terminating the meeting in order to obtain labor counsel to discuss the labor issues.

We are prepared to meet again. We, of course, remind you that we still need the information asked for on August 31. Additionally, you will need to come prepared to discuss these issues. You will need, particularly, to determine the impact of a 363 sale or any plan of reorganization on the very substantial withdrawal liability for both the Western Conference Plan as well as the BCT Pension Plan. Because you have ceased paying pension contributions, the debtor is incurring a substantial administrative claim for such contributions. Furthermore this is an unfair labor practice.

We do want to make it clear that should the plant or plants be sold, all current employees will seek employment with any purchaser or successor. That successor may not change wages, hours

and working conditions at any such successor will be a "perfectly clear successor/"

If you have any questions, please let me know.

Sincerely,

David A. Rosenfeld

DAR/rfb
opeiu 3 afl-cio(1)

# EXHIBIT G
## TO DECLARATION OF
## YURI Y. GOTTESMAN
## IN OPPOSITION TO DEBTORS'
## MOTION TO MODIFY OR REJECT
## COLLECTIVE BARGAINING
## AGREEMENTS

### OF
### THE BAKERY, CONFECTIONERY, TOBACCO
### WORKERS AND GRAIN MILLERS' LOCAL NO. 85
### AND TEAMSTERS LOCAL 324



United States Government
**NATIONAL LABOR RELATIONS BOARD**
Subregion 36
601 S.W. Second Avenue, Room 1910
Portland, OR  97204-3170

Telephone: (503) 326-3085
Facsimile:  (503) 326-5387
Toll Free:   (866) 667-6572
Agency WEB site: www.nlrb.gov

October 15, 2010

**RECEIVED**
OCT 18 2010
**W R & R**

Mr. Yuri Gottesman
Weinburg, Roger, & Rosenfeld
1001 Marina Village Parkway, Suite 200
Alameda, CA 94501

Re:  Deluxe Ice Cream Company
        36-CA-10739

Dear Mr. Gottesman:

This will acknowledge receipt of the charge which you recently filed in the above-entitled matter.

---

**FILING DOCUMENTS WITH REGIONAL OFFICES: The Agency is moving toward a fully electronic records system. To facilitate this important initiative, the Agency strongly urges all parties to submit documents and other materials (EXCEPT unfair labor practice charges and representation petitions) to Regional Offices through the Agency's E-Filing system on its website:  http://www.nlrb.gov (See Attachment to this letter for instructions). Of course, the Agency will continue to accept timely filed paper documents.**

---

Your attention is directed to the enclosed Form NLRB-4541, wherein your right to be represented by counsel or other representative in any proceeding before this Agency is discussed, and for an explanation of the Agency's processes for handling unfair labor practice charges.

If you have not already done so, please submit to us a full factual account of the matters alleged in your charge and attach to it all documentary evidence that pertains thereto. Also, please submit to us the names, addresses and telephone numbers of all witnesses, together with a summary of the facts to which each can testify, or if available, his/her affidavit. Our practice requires that this material supporting your charge be submitted to us as soon as possible.

**All communications and submissions should be made to Helena A. Fiorianti; telephone (503)326-3284; Helena.Fiorianti@nlrb.gov (please see attached e-mail policy).**

EXHIBIT G

-54-

Please be advised that under the Freedom of Information Act, unfair labor practice charges and representation petitions are subject to prompt disclosure to members of the public upon request. In this regard, you may have received a solicitation by organizations or persons who have obtained public information concerning this matter and who seek to represent you before our Agency. You may be assured that no organization or person seeking your business has any "inside knowledge" or favored relationship with the National Labor Relations Board; their information regarding this matter is only that which must be made available to any member of the public.

If you are a non-English speaker and need assistance, please inform the Board Agent assigned to this case.

Customer service standards concerning the processing of unfair labor practice cases are available under Public Notices on the Agency's website listed above.

Very truly yours,

*Linda L Davidson*

Linda L. Davidson
Officer in Charge

Enclosures

cc:

Teamsters Local Union No. 324
2686 Portland Road, N.E.
Salem, OR 97301

FORM EXEMPT UNDER 44 U.S.C 3512

INTERNET
FORM NLRB-501
(2-08)

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
CHARGE AGAINST EMPLOYER

| DO NOT WRITE IN THIS SPACE | |
|---|---|
| Case 36-CA-10739 | Date Filed 10-14-10 |

**INSTRUCTIONS:**
File an original with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.

## 1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT

| | |
|---|---|
| a. Name of Employer **Deluxe Ice Cream Company** | b. Tel. No. **(208) 459-1635** |
| | c. Cell No. |
| | f. Fax No. **(310) 229-1244** |
| d. Address (Street, city, state, and ZIP code) Local plant  e. Employer Representative **Ron Bender** **1860 State St. Salem, OR  97301** | g. e-Mail **rb@lnbyb.com** |
| | h. Number of workers employed |
| i. Type of Establishment (factory, mine, wholesaler, etc.) **Factory** | j. Identify principal product or service **Frozen Novelty Manufacturing** |

k. The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) and (list subsections) **(5)** _____ of the National Labor Relations Act, and these unfair labor practices are practices affecting commerce within the meaning of the Act, or these unfair labor practices are unfair practices affecting commerce within the meaning of the Act and the Postal Reorganization Act.

2. Basis of the Charge (set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)

Within the last six months the above named employer, by itself and through its agent Ron Bender of Levene, Neale, Bender, Yoo & Brill L.L.P., refused to bargain in good faith with the Charging Party by insisting on bargaining over non-mandatory subjects of bargaining.  Further, the above named employer unilaterally announced it would stop all pension contributions, stopped making all pension contributions and failed to implement wage increases, required by the Collective Bargaining Agreement.

The employer and Mr. Bender should be held responsible for remedying these unfair labor practices.

| 3. Full name of party filing charge (if labor organization, give full name, including local name and number) **Teamsters Local 324** | |
|---|---|
| 4a. Address (Street and number, city, state, and ZIP code) **2688 Portland Road, N.E. Salem, OR 97301-0125** | 4b. Tel. No. **(800) 822-7953** |
| | 4c. Cell No. |
| | 4d. Fax No. **(503) 378-7590** |
| | 4e. e-Mail |

| 5. Full name of national or international labor organization of which it is an affiliate or constituent unit (to be filled in when charge is filed by a labor organization) **Teamsters Local 324** | |
|---|---|

## 6. DECLARATION

| I declare that I have read the above charge and that the statements are true to the best of my knowledge and belief. | Tel. No. **(510) 337-1001** |
|---|---|
| By [signature] **Yuri Y. Gottesman** (signature of representative or person making charge)   (Print/type name and title or office, if any) **Weinberg, Roger & Rosenfeld 1001 Marina Village Parkway, Suite 200** Address  **Alameda, CA  94501-1091** | Office, if any, Cell No. |
| | Fax No. **(510) 337-1023** |
| | e-Mail **ygottesman@unioncounsel.net** |
| | **10/14/10** (date) |

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**

PRIVACY ACT STATEMENT

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq. The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information will cause the NLRB to decline to invoke its processes.

EXHIBIT G

-56-

# NATIONAL LABOR RELATIONS BOARD

## NOTICE OF APPEARANCE

```
┌─────────────────────────────────────────────────┐
│                                                   │
│                                                   │
│                                                   │
│              and                    CASE          │
│                                                   │
│                                                   │
│                                                   │
│                                                   │
└─────────────────────────────────────────────────┘
```

☐ REGIONAL DIRECTOR     ☐ EXECUTIVE SECRETARY        ☐ GENERAL COUNSEL
                            NATIONAL LABOR RELATIONS BOARD     NATIONAL LABOR RELATIONS BOARD
                            Washington, DC 20570              Washington, DC 20570

THE UNDERSIGNED HEREBY ENTERS APPEARANCE AS REPRESENTATIVE OF _____

_____

IN THE ABOVE-CAPTIONED MATTER.

CHECK THE APPROPRIATE BOX(ES) BELOW:

☐   REPRESENTATIVE IS AN ATTORNEY

☐   IF REPRESENTATIVE IS AN ATTORNEY, IN ORDER TO ENSURE THAT THE PARTY MAY RECEIVE COPIES OF CERTAIN DOCUMENTS OR CORRESPONDENCE FROM THE AGENCY IN ADDITION TO THOSE DESCRIBED BELOW, THIS BOX MUST BE CHECKED. IF THIS BOX IS NOT CHECKED, THE PARTY WILL RECEIVE ONLY COPIES OF CERTAIN DOCUMENTS SUCH AS CHARGES, PETITIONS AND FORMAL DOCUMENTS AS DESCRIBED IN SEC. 11842.3 OF THE CASEHANDLING MANUAL.

*(REPRESENTATIVE INFORMATION)*

```
┌─────────────────────────────────────────────────────────────────────────┐
│ NAME:_____ │
│                                                                            │
│ MAILING ADDRESS:_____ │
│ _____   │
│                                                                            │
│ E-MAIL ADDRESS:_____ │
│                                                                            │
│ OFFICE TELEPHONE NUMBER:_____ │
│                                                                            │
│ CELL PHONE NUMBER:_____  FAX:_____  │
│                                                                            │
│                                                                            │
│ SIGNATURE:_____ │
│            (Please sign in ink.)                                           │
│ DATE:_____ │
└─────────────────────────────────────────────────────────────────────────┘
```

[1] IF CASE IS PENDING IN WASHINGTON AND NOTICE OF APPEARANCE IS SENT TO THE GENERAL COUNSEL OR THE EXECUTIVE SECRETARY, A COPY SHOULD BE SENT TO THE REGIONAL DIRECTOR OF THE REGION IN WHICH THE CASE WAS FILED SO THAT THOSE RECORDS WILL REFLECT THE APPEARANCE.



UNITED STATES GOVERNMENT
NATIONAL LABOR RELATIONS BOARD
Region 20

901 Market Street, Suite 400

San Francisco, California 94103-1735

Telephone: 415/356-5130
FAX: 415/356-5156
Website: www.nlrb.gov

October 15, 2010

Bakery, Confectionery, Tobacco Workers & Grain Millers Union Local 85
7125 Governors Circle
Sacramento, CA 95823

**RECEIVED**

OCT 18 2010

**W R & R**

Re:    Vitafreze Frozen Confections, Inc.
       Case 20-CA-35299
       Board Agent: Lana Pfeifer
       Telephone: (415)356-5187
       Board Agent's E-Mail: Lana.Pfeifer@nlrb.gov

Dear Sir or Madam:[1]

Enclosed is a copy of the charge that you filed in this case. The Board Agent named above will communicate with you to obtain the relevant evidence regarding the case.

> **FILING DOCUMENTS WITH REGIONAL OFFICES: The Agency is moving toward a fully electronic records system. To facilitate this important initiative, the Agency strongly urges all parties to submit documents and other materials (except unfair labor practice charges and representation petitions) to Regional Offices through the Agency's E-Filing system on its website: http://www.nlrb.gov (See Attachment to this letter for instructions). Of course, the Agency will continue to accept timely filed paper documents.**

However, prior to such communication, it is essential that you aid the investigator by sending a detailed written account of the facts regarding the case. If there are any documents, such as letters, collective bargaining agreements, or similar items, which are necessary to understanding or resolving the case, please submit copies to the investigator. In addition to these items, please send a list containing the names, addresses and phone numbers of all witnesses who have relevant information regarding the case, together with a summary of the testimony expected from each. If you have not already done so, please submit this material by **October 22, 2010.**

---

1    The National Labor Relations Board will provide assistance to individuals with limited English. If you or anyone involved in this case needs assistance due to limited English, please advise this Office as soon as possible.

La Junta Nacional de Relaciones de Trabajo proveerá asistencia a personas con ingles limitado. Si usted u otra persona necesita ayuda en relacion a este caso debido al ingles limitado, por favor avise a esta Oficina tan pronto posible.

EXHIBIT G
-58-

DOCKET yuri

Additionally, as the Charging Party, you have an obligation to submit evidence in support of your charge in a prompt manner. You should also be aware that the Region's investigative goal is to obtain your evidence in affidavit form by no later than 14 calendar days of the filing of the charge. Failure to assist or cooperate with the investigation in obtaining the initial evidence may result in a dismissal of the charge.

