FILED
October 20, 2010
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

0003015297

*In re: Matterhorn Group, Inc.*
Case No. 10-39672 (MSM)
United States Bankruptcy Court –Eastern District of California
(Sacramento Division)

# EXHIBIT 1

## TO DECLARATION OF EMILY P. RICH IN SUPPORT OF UNIONS' JOINT MOTION TO WITHDRAW THE REFERENCE OF DEBTORS' MOTION TO MODIFY OR REJECT COLLECTIVE BARGAINING AGREEMENTS

### WITH
### THE BAKERY, CONFECTIONERY, TOBACCO WORKERS AND GRAIN MILLERS' LOCAL NO. 85 AND TEAMSTERS LOCAL 324

**34**

RON BENDER (SBN 143364)
BETH ANN R. YOUNG (SBN 143945)
TODD M. ARNOLD (SBN 221868)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: rb@lnbyb.com; tma@lnbyb.com; bry@lnbyb.com

Attorneys for Chapter 11 Debtors and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF CALIFORNIA
## (SACRAMENTO DIVISION)

| | |
|---|---|
| In re:<br><br>MATTERHORN GROUP, INC.,<br><br>    Debtor.<br><br>———————————————<br><br>VITAFREZE FROZEN CONFECTIONS, INC.,<br><br>    Debtor.<br><br>———————————————<br><br>DELUXE ICE CREAM COMPANY,<br><br>    Debtor.<br><br>———————————————<br><br>☒ Affects ALL DEBTORS<br>☐ Affects only MATTERHORN GROUP, INC.<br>☐ Affects only VITAFREZE FROZEN CONFECTIONS, INC.<br>☐ Affects only DELUXE ICE CREAM COMPANY | Lead Case No. 10-39672 (MSM)<br>Jointly Administered with Case Nos. 10-39664 (MSM), and 10-39670 (MSM).<br><br>DC No. LNB-17<br><br>Chapter 11 Cases<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEBTORS' MOTION TO MODIFY OR REJECT COLLECTIVE BARGAINING AGREEMENTS WITH THE BAKERY, CONFECTIONERY, TOBACCO WORKERS AND GRAIN MILLERS' INTERNATIONAL UNION, AFL-CIO LOCAL NO. 85 AND GENERAL TEAMSTERS LOCAL NO. 324**<br><br>Hearing:<br>Date:    October 25, 2010<br>Time:    9:00 a.m.<br>Place:    Department A<br>           Judge Michael S. McManus<br>           Courtroom No. 28<br>           Floor No. 7<br>           Robert T. Matsui Courthouse<br>           501 I Street<br>           Sacramento, CA 95814 |

1

**34**

# TABLE OF CONTENTS

I.      SUMMARY OF REQUESTED RELIEF .................................................................... 2

II.     COMPANY BACKGROUND ................................................................................ 3

III.    BECAUSE OF DEBTORS' DIRE FINANCIAL CONDITION
        DEBTORS MUST IMMEDIATELY SELL THEIR ASSETS AS
        A GOING CONCERN ......................................................................................... 5

        a.      Payroll ..................................................................................................... 7
        b.      Pension .................................................................................................... 8
        c.      Healthcare ............................................................................................... 8

IV.     DEBTORS DELIVERED TO THE UNIONS' AUTHORIZED
        REPRESENTATIVES DEBTORS' PROPOSED MODIFICATIONS TO
        THE COLLECTIVE BARGAINING AGREEMENTS ..................................... 10

        A.      The Wages Paid In Sacramento Are Excessive Compared to the Market ........... 11

        B.      The Obligation to Provide Over-Time to Employees With Seniority
                in Sacramento Is An Extreme Financial Burden on the Debtors .......................... 13

        C.      Healthcare and Pension Benefits to Both Full-Time and Temporary
                Employees at Both Facilities Are A Substantial Financial Burden ...................... 14

                1.      The Healthcare Costs for Full-Time Employees Are Excessive ............... 14
                2.      Seasonal-Employees Should Not Be Provided Health Insurance ............. 15
                3.      Dental Insurance is Too Expensive ......................................................... 15
                4.      The Pension Contributions Are Excessive ............................................... 16
                5.      The "No Strike Clause" Should Be Extended Through 2020 .................. 16

V.      DEBTORS HAVE ESTABLISHED "GOOD CAUSE" FOR SEEKING
        MODIFICATION OR REJECTION OF THE COLLECTIVE BARGAINING
        AGREEMENTS ................................................................................................. 17

        1.      Debtors Made Proposals To The Unions To Modify The CBA ............................. 19
        2.      The Proposals Were Based On The Most Complete And Reliable
                Information Available At The Time Of The Proposals ......................................... 20
        3.      The Proposed Modifications Are Necessary To Permit Reorganization .............. 21
        4.      The Modifications Assure That All Creditors, The Debtor, And All Other
                Affected Parties Are Treated Fairly And Equitably ............................................ 23
        5.      The Debtor Provided The Union With Relevant Information As
                Is Necessary To Evaluate The Proposal ............................................................. 24

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION TO REJECT CBA

**34**

6.    The Debtor Have and Will Have Met At Reasonable Times With The
Union Between The Time Of The Proposal And The Time Of The Hearing .......25

7.    The Debtors Negotiated With The Union In Good Faith At These Meetings.......26

8.    Unions' (Possible) Refusal To Accept Debtors' Proposal Without
Good Cause ........................................................................................................27

9.    The Balance Of Equities Clearly Favors Rejection.................................................28

VI.    CONCLUSION .............................................................................................................31

**34**

# TABLE OF AUTHORITIES

**FEDERAL CASES**                                                           **Page(s)**

In re American Provision Co.
    44 B.R. 907 (Bankr. Minn. 1984)................................................................18, 19

In re In re Buhrke Indus., Inc.
    94-B-1671, 1996 WL 520771, at *1 (Bankr.N.D.Ill.Sept. 13,1996)....................22

In re Family Snacks, Inc.
    257 B.R. 884 (B.A.P. 8th Cir. 2001) ...............................................................22

In re Karykeion
    2010 WL 3297029* (Bankr.C.D.Cal. 2010) .............................17, 21, 23, 25, 26, 28

In re Maxwell Newspapers, Inc.
    981 F.2d 85 (2nd Cir. 1992) .............................................................................18

In re The Lady h Coal Co.
    193 B.R. 233 (Bankr.S.D.W.Va. 1996) ............................................................22

**FEDERAL STATUTES**

11 U.S.C. § 101 .....................................................................................passim

11 U.S.C. § 1113 .........................................................................17, 18, 22

11 U.S.C. § 1113(b)(1) .....................................................................................25

11 U.S.C. § 1113(b)(1)(A) ...............................................................................18

11 U.S.C. § 1113(b)(2) .....................................................................................10

11 U.S.C. § 1113(c) ..........................................................................................18

11 U.S.C. § 1113(c)(2) ......................................................................................18

11 U.S.C. § 503(b)(9) ........................................................................................30

11 U.S.C. §§ 1107 and 1108.............................................................................3

iii

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## SUMMARY OF REQUESTED RELIEF

Regardless of whether there is ultimately an approved sale of Debtors' assets on November 8, 2010, and particularly if there is no sale at that time, the overwhelming evidence confirms that the Debtors cannot afford the substantial financial burdens imposed on the Debtors by, *inter alia*, the existing terms of the Collective Bargaining Agreements with Local 85 and Local 324. If the proposed sale of Debtors' assets is not completed as contemplated by the Debtors' Sale Motion, then Debtors have no alternative but to shut their doors. Accordingly, for all of those detailed reasons outlined below and supported by the Declarations of Nathan Bell, Andrew De Camara and Jim Presley, the balance of the equities warrants rejection of the Collective Bargaining Agreements.

