FILED

November 09, 2010

CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

0003061810

RON BENDER (SBN 143364)
TODD M. ARNOLD (SBN 221868)
J.P. FRITZ (SBN 245240)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: rb@lnbyb.com; tma@lnbyb.com; jp@lnbyb.com

Attorneys for Chapter 11 Debtors and Debtors in Possession

### UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF CALIFORNIA
### (SACRAMENTO DIVISION)

| | |
|---|---|
| In re:<br><br>MATTERHORN GROUP, INC.,<br><br>     Debtor.<br><hr>VITAFREZE FROZEN CONFECTIONS, INC.,<br><br>     Debtor.<br><hr>DELUXE ICE CREAM COMPANY,<br><br>     Debtor.<br><hr>☒ Affects ALL DEBTORS<br>☐ Affects only MATTERHORN GROUP, INC.<br>☐ Affects only VITAFREZE FROZEN<br>        CONFECTIONS, INC.<br>☐ Affects only DELUXE ICE CREAM COMPANY | Lead Case No. 10-39672 (MSM)<br>Jointly Administered with Case Nos. 10-39664 (MSM), and 10-39670 (MSM).<br><br>DC No. LNB-16<br>Chapter 11 Cases<br><br>**AMENDED EXHIBIT "1" RE: ORDER: (1) APPROVING SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS (EXCLUDING CASH AND AVOIDANCE CAUSES OF ACTION) FREE AND CLEAR OF ALL LIENS, CLAIMS AND INTERESTS; (2) APPROVING DEBTORS' ASSUMPTION AND ASSIGNMENT AND REJECTION OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS AND DETERMINING CURE AMOUNTS; AND (3) WAIVING THE 14-DAY STAY PERIODS SET FORTH IN BANKRUPTCY RULES 6004(h) AND 6006(d)**<br><br><u>Hearing:</u><br>Date:    November 10, 2010<br>Time:    10:00 a.m.<br>Place:    Department A<br>           Judge Michael S. McManus<br>           Courtroom No. 28<br>           Floor No. 7<br>           Robert T. Matsui Courthouse<br>           501 I Street<br>           Sacramento, CA 95814 |

37

# INDEX OF EXHIBITS

| EXHIBIT | DOCUMENT | PAGES |
|---------|----------|-------|
| 1 | Asset Purchase Agreement | 000003-000037 |

**ASSET PURCHASE AGREEMENT**

**dated as of November 9, 2010**

**by and between**

**Foster Dairy Farms**

**as Purchaser**

**and**

**Matterhorn Group, Inc.**

**and certain of its Subsidiaries**

**as Sellers**

EXHIBIT "1"

# ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT, dated as of November 9, 2010 (this "Agreement"), is entered into by and among Matterhorn Group, Inc. and its subsidiaries, Deluxe Ice Cream Company and Vitafreze Frozen Confections, Inc. (collectively, "Sellers"), and Foster Dairy Farms, a California corporation ("Purchaser"). (Each of Sellers and Purchaser is a "Party" and collectively they are the "Parties" to this Agreement).

## RECITALS

WHEREAS, Sellers own the Purchased Assets;

WHEREAS, Sellers are debtors and debtors in possession in jointly administered chapter 11 bankruptcy cases pending before the United States Bankruptcy Court for the Eastern District of California, Sacramento Division (the "Bankruptcy Court"), Case Nos. 10-39672 (MSM); 10-39664 (MSM); and 10-39670 (MSM) (collectively, the "Chapter 11 Cases"). Sellers commenced the Chapter 11 Cases with the filing of voluntary petitions under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") on July 26, 2010 (the "Petition Date");

WHEREAS, Sellers are engaged in the business of manufacturing branded and private label packaged ice cream and ice cream and water ice novelty products (the "Business"); and

WHEREAS, on the terms and subject to the conditions set forth in this Agreement, Sellers desire to sell, transfer and assign to Purchaser, and Purchaser desires to purchase, acquire and assume from Sellers, pursuant to sections 363 and 365 of the Bankruptcy Code, all of the Purchased Assets and Assumed Liabilities, all as more specifically provided herein.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I

## DEFINITIONS

1.1     Certain Definitions.  For purposes of this Agreement, the following terms shall have the meanings specified in this Section 1.1:

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Agreement" has the meaning set forth in the introductory paragraph hereof.

"Allocation Schedule" has the meaning set forth in Section 11.2 hereof.

1
EXHIBIT "1"

"Assumed Contracts" has the meaning set forth in Section 2.1(b) hereof.

"Assumed Leases" has the meaning set forth in Section 2.1(e) hereof.

"Assumed Liabilities" has the meaning set forth in Section 2.3 hereof.

"Assumed Personal Property Leases" has the meaning set forth in Section 2.1(e) hereof.

"Assumed Real Property Leases" has the meaning set forth in Section 2.1(a) hereof.

"Bankruptcy Code" has the meaning set forth in the recitals hereto.

"Bankruptcy Court" has the meaning set forth in the recitals hereto.

"Business Day" means any day of the year on which national banking institutions in Las Vegas , Nevada are open to the public for conducting business and are not required or authorized to close.

"Business" has the meaning set forth in the recitals hereto.

"Cash Purchase Price" has the meaning set forth in Section 3.1 hereof.

"Chapter 11 Cases" has the meaning set forth in the recitals hereto.

"Claims" means any and all claims as defined in Section 101(5) of the Bankruptcy Code.

"Closing Date" has the meaning set forth in Section 4.1 hereof.

"Closing" has the meaning set forth in Section 4.1 hereof.

"Closing Conditions" has the meaning set forth in Section 4.1 hereof.

"Closing Net Working Capital" means the sum of the accounts receivable, Inventory and prepaid rents and utilities included in the Purchased Assets at the Closing; provided, however, that for purposes of this calculation, the value of the Inventory shall specifically exclude any Inventory that (i) is not saleable or is obsolete, or (ii) is out of code or unreasonably close to its code expiration dated on the Closing Date; or (iii) is in excess of sixty (60) days worth of Seller's normal supply on the Closing Date; provided, further, that, for purposes of this calculation, the value of the accounts receivable shall specifically exclude any receivables over sixty (60) days outstanding on the Closing Date and any notes receivable regardless of the collection history of such note.

"Collective Bargaining Agreements" means any and all collective bargaining agreements or other similar agreements or arrangements currently existing or previously existing between any of Sellers and any labor union.

"Confidentiality Agreement" has the meaning set forth in Section 4.6(c) hereof.

"Contract Assignment" has the meaning set forth in Section 4.2(c) hereof.

2
EXHIBIT "1"

000005

"Contract" means any written or oral contract, indenture, note, bond, lease, license or other legally binding agreement or arrangement.

"Copyrights" means all copyrightable works, and all United States and foreign registered copyrights and applications, registrations and renewals therefore owned by or licensed to Sellers, and any past, present or future claims or causes of actions arising out of or related to any infringement or misappropriation of any of the foregoing, that are used or useful in connection with or related to the Business.

"Cure Amounts" has the meaning set forth in Section 2.3(a) hereof.

"Debt" of any Person means all obligations of such Person (a) for borrowed money (including principal, accrued but unpaid interest, prepayment premiums or penalties and expenses); (b) evidenced by notes, bonds, debentures or similar instruments; (c) under or relating to letters of credit (including any obligation to reimburse the issuer thereof with respect to amounts drawn on such instruments); (d) to pay any accrued dividends or distributions (or dividends or distributions that have otherwise been declared and not yet paid) or to redeem any securities or rights; and (e) in respect of the obligations described in clauses (a) through (d) above, (i) any guarantee of the payment or performance of, or any Liability in respect of, any Debt or other obligation of any other Person, (ii) any other arrangement whereby credit is extended to one obligor on the basis of any promise or undertaking of another Person (A) to pay the Debt of such obligor, (B) to purchase any obligation owed by such obligor, (C) to purchase or lease assets under circumstances that would enable such obligor to discharge one or more of its obligations, or (D) to maintain the capital, working capital, solvency or general financial condition of such obligor, and (iii) any Liability as a general partner of a partnership or as a venturer in a joint venture in respect of Debt or other obligations of such partnership or joint venture of any other Person.

"Domain Names" means the internet web sites, web pages, and/or domain names owned, licensed, used or held for use by Sellers in connection with the Business, and all registrations, applications, renewals and all intellectual property used in connection with or otherwise related to the foregoing, including all versions of such web sites.

"Effective Time" has the meaning set forth in Section 4.1 hereof.

"Employee Plans" has the meaning set forth in Section 5.6 hereof.

"Employee(s)" means all individuals, whether or not actively at work as of the date hereof, who are employed by Sellers in connection with the Business, together with individuals who are hired in respect of the Business after the date hereof and prior to the Closing.

"Encumbrance" means any mortgage, conditional sales agreement, title retention contract, easement, encumbrance, security interest, Lien, debt, levy, charge, indenture, lease, option, pledge or restriction (whether on voting, sale, transfer, disposition or otherwise), whether imposed by agreement, understanding, law, equity or otherwise.

"Equipment" means all machinery, equipment, furniture, trade fixtures, furnishings, computer and computer-related hardware, vehicles, leasehold improvements and other tangible

000006

personal property used in connection with the Business as presently conducted, including all artwork, desks, chairs, tables, copiers, telephone lines and numbers, facsimile machines and other telecommunication equipment, cubicles and miscellaneous office furnishings and supplies.