Please be advised that under the Freedom of Information Act, unfair labor practice charges and representation petitions are subject to prompt disclosure to members of the public upon request. In this regard, you may have received a solicitation by organizations or persons who have obtained public information concerning this matter and who seek to represent you before our Agency. You may be assured that no organization or person seeking your business has any "inside knowledge" or favored relationship with the National Labor Relations Board; their information regarding this matter is only that which must be made available to any member of the public.

Very truly yours,

Joseph F. Frankl
Regional Director

Enclosures

     Yuri Gottesman
     Weinberg Roger & Rosenfeld
     1001 Marina Village Parkway Suite 200
     Alameda, CA 94501

     ky

EXHIBIT G
-59-

FORM EXEMPT UNDER 44 U.S.C 3512

INTERNET
FORM NLRB-501
(2-08)

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
CHARGE AGAINST EMPLOYER ~~RECEIVED~~
NLRB, REGION 20

**DO NOT WRITE IN THIS SPACE**

| Case | Date Filed |
|---|---|
| 20-CA-35299 | 10/14/2010 |

**INSTRUCTIONS:**
File an original with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.

2010 OCT 14 P 2: 44

SAN FRANCISCO, CA

## 1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT

| a. Name of Employer | | b. Tel. No. (916) 455-3030 |
|---|---|---|
| Vitafreze Frozen Confections, Inc. | | c. Cell No. |
| | | f. Fax No. (310) 229-1244 |
| d. Address (Street, city, state, and ZIP code) | e. Employer Representative | g. e-Mail |
| 1220 66th Street | Ron Bender | rb@lnbyb.com |
| Sacramento, CA 95819 | | h. Number of workers employed |
| I. Type of Establishment (factory, mine, wholesaler, etc.) | J. Identify principal product or service | |
| Factory | Frozen Novelty Manufacturing | |

k. The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) and (list subsections) (5) of the National Labor Relations Act, and these unfair labor practices are practices affecting commerce within the meaning of the Act, or these unfair labor practices are unfair practices affecting commerce within the meaning of the Act and the Postal Reorganization Act.

2. Basis of the Charge (set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)

Within the last six months the above named employer, by itself and through its agent Ron Bender of Levene, Neale, Bender, Yoo & Brill L.L.P., refused to bargain in good faith with the Charging Party by insisting on bargaining over non-mandatory subjects of bargaining. Further, the above named employer unilaterally announced it would stop all pension contributions and stopped all pension contributions, required by the Collective Bargaining Agreement. The employer and Mr. Bender should be held responsible for remedying these unfair labor practices.

| 3. Full name of party filing charge (if labor organization, give full name, including local name and number) | | |
|---|---|---|
| Bakery, Confectionery, Tobacco Workers & Grain Millers Union Local 85 | | |
| 4a. Address (Street and number, city, state, and ZIP code) | | 4b. Tel. No. (916) 393-7233 |
| 7125 Governors Circle | | 4c. Cell No. |
| Sacramento, CA 95823 | | 4d. Fax No. (916) 393-5229 |
| | | 4e. e-Mail |

5. Full name of national or international labor organization of which it is an affiliate or constituent unit (to be filled in when charge is filed by a labor organization) Bakery, Confectionery, Tobacco Workers & Grain Millers Union Local 85

## 6. DECLARATION

I declare that I have read the above charge and that the statements are true to the best of my knowledge and belief.

| | | Tel. No. (510) 337-1001 |
|---|---|---|
| By (signature of representative or person making charge) | Yuri Y. Gottesman (Print/type name and title or office, if any) | Office, if any, Cell No. |
| Weinberg, Roger & Rosenfeld | | Fax No. (510) 337-1023 |
| 1001 Marina Village Parkway, #200 | 10/14/10 (date) | e-Mail ygottesman@unioncounsel.net |
| Address    Alameda, CA 94501-1091 | | |

EXHIBIT "G"

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**

PRIVACY ACT STATEMENT
Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq. The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information will cause the NLRB to decline to invoke its processes.

# EXHIBIT H
## TO DECLARATION OF
## YURI Y. GOTTESMAN
## IN OPPOSITION TO DEBTORS'
## MOTION TO MODIFY OR REJECT
## COLLECTIVE BARGAINING
## AGREEMENTS

### OF
### THE BAKERY, CONFECTIONERY, TOBACCO
### WORKERS AND GRAIN MILLERS' LOCAL NO. 85
### AND TEAMSTERS LOCAL 324

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

(SACRAMENTO DIVISION)

---oOo---

In re: MATTERHORN GROUP, INC.,       No. 10-39672

                Debtor.             A-11

_____/


BEFORE THE HONORABLE MICHAEL S. McMANUS, JUDGE OF

THE UNITED STATES BANKRUPTCY COURT, EASTERN DISTRICT OF

CALIFORNIA, AND ON OCTOBER 4, 2010, AT 1:30 P.M.


--oOo--

REPORTER'S EXCERPT OF PROCEEDINGS

HEARING ON MOTION FOR ORDER AUTHORIZING DEBTOR'S

CONTINUED USE OF CASH COLLATERAL AND APPROVING AUCTION

SALE FORMAT AND BIDDING PROCEDURES

---oOo---


REPORTED BY:               LISA MARIE USSERY
                               CSR NO. 11534

```
1              A P P E A R A N C E S

2                    ---oOo---

3   For the Creditors:

4                   Downey Brand LLP
                    621 Capitol Mall, 18th Floor
5                   Sacramento, CA 95814
                    BY:  JAMIE DREHER, ESQ.
6
                    Hanson Bridgett LLP
7                   425 Market Street, 26th Floor
                    San Fransisco, CA 94105
8                   BY:  RICHARD ADLER, ESQ.

9                   SulmeyerKupetz
                    333 S. Hope St., 35th Floor
10                  Los Angeles, CA 90071
                    BY:  JOHN M. SAMBERG, ESQ.(TELEPHONE)
11
                    Weinberg, Roger & Rosenfeld
12                  428 J Street
                    Sacramento, CA 95814
13                  BY:  CHRISTIAN L. RAISNER (TELEPHONE)

14
    For the Debtors:    Levene Neale Bender Yoo & Brill
15                      10250 Constellation Blvd, Suite 1700
                        Los Angeles, CA 90067
16                      BY:  RON BENDER, ESQ.
                                 AND
17                      BETH ANN R. YOUNG, ESQ. (TELEPHONE)
                        JOHN-PATRICK M. FRITZ    (TELEPHONE)
18

19
    ALSO PRESENT:       NATHAN BELL, CEO of
20  (By Telephone)      Matterhorn Group, Inc.

21
                        ANDREW DE CAMARA, Executive V.P.
22                      Sherwood Partners, LLC
                        1100 La Avenida St., Bldg. A
23                      Mountain View, CA 94043

24                    ---oOo---
                                            EXHIBIT H
25                                            -63-
```

MONDAY, OCTOBER 4, 2010, SACRAMENTO, CALIFORNIA

2     BEFORE THE HONORABLE MICHAEL S. McMANUS

3                    ---o0o---

4  *        *              *          *              *

5  (Whereupon, the following proceedings are an excerpt.)

6         THE COURT:  As I said, if something comes out of

7  the woodwork that makes this more significant and in

8  hindsight, we'll revisit it.  All right.

9         So, I haven't heard from Mr. Raisner.

10        Does the union you represent have any objection

11 to these sale procedures?

12        MR. RAISNER:  I am not here to make an

13 objection.  I do have a question of whether any

14 consideration has been or was given to the possibility of

15 a procedure allowing sale of one of the facilities, that

16 is Vitafreze in Sacramento or the Oregon facility, Deluxe

17 Ice Cream, in that might -- whether there's been

18 consideration given to that.

19        It might involve such sale could -- there's pros

20 and cons, potentially, in the market.  It could involve

21 more buyers for one or the other.  It could perhaps

22 increase the price in consideration contrary to that.

23        THE COURT:  Mr. Bender?

24        MR. BENDER:  Mr. De Camara, are you still on the

25 phone?

EXHIBIT H
-64-

```
 1        MR. DE CAMARA:  Yes.

 2        MR. BENDER:  So, Your Honor, the answer to

 3   Mr. Raisner's excellent question, which we have thought

 4   of.  There are two plants, but they are still owned by

 5   this group of Debtors.  And as a practical matter of

 6   course, unless multiple buyers teamed up to buy the

 7   separate plants and exceeded the floor price, we still

 8   would need the bank's consent.

 9        As a practical matter, I would think it's

10   unlikely that the highest bid for the combined plants

11   would be lower than the highest bid for just one plant.

12   But, I suppose it is possible that Sherwood would be able

13   to combine two buyers looking each for one plant but not

14   the other, into the highest bid.  I think Sherwood would

15   simply have to use its best judgment.

16        I ask Mr. De Camara if he has any thoughts on

17   the topic.  Of course all along, the process is designed

18   to maximize value.

19        THE COURT:  So, what you are saying is if two

20   buyers showed up, each one wanting to buy one of the two

21   plants, that it would be within the possibility -- within

22   the realm of possibility that the investment banker would

23   figure out a way to combine them and making a single

24   bid.

25        MR. BENDER:  Right.  It's not something that
```

EXHIBIT H
-65-

1 specific fact pattern that you just described, which of

2 course is theoretical and possible, but isn't something

3 we discussed. But, certainly, it's something that could

4 be done in any auction when you combine bidders with

5 different assets. And that's what I was asking Mr. De

6 Camara, that if he thought that was a realistic

7 scenario.

8        THE COURT: Mr. De Camara?

9        MR. DE CAMARA: Yeah. I think from Sherwood's

10 perspective, as I've already mentioned, we've already

11 been reaching out to some of the prospective buyers. I

12 think if we get feedback from the prospective buyers that

13 certain buyers may have more interest in the assets that

14 are found in Salem versus Sacramento or vice versa, we

15 would obviously try to combine efforts as much as

16 possible to maximize value. That's our goal.

17        I have not heard anything like that. But, we

18 are not putting any sort of preconditions on anything in

19 terms of trying to strategize and figure out what would

20 be the best task to maximize value. I think that's

21 something that would be clearer in the next couple

22 weeks.

23        THE COURT: I think that would be something

24 that's entertained. But, I guess the reason both are

25 being sold now is because of the cash problem the Debtor

EXHIBIT H
-66-

1  foresees down the road.

2          MR. BENDER:  This company is losing a lot of

3  money and draining cash.  I think if we were to sell one

4  plant and leave the other open, the problems would be

5  even greater.  I think what is going to happen, more

6  likely, is there may be a buyer who looks to shut one of

7  the plants down.

8          If the hypothetical that Mr. Raisner raises is

9  two different buyers wants two different plants, and

10  their combined price is the highest and best price for

11  the estate, I would think certainly that's something that

12  Sherwood would pursue.

13          MR. RAISNER:  If I may; just a little more on

14  this exact point of whether or not the sale procedure now

15  is one reason -- it does not invite a buyer from one

16  facility or anything less than the whole and --

17          THE COURT:  That's because the Debtor can't

18  continue to operate.

19          MR. RAISNER:  Well, yeah.  I understand what's

20  been said in that regard.  And, you know, I really don't

21  have anything to offer on that specific point.  Not that

22  one unit should be sold separately, but if there could be

23  an understanding that someone could provisionally be in

24  the game provided there were a sale of both assets, you

25  know, both major assets -- both facilities did take

EXHIBIT H
-67-

1  place.

2        For example, if one could become -- it's the

3  same thing -- one could not become a qualified bidder, I

4  gather, unless he paid a $500,000 deposit and made a bid

5  on the other entire process.  If I understand what's been

6  said in colloquy is that Sherwood might attempt or would

7  reasonably, I suppose, be charged with attempting to

8  package, if you will, two potential buyers if that

9  situation were to come about.  Although, the way it reads

10 right now it's not clear that would be required.  I think

11 it might be advisable.

12       THE COURT:  Again, I can't think of a reason

13 anybody would cut off or preclude the possibility if two

14 buyers wanted to aggregate in order to divide the assets

15 between them.  And I don't see anything here precluding

16 it other than they need to present a unified bid for all

17 the assets.

18       I understand the need Debtor -- for Debtor to

19 sell all the assets given its looming cash problems.

20 There needs to be a sale of everything.  Nothing here

21 precludes the investment banker from aggregating

22 potential bids into sort of a combined bid.