Dating back to August, 2010, the Debtors made their proposals to the authorized representatives of Local 85 and Local 324 seeking modifications to the Collective Bargaining Agreements; and shortly thereafter the Debtors commenced negotiations in good faith, in an effort to reach a resolution acceptable to the parties. As of the filing of this Motion, no resolution has been reached, and the Debtors are committed to continuing their negotiations with authorized representatives of Local 85 and Local 324. However, as the Sale Motion approaches, and an auction is set to take place on November 1, 2010, it is imperative that prospective buyers have a better understanding of the Debtors' assets subject to the sale, and whether the financial burdens associated with the Collective Bargaining Agreements and strangling the Debtors should be considered in formulating a proposed purchase price.

As shown in greater detail in the Declarations submitted herewith, the Collective Bargaining Agreements impose substantial financial burdens on the operations of the Debtors

business to such an extent that it demonstrably detracts from and reduces the market value that can otherwise be achieved if the Collective Bargaining Agreements were modified as requested by Debtors in their proposals, or rejected if no agreement can be reached. Accordingly, the Debtors seek to have the Collective Bargaining Agreements substantially modified, or if such necessary modifications are not acceptable to the Local 85 and/or Local 324, then rejected. This is not just necessary, but critical to permitting Debtors' reorganization, whether there is a sale of Debtors' assets, and particularly if there is not a sale.

## II.

## COMPANY BACKGROUND

Matterhorn Group, Inc. ("MGI"), Vitafreze Frozen Confections, Inc. ("Vitafreze"), and Deluxe Ice Cream Company ("Deluxe"), the debtors and debtors in possession in the above-captioned, jointly administered Chapter 11 bankruptcy cases (collectively, the "Debtors"), commenced their bankruptcy cases by filing voluntary petitions under Chapter 11 of 11 U.S.C. § 101 et seq. (the "Bankruptcy Code") on July 26, 2010 (the "Petition Date"). The Debtors continue to operate their business, manage their financial affairs, and operate their bankruptcy estates as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

MGI was formed in 2004 as a vehicle to "roll-up" frozen novelty manufacturing companies in the Western United States. The initial step in this strategy was MGI's acquisition of Vitafreze, Deluxe, and Matterhorn Ice Cream Company ("Matterhorn"),[1] each of which became wholly owned subsidiaries of MGI. As a result of these acquisitions, by 2005, the Debtors had established themselves as high-quality, high-service, private label manufacturers with a strong

---

[1] Matterhorn is also a wholly owned subsidiary of MGI. Matterhorn is not operating and has not filed a bankruptcy case.

**34**

Western United States customer base, and became one of the dominant producers of ice cream novelties in the Western United States.

In 2006, in an effort to improve operations and profitability, MGI closed Matterhorn's manufacturing plant in Caldwell, Idaho and consolidated its manufacturing into Vitafreze, located in Sacramento, California, and Deluxe, located in Salem, Oregon. MGI also took aggressive steps to restructure its remaining operations to reduce overhead and reposition MGI with its customers and suppliers. The Debtors' administrative office is located in Las Vegas, Nevada. (See, Bell Declaration at ¶6.)

At present, the Debtors, which have approximately 31 non-union employees and 226 union employees, are collectively one of the largest independent producers of ice cream and water-ice novelty products in the United States. The 226 union employees are divided between two unions: (1) The Bakery, Confectionery, Tobacco Workers and Grain Millers' International Union, AFL-CIO Local No. 85 ("Local 85")[2]; and (2) the General Teamsters Local No. 324 as to (a) Machine Operators, Forklift, Salesmen, Loaders & Checkers, Drivers and Maintenance, and (b) Palletizers and Packagers ("Local 324").[3] See, Bell Declaration at ¶7.) These three Collective Bargaining Agreements (the one with Local 85 and the two with Local 324) are collectively referred to as the "Collective Bargaining Agreements," or individually by name, where applicable. (True and correct copies of the Collective Bargaining Agreements are at Exhibits "1," "2" and "3" to the Bell Declaration.)

Pre-petition, the Debtors manufactured (1) self-branded products for grocery retailers, (2) co-branded products, and (3) the Debtors' own products, including the Debtor's Oh My!

---

[2] The Local 85 Collective Bargaining Agreement is between Local 85 and Vitafreze Frozen Confections.

[3] The Local 324 Collective Bargaining Agreements are between the two Local 324 unions identified above, and Deluxe Ice Cream Company.

**34**

Goodness™ branded products. The Debtors' customers included the largest big-box grocery retailers, club stores, and independent cooperative distribution companies in the United States, such as Wal*Mart, Sam's Club, Giant Eagle, Kroger, Stater Brothers, Albertsons, Winco Foods, Raley's, Save Mart Supermarkets, Safeway, Smart & Final, the Schwan Food Company, and Western Family. The Debtors also sold to various retailers in Mexico. (See, Bell Declaration at ¶7.)

**III.**

**BECAUSE OF DEBTORS' DIRE FINANCIAL CONDITION**

**DEBTORS MUST IMMEDIATELY SELL THEIR ASSETS AS A GOING CONCERN**

Simply put, and as outlined in detail in the Sale Motion, and related pleadings, set for hearing on October 25, 2010 and November 8, 2010, Debtors and their professionals, at the urging of the Debtors' primary secured creditor, Key Bank, N.A. (the "Bank"), have determined that an immediate sale of Debtors' assets is necessary because the Debtors do not have the financial wherewithal to survive continued operation much longer. (See, De Camara Declaration at ¶9; and Bell Declaration at ¶11). The Bank's requirement of the Sale on an expedited basis is for the sole purpose of enabling the Debtors to sell their assets in a manner specifically designed to maximize value for the benefit of Debtors' creditors. (See, De Camara Declaration at ¶ 15.)

The Debtors' financial advisors have confirmed that the Debtors have no ability to survive on cash collateral use alone beyond the early part of 2011, and obtaining the additional financing necessary to enable the Debtors to continue to survive and reorganization is not possible. (See, De Camara Declaration at ¶9; and Bell Declaration at ¶11). As a result, the only option available to the Debtors to avoid a shut down and liquidation of the Debtors' business is to consummate a sale of their business on an expedited basis. Without a sale approved by the Bank and of course,

this Court, the Debtors will have no choice but to close their doors. In such case, all employees will lose their jobs.

The Debtors' primary secured creditor is Key Bank, N.A. (the "Bank"). As of the Petition Date, Key Bank was owed approximately $10.5 million, which the Bank contends is secured by a first priority lien against substantially all of the Debtors' assets. However, the Debtors and the Bank have reached an overall settlement agreement which provides for an allocation of the assets of these estates following the closing of a sale of the Debtors' assets. A hearing is scheduled to be held on October 25, 2010 for the Court to consider approval of that settlement agreement in the context of an approval of the proposed sale. (See, Bell Declaration at ¶ 8).