"Escrow Agent" has the meaning set forth in Section 3.2 hereof.

"Escrowed Funds" has the meaning set forth in Section 3.2 hereof.

"Excluded Assets" has the meaning set forth in Section 2.2 hereof.

"Excluded Claims" has the meaning set forth in Section 2.2 hereof.

"Excluded Liabilities" has the meaning set forth in Section 2.4 hereof.

"Final Order" means an order entered by the Bankruptcy Court, the implementation or operation or effect of which has not been stayed, and as to which the time to appeal, petition for certiorari, or move for reargument, rehearing or reconsideration has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument, rehearing or reconsideration thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or certiorari, reargument, rehearing or reconsideration shall have been denied and the time to take any further appeal, petition for certiorari, or move for reargument, rehearing or reconsideration shall have expired.

"Financial Statements" has the meaning set forth in Section 5.9 hereof.

"Governmental Body" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

"Intellectual Property" means intellectual property or other proprietary rights of every kind throughout the world, both domestic and foreign, which, in each case, are used or useful in connection with or related to the Business, including all inventions and improvements thereon, including all Patents, Trademarks, Domain Names, Trademark Rights, Copyrights, Technology and trade secrets.

"Interest" includes any Encumbrance, interest, Claim, charge, pledge, mortgage, deed of trust, or security interest.

"Inventory" means all finished goods, work in process, raw materials, goods in transit, goods at customer sites and other inventory or goods held for sale of a Person in all forms, wherever located, now or hereafter existing.

"Law" means any federal, state or local law, common law, statute, code, ordinance, rule, regulation or Order.

"Lease Assignments" has the meaning set forth in Section 4.2(d) hereof.

000007

"Legal Proceeding" means any judicial, regulatory, administrative or arbitral actions, demands, suits, proceedings (public or private), audit or investigation by or before a Governmental Body or arbitral tribunal.

"Liability" means any Debt, labor-related claim, grievance or dispute, liability or obligation (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due) and including all penalties, costs and expenses relating thereto.

"Lien" means any Debt, mortgage, security interest, lien, Encumbrance, pledge, charge, defect, Claim, option, right of first refusal, restriction or adverse claim of any kind or nature whatsoever.

"Licensed Intellectual Property" means all Patents, Trademarks, Domain Names, Trademark Rights, Copyrights and Technology that are licensed to Sellers from another Person.

"Material Adverse Effect" means any effect or change that is or would reasonably be expected to be materially adverse to the condition (financial or otherwise) or results of operations of the Purchased Assets taken as a whole or the Assumed Liabilities taken as a whole (other than changes generally affecting the United States economy or the industry of Sellers; provided, that, such changes do not have a disproportionate effect on the Purchased Assets taken as a whole or the Assumed Liabilities taken as a whole).

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body.

"Party" and "Parties" has the meaning set forth in the introductory paragraph hereof.

"Patents" means the United States patents and patent applications owned by or licensed to Sellers, including, any continuations, divisionals, continuations in part, or reissues of patent applications and patents issuing thereon and any past, present or future claims or causes of action arising out of or related to any infringement or misappropriation of any of the foregoing, that are used or useful in connection with or related to the Business.

"Permits" means any approvals, authorizations, consents, licenses, permits or certificates of a Governmental Body.

"Person" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"Petition Date" has the meaning set forth in the recitals hereto.

"Prepaid and Accrued Expenses" has the meaning set forth in Section 3.4 hereof.

"Products" means any and all products developed, manufactured, marketed, licensed, distributed or sold in connection with the Business.

000008

"Purchase Price" has the meaning set forth in Section 3.1 hereof.

"Purchased Assets" has the meaning set forth in Section 2.1 hereof.

"Purchaser Documents" has the meaning set forth in Section 6.1 hereof.

"Purchaser" has the meaning set forth in the introductory paragraph hereof.

"Requested Party" has the meaning set forth in Section 8.7(b) hereof.

"Sale Hearing" has the meaning set forth in Section 2.1 hereof.

"Sale Motion" has the meaning set forth in Section 7.1 hereof.

"Sale Order" has the meaning set forth in Section 7.1 hereof.

"Seller Documents" has the meaning set forth in Section 5.2 hereof.

"Sellers" has the meaning set forth in the introductory paragraph hereof.

"Tax Authority" means any federal, state, local or foreign Governmental Body, or any agency, instrumentality or employee thereof, charged with the administration of any Law relating to Taxes.

"Tax Return" means all returns, declarations, reports, estimates, information returns and statements required to be filed in respect of any Taxes.

"Taxes" means (i) all federal, state, local or foreign taxes, charges or other assessments, including all net income, gross receipts, capital, sales, use, *ad valorem*, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property and estimated taxes; and (ii) all interest, penalties, fines, additions to tax or additional amounts imposed by any Tax Authority in connection with any item described in clause (i).

"Technology" means, collectively, all designs, formulae, algorithms, procedures, methods, techniques, ideas, know-how, research and development, technical data, programs, subroutines, tools, materials, specifications, processes, inventions (whether patentable or unpatentable and whether or not reduced to practice), discoveries, apparatus, creations, improvements, works of authorship and other similar materials, and all recordings, graphs, drawings, reports, analyses, and other writings, and other tangible embodiments of the foregoing, in any form whether or not specifically listed herein, and all related technology, that are used in, incorporated in, embodied in, displayed by, or are used in the design, development, reproduction, maintenance or modification of, any of the Products.

"Termination Date" has the meaning set forth in Section 4.4(a) hereof.

"Trademark Rights" means all common law rights in the United States in trade names, corporate names, logos, slogans, designs, trade dress, and unregistered trademarks and service

marks, together with all translations, adaptations, derivations and combinations thereof, and the goodwill associated with any of the foregoing, which, in each case, are used by Sellers with regard to the Business.

"Trademarks" means the trademark registrations and applications for trademark registration owned by or licensed to Sellers, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof, and any past, present or future claims or causes of action arising out of or related to any infringement or misappropriation of any of the foregoing, that are used or useful in connection with or related to the Business.

"Transfer Taxes" means any and all sales, use, stamp, documentary stamp, filing, recording, transfer or similar fees or taxes or governmental charges of or from any Governmental Body (including any related interest and penalty) payable in connection with the transactions contemplated by this Agreement, whether or not Sellers have primary liability for same under applicable Law.

"Transferred Employees" has the meaning set forth in Section 9.1 hereof.

1.2     Other Definitional and Interpretive Matters.

(a)     Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

Calculation of Time Period.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

Dollars.  Any reference in this Agreement to "$" shall mean U.S. dollars.

Exhibits/Schedules.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

Gender and Number.  Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

Headings.  The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

Herein.  The words such as "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

000010

Including.  The words such as "includes" and "including" shall mean "including without limitation."

(b)     The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event any ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

## ARTICLE II

## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

2.1     Purchase and Sale of Assets.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall purchase, acquire and accept from Sellers, and Sellers shall sell, transfer, assign, convey and deliver to Purchaser, all of Sellers' right, title and interest in, to and under the Purchased Assets.  "Purchased Assets" shall mean all assets, properties, interests and rights of Sellers, other than the Excluded Assets, that are used or useful in connection with or related to the Business, including:

(a)     all leased real property described on Schedule 2.1(a) (the "Assumed Real Property Leases");

(b)     all Contracts and purchase orders listed on Schedule 2.1(b), and (ii) all Contracts and purchase orders related to the Business which are made between the date hereof and the Closing (clauses (i) and (ii), collectively, the "Assumed Contracts"); provided, in no event, and under no circumstances, shall any of the Collective Bargaining Agreements be included among the Assumed Contracts;

(c)     the Intellectual Property;

(d)     Sellers' corporate names;

(e)     all personal property leases as listed on Schedule 2.1(e) (the "Assumed Personal Property Leases" and together with the Assumed Real Property Leases, the "Assumed Leases");

(f)     all Equipment;

(g)     all Inventory;

(h)     all accounts receivable of Sellers with the exception of certain notes owing by former employees of Sellers as set forth on Schedule 2.1(h);

(i)     all deposits and prepaid expenses set forth on Schedule 2.1(i);

(j)     all current and old customer lists, files, books and records used or useful in connection with the Business as presently conducted; and

EXHIBIT "1"

000011

(k)     all books, records, papers and instruments of whatever nature and wherever located that are in the possession or control of Sellers that are used or useful in connection with or related to the Business or the Purchased Assets.

Notwithstanding anything to the contrary contained herein, Purchaser may (x) at any time up to Closing, supplement, as applicable, Schedule 2.1(a), Schedule 2.1(b), and Schedule 2.1(e) to add any Contract that was not previously listed thereon, in which case such Contract shall, subject to the non-debtor party's consent or upon approval of the Bankruptcy Court be, as applicable, an Assumed Contract or an Assumed Lease, (y) at any time prior to the Closing remove any Contract from, as applicable, Schedule 2.1(a), Schedule 2.1(b) and/or Schedule 2.1(e) listed thereon, in which case such Contract shall not be, as applicable, an Assumed Contract or Assumed Lease, but rather shall be an Excluded Asset.  Any Executory Contract not added to Schedule 2.1(a), Schedule 2.1(b) or Schedule 2.1(e) in accordance with this Section 2.1 shall be an Excluded Asset.  Purchaser shall pay all amounts accruing and attributable to the period from and after the Closing Date with respect to each Assumed Contract and Assumed Lease.