23       MR. BENDER:  Your Honor, if I could add one

24 point to what Mr. Raisner is saying.  I don't have the

25 purchase agreement handy, but my memory is that the buyer

EXHIBIT H
-68-

1 has the right not to buy all the assets. The buyer can

2 add to the excluded assets whatever it wants. Just as a

3 practical matter, if a buyer starts taking out equipment,

4 which they are getting free and clear and taking out

5 accounts receivable, which they are getting free and

6 clear, logic would dictate that their price is going

7 down.

8      So, it really just comes back to does Sherwood

9 get in touch with the buyer who says to Sherwood, we

10 might be interested in only one plant; should we bother?

11 And Sherwood's answer of course -- and Mr. De Camara is

12 on the phone -- will be, unless I can package you up with

13 another buyer who wants the other plant, then unless the

14 bank is prepared to lower the floor price, you still have

15 to still beat the floor price.

16      It wouldn't behove a buyer, as a practical

17 matter, to take less of the assets. They could only take

18 them and sell them or liquidate them. As I said

19 before -- and Mr. Bell can comment and Mr. De Camara can

20 comment -- I think it's a much more likely sceneario that

21 you might have a buyer who maybe shuts one of the plants

22 down; especially, if they can't reach an applicable

23 agreement with the unions let's say.

24      But, it would be their receivables and their

25 equipment to liquidate. I think the main point that

EXHIBIT H
-69-

1 | Mr. Raisner is making -- I have known him in many cases

2 | before in Sacramento -- is if there are two different

3 | buyers who are looking at the two different plants, I

4 | think his main point is can they make a collective bid;

5 | and the answer is of course they can.

6 |       THE COURT: His point may be can they make

7 | separate bids.

8 |       MR. BENDER: If they make separate bids, the

9 | difficulty with that is -- and one of the motions we are

10 | going to be filing before Your Honor. And the only

11 | reason for the delay is because I obtained board approval

12 | of this on the first week of the case, I think. It is a

13 | substantive consolidation motion.

14 |       As a practical matter as one of the things we

15 | are struggling with the U.S. Trustee's Office is the

16 | monthly operating reports is this is really one company.

17 | And breaking down, for example accounts receivable,

18 | breaking down inventory, it's very difficult to do by

19 | Debtor. Probably impossible to do.

20 |       The only reason we didn't bring a substantive

21 | consolidation motion today is because we wanted to reach

22 | an agreement with the bank first on the settlement

23 | agreement because we were concerned that substantively

24 | consolidating and then leaving a dispute with the bank

25 | later was a bed idea. There is only one creditor's

EXHIBIT H
-70-

```
 1  committee.  So, the idea of this multiple buyers is

 2  possible in theory, but I think it is very unlikely.  If

 3  it were to arise and results in the highest price, then

 4  that's certainly not being precluded here.

 5        THE COURT:  Mr. Raisner, I understand what

 6  you're saying.  But, we are not dealing with a Debtor who

 7  can sell some and not all.

 8        MR. RAISNER:  I understand, Your Honor.  If I

 9  may, the question I guess at this point comes down to

10  whether Sherwood -- it would be within their charge, if

11  you will, or the statement having the responsibility to

12  fairly match up separate purchasers -- I mean, they may

13  not know each other.  That's kind of it.

14        THE COURT:  Well, I can't imagine there is any

15  distance benefit for someone who wants to contact

16  Sherwood about one plant and Sherwood's contacted by

17  someone else about the other plant, for Sherwood to

18  suggest they talk to one another and present a unified

19  bid.  But, maybe I am being naive.

20        Counsel?

21        MR. ADLER:  Your Honor, I have been in at least

22  one situation where we have this kind of two parts or

23  whole.  And we ultimately could do a scenario where both

24  were allowed.  You don't know who comes out -- some who

25  are bidding on parts and some who are bidding on whole;
```

EXHIBIT H
-71-

1  we'll take one plant and bid up to this level.  Unless

2  you allow that to happen independently without forcing

3  the combinations, you don't really see the full market

4  value there.

5         So, what I am thinking is that the bidding

6  procedures be flexible enough to allow if anyone wants to

7  make a bid on a single plant, to allow that and to allow

8  it to proceed -- and the two parts.  So, that if it's a

9  bigger number than the bidding on the whole, then we

10  should be able to take that.

11         I don't know that we are going to get anyone to

12  bid on a single plant.  But, if someone says we want to

13  bid on the single plant, we should take any separate bids

14  on the second plant and run it through and see what that

15  process results.  I think it can be done all the same

16  day, same auction.  It's just a two-part process to come

17  up with the highest bid for all the assets.

18         THE COURT:  In other words, give Sherwood the

19  ability to -- even though bids aren't presented -- there

20  isn't a unified bid by multiple buyers and bidders, that

21  it can aggregate the bids, and say that these two bids

22  together are equivalent or higher than the last single

23  bid for everything.

24         MR. ADLER:  Just as an example we could do the

25  bids for the whole plants together first, come up with

EXHIBIT H
-72-

1  whatever the high bid is there and come find out if

2  anyone is interested is bidding on the single plant, and

3  if so, go through that process.

4        THE COURT:  Sounds like you probably want to

5  know before you start whether there's anyone to bid on

6  only one thing.

7        MR. ADLER:  That's probably true.  That makes

8  sense.

9        THE COURT:  If you do it the other way,

10  everybody who is not the highest bidder is going to try

11  to crack it a different way.

12       MR. ADLER:  It makes sense to approach it that

13  way; the parts first and see what happens.  And if there

14  is no bid for the second plant, we probably know it's not

15  going to be the highest bid and move on to those who are

16  willing to pay for the whole.

17       THE COURT:  We'll end up building that

18  flexibility so if there are bidders for single plants,

19  that if Sherwood in its opinion believes its -- that it

20  can sell both plants to separate groups, and that would

21  yield the best price over an aggregate buyer, that's

22  fine.  I got no problem with that.

23       I don't think they would have a problem with it,

24  would they?

EXHIBIT H
-73-

25       MR. BELL:  Nathan Bell, CEO here.  I take this

1 though that it could have a dramatic effect on the psyche

2 of our employees as far as their staying or leaving.  I

3 am not saying we shouldn't do it.  It certainly sounds

4 fair, but I would probably want to think about this for

5 24 hours and probably come back with a significant

6 increased stay-pay package.

7 　　　　If people believe the plant is going to be

8 broken up, they are not going to see the corporate

9 structure that we got and assume they will lose their

10 jobs, rightly or wrongly.  Probably more rightly than

11 wrongly.  I am not sure the stay packages are adequate

12 then.

13 　　　　THE COURT:  All right.

14 　　　　MR. DREHER:  Jamie Dreher for the committee.  We

15 can build the language providing sufficient flexibility

16 into the bid procedures order without necessarily noting

17 that we are discussing one plant versus another; but

18 simply couching a language that I think we can work on

19 that couches it rather in terms of all or not all of the

20 assets.  I think that's something we can work through.

21 　　　　From my perspective, we are going to be in front

22 of Your Honor for approval of the sale.  If there is any

23 dispute or problems with the bid, Your Honor can weigh in

24 over the process.  In my perspective, any flexibility

25 that we can provide Sherwood with potential bidders to

EXHIBIT H
-74-

```
 1   increase the value of assets, I think is appropriate.

 2   Between counsel, we can come up with language to put in

 3   the order that accomplishes that without running afoul of

 4   Mr. Bell's concern here.

 5            THE COURT:  It certainly is a concern.

 6            What do you want to do, Mr. Bender?

 7            MR. BENDER:  I think some generic language in

 8   the bid procedures order that builds in flexibility --

 9            THE COURT:  Don't come out and invite people to

10   come out and bid on just one plant.  Just basically say

11   the assets of the company are being put up for sale.

12            MR. BENDER:  Sherwood is very smart and

13   experienced.  If it becomes an issue, a buyer wants to

14   buy one plant, it's going to take at least two buyers who

15   each want one plant and a different plant for this to be

16   an issue.  I think we have the flexibility to come back

17   before Your Honor and put some generic flexible language

18   in the order that wouldn't create Mr. Bell's concern

19   about employees thinking they are even more likely to

20   lose their jobs but build in flexibility and put in some

21   language we can come back before Your Honor or something

22   like.

23            THE COURT:  I think I prefer to take that

24   approach.  I am -- well, maybe I am saying mask it

25   slightly; make it clear to the person that the entity
```

1   that's been retained to find buyers that this is

2   something that they can pull out if it makes business

3   sense, but only then. You're right, it's only going to

4   become an issue if there is two different buyers

5   interested in two different plants. I don't know if

6   that's a realistic possibility here.

7        MR. BELL: Your Honor, Nathan Bell, here. I am

8   not sure if I can make any definitive statement here.

9        But, can I ask Mr. Raisner, is anyone aware that

10   anyone would want to bid on any of the plants?

11        The negative consequences of this discussion are

12   significant the more I think about it. I talk to

13   customers and suppliers and employees. I raise the

14   employee issue. I think through the customers our

15   ability to multisource from different plants have backup

16   to one plant to the other plant. This is a significant

17   business model issue. And if this were to be raised in

18   any kind of material manner with various entities, this

19   could be a real problem.

20        I have been advertising this internally and to

21   customers, yes, it is an asset sale, but essentially, the

22   same as a stock sale, all assets will be sold as one

23   group to a buyer. Maybe I stepped out of bounds. That's

24   been my experience that's the way these things go.

25        And I've been able to mollify everyone's fears,

EXHIBIT H
-76-

```
 1   at least for the moment, with that speech.  And I am

 2   wondering if we are making a mountain out of a mole hill

 3   or a theoretical that may not occur.  I have certainly

 4   heard of no one wanting to buy one plant.  Maybe it's not

 5   an issue.  Maybe it's just language in these motions that

 6   no one will ever see.  I am getting more and more worried

 7   the more we talk about it.

 8          MR. RAISNER:  This is Chris Raisner on behalf

 9   of the union.  I don't know if the question is directly

10   to me.  Do I have a purchaser that I know of?  No.  But,

11   there has been from the beginning of the case -- and I

12   was present at the first status over the phone.  And I

13   believe the meeting of creditors there were

14   representations to the effect that something had to give

15   and had to sell one or both facilities.

16          And you know, it was wide open given the dire

17   situation of the Debtor.  And that's all -- I know is

18   maximize potential here.  And also note that there is a

19   considerable distance between Salem and Oregon and

20   Sacramento and somewhat different products involved and

21   the different processes and might attract different

22   buyers.

23          THE COURT:  Well, look.  This is a Chapter 11.

24   There is a Debtor in possession.  If the Debtor -- if

25   current management wants to sell the entire asset, and
```

EXHIBIT H
-77-

1   that's I am being asked to do, I guess that's what is on

2   the table. And if the professionals for the Debtor and

3   professionals conclude that's not likely to produce the

4   highest and best price, I suppose they're going to come

5   back to me and modify the order. And I'll say there is

6   going to be a hearing to approve any ultimate sale. If

7   that sale is not in the best interest of creditors

8   because there are other people likely to bid more for

9   separate and distinct assets, I guess I'll hear it then.

10       But, Mr. Raisner, I am -- I'm faced -- I'm

11  looking at a Debtor that's telling me they are going to

12  have a cash problem, and they're going to have to

13  transfer business operations to another entity or

14  entities. And in their opinion, this is the best way to

15  handle it. If the scenario you are painting comes to

16  fruition, there is someone else there who will try and

17  change the rules of the game or aggregate buyers or

18  whatever.