During the period of 2007 through 2009, the Debtors gross revenues increased substantially from approximately $42,564,029 in 2007, to approximately $47,986,399 in 2008, to approximately $54,436,328 in 2009. However, due to expansion into new product categories, requiring greater capital investment, non-competitive labor costs, including work rules resulting in excessive overtime, expense and pension contribution amounts, and the continued need to make capital expenditures, both routine and those necessary to accommodate the increased manufacturing levels, the resulting increases in gross revenue did not generate corresponding increases in net income and liquidity. Instead, based on the foregoing and seasonal fluctuations in the Debtors' business and borrowing limits under the Bank loans, the Debtors found themselves in a cash crunch and were unable to meet their funding needs solely from advances made by the Bank. In consideration of the Debtors' ongoing cash crunch and the need for breathing room to formulate and implement a restructuring plan or a sale, the Debtors came to the conclusion that filing for bankruptcy protection was in the best interests of the Debtors and their creditor. (See, Bell Declaration at ¶ 9).

**34**

Since the Petition Date, the Debtors have been using cash collateral in accordance with four prior orders which have been approved by the Court. The Bank consented to the Debtors' cash collateral use in connection with the first two orders. The Bank filed a limited opposition to the Debtors' third cash collateral motion because the Bank wanted the Debtors to agree to an expedited sale process as a condition to the Debtors' continued use of cash collateral. (See, Bell Declaration at ¶ 10).

The Debtors made clear to the Bank and the Creditors' Committee from the outset of these cases that before the Debtors would be in a position to agree upon an expedited sale process, the Debtors first had to complete a one-year operating budget to determine if it was possible for the Debtors to reorganize on a stand-alone basis or to remain in Chapter 11 for an extended period of time and operate solely through use of the Debtors' cash collateral. (See, De Camara Declaration at ¶ 7; Bell Declaration at ¶ 11 and ¶13.) With the assistance of the Debtors' financial advisor, Sherwood Partners, several weeks ago the Debtors completed a comprehensive one-year operating budget and delivered a copy of that one-year budget to the Bank and the Creditors' Committee. The one–year budget confirmed that even with reductions and modifications to the compensation structure of the union employees, the ultimate determination was that the Debtors would not be able to survive on cash collateral alone. (See, De Camara Declaration at ¶ 8 and; Bell Declaration at ¶ 11 and ¶ 13).

The Budget was based upon, *inter alia*, assumptions directly related to the reductions to the compensation structure required under the existing Collective Bargaining Agreements. (See, De Camara Declaration at ¶ 8.) As set forth in detail in the Declaration of Mr. De Camara, the assumptions contained in the preparation of the Budget were based upon an analysis of the Debtors' historical financial performance, as well as future actions designed to improve performance. Some of the assumptions include the following:

**34**

      a.   **Payroll**: The Budget assumes a successful restructuring of the Local 85 Union obligations in Sacramento by November 2010, resulting in a decreased cost structure. However if the restructuring is not successful, the continued higher payroll amounts will have a negative impact on the Debtors' profitability.

      b.   **Pension**: The Budget assumes (i) no 401(k) matching payments are made through October, 2010, (ii) no "true-up" is required upon renegotiation of terms with the unions; (iii) beginning in November, 2010, the Debtors resume the 401(k) match at 3.2% of the former pension rate for Sacramento and 6.6% of the former pension rate for Salem; and (iv) no pension payments are assumed.

      c.   **Healthcare**: The Budget assumes that in Sacramento, healthcare costs will be reduced to 28.9% of the current rate beginning in November, 2010; and that in Salem, healthcare costs will be reduced to 29.9% of the current rate beginning in November, 2010.

(See, De Camara Declaration at ¶ 8.)

Indeed, upon review of the one-year budget by the Bank, the Creditors' Committee, the Debtors and their financial advisors, it became clear to the parties that the Debtors will not be able to survive economically on cash collateral use alone over the next year or even past the beginning of 2011. (See, De Camara Declaration at ¶ 9; and Bell Declaration at ¶ 13). Accordingly, the Bank determined that it would no longer fund Debtors' operations and that an immediate sale of the Debtors' assets was mandatory. At that time it was also determined that the only way for the Debtors to avoid a complete shut down and liquidation of their business was for the Debtors to consummate an expedited sale of their assets or to obtain millions of dollars of additional financing. (See, De Camara Declaration at ¶ 9; and Bell Declaration at ¶ 13.)

8

**34**

Given the extent of the Debtors' debt structure, it is not possible for the Debtors to obtain the necessary additional financing to survive beyond the early part of 2011. The Debtors have therefore concluded that embarking on an expedited asset sale process is in the overwhelming best interests of the Debtors' estates and the only way to avoid a complete shut down and liquidation of the Debtors' business. Accordingly, the Debtors are now engaging in the process of selling the Debtors' businesses, with an auction set on November 1, 2010 (the "Auction"), and the Motion to approve any sale set for November 8, 2010.

Regardless of whether there is ultimately an approved sale, the stringent financial analysis and Budget confirm that Debtors cannot afford the financial burdens imposed by the existing terms of the Collective Bargaining Agreements, and it would be burdensome for any prospective purchaser to buy the Debtors' assets including the over-market obligations required by the Collective Bargaining Agreement. (See, De Camara Declaration at ¶ 8.) Therefore, the Debtors seek to have the Collective Bargaining Agreement substantially modified, or if the proposed modifications are not acceptable to the Local 85 and/or Local 324 unions, then rejected. Modification or rejection is necessary to enable Debtors' reorganization. (See, Bell Declaration at ¶ 16).

To address these issues, the Debtors made a proposal to the pertinent union representative for certain modifications to the existing employee benefits which were necessary to permit the reorganization of the Debtors. (See, Declaration of Jim Presley ("Presley Declaration"), filed concurrently herewith, at ¶ 5 and Exhibits "4" and "5" thereto.). In the Presley Declaration, Mr. Presley outlines the proposed modification and summarizes the substantial financial savings to the Debtors if those proposed modifications are implemented. As to Vita Freeze, the annual savings exceed $1,780,000; and as to Deluxe, the annual savings exceed $869,000. (See, Presley Declaration at ¶ 7.)

**34**

To be fair, as of the filing of this Motion, the Debtors and the unions are still negotiating in good faith, and the employees have not agreed to accept or reject the proposed modifications.[4] If, however, the modifications are not accepted as of the hearing on this Motion, then it is necessary for the Debtors to reject the Collective Bargaining Agreements in order to enhance the market value of the Debtors' assets; maximize the recovery to the estates; permit the immediate sale of the Debtors' business operations as a going concern to maximize the value, and thereby facilitate the reorganization of the Debtors.