2.2     Excluded Assets.  Nothing contained herein shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchaser, and Sellers shall retain all right, title and interest to, in and under the Excluded Assets.  "Excluded Assets" shall mean the following assets of Sellers:

(a)     except for Claims, counterclaims, causes of action and demands that are expressly described herein as Purchased Assets (including those included in the definitions of Copyrights, Patents and Trademarks), any and all rights, Claims, counterclaims, demands and causes of action of Sellers, including all avoidance Claims or causes of action arising under Chapter 5 of the Bankruptcy Code (including all preference, fraudulent conveyance and any other avoidance claims and actions of Sellers, including, any such claims and actions arising under Sections 544, 547, 548, and 550 of the Bankruptcy Code), and any and all Claims, counterclaims, demands, and causes of action of Sellers against any current or former directors, officers, attorneys, accountants, investment bankers, and other professionals, employees, shareholders or agents of Sellers (the "Excluded Claims") and any directors and officers insurance policies.

(b)     all leases other than the Assumed Leases, and all Contracts other than the Assumed Contracts (which excluded Contracts shall include, for avoidance of doubt, all Collective Bargaining Agreements);

(c)     any and all deposits and prepaid expenses that are not set forth on Schedule 2.1(i) and any and all instruments, unbilled costs and fees, and accounts primarily relating to any Excluded Assets;

(d)     any and all cash and cash equivalents, including all deposits and bank account balances;

(e)     any: (i) confidential personnel and medical records pertaining to any Employee to the extent such records may not be transferred to Purchaser pursuant to applicable Law; (ii) other books and records that Sellers are required by Law to retain including, without limitation, Tax Returns, taxpayer and other identification numbers, financial statements and

corporate or other entity filings; provided, that prior and subsequent to the Closing Date, Purchaser shall have the right to make copies of any portions of such retained books and records to the extent that such portions relate to the Business or any of the Purchased Assets; and (iii) minute books, stock ledgers and stock certificates of Sellers;

(f)     any claim, right or interest of Sellers in or to any refund, rebate, abatement or other recovery for Taxes, together with any interest due thereon or penalty rebate arising therefrom, for any Tax period (or portion thereof) ending on or before the Closing Date, and excluding in all cases any amounts paid to Sellers under Section 3.4;

(g)     any insurance proceeds, insurance claims and related causes of action;

(h)     the stock of any of Sellers;

(i)     assets of any Employee Plan, except as provided in Article IX; and

(j)     other assets listed on Schedule 2.2(j).

2.3     Assumption of Liabilities.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall assume the following, and only the following, Liabilities of Sellers (the "Assumed Liabilities"):

(a)     all Liabilities of Sellers for all amounts payable under Section 365 of the Bankruptcy Code to cure monetary defaults under Assumed Contracts and Assumed Leases (the "Cure Amounts"), not to exceed the amounts set forth on Schedule 2.4(i) hereto; and

(b)     all Liabilities of Sellers under the Assumed Contracts and any Assumed Leases that first arise solely from events, facts or circumstances that occur after the Closing.

2.4     Excluded Liabilities.  Notwithstanding anything in this Agreement to the contrary, except for the Assumed Liabilities specifically described in Section 2.3, Purchaser shall not assume or be liable for, and shall be deemed not to have assumed or be liable for, any of the Liabilities of or attributable to Sellers (collectively, the "Excluded Liabilities"), which Excluded Liabilities include:

(a)     all Liabilities arising out of Excluded Assets, including Contracts that are not Assumed Contracts or Assumed Leases;

(b)     Liabilities (whether known or unknown) arising from the sale of Products or Inventory prior to the Closing, whether pursuant to product warranties, product recalls, returns and rebates or otherwise;

(c)     except as provided in Article IX, all current and/or contingent Liabilities with respect to all employee benefit plans, policies, agreements and arrangements of Sellers, including all Employee Plans and equivalent benefit plans, and any Liability to or in respect of, or arising out of or in connection with, the employment by Sellers or cessation of employment with Sellers of any employees or independent contractors or former employees or independent contractors of Sellers, including any severance obligations or accrued paid time off that arise on

000013

or prior to the Closing Date, including any Liabilities under any agreement between Sellers and the Bakery, Confectionary, Tobacco Workers and Grain Millers' International Union Local No. 85 or the General Teamsters Local 324, Northern California Bakery and Confectionary Health and Welfare Fund, the B&C Western Conference Dental Fund, the Bakery and Confectionary Union and Industry International Pension Fund, the Western Conference of Teamsters Pension Plan and/or the Pacific Coast Benefits Trust, and any Liability of Sellers arising out of Sellers' actions or omissions with respect to the Worker Adjustment and Retraining Notification Act of 1988 (the "WARN Act") or any similar Law;

(d)     all Liabilities for (i) Taxes of Sellers (including all Liabilities for Taxes relating to the Purchased Assets) for any Tax periods (or portions thereof)  before or after the Effective Time and (ii) the Transfer Taxes;

(e)     Liabilities incurred by Sellers that arose or arise from events, facts or circumstances that occurred prior to the Closing or were attributable to actions or omissions of Sellers, or from the conduct of the Business prior to the Closing, whether or not subject to compromise under the Bankruptcy Code.

(f)     any Debt of Sellers except as specifically set forth herein;

(g)     all Liabilities relating to amounts required to be paid by Sellers hereunder;

(h)     all Liabilities associated with brokers, finders or other consultants or advisors to Sellers entitled to a fee or reimbursement of expenses with respect to the transactions contemplated by this Agreement;

(i)     all Cure Amounts under the Assumed Contracts and Assumed Leases in excess of the amounts set forth on Schedule 2.4(i) hereto;

(j)     any and all of the Transfer Taxes;

(k)     all other Liabilities, accrued expenses, accounts payable of Sellers arising from or associated with the Business, the Purchased Assets or the Permits arising from events, facts or circumstances occurring before the Closing, except to the extent expressly identified as an Assumed Liability; and

(l)     all liabilities relating to or arising under the Collective Bargaining Agreements, including, without limitation, any and all Liabilities associated with any unfunded pension fund or health and welfare fund liabilities of Sellers (or any of them).

2.5     Further Conveyances and Assumptions.  From time to time following the Closing, Sellers and Purchaser shall, on a timely basis, execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and such other instruments and take such further actions as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement (including the Purchased Assets) and the Seller Documents and to assure fully to Sellers the assumption of the Assumed Liabilities under this Agreement and such other agreements contemplated hereby, and

000014

to otherwise make effective the transactions contemplated hereby and thereby.

ARTICLE III

CONSIDERATION

3.1     Consideration.  The aggregate consideration for the Purchased Assets shall be (a) an amount in cash equal to four million five hundred thousand dollars ($4,500,000.00) plus thirty thousand dollars ($30,000.00) for each day that the Closing Date is later than November 15, 2010 (the "Cash Purchase Price"), plus (b) the assumption of the Assumed Liabilities, (clauses (a) and (b), collectively, the "Purchase Price").  The Parties acknowledge that Purchaser has agreed to the amount of the consideration based not only on the value of the Purchased Assets to Purchaser but also on the  non-assumption by Purchaser of any of the Excluded Liabilities.   The amount of the Cash Purchase Price to be paid by Purchaser shall be reduced on a dollar-for-dollar basis to the extent the Closing Net Working Capital is less than five million eight hundred thousand dollars ($5,800,000.00), with a maximum amount of reduction to the Cash Purchase Price of three hundred thousand dollars ($300,000.00).

3.2     Purchase Price Deposit.  Purchaser has deposited with counsel to Sellers, Levene, Neale, Bender, Yoo & Brill L.L.P., in its capacity as escrow agent (the "Escrow Agent"), the sum of $500,000.00 by wire transfer or other immediately available funds (the "Escrowed Funds"), to be released by the Escrow Agent and delivered to either Purchaser or Sellers, in accordance with the provisions hereof.  The Escrowed Funds shall be distributed as follows:

(a)     if the Closing occurs hereunder, the Escrowed Funds shall be applied towards the Purchase Price payable by Purchaser to Sellers at the Closing under Section 3.3 hereof;

(b)     if this Agreement is terminated by Sellers due to a breach by Purchaser, (i) the Escrowed Funds shall be released to Sellers as liquidated damages and not as a penalty and (ii) as further liquidated damages, Purchaser shall also pay Sellers thirty thousand dollars ($30,000.00) per day for each day after November 15, 2010 through the date of termination up to a maximum of fourteen (14) days, as Sellers' sole and exclusive recourse and remedy for such breach and termination;

(c)     if this Agreement is not approved by the Bankruptcy Court, the Escrowed Funds shall be returned to Purchaser within 48 hours of such event; and

(d)     if this Agreement is terminated for any reason other than Purchaser's breach of this Agreement, the Escrowed Funds shall be returned to Purchaser within 48 hours of the events giving rise to the termination of this Agreement.