19       I am not going to require the Debtor to market

20  both ways. The more I listen to Mr. Bell, the more I am

21  concerned that I'm making business decisions for a Debtor

22  that has consequences that I don't really appreciate. I

23  am going to deal with the motion I have before me. And I

24  am going -- unless there is other objections, I am going

25  to authorize that bidding procedure. I am confident if

EXHIBIT H
-78-

```
 1  this -- if this possibility becomes more possible, that

 2  someone will ask to modify the rules.  So, I guess I am

 3  going to take it as it's been presented.

 4          All right.  So, I am going to authorize the

 5  auction procedure you have asked me to approve.  I am

 6  going to set a hearing on Wednesday at 1:30 to clear up

 7  the issue for the retention bonuses for noninsider

 8  creditors.  And we'll take up the balance of the motion

 9  of the compromise, insider bonuses, and everything else

10  on the 25th of October, right?

11          MR. BENDER:  Right, Your Honor.

12          MR. ADLER:  What time?

13          THE COURT:  Nine o'clock.

14          MR. BENDER:  That's the same time we already had

15  scheduled the Matterhorn status conference.

16          THE COURT:  Right.

17          MR. BENDER:  Do we need another status

18  conference report?

19          THE COURT:  No.  This is far enough along that I

20  am just keeping it on calendar.

21          MR. BENDER:  We are able to schedule the actual

22  sale hearing for November 8th, at 9:00 a.m.

23          THE COURT:  That's our regular calendar,

24  November 8th.  I looked.  It is.

25          THE CLERK:  It is.
```

EXHIBIT H
-79-

```
 1          THE COURT:  Maybe the thing to do is set it at

 2   10:00 rather than 9:00 on November 8th.  Let me clear out

 3   the bulk of the calendar.

 4          MR. BENDER:  We may have some related matters

 5   that will be filed in connection with the sale, but all

 6   scheduled --

 7          THE COURT:  Rejection, that kind of thing?

 8          MR. BENDER:  Possibly the consolidation,

 9   et cetera.

10          THE COURT:  Why do you need to get that resolved

11   at the same time?

12          That's what happens with the money, right?

13          MR. BENDER:  Not necessary.  And there may be

14   union motions as well.

15          MS. YOUNG:  That scheduling -- this is Beth

16   Young from the Levene, Neale, Bender.  Would it make

17   sense to schedule the motions relative to modifying or

18   rejecting the collective bargaining agreements on the

19   October 25th date that the Court already has for other

20   matters?

21          THE COURT:  You're rejecting collective

22   bargaining agreements before the sale?

23          MR. BENDER:  What will have to happen, Your

24   Honor, is Debtors would not be seeking to assume or to

25   reject collective bargaining agreements before the sale
```

EXHIBIT H
-80-

1  because the Debtors don't know what the buyers will want.

2  Given the timing here, the Debtors need to have in place

3  the ability to reject the union contracts if that's a

4  condition of the buyer.  And I don't think the timing

5  will work out if we only start the 1113 process after the

6  auction sale.  That's why what I think Miss Young, who is

7  handling this matter, is asking about.

8          MS. YOUNG:  That's correct.

9          THE COURT:  You want to set hearings on a motion

10  to start the process?

11          MR. BENDER:  It would be for authority to reject

12  the collective bargaining agreements if that's what the

13  buyer conditions its purchase offer upon.

14          THE COURT:  You have to start the negotiation

15  process.

16          MR. BENDER:  We have started the negotiation

17  process.

18          MS. YOUNG:  We have done that.  1113 just

19  requires we submit the application for modification or

20  rejection and that a hearing be set within 14 days.

21  We've already started the process.  And we are going to

22  meet further with the union.  And if we can reach a

23  resolution, that would be great.  If not, we would like

24  something definitive that we can offer before the bidding

25  process.  And it seems like the October 25th date might

EXHIBIT H
-81-

```
 1  be a good date to get that in place.  And we can file our

 2  brief by October 11th, which would be timely under

 3  1113.

 4          THE COURT:  All right.

 5          MR. RAISNER:  Excuse me.  I didn't want to get

 6  cut off.

 7          THE COURT:  Go ahead.

 8          MR. RAISNER:  I am having trouble understanding

 9  the view of 1113.  It's been presented where it appeared

10  to be rather a contingent approach.  I am not sure the

11  statute actually provides for that.  In other words, as I

12  understand some kind of contingency, if it's desired to

13  reject, we can reject.  I am not sure that's what is

14  vouched for.  I know most of it has been filed.

15          MS. YOUNG:  The concern we have at this point is

16  that the Debtor can more effectively market the

17  businesses with either a modification to the existing

18  collective bargaining agreement, which has been proposed

19  to the union as I understand it, or if the collective

20  bargaining agreements are rejected and whether we can

21  reach some resolution with the unions that allow them to

22  be modified is something we are going to work toward with

23  you.  Mr. Bender said it might be complicated if this

24  process occurs after someone buys the Debtors.

25          THE COURT:  Don't you have to make a proposal to
```

EXHIBIT H
-82-

1  the unions?

2       MR. BENDER:  The reason that my partner Miss

3  Young is on the phone is that she is handling this

4  matter.  The issue is the following:  The way we

5  interpret the whole rules regarding executory contracts

6  and unexpired leases is debtors ask bankruptcy courts for

7  authority to assume or authority to reject.  And then,

8  the Debtors make a decision regarding assumption or

9  rejection.

10      We believe that 1113 is simply a separate

11  provision of the bankruptcy code that requires a Chapter

12  11 Debtor to go through various additional steps to get

13  to the same result regarding assumption rejection.  Just

14  like we are going to be filing a 28-day notice motion for

15  authority to assume or reject other unexpired leases or

16  executory contracts and expect to have that hearing on

17  November 8th.

18      What Miss Young is saying is the way 1113 reads

19  is the 14 days later.  And I think she's asking that be

20  heard on October 25th.  That would be just for authority

21  to reject; not to reject, which is how every -- as far as

22  I am concerned -- assumption rejection motion works.

23      THE COURT:  But before you can file the

24  application, which I hear on 14 days notice, you need to

25  make a proposal to the union, which provides for those

EXHIBIT H
-83-

```
 1   necessary modifications and the benefits and protections

 2   necessary for reorganization.

 3          MR. BENDER:  Correct.  The debtor has done

 4   that.

 5          THE COURT:  So, you can set a hearing on 14 days

 6   notice.

 7          MR. BENDER:  I think what Miss Young --

 8          THE COURT:  Why are you asking me permission?

 9          MR. BENDER:  Just to clear a date with you

10   rather than be presumptuous.

11          THE COURT:  We have a self-set calendar.  If you

12   do it on my regular calendar, you don't need my

13   permission.

14          MR. ADLER:  We need your permission for October

15   25th.

16          MR. RAISNER:  If I may.  It does appear to be a

17   contingent motion; the unions have not rejected.  We've

18   asked for information which is required.

19          THE COURT:  I am not going to make a

20   determination that they have done what they need to do

21   before they can set the hearing.  They said they did.  It

22   may be wrong; it may be right.  I don't know.  But, the

23   hearing -- isn't the 25th -- it's not a regular day.

24          Is it a regular day?

25          THE CLERK:  It's a regular day.
```

EXHIBIT H
-84-

```
 1          THE COURT:  You don't need my permission to

 2  set.

 3          MS. YOUNG:  Your Honor, it's on your local

 4  bankruptcy Rule 9014.

 5          THE COURT:  Unless the statute or the codes

 6  provides otherwise.  And the code does provide for 14

 7  days.  So, you can set it on 14 days.

 8          MS. YOUNG:  That's correct.  I saw the local

 9  rules.  I didn't see lesser notice.

10          THE COURT:  That is one of the situations where

11  it permits less notice.  So, but the -- what we haven't

12  gotten around to figuring out is what Mr. Raisner's going

13  to file, if anything, in response to the motion, if he's

14  only getting 14 days notice.  And the rule doesn't seem

15  to require he file anything, does it?

16          MS. YOUNG:  Correct.  He can present argument at

17  the hearing, unless Your Honor wanted to set something

18  the day before or a earlier date.

19          THE COURT:  I am scanning the statute here.

20          It says the Court shall schedule a hearing not

21  later than 14 days.  If you want to give it to Mr.

22  Raisner earlier, then fine.  You have a date set.  You

23  can set matters for hearing on October 25th.  Please

24  don't file it before October 11th.  I guess that's a
```

EXHIBIT H
-85-

```
25  holiday.  You have to do it the day prior to that.
```

```
 1              Isn't October 11th, a holiday?

 2              THE CLERK:  It is.

 3              THE COURT:  The statute doesn't require the

 4    unions to file.

 5              MR. RAISNER:  Correct.

 6              THE COURT:  So, it would be nice if you did,

 7    Mr. Raisner.  I certainly understand why you might not,

 8    given the amount of notice.

 9              MR. RAISNER:  I certainly expect we will be

10    responding to any motion filed, if it is filed.

11              THE COURT:  All right.

12              MR. RAISNER:  And so, if we are clear, that I am

13    understanding from what's been said, that the motion

14    would have to be complete and upon it being filed on what

15    date; 14 days prior to the 25th?

16              THE COURT:  That works out to October 11th,

17    which is a court holiday.  It would have to be the Court

18    date prior to that.  We have electronic filing.  It could

19    be filed on the 11th, even though no one is here.

20              MS. YOUNG:  It's interesting that 1113 provides

21    that we file it 14 days in advance, but notice is 10 days

22    before the date of the hearing.

23              THE COURT:  I think that's other parties; or is

24    that the union?

25              MS. YOUNG:  It says such parties.
```

EXHIBIT H
-86-

```
 1          THE COURT:  Okay.  So, you got to give at least

 2    10 days notice.  Let's give as much -- if you're filing

 3    in this day of age of electronic filing, let's give them

 4    notice the day you file it.

 5          MS. YOUNG:  Absolutely.

 6          THE COURT:  All right.

 7          MR. RAISNER:  I guess it's just my question --

 8    one of them -- was that the motions when filed would

 9    probably be completed.  The -- there is no backup of --

10    the motion would not be presented at the hearing but

11    would be in the written motion.

12          THE COURT:  No sandbagging, right.

13          MR. RAISNER:  Thank you, Your Honor.

14          MS. YOUNG:  I agree with that completely.  Under

15    1113(B)(2) while negotiations that started may not be

16    complete until the hearings.  So, I contemplate with all

17    the information that we had we filed in time for our

18    motion.  But, we certainly intended to have it to

19    continue to engage in negotiations with the unions in

20    good faith through the hearing day to reach a resolution.

21    So, I don't believe under 1113 we have to have completed

22    everything by the time we file.

23          THE COURT:  The evidence you're relying on for

24    rejection needs to be in the motion.  And if there's been

25    further negotiations since the filing of the motion, then
```

EXHIBIT H
-87-

```
1   something is relevant, that's fine.  I understand.  But,

2   Mr. Raisner wants to make sure when he gets the motion he

3   knows why you think the contracts ought to be rejected or

4   they ought to have the right to be rejected.  And you

5   satisfied the conditions to the filing of that motion.

6        All right.  Well, I learned quite a bit about

7   collective bargaining agreements in recent months,

8   although different types of union contracts and this.

9        All right.  Anything else?

10       MR. BENDER:  No, Your Honor.  Thank you.

11       THE COURT:  I'll get an order on this.  And I'll

12  be getting another order on noninsider retention bonuses

13  after we have the hearing on Wednesday at 1:30, right?

14       MR. BENDER:  Yes, Your Honor.

15       THE COURT:  Everything else that was presented

16  in this motion will be heard on the 25th with opposition

17  due on the 18th, right?

18       MR. BENDER:  Yes.

19       THE COURT:  Then final hearing on the sale on

20  November 8th, at 10:00.

21       MR. BENDER:  Yes, Your Honor.  We will

22  distribute the revised exhibit list on the noninsider

23  employees.

24       MR. ADLER:  What kind of notice do they need to

25  give on the hearing on the 25th?  Are we going --
```

EXHIBIT H
-88-

```
 1          THE COURT:  National rules require 21 days

 2   notice.  You have to give 21 days.  And if you want to

 3   preclude the possibility -- the sale's going to be on the

 4   1st, right?  The actual sale is in someone's office?

 5          MR. BENDER:  That notice is attached as an

 6   exhibit.  I think Mr. Adler's referring to the matters

 7   scheduled for hearing on the 25th.  That will be the

 8   settlement hearing itself, continued cash collateral.

 9          Do you want us to give notice to all creditors?

10          THE COURT:  Notice of the hearing, yes.

11          MR. BENDER:  To all creditors.

12          THE COURT:  Did we restrict notice in this case?

13          MR. BENDER:  I think we have a little bit, I

14   believe --

15          THE COURT:  That's fine.

16          MR. BENDER:  I don't know if it would cover all

17   these matters is all.

18          THE COURT:  I am sorry.  I am not getting

19   something.

20          MR. BENDER:  I am not sure that with the limited

21   notice, which of the 2002 -- I am not sure it would cover

22   the insider comp for example.

23          THE COURT:  Probably not.

24          MR. BENDER:  Let me give notice to all creditors

25   so nobody can claim they didn't get notice.
```