**IV.**

## DEBTORS DELIVERED TO THE UNIONS' AUTHORIZED REPRESNTATIVES

## DEBTORS' PROPOSED MODIFICATIONS TO

## THE COLLECTIVE BARGAINING AGREEMENTS

On or about August 29, 2010 and then September 22, 2010, the Debtors made proposals to both Local 85 (in Sacramento, California) and Local 324 (in Salem, Oregon), respectively, in a good faith effort to modify the Collective Bargaining Agreements for each of these two facilities. On September 20, 2010, the Debtors met in person with authorized representatives of Local 85 to discuss the Debtors' proposal with regard to the Collective Bargaining Agreement pertaining to Local 85. (See, Presley Declaration at Exhibits "4" and "5" and ¶ 5.) The nature of the Debtors' proposals for each of the two facilities, and an outline of the financial impact of the modifications

---

[4] Pursuant to 11 U.S.C. §1113(b)(2), the negotiations can continue folliong the date of the proposal theoruhg the date of the hearing. Negotiations need not be completed as of the filing of the Motion. The Debtors intend to continue to negotiate with the unions in good faith in an effort to reach an accord. However, because time is of the essence, and an auction is presently set for November 2, 2010 and a Motion to approve any sale is set for November 8, 2010, it is necessary to resolve the status of the Collective Bargaining Agreements prior to the Auction.

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION TO REJECT CBA

**34**

requested are described below[5], and supported by the Presley Declaration filed concurrently herewith.

Debtors' Sacramento facility employs approximately 110 union workers, 87 of which are full-time and 23of which are "temporary" or seasonal. These union workers hold the following job positions: (1) Forepersons; (2) Hardening Room Workers; (3) Lead Packers; (4) Maintenance Workers; (5) Operators; (6) Packers; and (7) Utility Workers. The main issues which impose the greatest financial burden on the Debtors' business operations and require the requested modifications to the Collective Bargaining Agreement in order to permit reorganization specifically relate to (a) the over-market wages paid to Packers and Operators; (b) the Debtors' obligation to provide over-time to workers with seniority before any other lesser compensated or lower rate employees; and (c) the Debtors' obligation to provide healthcare benefits to the temporary employees, in addition to the excessive rates of healthcare insurance for full-time employees. The magnitude of the requested modifications as set forth in the Debtors' proposal would save Debtors at their Sacramento facility, in the aggregate, more than $1,780,000 per year. (See, Presley Declaration at ¶ 8.)

### A.    The Wages Paid In Sacramento Are Excessive Compared to the Market

A major contributor to the Debtors' impaired financial condition relates to the fact that the wages paid to union in employees in the Sacramento facility substantially exceed the median wages paid to similarly situated workers in the same geographic area. The Debtors have researched the median wages paid in Sacramento for similar worker by contacting the Economic Development Offices for the City and County of Sacramento, and by obtaining data from the website: www.onetcenter.org. From these sources, the Debtors determined that wages paid to the

---

[5]  To the extent that the proposed modification to a component of the Collective Bargaining Agreement relates to only one of the two facilities, that facility will be identified by name.

**34**

Vita Freeze employees are substantially higher than the median wages for similar workers within the same geographic community. (See, Presley Declaration at ¶ 9.)

For example, with regard to the job performed by "operators," although the median wages paid to these workers at other facilities is $11.94 per hour, Debtors are currently paying two-thirds of their operators (approximately 19 of the 28) $18.20 per hour, while the other one-third of the operators are being paid $14.56 to $15.87 per hour, all of which is substantially above the median wages paid to similar workers. (See, Presley Declaration at ¶ 10.)

Similarly, the wages paid to "packers" at the Sacramento facility exceed the median wages paid to packer-workers at other facilities. The majority of the Debtors' packers (32 of 37) employed at the Sacramento facility are paid $17.52 per hour, while the median wages for similar workers is the substantially lesser sum of $9.41 per hour. This is almost double the median wages in the market-place. The Debtors' other five packers earn wages of $15.06 to $16.12 per hour, which is still substantially above the median wages paid to similar workers. (See, Presley Declaration at ¶ 11.)

The financial impact of these obviously above-market wages is $466,810.72 per year more than Debtors should be paying for these same services. (See, Presley Declaration at ¶ 12.) The conclusion that Debtors are paying wages substantially over-market for the job performed by its operators and packers, and the obvious severe financial burden that this places upon the Debtors, cannot be avoided. It is imperative that the wages of these employees be substantially reduced to comport with the median market rate wages. It is clear from the Debtors' one-year budget that Debtors have no ability to continue operating if these excessive wages remain in place and modification is required if there is to be any reorganization. (See, Presley Declaration at ¶ 13.)

**34**

**B.**   <u>The Obligation to Provide Over-Time to Employees With Seniority in</u>

   <u>Sacramento Is An Extreme Financial Burden on the Debtors</u>

In addition to the excessive above-market wages being paid to its employees in Sacramento, a further financial burden imposed upon the Debtors by the terms of the existing Collective Bargaining Agreements relates to the Debtor's obligation to offer over-time to the most senior union employees ahead of or instead of the lesser paid union employees in the same job category.   Because the wages are already excessively above-market as to most employees in Sacramento, providing already over-paid employees with 1½ times their hourly rate just compounds the financial burden even more. The impact of over-time is an annual financial burden of approximately $210,607.91.  (See, Presley Declaration at ¶ 14.)  Thus, modifying the seniority requirement is essential to the ability of the Debtors to reorganize.

As set forth in greater detail in the Presley Declaration, the problem with the seniority requirement imposed on over-time is at least three-fold:

**First**, in many cases, junior employees are as skilled as the senior employees, so permitting over-time for those higher rate employees does not lead to either efficiency or greater productivity.  (See, Presley Declaration at ¶ 15(a).)

**Second**, the Debtors' obligation to offer over-time to senior employees extends to permitting them to work in <u>other</u> areas.  For example, a packer with seniority who works on "packing line one" has the right to work over-time on "packing line two," even though his/her experience is only on packing line one, and even if an employee who works on packing line two but has lesser seniority is available.  This means that the Debtors are paying higher over-time rates (the higher salaried worker at 1½ times their regular hourly rate) and is getting lesser services than could otherwise be provided by junior employees with greater skill but less seniority, at a less cost.  In fact, sometimes Debtors have to employ the over-time services of

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION TO REJECT CBA

**34**

1  additional staff just to compensate for the inefficiencies of these senior employees, which is an

2  additional financial burden that Debtors simply cannot afford.  (See, Presley Declaration at ¶

3  15(b).)

4
5       **Third**, because of the fact that there is a requirement to administer the over-time

6  assignments based upon seniority, Debtors must employ on a full-time basis an administrator who

7  can perform this single function of regulating over-time assignments.  If the over-time did not

8  have to be so stringently monitored in this fashion, the services of a full-time administrator would

9  not be required and the costs associated with this function could be avoided at substantial savings

10  to the Debtors. (See, Presley Declaration at ¶ 15(c).)

11      C.   **Healthcare and Pension Benefits to Both Full-Time and Temporary**

12         **Employees at Both Facilities Are A Substantial Financial Burden**

13
14       At both the Sacramento facility and also the Salem facility, employee healthcare and

15  pension benefits are imposing a substantial financial burden upon the Debtors which requires

16  immediate attention and modification if the Debtors have any chance of reorganizing.  The

17  benefits are presently paid to both full-time employees and also seasonal, or temporary

18  employees. (See, Presley Declaration at ¶ 16.) The problems with the existing healthcare plans at

19  both facilities are as follows:

20
21      1.   **The Healthcare Costs for Full-Time Employees Are Excessive**

22       In an effort to reduce the financial hardships imposed upon Debtors by virtue of the costs

23  of health insurance.  Debtors sought out quotes for health insurance from various companies,

24  seeking similar benefits for its full-time employees. (See, Presley Declaration at ¶ 16(a).)  While

25  presently Debtors are required to pay monthly premiums in the sum of $943 for each of their

26  employees, insurance brokers provided Debtors with quotes of replica insurance coverage for the

27  substantially lesser sum of $300 to $450 per month, per employee. (See, Presley Declaration at ¶

28

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION TO REJECT CBA

**34**

16(a).)   Changing the carrier for health insurance for full-time employees would provide

substantial financial savings to the Debtors in the annual sum of $851,316 at the Sacramento

facility, and financial savings to the Debtors in the annual sum of $657,620.94 at the Salem

facility.