3.3     Payment of Purchase Price; Proration Amounts.

(a)     Purchaser shall pay to Sellers, by wire transfer of immediately available funds into an account designated by Sellers:

(i)     at the Closing, the Purchase Price, <u>less</u> any amounts Purchaser elects to credit toward the Purchase Price pursuant to <u>Section 3.4</u>, <u>less</u> the Escrowed Funds, <u>plus</u> any amounts due to Sellers under <u>Section 3.4</u>.

(b)     At the Closing, the Escrow Agent shall pay to Sellers, by wire transfer or immediately available funds into an account designated by Sellers, the Escrowed Funds, which funds shall be applied to pay the balance of the Purchase Price.

3.4     <u>Prorations; Prepaid Expenses</u>.   Prepaid rent, prepaid utility charges, real and personal property taxes or similar *ad valorem* obligations (for the tax year with respect to which payments are currently due and any subsequent tax years up to the tax year that includes the Closing Date), and other prepaid expenses and accruals payable in respect of any of the Purchased Assets or Assumed Liabilities, a true and complete list of which is attached hereto as <u>Schedule 3.4</u> (the "<u>Prepaid and Accrued Expenses</u>"), shall be prorated as of the Closing Date based on the number of days in the period to which each Prepaid and Accrued Expense relates that fall, respectively, (i) on or before and (ii) after the Closing Date.   The net amounts of such prorations shall be payable to Purchaser at Closing or, at Purchaser's election, may be credited toward the Purchase Price, if Purchaser is entitled to a credit therefor, or payable to Sellers, if Sellers are entitled to a credit therefor.

## ARTICLE IV

## CLOSING AND TERMINATION

4.1     <u>Closing Date</u>.   The closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in <u>Article II</u> hereof (collectively, the "<u>Closing</u>") shall take place at 10:00 a.m. (Pacific time) on the Business Day selected by Purchaser that is on or before three (3) Business Days after the satisfaction of the conditions set forth in <u>Article X</u> hereof (or the waiver thereof by the Party entitled to waive that condition) (the "Closing Conditions").   The Closing shall take place at the offices of Levene, Neale, Bender, Yoo & Brill L.L.P. located at 10250 Constellation Blvd., Suite 1700, Los Angeles, California 90067 (or at such other place as the Parties may designate in writing).   The date on which the Closing shall be held is referred to in this Agreement as the "<u>Closing Date</u>."   The Closing shall be deemed to have occurred at 11:59 p.m. on the Business Day prior to the Closing Date (the "<u>Effective Time</u>").

4.2     <u>Deliveries by Sellers</u>.   At the Closing, Sellers shall deliver to Purchaser:

(a)     a bill of sale in the form of <u>Exhibit A</u> hereto, duly executed by Sellers;

(b)     any amounts due to Purchaser pursuant to <u>Section 3.4</u> hereof that are not credited at Purchaser's election against the Purchase Price;

(c)     an assignment and assumption agreement with respect to the Assumed Contracts in the form attached hereto as <u>Exhibit B</u> (the "<u>Contract Assignment</u>"), duly executed by Sellers;

(d)     an assignment and assumption agreement with respect to the Assumed Leases in the form attached hereto as Exhibit C (the "Lease Assignments"), duly executed by Sellers;

(e)     duly executed assignments of (i) any Patents and Trademarks and (ii) duly executed assignments of any copyright registrations and applications for copyright registration owned by Sellers that are included in Intellectual Property, with all such assignment agreements to be prepared by Purchaser at Purchaser's expense and delivered to Sellers;

(f)     a copy of the Sale Order; and

(g)     all instruments of conveyance and transfer, in form and substance reasonably acceptable to Purchaser, as may be necessary to validly convey good title to the Purchased Assets to Purchaser.

4.3     Deliveries by Purchaser.  At the Closing, Purchaser shall deliver to Sellers:

(a)     the Purchase Price (less the Escrowed Funds and any amounts credited pursuant to Sections 3.3, and 3.4) in immediately available funds;

(b)     any net amounts due to Sellers pursuant to Section 3.4 hereof;

(c)     the Contract Assignment duly executed by Purchaser; and

(d)     the Lease Assignments duly executed by Purchaser.

4.4     Termination of Agreement.  This Agreement may be terminated prior to the Closing as follows:

(a)     by Purchaser, if the Closing shall not have occurred by the close of business on November 29, 2010 (the "Termination Date"); provided, that if the Closing shall not have occurred on or before the Termination Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Purchaser, then Purchaser may not terminate this Agreement pursuant to this Section 4.4(a);

(b)     by Purchaser if (i) the Sale Order is not entered by the Bankruptcy Court on or before November 12, 2010, or (ii) the Sale Order does not become a Final Order by the Termination Date;

(c)     by mutual written consent of Sellers and Purchaser;

(d)     by Purchaser, if any of the conditions to the obligations of Purchaser set forth in Sections 10.1 and 10.3 have not been satisfied or, as of the Closing, cannot be satisfied (or waived by Purchaser in a writing specifically referring to the condition that is waived by Purchaser), other than as a result of a breach by Purchaser of any covenant or agreement of Purchaser contained in this Agreement;

(e)     by Sellers, if any condition to the obligations of Sellers set forth in Sections 10.2 and 10.3 shall have become incapable of fulfillment other than as a result of a breach by Sellers of any covenant or agreement of Sellers contained in this Agreement, and such condition is not waived by Sellers; provided, that if the Closing shall not have occurred on or before the Termination Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Sellers, then Sellers may not terminate this Agreement pursuant to this Section 4.4(e);

(f)     by Sellers, if the Closing shall not have occurred by the close of business on the Termination Date; provided, that if the Closing shall not have occurred on or before the Termination Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Sellers, then Sellers may not terminate this Agreement pursuant to this Section 4.4(f);

(g)     by Sellers, if Purchaser has not removed or waived the conditions set forth in Sections 10.1(f) and 10.1(g) by the close of business on November 18, 2010;

(h)     by Sellers or Purchaser if there shall be in effect an Order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby, or the Bankruptcy Court or another court of competent jurisdiction shall stay the Sale Order;

(i)     by Purchaser if a Governmental Body of competent jurisdiction, the Bankruptcy Court or any United States District Court, has entered an order which enjoins or otherwise prohibits the consummation of the transactions contemplated hereby or which relates to any violation of federal or state labor Laws alleged to have been committed by Sellers;

(j)     by Purchaser if the Closing Net Working Capital at the Closing is less than five million five hundred thousand dollars ($5,500,000.00); or

(k)     by Purchaser pursuant to Section 5.19.

4.5     Procedure Upon Termination.  In the event of termination by Purchaser or Sellers, or both, pursuant to Section 4.4 hereof, written notice thereof shall forthwith be given to the other Party, and this Agreement shall terminate, and the purchase of the Purchased Assets hereunder shall be abandoned, without further action by Purchaser or Sellers.  If this Agreement is terminated as provided herein each Party shall redeliver all documents, work papers and other material of any other Party relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof, to the Party furnishing the same; provided, that (i) no Party shall be required to return or destroy any memoranda, notes, analyses or studies prepared by such Party based on, containing or reflecting any confidential information, and (ii) each Party shall be entitled to retain one copy of all confidential information received under this Agreement for its records (which shall remain subject to the Confidentiality Agreement in Section 8.6 hereof). Notwithstanding the foregoing, no Party shall be required to return or destroy any such materials to the extent such return or destruction would violate any Law, regulation or internal policy to which the Party is subject, provided that in all such cases the Party will maintain the confidentiality of the materials as required by this Agreement.

15
EXHIBIT "1"

4.6     Effect of Termination.

(a)     In the event that this Agreement is validly terminated as provided herein, then each of the Parties shall be relieved of its duties and obligations arising under this Agreement after the date of such termination and such termination shall be without liability to Purchaser or Sellers; provided, however, that the obligations and agreements of the Parties set forth in Section 3.2, this Section 4.6, Section 8.6 and Article XIII hereof shall survive any such termination and shall be enforceable hereunder.

(b)     If this Agreement is terminated, the Escrowed Funds shall be released to the appropriate Party pursuant to Section 3.2.

(c)     Section 8.6 of this Agreement regarding confidentiality (the "Confidentiality Agreement") shall survive any termination of this Agreement and nothing in this Section 4.6 shall relieve Purchaser or Sellers of their respective obligations under the Confidentiality Agreement. If this Agreement is terminated in accordance with Section 4.4, Purchaser agrees that the prohibition in the Confidentiality Agreement restricting Purchaser's ability to solicit any employee of Sellers to join the employ of Purchaser or any if its Affiliates shall be extended to a period of two (2) years from the date of this Agreement.

(d)     In the event of a breach of this Agreement by Purchaser, Sellers shall be entitled to receive the Escrowed Funds as liquidated damages and not as a penalty as their sole and exclusive recourse and remedy relating to or arising from any such breach, and in no event shall Sellers be entitled to any other form of legal or equitable relief, recourse or remedy, including specific performance or injunctive relief.

ARTICLE V

REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as set forth on Sellers' schedules attached hereto, Sellers hereby represent and warrant to Purchaser that:

5.1     Organization and Good Standing. Sellers are corporations duly organized, validly existing and in good standing. Subject to the fact that Sellers are debtors in the Chapter 11 Cases, Sellers have the requisite power and authority to own, lease and operate their properties and to carry on the Business as now conducted.