EXHIBIT H
-89-

```
 1          THE COURT:  When are you going to give the

 2   notice?

 3          MR. BENDER:  Give notice by --

 4          THE COURT:  Well, if they are going to be filing

 5   written responses by the 18th, you have to make that

 6   meaningful.  It would be --

 7          MR. BENDER:  How about by this Wednesday; would

 8   that be okay?

 9          THE COURT:  That's fine.

10          MR. BENDER:  Do we need an order shortening time

11   or is the record fine?

12          THE COURT:  The record is fine.

13          MR. BENDER:  Thank you.

14          MR. RAISNER:  Thank you, Your Honor.

15          (Whereupon, proceedings were concluded.)

16                      ---o0o---

17

18

19

20

21

22

23

24                                    EXHIBIT H
                                         -90-
25
```

```
 1
 2                    REPORTER'S CERTIFICATE
 3
 4   STATE OF CALIFORNIA    )
                            ) ss.
 5   COUNTY OF SACRAMENTO   )
 6
 7        I, LISA MARIE USSERY, CSR, hereby certify that I was
 8   duly appointed and qualified to take the foregoing
 9   matter;
10        That acting as such reporter, I took down in
11   stenotype notes the testimony given and proceedings had;
12        That I thereafter transcribed said shorthand notes
13   into typewritten longhand, the above and foregoing pages
14   being a full true and correct transcription of the
15   testimony given and proceedings had.
16
17
18
19
20
21                    _____
22                    LISA MARIE USSERY, CSR
                      License No. 11534
23
24                                        EXHIBIT H
                                          -91-
25
```

# EXHIBIT I

## TO DECLARATION OF YURI Y. GOTTESMAN IN OPPOSITION TO DEBTORS' MOTION TO MODIFY OR REJECT COLLECTIVE BARGAINING AGREEMENTS

### OF

### THE BAKERY, CONFECTIONERY, TOBACCO WORKERS AND GRAIN MILLERS' LOCAL NO. 85 AND TEAMSTERS LOCAL 324

EXHIBIT I
-92-

## Chris Raisner

**From:** nwbell@gmail.com on behalf of Nathan Bell [nwbell@pacmezz.com]
**Sent:** Friday, October 08, 2010 4:21 PM
**To:** Chris Raisner
**Cc:** jim.presley@matterhorngroupinc.com; rb@inbyb.com; Ron Klepetar; Ron Bender; Beth R. Young; Andrew De Camara; Michael Hogan; Jennifer Loving
**Subject:** Re: Document in Word format

Mr. Raisner:

I'm cc'ing company bk counsel and labor counsel on this message so they might comment or correct me.

In response to your e-mail below, Jim Presley will respond with the marked up Vitafreze contract that you sent him on the 7th, as indicated in this e-mail.

As to providing you the name of all potential buyers, we do not know who they might be as it is early in the process. Sherwood Partners (cc'd on this e-mail as well) is acting as the investment banker and they can determine if that is advisable or necessary. It would be my judgment that it would be premature at this point and I would need to better understand the purpose to authorize the names even at a later date.

As to providing you "all information and representations passed between the Debtor or the sales agents and any of them relevant to finances of purchase and sale and labor costs and the CBA" this strikes me as tremendously broad and unnecessary. For example, why would the union need to understand the profit margin by customer by SKU? This is sensitive information, and given the speed with which news travels (and is posted, often inaccurately I might add, on union websites etc.), I think it would be irresponsible of me to give such a broad authorization.

Jim Presley is in the process of responding to your specific requests for information and commenting item by item. This allows management to assess the appropriateness of each request. If there are specific items which you believe are necessary but Jim is not providing, then we should have a discussion item by item.

You would know better than I what the appeal process would be in the case of a stalemate.

Ron Klepatar, our labor counsel, will return from his vacation Monday and he can possibly be a good counter party to such discussions for you.

Regards, Nate

On Wed, Oct 6, 2010 at 5:03 PM, Chris Raisner <CRaisner@unioncounsel.net> wrote:
  Jim Presley

  Jim --

EXHIBIT I
-93-

Unfortunately I will not be able to provide the document you requested re Vitafreze in Word format today. I expect to do so tomorrow morning, and I will let you know if there is a problem.

In the meantime, though, please forward the information requested regarding the CBA modifications proposed for Deluxe Ice Cream in Salem, which you said is ready.

Also, as I mentioned on the telephone, since the Company stated in court October 4 that the reason it would move to reject the CBAs was to appeal to some potential buyer that may want them rejected, both Unions will need you to identify each potential purchaser of the Debtors' assets, and to provide all information and representations passed between the Debtor or the sales agents and any of them relevant to finances of purchase and sale and labor costs and the CBA. Please therefore forward this information as well. If a nondisclosure agreement is desired, please also forward such NDA, or be in touch if one is desired.

Thank you.

-- Chris Raisner

*CHRISTIAN L. RAISNER*
WEINBERG, ROGER & ROSENFELD
Phone: (510) 337-1001
Fax: (510) 337-1023
e-mail: <mailto:craisner@unioncounsel.net>

--

Nathan W. Bell
Managing Director
Pacific Private Capital, LLC
Two Theatre Square, Suite 210
Orinda, CA 94563
(925) 253-2900 (O)
(925) 253-2901 (F)
(925) 878-1616 (C)
nwbell@pacmezz.com

EXHIBIT I
-94-

# EXHIBIT J

## TO DECLARATION OF
## YURI Y. GOTTESMAN
## IN OPPOSITION TO DEBTORS'
## MOTION TO MODIFY OR REJECT
## COLLECTIVE BARGAINING
## AGREEMENTS

### OF
### THE BAKERY, CONFECTIONERY, TOBACCO
### WORKERS AND GRAIN MILLERS' LOCAL NO. 85
### AND TEAMSTERS LOCAL 324

FILED

October 08, 2010

CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

0002988611

1 | RON BENDER (SBN 143364)
2 | TODD M. ARNOLD (SBN 221868)
  | J.P. FRITZ (SBN 245240)
3 | LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
  | 10250 Constellation Boulevard, Suite 1700
4 | Los Angeles, California 90067
  | Telephone: (310) 229-1234
5 | Facsimile: (310) 229-1244
  | Email: rb@lnbyb.com; tma@lnbyb.com; jp@lnbyb.com

6 | Attorneys for Chapter 11 Debtors and Debtors in Possession

7 |                **UNITED STATES BANKRUPTCY COURT**
  |                **EASTERN DISTRICT OF CALIFORNIA**
8 |                      **(SACRAMENTO DIVISION)**

9

| In re: | Lead Case No. 10-39672 (MSM) |
|---|---|
| | Jointly Administered with Case Nos. 10-39664 (MSM), and 10-39670 (MSM). |
| MATTERHORN GROUP, INC., | |
| Debtor. | DC No. LNB-16 |
| | |
| VITAFREZE FROZEN CONFECTIONS, INC., | Chapter 11 Cases |
| | **DECLARATION OF NATHAN W. BELL IN SUPPORT OF DEBTORS' MOTION FOR AN ORDER: (1) APPROVING SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS (EXCLUDING CASH AND AVOIDANCE CAUSES OF ACTION) FREE AND CLEAR OF ALL LIENS, CLAIMS AND INTERESTS; (2) APPROVING DEBTORS' ASSUMPTION AND ASSIGNMENT AND REJECTION OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS AND DETERMINING CURE AMOUNTS; AND (3) WAIVING THE 14-DAY STAY PERIODS SET FORTH IN BANKRUPTCY RULES 6004(h) AND 6006(d)** |
| Debtor. | |
| | |
| DELUXE ICE CREAM COMPANY, | |
| Debtor. | |
| | |
| ☒ Affects ALL DEBTORS | |
| ☐ Affects only MATTERHORN GROUP, INC. | |
| ☐ Affects only VITAFREZE FROZEN CONFECTIONS, INC. | |
| ☐ Affects only DELUXE ICE CREAM COMPANY | |

Hearing:
Date:    November 8, 2010
Time:    10:00 a.m.
Place:   Department A
         Judge Michael S. McManus
         Courtroom No. 28    EXHIBIT J
         Floor No. 7         -96-

1        BELL DECLARATION ON
         CASH COLLATERAL MOTION

**12**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Robert T. Matsui Courthouse
501 I Street
Sacramento, CA 95814

EXHIBIT J

BELL DECLARATION ON
CASH COLLATERAL MOTION

**12**

## DECLARATION OF NATHAN W. BELL

I, Nathan W. Bell, hereby declare as follows:

1.     I am over 18 years of age.  Except where otherwise stated, I have personal knowledge of the facts set forth below and, if called to testify, I could and would testify competently thereto.

2.     I am the President, Chief Executive Officer and Chairman of the Board of Directors of Matterhorn Group, Inc. ("MGI"), Vitafreze Frozen Confections, Inc. ("Vitafreze"), and Deluxe Ice Cream Company ("Deluxe"), the debtors and debtors in possession in the above-captioned, jointly administered Chapter 11 bankruptcy cases (collectively, the "Debtors").

3.     The Debtors commenced their bankruptcy cases by filing voluntary petitions under Chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their business, manage their financial affairs, and operate their bankruptcy estates as debtors in possession.

4.     MGI was formed in 2004 as a vehicle to "roll-up" frozen novelty manufacturing companies in the Western United States.  The initial step in this strategy was MGI's acquisition of Vitafreze, Deluxe, and Matterhorn Ice Cream Company ("Matterhorn"),[1] each of which became wholly owned subsidiaries of MGI.  As a result of these acquisitions, by 2005, the Debtors had (1) established themselves as high-quality, high-service private label manufacturers with a strong Western United States customer base, and (2) become one of the dominant producers of ice cream novelties in the Western United States.

5.     In 2006, in an effort to improve operations and profitability, MGI (1) closed Matterhorn's manufacturing plant in Caldwell, Idaho and consolidated its manufacturing into Vitafreze, located in Sacramento, California, and Deluxe, located in Salem, Oregon, and (2) took

---

[1] Matterhorn is also a wholly owned subsidiary of MGI.  Matterhorn is not operating and has not filed a bankruptcy.

EXHIBIT J

-98-

BELL DECLARATION ON
                                          CASH COLLATERAL MOTION

**12**

1   aggressive steps to restructure its remaining operations to reduce overhead and reposition MGI

2   with its customers and suppliers.  The Debtors' administrative office is located in Las Vegas,

3   Nevada.

4
        6.      At present, the Debtors, which have approximately 31 non-union employees and

5
    226 union employees, are collectively one of the largest independent producers of ice cream and

6
    water-ice novelty products in the United States.  The Debtors manufacture (1) self-branded

7
    products for grocery retailers, (2) products from brand licenses held by the Debtors, such as Mike

8
    and Ike™, HotTamales™, and Zours™ popsicles, (3) co-branded products, and (4) the Debtors'

9
    own products, including the Debtor's Oh My! Goodness™ branded products.  The Debtors'

10
    customers include large regional and national retailers, club stores, and independent cooperative

11
    distribution companies in the United States.  The Debtors also sell to various retailers in Mexico.

12
        7.      The Debtors' primary secured creditor is Key Bank, N.A. (the "Bank").  As of the

13
    Petition Date, Key Bank was owed approximately $10.5 million, which the Bank contends is

14
    secured by a first priority lien against substantially all of the Debtors' assets.  As explained in

15
    more detail below, the Debtors and the Bank have reached an overall settlement agreement which

16
    provides for an allocation of the assets of these estates following the closing of a sale of the

17
    Debtors' assets.  A hearing is scheduled to be held on October 25, 2010 for the Court to consider

18
    approval of that settlement agreement.

19
        8.      During the period of 2007 through 2009, the Debtors gross revenues increased

20
    substantially from approximately $42,564,029 in 2007, to approximately $47,986,399 in 2008, to

21
    approximately $54,436,328 in 2009.  However, due to expansion into new product categories,

22
    increased costs related thereto, a delayed selling season due to unusually cool temperatures in the

23
    Debtors geographical market and the continued need to make capital expenditures to maintain the

EXHIBIT J

-99-

case.

4          BELL DECLARATION ON
           CASH COLLATERAL MOTION

**12**

1   Debtors' manufacturing facilities, these increases in gross revenue did not result in corresponding

2   increases in net income and liquidity. Instead, based on the foregoing and seasonal fluctuations in

3   the Debtors' business and borrowing limits under the Bank loans, the Debtors found themselves

4   in a cash crunch and were unable to meet their funding needs solely from advances made by the

5

6   Bank. In consideration of the Debtors' ongoing cash crunch and the need for breathing room to

7   formulate and implement a restructuring plan or a sale, the Debtors came to the conclusion that

8   filing for bankruptcy protection was in the best interests of the Debtors and their creditors.