### 2.   <u>Seasonal-Employees Should Not Be Provided Health Insurance</u>

A substantial cost to the Debtors at both facilities relates to the obligation to provide

health insurance to seasonal or temporary employees, who typically work only five months out of

the year.   The obvious problem is that insurance coverage does not even kick in until after the

third month of employment, and then there is coverage for only two months before the temporary

employee terminates.   However Debtors must pay premiums for five months for these seasonal

employees.   Thus, per employee, premiums in the sum of approximately $2,700 is paid on their

behalf prior to any coverage becoming available, but this has no value to either the Debtors or the

seasonal employees because they do not qualify for use of insurance during this three month

period.   The costs associate with eliminating health insurance for these seasonal employees is

included in the substantial savings set forth in section above. (See, Presley Declaration at ¶ 16(b).)

### 3.   <u>Dental Insurance is Too Expensive</u>

The cost to Debtors for providing dental insurance to its employees is prohibitively

expensive.   However, the proposed modification is that dental insurance can be added for

approximately $50 per month by any employees who elect to pay the premiums for the dental

insurance.   The savings to the Debtors at the Salem facility in eliminating this dental benefit

otherwise required under the Collective Bargaining Agreements is $101,522.52.   (See, Presley

Declaration at ¶ 16(c).)

1    **4.    The Pension Contributions Are Excessive**

2    At both facilities, there is a pension obligation under the terms of the Collective

3    Bargaining Agreements.    Under the terms of the Collective Bargaining Agreement, the

4    Sacramento facility requires a pension contribution at the rate of $2.09 per hour, per employee, up

5    to the sum of $98.40 per week, from the first day of employment, while the Salem facility

6    requires a pension contribution at the rate of .43¢ per compensable hour, per employee after the

7    first year of employment is completed.    These pension contributions require Debtors to expend

8    more than $350,000 annually.    In order to address this, Debtors' Proposals sought to replace the

9    pension obligation by instead contributing as a matching payment to the employee's 401(k)

10   account a sum up to 2% of contributions made by the employees to their 401(k) plan, but

11   terminating the pension contributions in total.    By implementing this replacement, Debtors save

12   annually at the Sacramento facility the sum of $254,245.29, and Debtors save annually at the

13   Salem facility the sum of $110,351.71.    (See, Presley Declaration at ¶16(d).)

14   **5.    The "No Strike Clause" Should Be Extended Through 2020**.

15   Presently, the Collective Bargaining Agreements provide for a "no strike" through the

16   term of the Collective Bargaining Agreements.    However, the Local 324 Collective Bargaining

17   Agreement is set to expire in July 2011, and the Local 85 Collective Bargaining Agreement is set

18   to expire in August 2013.    The leverage of a potential strike in the next 18 to 48 months severely

19   impacts the value of the company to any prospective purchaser.    (See, Presley Declaration at

20   ¶16(e).)  The unions' ability to strike at the end of the term, at the height of the ice cream season,

21   is a powerful weapon and could effectively cripple the company going forward and if timed

22   properly (as it is always scheduled and intended to do) even if only for a short two week period,

23   will erode any potential profits that the company might be able to make in that given year.    (See,

24   Presley Declaration at ¶ 16(e).)  This is a huge negative for any prospective purchaser, since the

**34**

anticipated earnings of the company could be entirely elusive in the event of a strike. However, by extending the term of the existing collective bargaining agreements (in addition to the specific financial modifications proposed to the unions and discussed above), the Debtors' ability to sell the company without the imminent threat of a strike is greatly enhanced and facilitates reorganization.

In any event, as shown below, each of the nine steps typically assessed by Courts in determining whether to permit modification or rejection of Collective Bargaining Agreements have been satisfied by the Debtors. Where the unions have failed to accept the proposed modifications without good cause, rejection is now appropriate to permit the reorganization of the Debtors and assure that all creditors, the debtor and all of the affected parties are treated fairly and equitably.

## V.

## DEBTORS HAVE ESTABLISHED "GOOD CAUSE" FOR SEEKING

## MODIFICATION OR REJECTION OF

## THE COLLECTIVE BARGAINING AGREEMENTS

Section 1113 provides a bankruptcy court with authority to modify, and in appropriate circumstances reject, an unexpired collective bargaining agreement. Indeed "§1113's language and purpose indicate that it allows a debtor to terminate or modify its ongoing obligations to its organized workforce, whether those arise as a result of a current or expired CBA." (See, In re Karykeion, 2010 WL 3297029* 9 (Bankr.C.D.Cal. 2010).)

Section 1113 of the Bankruptcy Code controls the rejection of collective bargaining agreements in Chapter 11 proceedings and sets forth the standards and procedure for rejection of a collective bargaining agreement. Section 1113 requires unions to face those changed circumstances that occur when a company becomes insolvent, and it requires all affected parties

**34**

to compromise in the face of financial hardship. See, <u>In re Maxwell Newspapers, Inc.</u>, 981 F.2d 85, 89 (2nd Cir. 1992). On the one hand, employers may only propose those necessary modifications in the employees' benefits and protections that are necessary to permit the effective reorganization of the debtor. "A debtor may sell the assets of the business unencumbered by a collective bargaining agreement if that agreement has been rejected pursuant to §1113." <u>Id</u>.

The thrust of §1113 is to ensure that well-informed and good faith negotiations occur in the market place, not as part of the judicial process; and reorganization procedures are designed to encourage a negotiated voluntary modification. <u>In re Maxwell Newspapers, Inc.</u>, 981 F.2d at 90. "Knowing that it cannot turn down an employer's proposal without good cause gives the union an incentive to compromise on modifications of the collective bargaining agreement, so as to prevent its complete rejection." <u>Id</u>. Most importantly, §1113 imposes upon all parties (employer and employees alike) the obligation to negotiate in good faith. Thus, the employer shall "make a proposal to the authorized representative of the employees covered by such agreement, based on the most complete and reliable information available at the time of such proposal." (See, 11 U.S.C. §1113(b)(1)(A).) Similarly, the authorized employee representative shall not refuse to accept such proposal without good cause. (See, 11 U.S.C. §1113(c)(2).) "The court shall approve an application for rejection of a collective bargaining agreement only if the court finds that – (1) the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (b)(1); (2) the authorized representative of the employees has refused to accept such proposal without good cause; and (3) the balance of the equities clearly favors rejection of such agreement." (See, 11 U.S.C. §1113(c).)