5.2     Authorization of Agreement. Subject to the approval of this Agreement by the Bankruptcy Court, Sellers have the requisite power and authority (a) to execute and deliver this Agreement and to execute and deliver each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by Sellers in connection with the consummation of the transactions contemplated by this Agreement (the "Seller Documents"), and (b) to consummate the transactions contemplated by this Agreement and the Seller Documents.

5.3     Purchased Assets. Subject to the entry of the Sale Order, on the Closing Date, Purchaser will acquire all of Sellers' right, title and interest in the Purchased Assets, free and

000019

clear of all Interests to the fullest extent permissible under section 363(f) of the Bankruptcy Code.

5.4    Real Property.

(a)    Sellers own no real property.

(b)    Set forth on Schedule 5.4 is a true, correct and complete list of all real property leases under which Sellers or one of them is the lessee.

5.5    Intellectual Property.

(a)    Except as set forth on Schedule 5.5(a), Sellers are the sole owner of the Intellectual Property, and Sellers have not granted to any Person any license, option, consent, right of first or last offer or negotiation or other rights in or to any such item.

(b)    Set forth on Schedule 5.5(b) are all items of Licensed Intellectual Property used or useful in connection with or necessary to conducting the Business as historically conducted.  Except as set forth on Schedule 5.5(b), Sellers have not granted any sublicense or similar right with respect to the Licensed Intellectual Property.

5.6    Employee Benefits.  Set forth on Schedule 5.6 is a list of all "employee benefit plans" and all employment, consulting, retention, deferred compensation, bonus or other incentive compensation, severance or termination pay, stock purchase, stock option and other equity compensation, and all other employee benefit plans, programs or arrangements of any kind that provide benefits to any current or former employee or independent contractor of Sellers (collectively the "Employee Plans").  Sellers have made available to Purchaser copies of the documents comprising each Employee Plan.

5.7    Litigation.  Except for the Chapter 11 Cases or as set forth on Schedule 5.7, there are no Legal Proceedings pending or threatened against or affecting the Business or any Purchased Assets.

5.8    Financial Advisors.  Except as set forth on Schedule 5.8, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for Sellers in connection with the transactions contemplated by this Agreement or any of the Seller Documents and no Person acting on behalf of Sellers is entitled to any fee or commission or like payment from Purchaser in respect thereof.

5.9    Financial Statements.  Schedule 5.9 contains (a) financial statements (including a balance sheet and income statement) of the Business for the fiscal years ended December 31, 2008 and 2009 (the "Financial Statements").  The Financial Statements have been prepared in accordance with generally accepted accounting principals consistently applied and are true and correct in all material respects.

5.10    Contracts.  Schedule 5.10 lists all Contracts that individually provide for annual payments of greater than Fifty Thousand Dollars ($50,000) or which are otherwise material to the Business or the Purchased Assets.  All of the Assumed Contracts were made in the ordinary

000020

course of business, are valid, binding and in full force and effect in accordance with their respective terms and conditions, and will be at the Closing Date. All of the Assumed Contracts will be assignable to Purchaser at the Closing Date and, as of the Closing Date, Sellers will have obtained any consents necessary to transfer the Assumed Contracts to Purchaser.

5.11    Inventory.    Schedule 5.11 contains a report of Sellers' current Inventory as of October 31, 2010.

5.12    Accounts Receivable.    Schedule 5.12 contains a schedule of Sellers' accounts receivable as of October 31, 2010.

5.13    Insurance.    Sellers have maintained and as of the Closing Date are maintaining insurance with respect to the Purchased Assets and the Business, including, without limitation, product liability insurance.

5.14    Customers and Suppliers.    Schedule 5.14 is a list of all customers and suppliers of Sellers as of August 31, 2010. The following customers are major customers of Sellers: (a) Winco, (b) SSI, (c) Western Family, (d) SuperValu - Albertsons, and (e) Topco (the "Major Customers"). With the possible exception of SSI, during the one year period ending on the Closing Date, none of the Major Customers have materially changed the amount of Products purchased from Sellers or the relationship between such Major Customer and Sellers (or any of them) or given Seller (or any of them) notice of any kind that such Major Customer intends to materially change such Major Customer's purchases or relationship with Sellers (or any of them) in the future.

5.15    Assumed Leases.    All of the Assumed Leases are valid, binding and in full force and effect in accordance with their respective terms and conditions, and will be at the Closing Date. All of the Assumed Leases for real property will, as of the Closing Date, have lease terms that expire no sooner than December 31, 2011, and shall have options to renew acceptable to Purchaser in Purchaser's sole discretion. All of the Assumed Leases will be assignable to Purchaser at the Closing Date and, as of the Closing Date, Sellers will have obtained any consents necessary to transfer the Assumed Leases to Purchaser.

5.16.    Permits.    Except as set forth on Schedule 5.16, to the knowledge of Sellers, all Sellers' Permits are assignable by Sellers to Purchaser. Except as set forth on Schedule 5.16, Sellers own or validly hold all material Permits needed to conduct the Business in the ordinary course of Business in compliance with Law in all material respects, all such material Permits are in full force and effect and, Sellers have not received notice that it is in default, or with the giving of notice or lapse of time or both, would be in default, under any such Permit, except where such default would not have a material adverse effect on Purchaser.

5.17.    Employee Matters.    Except as otherwise disclosed in Schedule 5.17:

(a)    Sellers are not a party to, or otherwise bound by, any consent decree or settlement agreement with, or citation by, any Governmental Body relating to Company Employees or employment practices of Sellers.

000021

(b)     Sellers are in compliance in all material respects with all applicable laws respecting labor, employment, employment practices, immigration, terms and conditions of employment, workers' compensation, plant closings, wages, hours of work, independent contractor classification and occupational safety and health, except, in each case, where the failure to so comply would not have a Material Adverse Effect.

(c)     Since the enactment of the WARN Act, Sellers have not effectuated (i) a "plant closing" (as defined in the WARN Act) affecting any site of employment or one or more facilities or operating units within any of Sellers' plants, or (ii) a "mass layoff" (as defined in the WARN Act) affecting any site of employment or facility of any of Sellers' plants, nor have Sellers been affected by any transaction or engaged in layoffs or employment terminations relating to Sellers' plants sufficient in number to trigger application of any similar state or local law.   Except as disclosed in this Agreement, none of Sellers' employees have suffered an "employment loss" (as defined in the WARN Act) in the past three years.

(d)     Since the Petition Date, other than in the ordinary course of business, Sellers have not either (i) terminated or (ii) transferred or reassigned to any business of Seller other than the business conducted at Sellers' plants, any employees employed by Seller in connection with the business conducted at Sellers' plants.

(e)     There is no labor strike, slowdown, work stoppage or lockout in effect, or, to the knowledge of Seller, threatened against or otherwise affecting the Business, Sellers have not experienced any such labor controversy within the past three years.

(f)     As of the date hereof there is no unfair labor practice charge or complaint pending or, to the knowledge of Sellers, threatened against or otherwise affecting Sellers before the National Labor Relations Board or the Equal Employment Opportunity Commission or any similar state or foreign agency.

(g)     No grievance or arbitration arising out of any collective bargaining agreement or other grievance procedure relating to Sellers is pending or, to the knowledge of Sellers, threatened that would reasonably be expected to have a Material Adverse Effect and no matter in which Sellers are a party by or before any Governmental Body brought by or on behalf of any employee, prospective employee, or former employee, labor organization or other representative of the employees is pending or, to the knowledge of Sellers, threatened against Sellers that would reasonably be expected to have a Material Adverse Effect.

5.18   Exceptions to Representations and Warranties.  By November 15, 2010, Sellers shall deliver in writing to Purchaser any exceptions to the representations and warranties contained in this Article V.   Purchaser shall have five (5) Business Days to approve or disapprove of any such exceptions.  Any such exceptions that are not timely disapproved shall be deemed approved.  If Sellers and Purchaser are not able to resolve any differences as to any disapproved exceptions, Purchaser shall have the right to terminate this Agreement.

000022

# ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Sellers that:

6.1     <u>Organization and Good Standing</u>.  Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of California and has all requisite corporate power and authority to own, lease and operate its properties, to carry on its business as now conducted and to perform its obligations under this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by Purchaser in connection with the consummation of the transactions contemplated by this Agreement (the "<u>Purchaser Documents</u>").

6.2     <u>Authorization of Agreement</u>.  Purchaser has full corporate power and authority to execute and deliver this Agreement and the Purchaser Documents, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Purchaser of this Agreement and the Purchaser Documents and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on behalf of Purchaser.  This Agreement has been, and each Purchaser Document will be at or prior to the Closing, duly executed and delivered by Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each Purchaser Document when so executed and delivered will constitute, the legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including, without limitation, principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

6.3     <u>Conflicts; Consents of Third Parties</u>.

(a)     None of the execution and delivery by Purchaser of this Agreement or the Purchaser Documents, the consummation of the transactions contemplated hereby or thereby, or compliance by Purchaser with any of the provisions hereof or thereof will conflict with, or result in any violation of or default under (with or without notice or lapse of time, or both), or give rise to a right of termination or cancellation under any provision of (i) the articles of organization and operating agreement of Purchaser, (ii) any Contract or Permit to which Purchaser is a party or by which Purchaser or its properties or assets are bound or (iii) any applicable Law.