9          9.       Since the Petition Date, the Debtors have been using cash collateral in accordance

10  with four prior orders which have been approved by the Court. The Bank consented to the

11  Debtors' cash collateral use in connection with the first two orders. The Bank filed a limited

12  opposition to the Debtors' third cash collateral motion because the Bank wanted the Debtors to

13

14  agree to an expedited sale process as a condition to the Debtors' continued use of cash collateral.

15         10.      The Debtors made clear to the Bank and the Creditors' Committee from the outset

16  of these cases that before the Debtors would be in a position to agree upon an expedited sale

17  process, the Debtors first had to complete a one-year operating budget to determine if it was

18  possible for the Debtors to reorganize on a stand-alone basis or to remain in Chapter 11 for an

19  extended period of time and operate solely through use of the Debtors' cash collateral. With the

20  assistance of the Debtors' financial advisor, Sherwood Partners, LLC ("Sherwood"), several

21

22  weeks ago the Debtors completed a comprehensive one-year operating budget and delivered a

23  copy of that one-year budget to the Bank and the Creditors' Committee. What the one-year

24  budget showed was that the Debtors could not survive economically on cash collateral use alone

25  over the next year or even past the beginning of 2011. As a result, the only way for the Debtors to

26  avoid a complete shut down and liquidation of their business is for the Debtors to consummate an

27  expedited sale of their assets or to obtain millions of dollars of additional financing. Given the

28

EXHIBIT J
-100-

**12**

extent of the Debtors' debt structure, I do not believe that it is possible for the Debtors to obtain the necessary additional financing to survive beyond the early part of 2011. The Debtors have therefore concluded that embarking on an expedited asset sale process is in the overwhelming best interests of the Debtors' estates and the only way to avoid a complete shut down and liquidation of the Debtors' business.

11.    The Debtors' have been advised that given the fact that the Bank asserts a senior priority lien against all or substantially all of the assets that the Debtors will be seeking to sell, the only way for the Debtors to be able to sell their assets free and clear of the Bank's liens and claims is to do so with the Bank's consent or to embark in significant litigation with the Bank.

12.    For the past several weeks, the Debtors and the Bank have engaged in extensive discussions regarding an asset sale process. The Debtors made clear to the Bank from the outset that the Debtors would not be willing to embark upon a consensual and expedited sale process unless the Debtors and the Bank were able to reach an agreement on (i) a minimum floor price that the Bank would consent to in order to make sure that the Debtors actually consummated a sale given the disruption to the Debtors' business operations from engaging in such a sale process, and (ii) an allocation of the sale proceeds which benefited creditors other than the Bank in a material manner and which the Debtors believed was an equitable result under the circumstances. Fortunately, the Debtors and the Bank were able to reach such an agreement, which is memorialized in settlement agreement which will be considered for approval by the Court at a hearing to be held on October 25, 2010.

13.    At a hearing held on October 4, 2010, the Court approved various sale procedures in connection with a pending auction sale of the Debtors' assets, which procedures were agreed to by the Debtors, the Bank and the Creditors' Committee.

EXHIBIT J
-101-

BELL DECLARATION ON
CASH COLLATERAL MOTION

**12**

14.     I believe that the facts pertaining to the Debtors' proposed asset sale clearly substantiate the Debtors' business decision that such contemplated sale serves the best interests of the Debtors' estates and their creditors and merits the approval of the Court.

15.     As indicated above, the Debtors have no ability to survive on cash collateral use alone beyond the early part of 2011, and obtaining the additional financing necessary to enable the Debtors to continue to survive and reorganize is not possible.  As a result, the only option available to the Debtors to avoid a shut down and liquidation of the Debtors' business is to consummate a sale of their business on an expedited basis.  The key to the Debtors' asset sale was to balance the timing of the sale to maximize the purchase price paid for the Debtors' assets against the fact that with the passage of time the Debtors' cash reserves are being depleted.  I believe that the Debtors arrived at the optimal balance by agreeing to the auction sale procedures which were approved by the Court at the hearing held on October 4, 2010, coupled with the asset allocation agreed by the Debtors and the Bank in their settlement agreement, which the Debtors hope will be approved by the Court at a hearing on October 25, 2010.

16.     It is important to note that pursuant to their settlement agreement with the Bank, the Debtors' estates will be receiving 15% of the amount of the sale proceeds but will be retaining 100% of their cash at the time of the closing of the sale.  Given the fact that the Debtors are in the midst of their slow season, which results in the depletion of their cash reserves with the passage of time, I believe that it is critically important for the Debtors to consummate their asset sale as quickly as possible while still making sure that sufficient time is allowed for a proper sale process to be conducted.  I believe that this has been accomplished by the timing set forth in the settlement agreement with the Bank.  Both the Bank and the Creditors' Committee have consented to this timing, which, absent something changing in the circumstances of these cases, will result in an auction sale being conducted on November 1, 2010 with a sale closing to occur

EXHIBIT J
-102-

**12**

1  by November 15, 2010.

2      17.    The Debtors have concluded that proceeding with a sale of their assets (excluding

3  cash and avoidance causes of action) to the winning bidder at the auction sale to be conducted on

4  November 1, 2010 is in the overwhelming best interests of their estates and their creditors and is

5  the only positive result available to the Debtors.  The Debtors will file the results of the auction

6  sale with the Court by November 3, 2010 and seek to have their asset sale to the winning bidder

7  be approved at the hearing on November 8, 2010.  The Debtors therefore submit that their

8  proposed sale is justified by sound business purposes.

9      18.    The sale process undertaken by the Debtors was specifically designed to insure

10 that the highest price possible is obtained for the Debtors' assets, balancing the fact that the

11 primary consideration to be received by the Debtors' estates is the Debtors' cash balance which

12 will be existing at the time of the sale closing, which is expected to be in excess of $2 million.  So

13 while the Debtors certainly want to make sure that the highest price possible is obtained for the

14 Debtors' assets, given the fact that the Debtors' estates will receive only 15% of any increase in

15 purchase price but will suffer the entire 100% of any reduction in their cash balance which results

16 from any delay in the sale process, it is in the best interests of the Debtors' estates to consummate

17 the sale of their assets in the most expeditious manner possible under the circumstances.  I believe

18 that this delicate balance has been accomplished by the timing and process agreed to in the

19 Debtors' settlement agreement with the Bank and the bid procedures approved by the Court.  In

20 this unique context, the Debtors submit that the entirety of the purchase price to be paid by the

21 winning bidder at the auction sale needs to be viewed in conjunction with the Debtors' expected

22 cash on hand at the time of the sale closing since the Debtors will be retaining 100% of their cash

23 on hand and, subject to limited exceptions, the Bank will not be receiving any portion of that

24 cash.  It is therefore likely that the primary consideration to be received by the Debtors' creditors

EXHIBIT J
-103-

**12**

1   other than the Bank will be the Debtors' cash on hand at the time of the sale closing.

2       19.   In Sherwood, the Debtors have engaged a highly experienced professional to assist
3   and advise the Debtors through this sale process and to manage the sale process. Sherwood has
4   already commenced an extensive and broad marketing and sale process, and expects to facilitate
5   due diligence with numerous parties. All interested and viable buyers will be provided with equal
6   access to the Debtors and their financial information and will have the same opportunity to submit
7   the highest and best bid at the auction sale, all designed to make sure that the highest and best
8   price possible under the circumstances is paid for the Debtors' assets.

9       20.   The identity of the winning bidder at the auction sale will not be known until the
10  auction sale on November 1, 2010 has been completed. However, by having an independent
11  party in Sherwood serving as the investment banker to facilitate the sale process, the Debtors are
12  confident that all prospective buyers will be treated fairly and equally. The Debtors and
13  Sherwood are not aware of any fraud, collusion or attempt to take unfair advantage of other
14  bidders and do not expect any such actions to occur. The Debtors and Sherwood expect that the
15  auction sale itself and the final terms of any asset purchase agreement with the winning bidder at
16  the auction sale will be conducted in good faith. I have previously made clear to both the Bank
17  and the Creditors' Committee that I, working alone or in conjunction with others, may be a bidder
18  at the auction sale.

19      21.   I am aware of three creditors who assert liens against the assets the Debtors
20  propose to sell, consisting of the Bank, PMF and CC&B. Subject to Court approval of the
21  settlement agreement, all three secured creditors have consented to the Debtors' sale of assets free
22  and clear of their liens.

23      22.   It is my understanding that the Debtors have various pension liabilities resulting
24  from their pre-petition collective bargaining agreements with the unions, consisting of the

EXHIBIT J
-104-

9       BELL DECLARATION ON
        CASH COLLATERAL MOTION

**12**

following multi-employer pension plans: the Western Conference of Teamsters Pension Trust for the General Teamsters Local Number 324, Machine Operators, Forklift, Salesmen, Loaders & Checkers, Drivers and Maintenance; the Pacific Coast Benefits Trust for the General Teamsters Local Number 324, Palletizers and Packagers and the Bakery and Confectionery Union and Industry International Pension Fund for the Bakery, Confectionery, Tobacco Workers and Grain Millers' International Union, FL-CIO Local Number 85.

23.     I believe that if the Debtors' asset sale is not free and clear of any liabilities owing under any such collective bargaining agreements, it will lower the sale price to the detriment of all creditors of the estates, and possibly even make any asset sale impossible, which would result in the closure of the Debtors' business and resulting liquidation of the Debtors' assets and loss of jobs of all of the Debtors' employees.

24.     Since the Debtors will not know the identity of the winning bidder until the completion of the auction sale on November 1, 2010, the Debtors have no way of knowing at this time which executory contracts and unexpired leases of the Debtors the winning bidder will want to have assigned to it. As a result, by November 3, 2010, the Debtors will file a pleading with the Court which will identify the winning bidder and identify which executory contracts and unexpired leases the Debtors seek to assume and assign to the winning bidder. The Debtors will serve that pleading by federal express overnight mail upon all other parties to executory contracts and unexpired leases. To the extent required by the other parties to executory contracts and unexpired leases which the Debtors seek to assume and assign to the winning bidder, adequate assurance of future performance will be provided.

25.     Set forth in Exhibit "1" filed concurrently herewith is a schedule which identifies each of the Debtors' known executory contracts (excluding any CBA's or other union contracts which are being dealt with in a separate motion) and unexpired leases and a description of the

EXHIBIT J
-105-

**12**

1   amounts the Debtors believe are necessary to cure any defaults under such executory contracts

2   and unexpired leases to enable the Debtors to assume and assign such executory contracts and

3   unexpired leases to the winning bidder at the auction sale if the winning bidder wants them to be

4   assigned to it.

5       26.    The Debtors are requesting an order of the Court which provides that unless

6   otherwise identified by the Debtors in a writing filed with the Court prior to the sale closing, all of

7   the Debtors' executory contracts (excluding any CBA's or other union contracts which are being

8   dealt with in a separate motion) and unexpired leases which are not assumed and assigned to the

9   winning bidder (or the winning backup bidder if the winning bidder fails to close) shall be

10  deemed rejected effective as of 11:59 p.m. on the day of the closing of the sale of the Debtors'

11  assets.

12      27.    For all of the reasons set forth above, I believe that it is critically important that the

13  Debtors be permitted to consummate the closing of the sale of their assets as soon after entry of

14  the Court order approving the sale as possible. As set forth above, under the settlement

15  agreement, the Debtors' estates will be retaining 100% of their cash existing at the time of the sale

16  closing, and the Debtors' cash is being reduced essentially with each passing day. As a result, the

17  sooner the buyer is able to close its purchase the better off the Debtors' estates will be. The sale

18  closing is currently scheduled to occur by November 15, 2010, which effective gives the buyer

19  fourteen days after learning that it is the winning bidder to close. However, the sale hearing is

20  only going to be held on November 8, 2010, which means that in order for the sale closing to

21  occur within this time frame, what I understand to be the normal fourteen-day waiting periods

22  must be waived.

/ / /

EXHIBIT J
-106-

BELL DECLARATION ON
CASH COLLATERAL MOTION

**12**

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 8th day of October, 2010, at San Francisco, California.