An application to reject a collective bargaining agreement is judged against a nine factor test, first articulated in <u>In re American Provision Co.</u>, 44 B.R. 907, 909 (Bankr. Minn. 1984). Under Section 1113(b), the <u>American Provision</u> test requires that:

**34**

(1) the debtor make a proposal to modify the CBA;

(2) the proposal be based on the most complete and reliable information available at the time of the proposal;

(3) the proposed modifications are necessary to permit reorganization of the debtor;

(4) the modifications assure that all creditors, the debtor, and all other affected parties are treated fairly and equitably;

(5) the debtor provides to the union such relevant information as is necessary to evaluate the proposal;

(6) the debtor meets at reasonable times with the union between the time of the proposal and the time of the hearing on the proposal;

(7) the debtor negotiates with the union in good faith at these meetings;

(8) the union refuses to accept the debtor's proposal without good cause; and

(9) the balance of equities clearly favors rejection to the agreement.

See, <u>American Provision</u>, 44 B.R. at 909.

As shown below and as supported by the evidence submitted with the Declarations of Bell, Presley and De Camara, each of the nine factors confirm that rejection of the Collective Bargaining Agreements in this case is warranted, in the event that the unions have refused to accept the proposed modifications without good cause.

The Debtors will address each of the nine factors in the order presented above:

1.     **Debtors Made Proposals To The Unions To Modify The CBA**

As indicated in the Presley Declaration filed herewith and at Exhibits "4" and "5" attached thereto, the Debtors submitted a proposal to Local 85 on August 29, 2010 and a separate proposal to Local 324 on September 22, 2010 (collectively, the "Proposals"). The Proposals sought to modify the Collective Bargaining Agreements and identified those specific provisions within

**34**

which were causing financial burdens upon the Debtors. The Proposal provided "redlined" modifications to the Collective Bargaining Agreement, and set forth proposed modifications which would enable the Debtors to keep the Collective Bargaining Agreements, as modified, in place.

Subsequent to submitting the Proposals, the Debtors have engaged, and will continue to engage, in an on-going dialogue with representatives of Local 85 and Local 324 in an effort to negotiate in good faith to a resolution of the requested modifications. (See, Presley Declaration at ¶6; and Bell Declaration at ¶ 18.)

2.   **The Proposals Were Based On The Most Complete And Reliable Information Available At The Time Of The Proposals**

Since the outset of Debtors' Chapter 11 cases, Debtors have been entirely transparent in all of their disclosures and dealings with the Court and their creditors. Indeed, on four occasions, the Debtors filed requests for use of cash collateral, and provided the details of the Debtors' financial needs and the constraints existing at the time of each request. Also, with the assistance of the Debtors' financial advisor, several weeks ago the Debtors completed a comprehensive one-year operating budget and delivered a copy of that one-year budget to the Bank and the Creditors' Committee. (See, Bell Declaration at ¶ 11.) Thus, there is no question that the unions have complete and reliable information to consider along with the Proposals. In fact, on four separate occasions, in addition to all the other financial data filed by the Debtors, the Debtors also filed detailed requests for use of cash collateral, and provided the details of the Debtors' financial needs and the constraints existing at the time of each request. The dire nature of the Debtors' financial condition has been known to all of the parties and their counsel since the inception of this case, and particularly counsel for the unions, Christian Raisner. Indeed, at the last hearing in these cases held on October 4, 2010, Mr. Raisner appeared telephonically on behalf of the unions

**34**

and stated that they "have known of the dire situation of Debtor and knew that a sale would have to occur." (See, Bell Declaration at ¶ 17.)

As a matter of law, "the statute's idea is that a debtor-employer must make a proposal firmly grounded in the historical reality of operational economics, an unvarnished evaluation of its current straits, and a thorough analysis of all of the incidents of income and expense that would bear on its ability to maintain a going concern in the future, whether subject to the financial obligations of its collective bargaining agreement(s) or not." (See, In re Karykeion, 2010 WL 3297029* 12 (Bankr.C.D.Cal. 2010).) Here, it is clear that this threshold requirement is satisfied where there has been vetted a thorough analysis of the Debtors' business operations and where the one-year budget prepared by Debtors' financial advisors at the behest of its secured lender, Key Bank, caused the lender to terminate its willingness to continue Debtors' use of any cash collateral beyond mid-November 2010, and forced the Debtor to aggressively market the Debtors' assets for sale to close prior to November 15, 2010. (See, De Camara Declaration at ¶ 9; and Bell Declaration at ¶ 11.)

There is no question that the Debtors' Proposals were based upon the undisputed facts and actual circumstances and were not merely cursory or arbitrary assessments of the Debtors' financial condition or ability to proceed going forward. In assessing this factor, the Court in Karykeion looked for evidence that the Proposals or any specific terms were result-driven in isolation rather than process-derived and based on actual experience. Here, the evidence all supports a finding that the Proposals were process-derived based upon actual experience as supported by the one-year budgets. Accordingly, the obvious conclusion is that the unions were provided with complete and reliable information from which to consider the Debtors' Proposals.

### 3. The Proposed Modifications Are Necessary To Permit Reorganization

Courts in the various circuits may differ as to whether "necessary" is synonymous with

**34**

"essential" or rather, has a more flexible meaning. (See, In re Family Snacks, Inc., 257 B.R. 884, 893 (B.A.P. 8th Cir. 2001).) However, where courts universally agree is that Section 1113 applies even in a case where the debtor will not be engaged in business because it is selling its assets. Id. Indeed, "the distinction between reorganization of a debtor and the sale of a going concern asset to a third party . . . [is] irrelevant to consider under section 1113, based on Chapter 11's goal of continuing the enterprise regardless of the ownership." See, In re Family Snacks, at 893-894, citing to In re The Lady h Coal Co., 193 B.R. 233, 240 – 243 (Bankr.S.D.W.Va. 1996)(denying a debtor's application for rejection on equitable grounds, but assuming that rejection may occur to facilitate a sale); In re Buhrke Indus., Inc., No 94-B-1671, 1996 WL 520771, at *1)(Bankr.N.D.Ill.Sept. 13,1996)(allowing a debtor to reject a CBA while the debtor was in the process of liquidation.)

The likely outcome here is that without a court-approved sale by mid-November, 2010, or an agreement by the Bank to permit the Debtors to use cash collateral to continue to operate pending a future sale (which is entirely unlikely), the Debtors will be shut down and out of business by the end of the year. In that case, all employees will be terminated. (See, Bell Declaration at ¶ 16.) The possibility that the Debtors can sell their assets for an amount at least equal to the floor imposed by the Bank, requires that the Debtors maximize the value of the businesses as much as possible. Whether the Collective Bargaining Agreements have been expressly rejected by a potential bidder is not as relevant to this part of the analysis as is the overall impact on the value of the business if the Collective Bargaining Agreements remain in tact. As shown above, the monetary burden of the Local 85 and Local 324 Collective Bargaining Agreements on the Debtors' annual operations exceed $2,652,475.09. (See, Presley Declaration at ¶ 7; and Bell Declaration at ¶ 16.)