(b)     No material consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of Purchaser in connection with the execution and delivery of this Agreement or the Purchaser Documents, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby without any material delay, the performance by Purchaser of its obligations hereunder, or the taking by Purchaser of any other action contemplated hereby.

6.4    <u>Litigation</u>.  There are no Legal Proceedings pending against Purchaser, which, if adversely determined, would reasonably be expected to have a Purchaser Material Adverse Effect.  For the purposes of this Agreement, "<u>Purchaser Material Adverse Effect</u>" means a material adverse effect on the ability of Purchaser to (i) consummate the transactions contemplated hereby or by the Purchaser Documents without any material delay or (ii) perform its obligations under this Agreement or the Purchaser Documents.  Purchaser is not subject to any Order of any Governmental Body except to the extent the same would not reasonably be expected to have a Purchaser Material Adverse Effect.

6.5    <u>Financial Advisors</u>.  No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Purchaser in connection with the transactions contemplated by this Agreement, and no Person is entitled to any fee or commission or like payment from Sellers in respect thereof.

6.6    <u>Financial Capability</u>.  Purchaser (i) has, based on existing commitments, sufficient funds available to pay the Closing Date Purchase Price and any expenses incurred by Purchaser in connection with the transactions contemplated by this Agreement, (ii) has, based on existing commitments, the resources and capabilities (financial or otherwise) to perform its obligations hereunder, and (iii) has not incurred any obligation, commitment, restriction or Liability of any kind, that would impair or adversely affect such resources and capabilities or could reasonably be expected to have a Purchaser Material Adverse Effect.

6.7    <u>Purchaser's Investigation</u>.  Purchaser represents that it is a sophisticated entity that was advised by knowledgeable counsel and financial and other advisors and hereby acknowledges that, due to time constraints and the limited information available concerning Sellers and the Business, it has conducted a limited, independent investigation and analysis of the Business (and its financial condition), the Purchased Assets and the Assumed Liabilities and, in making the determination to proceed with the transactions contemplated by this Agreement, Purchaser has relied solely on the results of its own independent investigation and the express representations set forth in this Agreement.

6.8    <u>Adequate Assurances Regarding Assumed Contracts and Assumed Leases</u>. Purchaser believes that it will be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed Contracts and the Assumed Leases.

<div align="center">ARTICLE VII</div>

<div align="center">BANKRUPTCY COURT APPROVALS</div>

7.1    <u>Sale Process</u>.  Sellers have filed motion with the Bankruptcy Court (the "<u>Sale Motion</u>") seeking an order (the "<u>Sale Order</u>") from the Bankruptcy Court.  The Sale Order shall be in the form attached hereto as Exhibit "D", or in a form otherwise approved by Purchaser in its sole and absolute discretion, and shall, among other things, (i) approve the sale of the Purchased Assets to Purchaser on the terms and conditions set forth in this Agreement and authorizes Sellers to proceed with this transaction, (ii) include specific findings that the Purchase Price constitutes fair value and consideration for the Purchased Assets and that Purchaser is a

000024

good faith purchaser of the Purchased Assets and is entitled to the protections provided for under section 363(m) of the Bankruptcy Code, (iii) provide for a waiver of the stays contemplated by Bankruptcy Rules 6004(h) and 6006(d); (iv) approve Sellers' assumption and assignment to Purchaser pursuant to Section 365 of the Bankruptcy Code of all the Assumed Contracts and Assumed leases included in the Purchased Assets; (v) state that the sale of the Purchased Assets to Purchaser shall be free and clear of all Liens, Claims, Interests and Encumbrances whatsoever, including under theories of successor or transferee liability, with all Liens, Claims, Interests and Encumbrances attaching solely to the net proceeds of sale, if any; and (vi) find that the notices provided with respect to the Sale Hearing and relief sought in the Sale Motion were proper and sufficient. Following the filing of the Sale Motion, Sellers shall use commercially reasonable efforts to obtain prompt entry of the Sale Order. Without limiting, and subject to the Closing Conditions, both Purchaser's and Sellers' obligations to consummate the transactions contemplated in this Agreement shall be conditioned upon the Bankruptcy Court's entry of the Sale Order. If the Bankruptcy Court does not enter the Sale Order by November 12, 2010, then this Agreement shall automatically terminate, and except as set forth in section 4.6 hereof, Sellers and Purchaser shall be relieved of any further liability or obligation hereunder.

      7.2    <u>Form of the Sale Order.</u> The form of the Sale Order is attached hereto as <u>Exhibit "D"</u>. Any modifications to the Sale Order shall be acceptable to Purchaser in its sole and absolute discretion.

      7.3    <u>Purchaser Actions.</u> Purchaser agrees that it will promptly take such reasonable actions as are reasonably requested by Sellers to assist in obtaining the Sale Order, including, without limitation, furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement.

<div align="center">ARTICLE VIII</div>

<div align="center">COVENANTS</div>

      8.1    <u>Access to Information.</u> Sellers agree that, prior to the Closing Date, Purchaser shall be entitled, through its officers, employees and representatives (including, without limitation, its legal advisors and accountants), to make such investigation of the Purchased Assets, the properties, businesses, operations and personnel of Sellers and the Business and such examination of the books and records of Sellers and the Business, the Purchased Assets and the Assumed Liabilities as it reasonably requests and to make extracts and copies of such books and records. Any such investigation and examination shall be conducted during regular business hours upon reasonable advance notice and shall be subject to restrictions under applicable Law. Sellers shall cause the officers, employees, consultants, agents, accountants, attorneys and other representatives of Sellers to cooperate with Purchaser and Purchaser's representatives in connection with such investigation and examination, and Purchaser and its representatives shall cooperate with Sellers and their representatives and shall use their reasonable efforts to minimize any disruption to the Business. Notwithstanding anything herein to the contrary, no such investigation or examination shall be permitted to the extent that it would require Sellers to disclose information subject to attorney-client privilege or conflict with any confidentiality obligations to which Sellers are bound. Purchaser will not contact any employee, customer or

<div align="center">EXHIBIT "1"</div>

supplier of Sellers with respect to this Agreement without the prior written consent of Sellers (which such consent will not be unreasonably withheld, delayed or conditioned); provided, however, that so long as there is no disruption to the Business and Purchaser's conduct is in accordance with the reasonable requirements and consent of Sellers, Purchaser shall be entitled to contact and engage in discussions with (i) counterparties to Assumed Contracts and Assumed Leases in connection with Purchaser's attempt to negotiate amounts necessary to cure any breach or default under such contracts, (ii) Sellers' vendors and licensees and (iii) Sellers' customers, and Sellers hereby agree to cooperate in good faith with Purchaser to facilitate such contact and discussions between Purchaser and such counterparties, vendors, licensees and customers (including in respect of any efforts by Purchaser to minimize Cure Amounts). Purchaser agrees to repair at its sole cost any damage to any of Sellers' facilities due to its investigation and to indemnify and hold Sellers harmless of and from any claim for physical damages or physical injuries arising from Purchaser's investigation of any of Sellers' facilities, and notwithstanding anything to the contrary in this Agreement, such obligations to repair and to indemnify shall survive the Closing or any termination of this Agreement.

8.2     <u>Conduct of the Business Pending the Closing</u>.  Prior to the Closing, and subject to any obligations as debtors-in-possession under the Bankruptcy Code and except as required by applicable Law, Sellers shall:

(i)     use commercially reasonable efforts to maintain the Purchased Assets in Sellers' ordinary course of business (normal wear and tear excepted) and otherwise conduct the Business in the ordinary course of business;

(ii)     (A) comply in all material respects with all Laws and Assumed Contracts and Assumed Leases, and (B) maintain all existing Permits applicable to the Business;

(iii)     maintain in full force and effect all Intellectual Property deemed material to the Business;

(iv)     use commercially reasonable efforts to (A) preserve the present business operations, organization and goodwill of the Business, and (B) preserve the present relationships with customers, suppliers, licensees, manufacturers and distributors of the Business; and

(v)     maintain their books of account and records relating to the Business in their usual, regular and ordinary manner.

8.3     <u>Regulatory Approvals</u>.  Purchaser and Sellers shall use commercially reasonable efforts to (a) obtain all consents and approvals of all Governmental Bodies and all other Persons required to be obtained by Purchaser or Sellers to effect the transactions contemplated by this Agreement and (b) take, or cause to be taken, all action, and to do, or cause to be done, all things necessary, consistent with applicable Law, to consummate the transactions contemplated by this Agreement and by the Seller Documents and the Purchaser Documents.

8.4     <u>Further Assurances</u>.  Each of Sellers and Purchaser shall use their commercially reasonable best efforts to (i) take all actions necessary or appropriate to consummate the transactions contemplated by this Agreement and (ii) cause the fulfillment at the earliest

practicable date of all of the conditions to their respective obligations to consummate the transactions contemplated by this Agreement and by the Seller Documents and the Purchaser Documents.

8.5     Assumed Liabilities.  Subsequent to the Closing, Purchaser agrees to pay, perform and discharge the Assumed Liabilities in accordance with their terms as they become due, including, without limitation, the discharge and performance when due of each and every obligation to be satisfied or performed on or after the Closing Date, under the Assumed Contracts and Assumed Leases, that, but for such assumption, would have been the responsibility of Sellers.