<div align="right">

/s/ Nathan W. Bell
NATHAN W. BELL

</div>

# EXHIBIT K

## TO DECLARATION OF YURI Y. GOTTESMAN IN OPPOSITION TO DEBTORS' MOTION TO MODIFY OR REJECT COLLECTIVE BARGAINING AGREEMENTS

### OF

### THE BAKERY, CONFECTIONERY, TOBACCO WORKERS AND GRAIN MILLERS' LOCAL NO. 85 AND TEAMSTERS LOCAL 324

 **O✳NET OnLine**

# Summary Report for:

Updated 2010

## 51-4081.00 - Multiple Machine Tool Setters, Operators, and Tenders, Metal and Plastic

Set up, operate, or tend more than one type of cutting or forming machine tool or robot.

**Sample of reported job titles:** Die Setter, Machine Operator, Machine Technician, Set-Up Person, CNC Operator (Computer Numerically Controlled Operator), CNC Machinist (Computer Numerically Controlled Machinist), Die Repairman, Cell Technician, CNC Machine Setter (Computer Numerically Controlled Machine Setter), Shear Operator

| View report: | Summary | Details | Custom |
|---|---|---|---|

Tasks | Tools & Technology | Knowledge | Skills | Abilities | Work Activities | Work Context | Job Zone | Education | Interests | Work Styles | Work Values | Related Occupations | Wages & Employment | Additional Information

## Tasks

- Inspect workpieces for defects, and measure workpieces to determine accuracy of machine operation, using rules, templates, or other measuring instruments.
- Observe machine operation to detect workpiece defects or machine malfunctions, adjusting machines as necessary.
- Read blueprints or job orders to determine product specifications and tooling instructions and to plan operational sequences.
- Set up and operate machines, such as lathes, cutters, shears, borers, millers, grinders, presses, drills, and auxiliary machines, to make metallic and plastic workpieces.
- Position, adjust, and secure stock material or workpieces against stops, on arbors, or in chucks, fixtures, or automatic feeding mechanisms, manually or using hoists.
- Select, install, and adjust alignment of drills, cutters, dies, guides, and holding devices, using templates, measuring instruments, and hand tools.
- Change worn machine accessories, such as cutting tools and brushes, using hand tools.
- Make minor electrical and mechanical repairs and adjustments to machines and notify supervisors when major service is required.
- Start machines and turn handwheels or valves to engage feeding, cooling, and lubricating mechanisms.
- Perform minor machine maintenance, such as oiling or cleaning machines, dies, or workpieces, or adding coolant to machine reservoirs.

back to top

## Tools & Technology

**Tools** used in this occupation:

**Cutting machines** — Lathe machines; Punching machines; Slitting machines

**Lifting hooks** — Lift bars

EXHIBIT K
-109-

**Milling cutters** — Computer numerical controlled CNC milling machines; Cutting machines

**Polishing machines**

**Taps or dies** — Dies; Taps

**Turning machines**

**Technology** used in this occupation:

**Data base user interface and query software** — Data entry software

**Electronic mail software** — Email software

**Spreadsheet software**

**Word processing software**

back to top

## Knowledge

**Mechanical** — Knowledge of machines and tools, including their designs, uses, repair, and maintenance.

**Production and Processing** — Knowledge of raw materials, production processes, quality control, costs, and other techniques for maximizing the effective manufacture and distribution of goods.

**Mathematics** — Knowledge of arithmetic, algebra, geometry, calculus, statistics, and their applications.

back to top

## Skills

**Operation Monitoring** — Watching gauges, dials, or other indicators to make sure a machine is working properly.

**Quality Control Analysis** — Conducting tests and inspections of products, services, or processes to evaluate quality or performance.

**Monitoring** — Monitoring/Assessing performance of yourself, other individuals, or organizations to make improvements or take corrective action.

**Complex Problem Solving** — Identifying complex problems and reviewing related information to develop and evaluate options and implement solutions.

**Critical Thinking** — Using logic and reasoning to identify the strengths and weaknesses of alternative solutions, conclusions or approaches to problems.

**Operation and Control** — Controlling operations of equipment or systems.

**Active Listening** — Giving full attention to what other people are saying, taking time to understand the points being made, asking questions as appropriate, and not interrupting at inappropriate times.

**Instructing** — Teaching others how to do something.

**Troubleshooting** — Determining causes of operating errors and deciding what to do about it.

**Equipment Maintenance** — Performing routine maintenance on equipment and determining when and what kind of maintenance is needed.

back to top

EXHIBIT K
-110-

## Abilities

**Control Precision** — The ability to quickly and repeatedly adjust the controls of a machine or a vehicle to exact positions.

**Arm-Hand Steadiness** — The ability to keep your hand and arm steady while moving your arm or while holding your arm and hand in one position.

**Manual Dexterity** — The ability to quickly move your hand, your hand together with your arm, or your two hands to grasp, manipulate, or assemble objects.

**Problem Sensitivity** — The ability to tell when something is wrong or is likely to go wrong. It does not involve solving the problem, only recognizing there is a problem.

**Near Vision** — The ability to see details at close range (within a few feet of the observer).

**Auditory Attention** — The ability to focus on a single source of sound in the presence of other distracting sounds.

**Finger Dexterity** — The ability to make precisely coordinated movements of the fingers of one or both hands to grasp, manipulate, or assemble very small objects.

**Reaction Time** — The ability to quickly respond (with the hand, finger, or foot) to a signal (sound, light, picture) when it appears.

**Selective Attention** — The ability to concentrate on a task over a period of time without being distracted.

**Deductive Reasoning** — The ability to apply general rules to specific problems to produce answers that make sense.

back to top

## Work Activities

**Controlling Machines and Processes** — Using either control mechanisms or direct physical activity to operate machines or processes (not including computers or vehicles).

**Repairing and Maintaining Mechanical Equipment** — Servicing, repairing, adjusting, and testing machines, devices, moving parts, and equipment that operate primarily on the basis of mechanical (not electronic) principles.

**Getting Information** — Observing, receiving, and otherwise obtaining information from all relevant sources.

**Handling and Moving Objects** — Using hands and arms in handling, installing, positioning, and moving materials, and manipulating things.

**Inspecting Equipment, Structures, or Material** — Inspecting equipment, structures, or materials to identify the cause of errors or other problems or defects.

**Identifying Objects, Actions, and Events** — Identifying information by categorizing, estimating, recognizing differences or similarities, and detecting changes in circumstances or events.

**Performing General Physical Activities** — Performing physical activities that require considerable use of your arms and legs and moving your whole body, such as climbing, lifting, balancing, walking, stooping, and handling of materials.

**Monitor Processes, Materials, or Surroundings** — Monitoring and reviewing information from materials, events, or the environment, to detect or assess problems.

**Organizing, Planning, and Prioritizing Work** — Developing specific goals and plans to prioritize, organize, and accomplish your work.

EXHIBIT K
-111-

**Training and Teaching Others** — Identifying the educational needs of others, developing formal educational or training programs or classes, and teaching or instructing others.

back to top

## Work Context

**Wear Common Protective or Safety Equipment such as Safety Shoes, Glasses, Gloves, Hearing Protection, Hard Hats, or Life Jackets** — How much does this job require wearing common protective or safety equipment such as safety shoes, glasses, gloves, hard hats or life jackets?

**Exposed to Contaminants** — How often does this job require working exposed to contaminants (such as pollutants, gases, dust or odors)?

**Sounds, Noise Levels Are Distracting or Uncomfortable** — How often does this job require working exposed to sounds and noise levels that are distracting or uncomfortable?

**Spend Time Using Your Hands to Handle, Control, or Feel Objects, Tools, or Controls** — How much does this job require using your hands to handle, control, or feel objects, tools or controls?

**Duration of Typical Work Week** — Number of hours typically worked in one week.

**Exposed to Hazardous Equipment** — How often does this job require exposure to hazardous equipment?

**Face-to-Face Discussions** — How often do you have to have face-to-face discussions with individuals or teams in this job?

**Pace Determined by Speed of Equipment** — How important is it to this job that the pace is determined by the speed of equipment or machinery? (This does not refer to keeping busy at all times on this job.)

**Importance of Being Exact or Accurate** — How important is being very exact or highly accurate in performing this job?

**Spend Time Standing** — How much does this job require standing?

back to top

## Job Zone

| | |
|---|---|
| **Title** | Job Zone Two: Some Preparation Needed |
| **Education** | These occupations usually require a high school diploma. |
| **Related Experience** | Some previous work-related skill, knowledge, or experience is usually needed. For example, a teller would benefit from experience working directly with the public. |
| **Job Training** | Employees in these occupations need anywhere from a few months to one year of working with experienced employees. A recognized apprenticeship program may be associated with these occupations. |
| **Job Zone Examples** | These occupations often involve using your knowledge and skills to help others. Examples include sheet metal workers, forest fire fighters, customer service representatives, physical therapist aides, salespersons (retail), and tellers. |
| **SVP Range** | (4.0 to < 6.0) |

**There are 15 recognized apprenticeable specialties associated with this occupation:**
Four-Slide-Machine Setter; Gunsmith; Gear-Cutting-Machine Set-Up Operator (Machine Shop); Gear Hobber Set-Up Operator; Machine Setter (Machine Shop); Machine Setter (Clock and Watch); Ornamental-Metal Worker; Machine Operator I; Spring Maker; Spring-Manufacturing Set-Up Technician; Tool-Machine Set-Up Operator; Machine Try-Out Setter; Gear-Cutting-Machine Set-Up Operator, Tool (Machine Shop); Machine

EXHIBIT K
12-

Setter (Any Industry); Machine Set-Up Operator

To learn about specific apprenticeship opportunities, please consult the U.S. Department of Labor State Apprenticeship Information ⅇ website.

For general information about apprenticeships, training, and partnerships with business, visit the U.S. Department of Labor Office of Apprenticeship ⅇ website.

back to top

## Education

| Percentage of Respondents | Education Level Required |
|---|---|
| 62 ▆▆▆▆▆▆▆▆ | High school diploma or equivalent |
| 22 ▆▆▆ | Some college, no degree |
| 13 ▆▆ | Less than high school diploma |

back to top

## Interests

Interest code: **R**

**Realistic** — Realistic occupations frequently involve work activities that include practical, hands-on problems and solutions. They often deal with plants, animals, and real-world materials like wood, tools, and machinery. Many of the occupations require working outside, and do not involve a lot of paperwork or working closely with others.

back to top

## Work Styles

**Attention to Detail** — Job requires being careful about detail and thorough in completing work tasks.

**Dependability** — Job requires being reliable, responsible, and dependable, and fulfilling obligations.

**Independence** — Job requires developing one's own ways of doing things, guiding oneself with little or no supervision, and depending on oneself to get things done.

**Initiative** — Job requires a willingness to take on responsibilities and challenges.

**Persistence** — Job requires persistence in the face of obstacles.

**Cooperation** — Job requires being pleasant with others on the job and displaying a good-natured, cooperative attitude.

**Adaptability/Flexibility** — Job requires being open to change (positive or negative) and to considerable variety in the workplace.

**Self Control** — Job requires maintaining composure, keeping emotions in check, controlling anger, and avoiding aggressive behavior, even in very difficult situations.

**Innovation** — Job requires creativity and alternative thinking to develop new ideas for and answers to work-related problems.

**Analytical Thinking** — Job requires analyzing information and using logic to address work-related problems.

EXHIBIT K
-113-

back to top

## Work Values

**Support** — Occupations that satisfy this work value offer supportive management that stands behind employees. Corresponding needs are Company Policies, Supervision: Human Relations and Supervision: Technical.

**Relationships** — Occupations that satisfy this work value allow employees to provide service to others and work with co-workers in a friendly non-competitive environment. Corresponding needs are Co-workers, Moral Values and Social Service.