**34**

Certainly this is a substantial factor that will undoubtedly be considered by any prospective purchaser, and will play a significant part in their formulating a purchase offer. Therefore, removing this financial burden from the playing field will obviously enhance the market value of Debtors' assets. While it can be argued that at the present time there is no purchase offer that is conditioned upon modification or rejection of the Collective Bargaining Agreements, there is no question that any purchaser will consider the costs associated with the Collective Bargaining Agreements (above-market wages; seniority in over-time assignments; pension costs; and health care costs) and the potential for a strike within 18 months of the sale closing and base any purchase offer on those critical factors. In Karykeion, the Court held that the even though the asset purchase agreement as signed did not contain a clause rejecting the collective bargaining agreements, the risk that the potential buyer would walk away, coupled with the likelihood of the Debtor's closing down if there was no sale, was sufficient to warrant rejection of the collective bargaining agreements. (See, In re Karykeion, 2010 WL 3297029 at*14.) This analysis is equally applicable here and the finding that the proposed modification is necessary to permit reorganization is appropriate.

4. **The Modifications Assure That All Creditors, The Debtors, And All Other Affected Parties Are Treated Fairly And Equitably**

As noted by the Court in Karykeion, the fact that the workers who have put their heart and soul into the facilities post-petition and are not guaranteed jobs in a sale is undoubtedly an unfair result. However, that reality must be tempered by an understanding of all the parties and interest in evaluating this prong of the analysis as well as the realities of this case. (See, In re Karykeion, 2010 WL 3297029 at*14.) Indeed, the lion's share of the sales proceeds will be paid to the Bank on its secured claim, with a carve-out for administrative fees and unsecured creditors. This is the kind of "shared pain" that the Karykeion Court sought to achieve in analyzing this element of the

**34**

nine prong test.   Admittedly, the Bank will not be paid in full in either scenario, however it is clear that all parties will be treated equally in that there will be a distribution of funds to multiple groups of creditors which otherwise would not be possible if the sale did not occur and the Debtors' businesses just shut down.

5.      **The Debtors Provided The Union With Relevant Information As Is Necessary To Evaluate The Proposal**

From the inception of this bankruptcy case, the Debtors have made all of the typical financial disclosures of Chapter 11 Debtors.  Moreover, as a consequence of the continued need for use of cash collateral, and the related stringent requirements of Key Bank in reluctantly consenting to Debtors' use of cash collateral, coupled with the Sale Motion, Bidding Procedures Motion and Sale Motion and the pleadings and evidence submitted therewith, there has been intense spotlight and scrutiny on the Debtors' dire financial condition and their inability to continue to operate but for an immediate sale of assets.  (See, Bell Declaration at ¶ ¶ 10, 11 and 17.)

The Budget confirms that the Debtors cannot <u>not</u> survive economically on cash collateral use alone over the next year or even past the beginning of 2011.  (See, Bell Declaration at ¶ 11 and  ¶13.)  Notably, the Budget also confirms that unless there is a substantial reduction in the fundamental components of compensation relating to wages, over-time, healthcare and pension obligations, the Debtors cannot continue to operate, and are unattractive to prospective purchasers.  (See, De Camara Declaration at ¶ 8.)

The evidence before this Court is that, the only way for the Debtors to avoid a complete shut down and liquidation of their business is for the Debtors to consummate an expedited sale of their assets or to obtain millions of dollars of additional financing and that given the extent of the Debtors' debt structure, it is not possible for the Debtors to obtain the necessary additional

24

**34**

financing to survive beyond the early part of 2011. (See, Bell Declaration at ¶ 11.) The breadth and scope of the information required depends upon the circumstances of the debtor and the severity of the modifications. (See, In re Karykeion, 2010 WL 3297029 at*15.) In Karykeion, where the debtor had presented adequate evidence of its dire financial condition in support of its disclosure statement, motions to modify cash collateral orders, and other proceedings before the Court, the Court held that the information provided was sufficient and Section 1113(b)(1) had been satisfied. Similarly, here too, in light of the numerous motions before the Court and the substantial pleadings and evidence submitted in connection with those motion, Debtors have provided sufficient evidence to the unions in furtherance of Debtors' obligations under Section 1113(b)(1).

As a part of its analysis, the Karykeion Court also considered the nature of the disclosures made in light of when things were definite and how fast things were moving. Here, with the Bank's demand for an expedited sale of assets, the Debtors have been moving at lightening speed to meet the Bank's demands. Not only in connection with the cash collateral motions, but also in moving forward with the sale process, the Debtors have made an overwhelming amount of financial information available to all interested parties, including the unions. Moreover, filed herewith is further financial information including the specific concerns with the existing terms of the Collective Bargaining Agreement which have been presented to the Unions in connection with the Proposals in August and September 2010, but also in the further negotiations regarding the potential resolution. (See, Presley Declaration at ¶ 5.)

6. **The Debtors Have and Will Have Met At Reasonable Times With The Union Between The Time Of The Proposal And The Time Of The Hearing**

Determining what amounts to reasonable times depends on the circumstances of the situation. (See, In re Karykeion, 2010 WL 3297029 at*16)(determining that this element was

**34**

satisfied where numerous other emergency motions and hearings were progressing and needed to be concluded to move case forward, so the decision not the spend hours in fruitless negotiations was not unreasonable).

Here, there is no question that Debtors have been engaged in numerous other emergency motions and hearings in order to properly tee-up an auction and hearing to approve any auction, as well as the substantial negotiations with the Bank to reach an agreement on a myriad of issues which would permit the auction and sale to go forward. Nonetheless, following the Proposals, the Debtors set aside time on September 20, 2010, to meet with the Unions in person. (See, Presley Declaration at ¶ 6.) Thereafter, the Unions sent a written request to the Debtors for more information regarding the financial impact of the economic modifications requested. The Presley Declaration submitted herewith provides the financial information requested. Moreover, the Debtors intend to meet again in person with the unions prior to the hearing on this Motion to see if there is a resolution that can be reached. (See, Presley Declaration at ¶ 6.) Therefore, the overwhelming evidence supports a finding that this element has been satisfied by the Debtors.

7.    **The Debtors Negotiated With The Union In Good Faith At These Meetings**

Beginning negotiations when one party is already locked into a position does not constitute good faith. However, this was not the Debtors' opening position. Indeed, the outline of the Proposals show that the Debtors requested modifications to the Collective Bargaining Agreements which would permit reorganization without rejection of the Collective Bargaining Agreements. As a matter of law, "the union has the burden of producing evidence that the debtor did not engage in good faith bargaining." (See, In re Karykeion, 2010 WL 3297029 at*17.) Clearly, with the assistance of its financial advisors, and the detailed redlines and analysis prepared by Mr. Presley, the only conclusion that can be drawn here is that the Debtors have made every possible endeavor to provide the unions with the most accurate information available

**34**

at each relevant juncture and that the Debtors operated in good faith in negotiating with the unions and meeting with them.

The undeniable fact is that the Debtors simply cannot successfully operate, in part, because of the onerous terms compelled by the Collective Bargaining Agreement which mandates (a) the over-market wages paid to Packers and Operators at the Sacramento facility; (b) the Debtors' obligation to provide over-time to workers with seniority before any other lesser compensated or lower rate employees can be hired for over-time; and (c) the Debtors' obligation to provide healthcare benefits to the temporary employees, in addition to the excessive rates of healthcare insurance for full-time employees.  (See, Presley Declaration at ¶7.)  Other than modification or rejection, there simply is no way for these terms to remain in tact if the Debtors are to reorganize, either independently, or through a sale of their assets.