8.6     Confidentiality.

(a)     Sellers shall permit Purchaser and its attorneys, accountants and other representatives to have reasonable access during normal business hours and, as necessary, during evenings and weekends, to all books, records, contracts, executive and other mutually agreed personnel of Sellers to complete a reasonable due diligence investigation of Sellers related to the transactions contemplated by this Agreement.  Such access shall continue until the earliest to occur of (i) the Closing; (ii) the termination of this Agreement, (iii) the conversion of the Chapter 11 Cases to Chapter 7 of the Bankruptcy Code, (iv) the appointment of a trustee or examiner in the Chapter 11 Cases with full powers similar to a trustee; or (v) the dismissal of the Chapter 11 Cases.

(b)     Each Party recognizes and acknowledges that it may receive confidential information regarding the other Party hereto and its Affiliates during the course of the investigations set forth above.  Each Party may disclose such information to its own officers, directors, employees, accountants, attorneys and other representatives if such disclosure is necessary to further the investigation.  Each Party will use reasonable efforts to prevent the unauthorized use or disclosure of any confidential information of or concerning the other Party that has been or is hereafter disclosed to it before the Closing.  The confidentiality obligations of this Section 8.6 do not apply to information that (i) at the time of an alleged breach hereof is part of the public domain (other than as a result of a breach of confidentiality obligations by the Party that is the recipient of the relevant confidential information or its Affiliates), (ii) has been disclosed, at the time of an alleged breach hereof, by the disclosing Party or its Affiliates to any third Person without restrictions on disclosure, (iii) has, at the time of an alleged breach hereof, been received by the receiving Party or its Affiliates from a third Person without, to the knowledge of such receiving party or its Affiliates, breach of a nondisclosure obligation of the third Person; (iv) is required to be disclosed pursuant to subpoena, court order or applicable Law or (v) is reasonably necessary to be disclosed in connection with either Party's rights, claims or defenses arising under this Agreement, any Ancillary Agreement or any Order in connection with this Agreement, provided, however that in connection with any disclosure in clauses (iv) or (v), the disclosing party will give the other Party notice and a reasonable opportunity to contest the need for disclosure or to request protective measures, shall cooperate with the non-disclosing party in all reasonable ways in obtaining a protective order or other protection in respect of such required disclosure, and shall limit such disclosure to the extent reasonably possible while still complying with such requirements.

000027

(c)     Notwithstanding anything set forth in either Section 4.6(c) or this Section 8.6 to the contrary, the confidentiality and non-solicitation provisions set forth in this Agreement shall be no broader or more cumbersome to Purchaser than those provisions set out in that certain Confidentiality Agreement dated October 12, 2010, by and among Sellers and Purchasers.

8.7     <u>Preservation of Records</u>.  For a period of two (2) years after the Closing Date (or such longer period as may be required by any Governmental Body or ongoing claim):

(a)     Purchaser shall not dispose of or destroy any of the business records and files of the Business included in the Purchased Assets delivered to Purchaser and relating to the period preceding the Closing Date without first giving 30 days' prior written notice to Sellers, and Sellers shall have the right, at its option and expense, upon prior written notice to Purchaser within such 30-day period, to take possession of the records and files within 15 days after the date of such notice.  Purchaser shall bear its costs associated with preserving these records.

(b)     Throughout the two (2) year period referenced above, each party (the "<u>Requested Party</u>") shall allow the other Party and any of its directors, officers, employees, counsel, representatives, accountants and auditors reasonable access during normal business hours to all employees and files of the Requested Party and any books and records and other materials included in the Purchased Assets relating to periods prior to the Closing Date in connection with general business purposes (including the preparation of tax returns, amended tax returns or claims for refund (and any materials necessary for the preparation of any of the foregoing), and financial statements for periods ending on or prior to the Closing Date, or the management and handling of any audit, investigation, litigation or other proceeding prior to the Closing, but only to the extent necessary to comply with the rules and regulations of the Internal Revenue Service, or any other Governmental Body in connection with any inquiry directly relating to the Business.

8.8     <u>Certain Consents</u>.  Sellers shall use their commercially reasonable efforts to obtain prior to (or, if not obtained prior to, subsequent to) the Closing all third party required consents.  Purchaser will cooperate with Sellers in connection with seeking and obtaining such required consents at Sellers' sole cost and expense.  At or prior to the Closing, Purchaser shall have paid all Cure Amounts, not to exceed the amounts set forth on Schedule 2.4(i) hereto, and Sellers shall have paid any Cure Amounts in excess of the amounts set forth on Schedule 2.4(i) hereto, or made arrangements, reasonably acceptable to Purchaser, to promptly pay such amounts, so that the Assumed Contracts and Assumed Leases may be assumed by Sellers and assigned to Purchaser in accordance with the provisions of section 365 of the Bankruptcy Code.

8.9     <u>Name Change</u>.  Effective as of the Closing, Sellers shall change their names to names which do not include the names of Sellers or any derivation thereof, or any related name in connection with the conduct of Business.  Sellers acknowledge that Purchaser shall have the right to file Certificates of Amendment to give effect to the foregoing in the event that Sellers do not change their names in accordance with the terms of this Section.

000028

## ARTICLE IX

## EMPLOYEES AND EMPLOYEE BENEFITS

9.1 <u>Employment</u>. Sellers shall terminate all Employees on the Closing Date except for those Employees who are not going to be offered employment by Purchaser and whom Sellers desire to continue to employ. Employees who accept Purchaser's offer of employment and become employees of Purchaser as of or after the Closing Date shall be referred to as the "<u>Transferred Employees</u>" effective on their respective initial dates of employment with Purchaser. On or before three (3) days prior to the Closing Date, Purchaser shall provide to Sellers a schedule listing the Transferred Employees. On or before the Closing Date, Sellers shall pay all amounts owed to Transferred Employees through the Closing Date in respect of any (i) accrued vacation time; (ii) accrued sick leave time; and (iii) other paid time off, owing to such Transferred Employees, which, as to <u>clauses (i), (ii) and (iii)</u> above, accrued during the period beginning immediately following the Petition Date through the Closing Date, to the extent such payments are required by applicable law. Notwithstanding the foregoing, Purchaser is making no representations or commitments of any kind concerning Purchaser's intent to hire some or any of Sellers' employees at Closing. Sellers agree and acknowledge that Purchaser is reserving absolute discretion in connection with the hiring of any of Sellers' employees at Closing. Sellers also agree and acknowledge that Purchaser does not intend to assume the terms and conditions of any of the Collective Bargaining Agreements in connection with the hiring of any Transferred Employees or otherwise and that Purchaser reserves the right to implement its own terms and conditions of employment in connection with any employees it hires after the Closing, including, without limitation, the Transferred Employees.

## ARTICLE X

## CONDITIONS TO CLOSING

10.1 <u>Conditions Precedent to Obligations of Purchaser</u>. The obligation of Purchaser to consummate the transactions contemplated by this Agreement is subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser in whole or in part to the extent permitted by applicable Law):

(a) Sellers shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by them prior to the Closing Date;

(b) all required consents shall have been duly obtained, made or given and shall be in full force and effect;

(c) Sellers shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in <u>Section 4.2</u>;

(d) The representations and warranties of Sellers shall be true and correct in all material respects as of the Closing as if given as of the Closing Date;

EXHIBIT "1"

000029

(e)     No event or condition shall have occurred since the execution of this Agreement that would have a Material Adverse Effect on the value or condition of the Purchased Assets; provided, however, that in no event shall a termination or reduction of business from SSI be considered an event or condition constituting a Material Adverse Effect.

(f)     The Bankruptcy Court has granted Sellers' motion to reject the Collective Bargaining Agreements without restrictions or conditions of any kind.

(g)     Purchaser shall have concluded discussions and executed and delivered a binding memorandum of understanding, in form and substance satisfactory to Purchaser in its sole and absolute discretion with the Bakery, Confectionary, Tobacco Workers and Grain Millers' International Union Local No. 85, the General Teamsters Local 324, the Northern California Bakery and Confectionary Health and Welfare Fund, the B&C Western Conference Dental Fund, the Bakery and Confectionary Union and Industry International Pension Fund, the Western Conference of Teamsters Pension Plan and the Pacific Coast Benefits Trust, satisfying Purchaser that it has worked out an acceptable arrangement with such parties relating to, among other things, (i) avoiding the disruption and expense of a labor controversy for a reasonable period following the Closing Date, and (ii) any unfunded pension liability, pension withdrawal liability and delinquent health and welfare payments claimed by such parties.  Nothing in this condition contemplates or requires Purchaser to engage in collective bargaining with either of the above-described unions or to recognize either or both unions as the bargaining representative of Purchaser's employees.  However, nothing in this condition shall ultimately preclude Purchaser from lawfully recognizing either or both of the above-described unions as the bargaining representative of its employees for the purposes of collective bargaining.

(h)     On or about November 5, 2010, Purchaser was informed for the first time that there may be some asbestos containing materials located within the Sacramento plant.  As a result, as an additional condition to the Closing, Purchaser shall have conducted a suitable investigation (as determined in Purchaser's sole and absolute discretion) of the Sacramento plant concerning this possible condition, and made a determination, in Purchaser's sole and absolute discretion, that the condition either does not exist or does not materially impact the value or condition of the Business or the Purchased Assets.