**Working Conditions** — Occupations that satisfy this work value offer job security and good working conditions. Corresponding needs are Activity, Compensation, Independence, Security, Variety and Working Conditions.

back to top

## Related Occupations

| | |
|---|---|
| 51-4011.00 | Computer-Controlled Machine Tool Operators, Metal and Plastic ✐ **Green** |
| 51-4022.00 | Forging Machine Setters, Operators, and Tenders, Metal and Plastic |
| 51-4023.00 | Rolling Machine Setters, Operators, and Tenders, Metal and Plastic |
| 51-4031.00 | Cutting, Punching, and Press Machine Setters, Operators, and Tenders, Metal and Plastic ✐ |
| 51-4032.00 | Drilling and Boring Machine Tool Setters, Operators, and Tenders, Metal and Plastic ✐ |
| 51-4033.00 | Grinding, Lapping, Polishing, and Buffing Machine Tool Setters, Operators, and Tenders, Metal and Plastic |
| 51-4072.00 | Molding, Coremaking, and Casting Machine Setters, Operators, and Tenders, Metal and Plastic |
| 51-4191.00 | Heat Treating Equipment Setters, Operators, and Tenders, Metal and Plastic |
| 51-9032.00 | Cutting and Slicing Machine Setters, Operators, and Tenders |
| 51-9192.00 | Cleaning, Washing, and Metal Pickling Equipment Operators and Tenders |

back to top

## Wages & Employment Trends

### National

| | |
|---|---|
| **Median wages (2009)** | $15.01 hourly, $31,220 annual |
| **Employment (2008)** | 86,000 employees |
| **Projected growth (2008-2018)** | ■■ Decline rapidly (-10% or lower) |
| **Projected job openings (2008-2018)** | 16,800 |
| **Top industries (2008)** | Manufacturing |

### State & National

EXHIBIT K
-114-



Select a State    Go

Source: Bureau of Labor Statistics <u>2009 wage data</u> ⊞ and <u>2008-2018 employment projections</u> ⊞. "Projected growth" represents the estimated change in total employment over the projections period (2008-2018). "Projected job openings" represent openings due to growth and replacement.

<u>back to top</u>

## Sources of Additional Information

**Disclaimer:** Sources are listed to provide additional information on related jobs, specialties, and/or industries. Links to non-DOL Internet sites are provided for your convenience and do not constitute an endorsement.

- <u>Machine setters, operators, and tenders--metal and plastic</u> ⊞. Bureau of Labor Statistics, U.S. Department of Labor. *Occupational Outlook Handbook, 2010-11 Edition.*
- <u>Precision Machined Products Association (PMPA)</u> ⊞, 6700 West Snowville Rd., Brecksville, OH 44141-3292. Phone: (440) 526-0300. Fax: (440) 526-5803.
- <u>Precision Metalforming Association Educational Foundation (PMAEF)</u> ⊞, 6363 Oak Tree Blvd., Independence, OH 44131-2500. Phone: (216) 901-8800. Fax: (216) 901-9190.

<u>back to top</u>

Send comments or questions to <u>O*NET Info</u> (onet@onetcenter.org).

EXHIBIT K
-115-



careeronestop
PATHWAYS TO CAREER SUCCESS

Home > Career InfoNet > Occupation Information > Occupation Profile
America's Career InfoNet

## Occupation Profile                    Find Related Content...    

**Selected Criteria:**

| | | |
|---|---|---|
| Occupation: | **Multiple Machine Tool Setters, Operators, and Tenders, Metal and Plastic** | Change Occupation |
| State: | **California** | Change State |
| Profile Content: | *(content listed below)* | Modify Profile Content |

Wages | Employment Trends

### MULTIPLE MACHINE TOOL SETTERS, OPERATORS, AND TENDERS, METAL AND PLASTIC: CALIFORNIA

## Occupation Description

Set up, operate, or tend more than one type of cutting or forming machine tool or robot.

## State and National Wages

▦ Wage Table   〰 Hourly Wage Chart   〰 Yearly Wage Chart

| Location | Pay Period | 2009 | | | | |
|---|---|---|---|---|---|---|
| | | 10% | 25% | Median | 75% | 90% |
| United States | Hourly | $10.05 | $12.16 | $15.01 | $18.62 | $23.14 |
| | Yearly | $20,900 | $25,300 | $31,200 | $38,700 | $48,100 |
| California | Hourly | $9.59 | $11.53 | $14.48 | $17.49 | $21.12 |
| | Yearly | $19,900 | $24,000 | $30,100 | $36,400 | $43,900 |

Occupation Wages FAQs

Median Wage by Occupation Across States
Compare Wages by Occupation and Local Area
Compare Wages by Metropolitan Areas

**National Data Source:** Bureau of Labor Statistics, Occupational Employment Statistics Survey
**State Data Source:** California Occupational Wages

Back to Top

## State and National Trends

| United States | Employment | | Percent Change | Job Openings[1] |
|---|---|---|---|---|
| | 2008 | 2018 | | |
| Multiple machine tool setters, operators, and tenders, metal and plastic | 86,000 | 73,400 | -15% | 1,680 |

| California | Employment | | Percent Change | Job Openings[1] |
|---|---|---|---|---|
| | 2006 | 2016 | | |
| Multiple machine tool setters, operators, and tenders, metal and plastic | 4,200 | 4,700 | +12% | 140 |

[1] Job Openings refers to the average annual job openings due to growth and net replacement.

Note: The data for the State Employment Trends and the National Employment Trends are not directly comparable. The projections period for state data is 2006-2016, while the projections period for national data is 2008-2018.

Occupation Trends FAQs

Employment Trends by Occupation Across States
Compare Employment Trends by Occupation

EXHIBIT K
-116-

Employment Trends by Industry and Occupation

**National Data Source:** Bureau of Labor Statistics, Office of Occupational Statistics and Employment Projections
**State Data Source:** California Employment Development Department, Labor Market Information Division

Back to Top

**Modify Occupation Profile Content :**

☑ Wage Information    ☐ Tools & Technology
☑ Employment Trends    ☐ Education & Training
☐ Knowledge, Skills & Abilities    ☐ Related Occupation Profiles
☐ Tasks & Activities    ☐ Web Resources

Select or deselect profile options individually or use the Select All button below to change the report. To view the new results, select the Update button.

**Related Content:**    Find Related Content...  go

New Profile

CareerOneStop is sponsored by the U. S. Department of Labor, Employment and Training Administration

Home | Explore Careers | Salary + Benefits | Education + Training | Job Search | Resumes + Interviews | People + Places to Help
About Us | Site Privacy | Contact Us | Link to Us | Site Map | Copyright © 2010 State of Minnesota

**EXHIBIT K**
**-117-**

# EXHIBIT L

## TO DECLARATION OF
## YURI Y. GOTTESMAN
## IN OPPOSITION TO DEBTORS'
## MOTION TO MODIFY OR REJECT
## COLLECTIVE BARGAINING
## AGREEMENTS

### OF
### THE BAKERY, CONFECTIONERY, TOBACCO
### WORKERS AND GRAIN MILLERS' LOCAL NO. 85
### AND TEAMSTERS LOCAL 324

EXHIBIT L
-118-

August 17, 2010

VIA CERTIFIED MAIL

Jennifer Loving
Chief Financial Officer
Matterhorn Group, Inc.
1635 Village Center Circle  Suite 270
Las Vegas, NV 89134-6375

Re: **Request for withdrawal liability information Vitafreze Frozen Confections, Inc.OC# 1347**

Dear Ms. Loving:

This is to acknowledge receipt of Vitafreze Frozen Confections, Inc. check #21506 for $300.00 and your recent request for us to compute the withdrawal liability of Vitafreze Frozen Confections, Inc. If Vitafreze Frozen Confections, Inc. were to withdraw from this Pension Fund during the plan year ending December 31, 2010, we estimate they would incur withdrawal liability in the amount of $4,491,918.

This estimate is based on information currently available in Fund records, but is subject to change at such time that an actual withdrawal or partial withdrawal occurs. At that time, the Fund will conduct a complete investigation of the withdrawal, which may lead to different results. In particular, the Fund would need to obtain up-to-date information regarding a withdrawing company's membership in a group of trades or businesses under common control (within the meaning of Section 4001(c)(1) of ERISA and Section 414(c) of the Internal Revenue Code) in order to make a final determination of withdrawal liability. Enclosed for your reference is a copy of our worksheet setting forth our calculation.

Should you have any questions please don't hesitate to contact the Fund Office.

Very truly yours,

Steven D. Brock
Manager, Administrative Services

SDB:lld

Enclosure

cc: BCTGM Local Union No. 85

**EXHIBIT L**
-119-

**BAKERY AND CONFECTIONERY UNION AND INDUSTRY**
**INTERNATIONAL PENSION FUND**

Withdrawal Liability Worksheet
For Total Withdrawal Occurring in the Period
January 1, 2010 - December 31, 2010

**Vitafreze Frozen - Ownership Code # 1347**

| | | | |
|---|---|---|---|
| 1 | December 31, 2009 unfunded present value of vested benefits | = | $3,172,584,943 |
| 2 | Outstanding collectibles expected to be collected for previously withdrawn employers | = | $45,542,719 |
| 3 | Net unfunded liability (1) - (2) | = | $3,127,042,224 |
| 4 | Total contributions of withdrawing employer 1/1/2000 - 12/31/2009 | = | $2,538,062 |
| 5 | Pension employer contributions net of withdrawn substantial employers January 1, 2000 - December 31, 2009 | = | $1,766,867,907 |
| 6 | Allocable share of liability = Items (3) x (4) / (5) | = | $4,491,918 |
| 7 | Item 6 - $100,000   (but no more than $50,000 and not less than zero) | = | $50,000 |
| 8 | De Minimis deductible $50,000 − item 7 (but no more than item 6) | = | $0 |
| 9 | Net withdrawal liability = (6) − (8) | = | $4,491,918 |
| 10 | Average annual number of cbu's (hours) for the last three consecutive highest Plan years in the last ten Plan years preceding year of withdrawal | = | 125,507 |
| 11 | Highest contribution rate during last ten years | = | $2.4600 |
| 12 | Total annual withdrawal liability payment = (10) x (11) | = | $308,748 |
| 13 | Monthly withdrawal liability payment adjusted for interest = $^{(12)}/_{11.92804}$ | = | $25,884 |

EXHIBIT L
-120-

## BAKERY AND CONFECTIONERY UNION AND INDUSTRY
## INTERNATIONAL PENSION FUND

### Worksheet for Determining Monthly Payment
### and Length of Payment Period

Employer Name: __**Vitafreze Frozen**__     Acct. No. ___**1347**___

| | | | |
|---|---|---|---|
| (a) | Required annual payment | $ | 308,748 |
| (b) | Withdrawal liability after deductible | $ | 4,491,918 |
| (c) | Amortization ratio = (b) / (a) | | 14.548818 |
| (d) | Largest value in Table Factor I which is less than (c) | | 10.959078 |
| (e) | Number of years for value (d) | | 20 |
| (f) | Amount amortized in (e) years = (a) x (d) | $ | 3,383,593 |
| (g) | Amount left to amortize = (b) - (f) | $ | 1,108,325 |
| (h) | Table Factor II value for (e) years | | 4.247851 |
| (i) | Amount to amortize in final year = (g) x (h) | $ | 4,708,001 |
| (j) | Quarterly payment = (a)/4 | $ | 77,187 |
| (k) | Full quarters to pay in final year = (i) / (j) | | 0 |
| (l) | Amount to pay in final quarter = (i) -[(j) x (k)] | | 0 |
| (m) | Monthly payment, adjusted for interest = (j) / 2.98201 | $ | 25,884 |
| (n) | Number of full monthly payments in final quarter= (l)/(m) | | 0 |
| (o) | Number of full monthly payments = [12 x (e)] + [3 x (k)] + (n) | | 240 |
| (p) | Final payment = (l)-[(n) x (m)] | $ | 0 |

Employer payment schedule:

$___25,884___ (m) per month for ___240___ (o) months plus a final payment of
$_____0_____ (p).

EXHIBIT L
-121-

Withdrawal Liability Factors
Based on 7.5% Interest Rate
For withdrawals occurring in Plan year 2010

interest rate =     7.50%

| Number of Years | Factor I | Factor II |
|---|---|---|
| 0 | 0.000000 | 1.000000 |
| 1 | 1.000000 | 1.075000 |
| 2 | 1.930233 | 1.155625 |
| 3 | 2.795565 | 1.242297 |
| 4 | 3.600526 | 1.335469 |
| 5 | 4.349326 | 1.435629 |
| 6 | 5.045885 | 1.543302 |
| 7 | 5.693846 | 1.659049 |
| 8 | 6.296601 | 1.783478 |
| 9 | 6.857304 | 1.917239 |
| 10 | 7.378887 | 2.061032 |
| 11 | 7.864081 | 2.215609 |
| 12 | 8.315424 | 2.381780 |
| 13 | 8.735278 | 2.560413 |
| 14 | 9.125840 | 2.752444 |
| 15 | 9.489154 | 2.958877 |
| 16 | 9.827120 | 3.180793 |
| 17 | 10.141507 | 3.419353 |
| 18 | 10.433960 | 3.675804 |
| 19 | 10.706009 | 3.951489 |
| 20 | 10.959078 | 4.247851 |

2.98201 adjustment for monthly
payments instead of
quarterly payments

EXHIBIT L
-122-