     8.    <u>Unions' (Possible) Refusal To Accept Debtors' Proposal Without Good Cause</u>

As of the time that the Motion is being filed, the Debtors and the unions are still actively involved in negotiations.  Therefore it would be unfair for the Debtors to contend at this point that the unions have refused to accept the Debtors' Proposals without good cause.  That being said, however, in the event that the unions do reject the Proposals at or prior to the hearing on the Motion, the only conclusion can be that such rejection is without good cause.  This is because of the over-whelming evidence weighing heavily in favor of the need for the modifications or outright rejection of the Collective Bargaining Agreements, given the Debtors' dire financial condition and the need for Debtors to shut their doors in the event that a sale cannot be approved and close by the short deadline imposed by the Bank.  (See, Bell Declaration at ¶ 13 and De Camara Declaration at ¶ 9.)

As a matter of law, the unions can only reject Debtors' Proposal of modifications to the Collective Bargaining Agreements <u>with good cause</u>.  "Courts have defined the good cause

**34**

requirement imposed on the unions as the counterpart to the requirement that the debtor negotiate in good faith. If a debtor, in good faith, makes a necessary and fair proposal to modify the collective bargaining agreement the union must produce sufficient evidence to justify its rejection of the proposal." (See, In re Karykeion, 2010 WL 3297029 at*19.) While the unions cannot be expected to accept a proposal which rejects their entire CBA, here, the Debtors did offer a reasonable accommodation that was better than what the employees would receive if Debtors cannot complete a timely sale and are forced to just close down. The modifications are the alternative to unemployment if the Debtors must close their doors.

The Debtors reserve their right to supplement this section of argument and evidence based upon facts that develop during the continued negotiations.

9. **The Balance Of Equities Clearly Favors Rejection**

Here, there is no question that the balance of the equities clearly favor rejection of the Collective Bargaining Agreement. First, there is the dire financial condition of the Debtors which caused the Bank to demand a sale of Debtors' assets by no later than mid-November 2010. (See, De Camara Declaration at ¶ 9; Bell Declaration at ¶ 11.) Second, there is the undisputed fact that if a sale cannot take place, the Debtors have no alternative but to shut their doors. (See, De Camara Declaration at ¶ 9; Bell Declaration at ¶ 13 and ¶ 14.) Third, there is the overwhelming evidence that the existing terms of the Collective Bargaining Agreement impose financial burdens on the Debtors (a) to pay over-market wages to Packers and Operators at the Sacramento facility; (b) to provide over-time to workers with seniority before any other lesser compensated or lower rate employees can be hired for over-time; and (c) to provide healthcare benefits to the temporary employees, in addition to the excessive rates of healthcare insurance for full-time employees at both facilities, all of which either combined, or alone impose a substantial financial burden on the Debtors that they cannot sustain. (See, De Camara Declaration at ¶ 8; Bell Declaration at ¶ 7.)

**34**

Fourth, there is the fact that there is only a short term remaining on the Collective Bargaining Agreements which alienates potential purchasers concerned by the ability of employees to strike at the height of the season, thereby crippling the company and eroding any chance of profits and sustainability. (See, Presley Declaration at ¶ 16(e).)

Fifth, and most important, is the financial benefits to the estate if the settlement with the Bank is approved and the Debtors' assets are sold. The Debtors currently project that they will have in the range of approximately $2.3 million of cash in the middle of November, 2010, which is when the Debtors expect to consummate the sale of the Purchased Assets to the winning bidder at the auction sale. (See, De Camara Declaration at ¶ 14; Bell Declaration at ¶ 14.) The Bank asserts a lien against all of the Debtors' cash and against all of the Purchased Assets that the Debtors seek to sell to the winning bidder at the auction sale, in addition to asserting a super-priority administrative claim against the Debtors for all post-petition diminution in the value of the Bank's collateral, which the Debtors acknowledge will likely be more than $2.5 million. (See, Bell Declaration at ¶ 8.) The timing of the asset sale is designed to maximize the amount of cash the Debtors will have to pay to their creditors by balancing the fact that the Debtors will be receiving only <u>15% of the sale proceeds but retaining 100% of their cash</u> (to wit: $2.3 million). Since the Debtors' cash will rapidly decline, particularly if the sale does not close by around the middle part of November, 2010, the Debtors' estates would bear 100% of the cost of any delay in the consummation of the sale. (See, De Camara Declaration at ¶ 15; Bell Declaration at ¶ 14.) In contrast, the Debtors' estates only receive 15% of any upside that might be obtained from a higher sale price if delaying the timing of the sale would result in achieving a higher sale price, which itself is uncertain. So the timing of the sale process is designed to maximize the total amount of cash that will be retained by the Debtors' estates. This timing is also consistent with the desires of the Bank, which wants to see a sale closing in the most expeditious manner possible. (See, De

**34**

Camara Declaration at ¶ 15; Bell Declaration at ¶ 14.) When 15% of any reasonable sale price is added to the Debtors' expected cash balance of approximately $2.3 million, the Debtors expect to be in a position to pay all allowed administrative claims (including the estimated $2.6 million of potential administrative claims arising under Section 503(b)(9) of the Bankruptcy Code to the extent they are allowed and not otherwise subject to avoidance causes of action and unpaid post-petition obligations to the Debtors' unions) in full or nearly in full. (See, De Camara Declaration at ¶ 16.) By capping the Bank's allowed super-priority administrative expense claim at $2.5 million and by the Bank agreeing that it will be paid only 85% of the Net Avoidance Action Recoveries on account of this claim, with the Debtors' estates to retain the other 15% of the Net Avoidance Action Recoveries until the Bank has been paid the total sum of $2.5 million and then 100% thereafter, the proposed Settlement Agreement maximizes the prospects for a meaningful recovery for the Debtors' general unsecured creditors. (See, De Camara Declaration at ¶ 17.) Any other outcome for these estates are certain or nearly certain to result in the Debtors' general unsecured creditors receiving no distribution. (See, De Camara Declaration at ¶ 17; Bell Declaration at ¶ 16.)

The undisputed evidence is that without rejection of the Collective Bargaining Agreements, a sale becomes more unlikely because of the disincentive to bid an amount sufficient to reach the Bank's imposed "floor" on any purchase price, since the existing terms of the Collective Bargaining Agreement impose huge financial burdens which any prospective bidder would have to take into consideration. Alternatively, if the Collective Bargaining Agreements are rejected, then it is likely that a sale will be achieved, which will permit at least $2.5 million to be available to administrative claimants, and make it more likely that the unsecured creditors will receive a distribution. (See, De Camara Declaration at ¶ 16.) Moreover, if there is a sale, then it is possible that the employees will be retained by the new owner and thus, keep their jobs.

**34**

Clearly, the balance of equities favors rejection where the impact of a sale on all of these interested parties, not just the interests if the employees, are considered.

## VI.

## <u>CONCLUSION</u>

Based upon all of the foregoing, the Debtors respectfully request that this Court permit Debtors to reject the Collective Bargaining Agreements.

Dated: October 11, 2010   LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.


*/s/ Beth Ann R. Young*
RON BENDER
BETH ANN R. YOUNG
TODD M. ARNOLD
JOHN-PATRICK M. FRITZ
Attorneys for Chapter 11 Debtors and Debtors in Possession

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION TO REJECT CBA