10.2   Conditions Precedent to Obligations of Sellers.  The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the satisfaction, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Sellers in whole or in part to the extent permitted by applicable Law):

(a)     Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date;

(b)     all required consents, and all other consents, approvals and actions of, filings with and notices to any Governmental Body or any other Person set forth on Schedule 10.2 shall have been duly obtained, made or given and shall be in full force and effect;

000030

(c)     Purchaser shall have delivered, or caused to be delivered, to Sellers all of the items set forth in Section 4.3; and

(d)     The representations and warranties of Purchaser shall be true and correct in all material respects as of the Closing as if given as of the Closing Date.

10.3    Conditions Precedent to Obligations of Purchaser and Sellers.  The respective obligations of Purchaser and Sellers to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser and Sellers in whole or in part to the extent permitted by applicable Law):

(a)     there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby;

(b)     the Bankruptcy Court shall have entered the Sale Order; and

(c)     the Sale Order entered by the Bankruptcy Court shall have become a Final Order.

ARTICLE XI

TAXES

11.1    Transfer Taxes.  Sellers shall have the sole liability (if any) for all Transfer Taxes.

11.2    Purchase Price Allocation.  Not later than five (5) days after the Closing Date, Purchaser shall in good faith prepare and deliver to Sellers for their review and consideration a schedule (the "Allocation Schedule") allocating the Purchase Price among the various assets comprising the Purchased Assets in accordance with Treasury Regulation 1.1060-1 (or any comparable provisions of state or local tax Law) or any successor provision.  If Sellers reasonably and in good faith object to the allocations specified in the Allocation Schedule, Purchaser and Sellers will promptly negotiate in good faith to resolve such objections; provided, that if the Parties cannot agree to such allocations after ten (10) Business Days of good faith discussions, the Parties may, by mutual agreement, submit any disputes over the allocation of the Purchase Price to be resolved by the Bankruptcy Court.  Purchaser and Sellers shall report and file all tax returns (including any amended tax returns and claims for refund) consistent with the final Purchase Price allocation, and shall take no position contrary thereto or inconsistent therewith (including in any audits or examinations by any taxing authority or any other proceedings).  Purchaser and Sellers shall file or cause to be filed any and all forms (including U.S. Internal Revenue Service Form 8594), statements and schedules with respect to such allocation, including any required amendments to such forms.  The provisions of this Section 11.2 shall survive the Closing.

000031

# ARTICLE XII

## REPRESENTATIONS AND WARRANTIES

12.1     <u>Survival of Representations and Warranties</u>.     All of the representations and warranties set forth in this Agreement or in any certificate delivered by Sellers or Purchaser in connection with the Closing shall survive the execution and delivery of this Agreement and through the Closing, but shall not survive, and shall terminate, at the Closing.

# ARTICLE XIII

## MISCELLANEOUS

13.1     <u>Expenses</u>.  Except as otherwise provided in this Agreement, Sellers and Purchaser shall bear their own expenses, including attorneys' fees, incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby.  Notwithstanding the foregoing, in the event of any action or proceeding to interpret or enforce this Agreement, the prevailing party in such action or proceeding shall be entitled to have and recover from the non-prevailing party such reasonable costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as the prevailing party may incur in the pursuit or defense thereof.

13.2     <u>Submission to Jurisdiction; Consent to Service of Process</u>.

(a)     Without limiting any Party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any Claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in <u>Section 13.8</u> hereof; <u>provided</u>, <u>however</u>, that if the Chapter 11 Cases have closed, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of any state or federal court located in the State of California and any appellate court from any thereof, for the resolution of any such claim or dispute.  The Parties hereby irrevocably waive, to the fullest extent permitted by applicable Law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  Each of the Parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(b)     Each of the Parties hereby consents to process being served by any Party in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of <u>Section 13.8</u>.

000032

13.3   <u>Waiver of Right to Trial by Jury</u>.  Each Party to this Agreement waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.

13.4   <u>Entire Agreement; Amendments and Waivers</u>.  This Agreement (including the schedules and exhibits hereto) represents the entire understanding and agreement between the Parties with respect to the subject matter hereof.  This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought.  No action taken pursuant to this Agreement, including, without limitation, any investigation by or on behalf of any Party, shall be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, covenant or agreement contained herein.  The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

13.5   <u>Parties in Interest</u>.  Nothing in this Agreement is intended to confer any rights or remedies under or by reason of this Agreement on any Persons other than Sellers and Purchaser and their respective successors and permitted assigns.  Nothing in this Agreement is intended to relieve or discharge the obligations or liability of any third Persons to Sellers or Purchaser.  No provision of this Agreement shall give any third Persons any right of subrogation or action over or against Sellers or Purchaser or their respective Affiliates.

13.6   <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the Bankruptcy Code and to the extent not consistent with the Bankruptcy Code, the laws of the State of California applicable to contracts made and performed in such State.

13.7   <u>Notices</u>.  All notices and other communications under this Agreement shall be in writing and shall be deemed given (i) when delivered personally by hand (with written confirmation of receipt), (ii) when sent by facsimile (with written confirmation of transmission) and electronically or (iii) one Business Day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a party may have specified by notice given to the other party pursuant to this provision):

If to Sellers:       Matterhorn Group, Inc.

                Las Vegas, NV
                Attn: Nathan Bell
                Telephone:
                Facsimile:
                Email: nathan.bell@matterhorngroupinc.com

000033

| With a copy to: | Levene, Neale, Bender, Yoo & Brill L.L.P.<br>10250 Constellation Blvd., Suite 1700<br>Los Angeles, California 90067<br>Attn: Ron Bender, Esq./Beth Ann R. Young, Esq./J.P. Fritz, Esq.<br>Telephone: 310-229-1234<br>Facsimile: 310-229-1244<br>Email: rb@lnbyb.com; bry@lnbyb.com; jp@lnbyb.com |
| --- | --- |
| If to Purchaser, to: | Foster Dairy Farms<br>525 Kansas Avenue<br>Modesto, California 95351<br>Attn: Tom Van Autreve<br>Facsimile: 209-576-3462<br>Email: tvanautreve@fosterdairyfarms.com |
| With a copy to: | Baker Manock & Jensen, PC<br>5260 North Palm Avenue, Suite 421<br>Fresno, California 93704<br>Attn: Jeffrey P. Kane, Esq.<br>Telephone: 559-432-5400<br>Facsimile: 559-432-5620<br>E-mail: jkane@bakermanock.com |
| With a copy to: | Sulmeyer Kupetz<br>333 South Hope Street, 35th Floor<br>Los Angeles, California 90071<br>Attn: John M. Samberg, Esq.<br>Telephone: (213) 626-2311<br>Facsimile: (213) 629-4520<br>E-mail: jsambereg@sulmeyerlaw.com |

13.8    Severability.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any Law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

13.9    Binding Effect; Assignment.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person or entity not a Party to this Agreement except an assignee of Purchaser as provided below.  No assignment of this Agreement or of any rights or obligations hereunder may be made by Sellers or Purchaser (by operation of Law or otherwise) without the prior written consent of the other

EXHIBIT "1"

000034

Parties hereto and any attempted assignment without the required consents shall be null and void *ab initio*. No assignment of any obligations hereunder shall relieve the Parties hereto of any such obligations. Upon any such permitted assignment, the references in this Agreement to Purchaser shall also apply to any such assignee unless the context otherwise requires.

13.10 <u>Non-Recourse</u>. No past, present or future director, officer, employee, incorporator, member, partner or equityholder of Sellers shall have any liability for any Liabilities of Sellers under this Agreement or the Seller Documents of or for any Claim, counterclaim, cause of action or demand based on, in respect of, or by reason of, the transactions contemplated hereby and thereby.

13.11 <u>Warranties Exclusive</u>. The representations and warranties contained herein are the only representations or warranties given by Parties or being relied upon by Parties, and all other express or implied warranties are disclaimed. Except as otherwise provided in this Agreement, all warranties of merchantability, usage or suitability or fitness for a particular purpose are disclaimed in respect of the Purchased Assets.

13.12 <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, including electronically or by facsimile, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

13.13 <u>Mutual Drafting</u>. This Agreement is the result of the joint efforts of Purchaser and Sellers, and each provision hereof has been subject to the mutual consultation, negotiation and agreement of the parties and there is to be no construction against either party based on any presumption of that party's involvement in the drafting thereof.

*[Remainder of page intentionally blank; next page is signature page]*

000035

IN WITNESS WHEREOF, the Parties hereto have caused this Asset Purchase Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**PURCHASER:**

**FOSTER DAIRY FARMS**


By: _____
     Name:  Tom Van Autreve
     Title:  Chief Financial Officer

**SELLERS:**

**MATTERHORN GROUP, INC.**


By: _____
     Name: Nathan Bell
     Title: President

**DELUXE ICE CREAM COMPANY**


By: _____
     Name: Nathan Bell
     Title: President

**VITAFREZE FROZEN CONFECTIONS INC.**


By: _____
     Name: Nathan Bell
     Title: President

A       Bill of Sale

B       Contract Assignment and Assumption Agreement

C       Real Property Lease Assignment and Assumption Agreement

D       Form of Sale Approval Order

E       Form of Non Disclosure Agreement